**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FT. MYERS DIVISION**

In re MIVA, Inc. Securities Litigation

Civil Action No.:  2:05-cv-201-FtM-29DNF

**PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**

**MILBERG WEISS BERSHAD &**
**SCHULMAN LLP**
Maya Saxena
Christopher S. Polaszek
Joseph E. White III
5200 Town Center Circle, Suite 600
Boca Raton, FL  33486
Tel: (561) 361-5000
Fax: (561) 367-8400

## TABLE OF CONTENTS

**Page**

I.      NATURE AND SUMMARY OF THE ACTION ..................................................1

II.     JURISDICTION AND VENUE ...........................................................................6

III.    THE PARTIES ......................................................................................................7

      A.    Lead Plaintiffs ...........................................................................................7

      B.    Defendants ..................................................................................................7

      C.    Findwhat's Business Model........................................................................9

      D.    Findwhat Struggles for Market Credibility in an Increasingly Competitive
           Environment..............................................................................................10

      E.    "We Live and Die by the Quality of our Traffic": The Impact of Poor
           Quality Distribution Partners on FindWhat's Revenues.........................14

IV.     DEFENDANTS' FRAUDULENT SCHEME.....................................................15

      A.    Defendants Fail to Reveal a Material Adverse Trend ............................15

      B.    Defendants Knowingly Rely on Improper Methods to Boost Revenue ...............18

      C.    Defendants' Are Directly Confronted With the Improper Techniques Used
           by Dmitri and Saveli and Refuse to Terminate the Relationship..........................22

      D.    The Spotlight is Shined on Click-Fraud and Defendants' Panic ...........................27

      E.    Additional Disclosures Regarding the "Quality" of the Company's
           Distribution Partners are Selectively Disclosed to Investors ................................31

V.      FALSE AND MISLEADING STATEMENTS ....................................................34

            1.    Fiscal Year 2003 False Statements and Reasons For Falsity.........34

            2.    Fiscal Year 2004 False Statements and Reasons For Falsity.........36

            3.    Fiscal Year 2005 False Statements and Reasons For Falsity.........41

VI.     DEFENDANTS' OMISSIONS AND FAILURE TO REVEAL THE
        TRUTH ...............................................................................................................47

      A.    THE TRUTH BEGINS TO EMERGE ...................................................47

VII.       POST CLASS PERIOD EVENTS ........................................................................51

VIII.      FINDWHAT'S FINANCIAL STATEMENTS AND FINANCIAL
DISCLOSURES DURING THE CLASS PERIOD WERE
MATERIALLY FALSE AND MISLEADING......................................................52

     A.   FindWhat's Financial Statements During the Class Period Did Not
Conform with GAAP ............................................................................53

     B.   FindWhat's Financial Disclosures during the Class Period Were
Materially False and Misleading............................................................55

     C.   FindWhat 's False and Misleading Reporting and Certifications of
Disclosure and Internal Controls ..........................................................56

     D.   Internal Control Deficiencies.................................................................58

     E.   Disclosure Control Deficiencies ...........................................................60

     F.   FindWhat's Additional Violations of GAAP and SEC Financial Reporting
Standards ............................................................................................61

     G.   Violations of SEC Regulations ..............................................................63

     H.   FindWhat's Improper Failure To Disclose Contingent Liabilities And
Significant Risks And Uncertainties ......................................................64

COUNT I  FOR VIOLATIONS OF SECTION 10(B) OF THE 1934 ACT AND RULE
10B-5 PROMULGATED THEREUNDER AGAINST ALL
DEFENDANTS ...........................................................................................65

COUNT II  FOR VIOLATIONS OF SECTION 20(A) OF THE 1934 ACT AGAINST
THE INDIVIDUAL DEFENDANTS ..............................................................67

IX.       CLASS ACTION ALLEGATIONS .......................................................68

X.        APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON
THE MARKET DOCTRINE....................................................................71

XI.       PRAYER FOR RELIEF .......................................................................73

XII.      JURY TRIAL DEMANDED...................................................................73

## I.     NATURE AND SUMMARY OF THE ACTION

1.     This federal securities fraud class action is brought on behalf of all persons or entities who purchased or otherwise acquired the publicly traded securities of Findwhat.com, Inc. ("Findwhat" or "the Company") between September 3, 2003 and May 4, 2005 inclusive, (the "Class Period"), seeking to recover damages caused by Defendants' violations of federal securities laws and to pursue remedies under the Securities Exchange Act of 1934.[1]

2.     Findwhat is an Internet commerce company which provides "pay-per-click" or keyword-targeted advertising services.   During the Class Period, Defendants issued public statements reporting seemingly unstoppable growth stemming from its primary pay-per-click business.  For example, on March 16, 2004, Defendant Pisaris-Henderson, the Company's Chief Executive Officer attributed the Company's success to a "proven and profitable business model." Pisaris-Henderson emphasized the Company's ability to meet Wall Street revenue goals, noting that the Company had seen "*seventeen straight quarters of sequential revenue growth and eleven straight quarters of sequential pre-tax income growth*."  In fact, prior to February 23, 2005, the Company met or exceeded analyst growth expectations in every single quarter during the Class Period – sometimes by as little as a penny.

3.     As a result of these positive statements, Findwhat's stock price soared to over $26 per share during the Class Period.  Behind the scenes however, things were dramatically different - - FindWhat was a company in trouble.  By the start of the Class Period in 2003, the Company was experiencing a severe decline in revenues from its core business due to competition from major industry players like Google and Yahoo.

---

[1] On June 6, 2005, Findwhat.com, Inc. changed its name to Miva, Inc., however, since Miva was a division of Findwhat during the entire class period, Plaintiffs refer to the Findwhat as "the Company."   Findwhat recently changed its ticker symbol from "FWHT" to "MIVA."

4.      A key part of FindWhat's business required that the Company work with distribution partners to generate Internet traffic. There is a direct correlation between the quality of these distribution partners and FindWhat's revenue, since advertisers will "bid" higher for Findwhat's products if they know there is a strong likelihood that using FindWhat will bring interested consumers to their websites. However, if the distribution partner did not provide authentic leads to advertisers, the bid price for FindWhat services declines, and the Company's revenues decline.

5.      During the Class Period, Defendants knew that there was an elephant in the room – two of the Company's main revenue generating distribution partners were using illegal means to inflate revenues. These distribution partners, described as "two young Russian men" used illicit tactics described below, which included among other things, "browser hijacking" and "spyware" to boost Company revenues.

6.      The use of these illicit methods of creating Internet traffic commonly referred to as "click-fraud" meant that advertisers were not forwarded legitimate leads of consumers interested in acquiring their products. As a result, advertisers refused to place high bids with FindWhat, causing the Company's revenue shortfall to worsen during the Class Period. As one former employee described it, the Company suffered from "serious, serious bid deflation." This erosion in bid price generated from Defendants' increasing reliance on poor quality distribution partners was a material adverse trend which Defendants were required to disclose under federal securities regulations – but did not.

7.      These two distribution partners were not inconsequential to the Company's bottom line – ***they represented an astonishing 36% of FindWhat's revenues during the Class Period.*** Thus, Defendants were legally required to, but again chose not to, disclose the fact that

these two partners represented more than 10% of the Company's revenues under applicable SEC regulations.

8.      Defendants were well aware of their fraudulent distribution partner network and resulting revenue declines, indeed, they were directly confronted with the problem by former employees.  Defendants sought to stem the floodgates by diversifying into areas other than pay-per-click service and through the acquisitions of other companies.  Defendants' aggressive acquisition activity was characterized by a former employee as a "mad buying binge" calculated to make up for FindWhat's markedly declining revenues.

9.      At the same time that FindWhat was seeking to rebuild its revenue coffers, Defendants were cognizant of the fact that FindWhat was a young second-tier company struggling to gain market credibility in a business dominated by multi-billion dollar players.  As such, Defendants were intensely focused if not obsessed, on meeting Wall Street's growth expectations, and knew what a missed quarter could do to the Company's stock price. Defendants regularly reviewed reports showing the Company's falling profits, indeed a Senior Vice President received calls from Defendants complaining that revenue was down, and telling him that he "needed to boost it" to meet Wall Street's expectations.  Driven by this desire, Defendants allowed the fraud to continue "to make numbers at the expense of FindWhat's business."[2]

10.     Although Defendants knew that these two partners were adversely impacting the Company's long term prospects due to their fictitious traffic, they were, according to a former Business Development Manager, "held hostage by these affiliates" because although they were not generating high quality traffic "they were bringing in so much revenue."  While Defendants

---

[2]  Source: A former FindWhat Marketing Manager, employed during the Class Period.

scrambled to diversify the Company's services and complete acquisitions, they became dependent upon these two partners to provide the band-aid to bridge the gap until Defendants could create new sources of business.  Defendants also used the fictitiously generated revenue to report an uninterrupted string of quarter-over-quarter financial growth.

11.     However, the declining bid prices became so severe, that Defendants knew they would have to take some action or risk losing even more advertisers who were fleeing to companies that promised higher-quality traffic.  According to a former Marketing Manager, during the Class Period there was "a big sense of desperation" and that "***Findwhat's [distribution] network is a house of cards***" which was "***held together by a thread***."   Defendants also feared that their practices would be exposed due to increased scrutiny of click fraud by government regulators, who had recently focused enforcement actions and legislation to curb these practices.  Defendants feared the "hammer would fall" and their own reliance on click fraud would be uncovered.  In addition to the precarious condition of FindWhat's distribution network, the Company was also plagued with serious internal control and accounting problems.

12.     Fearing imminent discovery of their accounting and distribution quality issues, insiders sold nearly $7 million worth of FindWhat stock in the fall and winter of 2004, at prices as high as $21.83 per share.  Indeed, the "thread" began to snap in February 2005.  Since the Company's bid price had declined so significantly, Defendants knew the only way they could entice advertisers to pay more for FindWhat services was to assure the market that the quality of the Company's distribution network had improved.  During a conference call on February 23, 2005, Defendants disclosed that they had removed two poor quality distribution partners, amounting to $70,000 of daily revenue, from the network.  Analysts and investors were shocked by this purported disclosure.  For example, one analyst noted the unexpected magnitude of the

poor quality traffic problem, stating: "*[w]e expected a gardener using pruning shears.  What we got was a lumberjack using a chainsaw.*"

13.    On May 2, 2005, Defendants revealed that its auditor Ernst & Young LLP had resigned over a disagreement concerning the impairment of goodwill in connection with the Company's 2004 financial statements.  On May 5, 2005, the Company revealed that it had been removing additional poor-quality distribution partners, which represented "a meaningful percentage of daily click-through revenue."  As a result, the Company dramatically lowered its earnings expectations for 2005.

14.    Yet again, the market was unprepared for the magnitude of Defendants' distribution problems.  For example, one analyst questioned management's credibility, noting that although Defendants had assured investors that no one distribution partner amounted to more than 10% of the Company's revenue, "*[t]he accuracy of this statement must also come under scrutiny as the company just lowered the midpoint of its [2005] guidance by 27.9%.*"

15.    After the Company partially revealed its accounting fraud and its reliance on distribution partners, FindWhat's stock price fell to $4.83 per share, a drop of nearly 90% from its Class Period high as depicted in the chart below:



16.     Even more shocking is the fact that Defendants' fraud is ongoing.  In fact, as detailed below, Defendants did not remove these illegitimate distribution partners from their network.  As of May 2005, the two distribution partners at issue *are still generating millions of dollars in revenue* for FindWhat.  This ongoing fraudulent scheme is enabling Defendants to falsely recognize revenue under Generally Accepted Accounting Principles, and to continue to portray the Company's business model as improving.

## II.     JURISDICTION AND VENUE

17.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§ 78j(b), 78t(a)), and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5 (17 C.F.R. § 240.10b-5).

18.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §1331.

19.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and (c).  Many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of false and misleading information, occurred in this District.  In addition, during the Class Period, Findwhat maintained its principal executive offices in this District at 5220 Summerlin Commons Boulevard, Suite 500, Fort Myers, Florida, 33907.

20.     In connection with the acts, conduct and other wrongs complained of herein, Defendants used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications and the facilities of national securities exchanges.

III.     **THE PARTIES**

A.     **Lead Plaintiffs**

21.     Y.P. and Sampurna Jain, Murtuza Tofafarosh and The David D. Berkey Trust (collectively "Lead Plaintiffs") were appointed by the Court on July 27, 2005 to serve as Lead Plaintiffs in this putative federal securities fraud class action.

22.     Lead Plaintiffs purchased Findwhat common stock during the Class Period, as set forth in the certifications accompanying Lead Plaintiffs' motion for appointment as Lead Plaintiff, and were damaged thereby.

B.     **Defendants**

23.     Defendant Findwhat is a Delaware corporation headquartered in this District at 5220 Summerlin Commons Boulevard, Suite 500, Fort Myers, Florida, 33907.  Findwhat is a

publicly traded company whose common stock is traded on the NASDAQ National Market System under the ticker symbol "MIVA."

24.     Defendant Craig Pisaris-Henderson ("Pisaris-Henderson") is one of the founders of the Company, and has served as the Company's Chairman since June 2002, and Chief Executive Officer since March 2001.

25.     Defendant Brenda Agius ("Agius") served as the Company's Chief Financial Officer from July 2004 until she was forced to resign from the Company on May 2, 2005. Defendant Agius was also a public accountant, first with Deloitte & Touche and then with Coopers & Lybrand.  Since Agius was asked to leave in the midst of the Compnay's scandal, a former Findwhat Account Manager noted that Agius was made to "walk the plank when all this stuff went down" and was in "way over her head."[3]

26.     Defendant Phillip R. Thune ("Thune") has been a Director for the Company since January 2002, served as the Company's President since July 2004, and as Chief Operating Officer since November 2000.  From April 2000 to June 2004, Defendant Thune served as the Company's Chief Financial Officer.  A former Findwhat Marketing Director characterized Thune as the "Guardian" of the spyware secret.

27.     Defendants Pisaris-Henderson, Agius, and Thune are referred to collectively herein as the "Individual Defendants."

28.     The Individual Defendants also had access to material adverse non-public information concerning Findwhat, as discussed in detail below.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse

---

[3] All confidential witnesses are referred to in the masculine gender in order to protect their identity.

facts specified herein had not been disclosed to, and were being concealed from, the investing

public. Specifically:

- Defendants received "War Reports" weekly which detailed traffic from fraudulent distribution partners and the revenue derived from these partners; and

- Defendant used an internal software system "the Interface" which showed the amount of illegitimate Internet traffic in red.

29. According to a former Findwhat Marketing Manager, the senior management at

Findwhat were micromanagers who refused to delegate authority to managers to make decisions,

and the "C-level Team [referring to Thune, Angius and Pisaris-Henderson] was very controlling

about little decisions."

## C.    Findwhat's Business Model

30. Findwhat develops and markets performance-based marketing and commerce

services for the Internet. Findwhat targets online consumers who are actively shopping for

goods and services or looking for information during the Class Period. Its marketing division

creates online marketplaces where buyers are introduced to sellers when they are searching for

products and services on the Internet; this introduction is based on a bid-for-position[4]; pay-per-

click[5] (U.S. only), or keyword-targeted advertising service[6]. Findwhat offers this service directly

---

[4] The highest bidder for a particular keyword receives the first place position within the respective network with all other bidders on that same keyword listed in descending bid order and will see their ad first within the Findwhat results.

[5] An advertiser only pays when an Internet user clicks on their ad and gets transferred to their website. These "clicks" are supposed to be highly qualified leads which could convert to a sale since if the user "clicked" on the ad intentionally, they presumably have some interest in the advertised product.

[6] Companies offering keyword advertising then distribute the ads to numerous other websites, large portals and search engines where everyday users are executing billions of searches. FindWhat has hundreds of these distribution partners where the keyword advertisements are delivered. The FindWhat distribution network includes high quality sites such as: CNET's Search.com, Excite, Webcrawler, NBCi, Dogpile, MetaCrawler, and Go2Net. In Q2 2002 there

to advertisers through the Findwhat.com Network™ in the U.S., the Espotting Network in Europe and offers a private label version of this service to large companies and portals worldwide, including Lycos and Mitsui & Co., Ltd.  Findwhat also operates a merchant services division, which includes Miva, an online platform of software and services for small to medium-sized enterprises.  Additionally, Findwhat has a primary traffic division, currently offered through Comet Systems, a leading provider of connected desktop consumer software.

31.     Every day, millions go online to search for products or information.  The online patterns of Internet users is referred to as "traffic."[7]  Websites contract with Findwhat to find advertisers for their sites.  The advertisers bid on placement of their ads and on placement in online search results through Findwhat, and pay the Company each time an Internet user clicks on an ad.  The Company then gives a portion of that revenue to the websites it has contracts with.

### D.     Findwhat Struggles for Market Credibility in an Increasingly Competitive Environment

32.     Findwhat went public through a merger with an inactive public company  based in Nevada in 1999.  The Company was considered a "Tier Two" company, with companies like Overture (which was later acquired by industry giant Yahoo!) and Google representing the lion's share of search listing providers.  Defendant Pisaris-Henderson's goal was to position Findwhat as a smaller, cheaper version of Overture.  In an effort to capitalize on Overture's enormous initial public offering, Findwhat started trading publicly through the merger with the Nevada shell company at about the time that Overture went public.

---

were, on average, 600,000 click-throughs each day on the FindWhat.com network.  *See* "The Evolution of Advertising" by Findwhat marketing employee, Karen Yagnesak, available online at http://www.active-marketer.com/2002/sept/25.html.

[7] *See Pay Per Click Universe: Your Traffic Is Served. Do you Like the Taste?* 8/14/05 available online at: http://www.payperclickuniverse.com/pay-per-click-search-engines-articles.php?article_id=13

33.     However, Findwhat's transition to a public company failed to capture the market
attention that Defendants yearned for.  As Defendant Pisaris-Henderson noted in a December 9,
2004 interview with *New Media Age* magazine:

> "People discredited us. They said we must not be good enough to be able to go
> public legitimately so we had to do a reverse takeover. That impression of us
> stuck all the way through to 2002."

34.     In an effort to distance the Company from its rocky start, Defendants began
aggressively marketing the Company as a growth stock with numerous opportunities ahead due
in part to its large network of quality distribution partners.  During the Class Period, it appeared
to investors that the Company's aggressive growth strategy had paid off.  On October 21, 2004,
the Company announced that it was named as one of the fastest growing companies in North
America on the "Deloitte Technology Fast 500" with a growth rate of "just under 16,000%" due
to "solid execution of its business strategy."

35.     Indeed, one of the key factors analysts relied on in giving Findwhat positive
recommendations, was its growth rate.  For example, a February 23, 2005 analyst report issued
by Pacific Growth Equities noted that with a "history of solid execution" and a "projected 3-year
'organic' growth rate of at least 20-30%" that "multiple expansion" was likely in the price of
Findwhat stock.   Defendants' plan to attract institutional and market interest paid off.  In a May
20, 2004 article in *The News-Press* entitled "FindWhat Speakers to hit Investor Sessions"
Pisaris-Henderson commented gleefully "[i]nstitutional investors are very excited about us."  In
fact Defendants' Class Period statements were highly positive, emphasizing strong financial
results and expectations.  During May 2004, after a barrage of positive statements about the
Company's strong distribution network and robust revenues, the stock reached over $23 per
share.

36.    Defendants were keenly aware of the importance of meeting Wall Street's insatiable revenue goals.  Throughout 2004, Senior VP/General Manager of the Private Label and Miva Network Rick Szatkowski got calls from Thune and Pisaris-Henderson complaining that revenue was down and Szatkowski "needed to boost it" to meet Wall Street's demanding expectations.

37.    Defendants succeeded in meeting Wall Street's expectations during this time as illustrated on the following chart:

| PERIOD | Company's Actual EPS | Wall Street's Consensus EPS Estimates | Percentage By Which Company Exceeded Wall Street Expectations |
|--------|------|------|------|
| 2Q05 | -.010 | .025 | -60.00% |
| 1Q05 | .100 | .137 | -27.01% |
| 4Q04 | .180 | .163 | 10.43% |
| 3Q04 | .150 | .136 | 10.29% |
| 2Q04 | .150 | .146 | 2.74% |
| 1Q04[8] | .27 | .22 | 22.73% |
| 4Q03 | .15 | .14 | 7.14% |
| 3Q03 | .12 | .11 | 9.09% |

38.    However, internal and external pressures threatened to jeopardize Defendants' seemingly unstoppable growth streak.  During the Class Period, the smaller companies such as Findwhat were squeezed by the domination of major players such as Google and Yahoo! which had extremely strong brands and growing networks of affiliates.  *See* "Why Little Search

---

[8] These figure for 1Q04 represent undiluted EPS figures.

Engines Can't": *TheStreet.com,* May 6, 2005.  In order to compensate for declining revenues

during the Class Period, Defendants embarked on an acquisition spree – purchasing 4 companies

for a total of $223.5 million in part through using Company stock as currency.  A former

Findwhat Account Manager characterized the Company's activity as a "mad buying binge"

which was needed in order to bring "earnings to the table as Findwhat's earnings were

declining."  An analyst report issued by RBC Capital Markets on February 24, 2005 noted the

decline in the Company's core business, stating:

> In short, we believe that Findwhat's core US business is deteriorating, albeit
> slowly.  While the company refuses to acknowledge that publicly, the acquisition-
> driven expansion strategy makes it clearer.

39.     On September 3, 2003, the Company publicly announced plans to acquire

privately-owned Miva Corporation, "a leading supplier of e-commerce software and services to

small and medium-sized businesses, for $5.5 million, plus the assumption of approximately $2.5

million in notes and other liabilities."  This acquisition, the first of four to be announced in the

next nine months, begins Findwhat's "mad buying binge" and course to transform its business

away from its secret dependence on spyware wielding distribution partners.  Like several

additional acquisitions to follow, the currency predominantly used by Defendants to fund this

acquisition was the Company's fraudulently inflated common stock.  Indeed, the following table

illustrates the number and value of Findwhat's inflated shares used to complete each acquisition.

| Acquired Company | Date | Total Cost of Acquisition | Findwhat Shares Transferred | Per Share Value of Transferred Shares |
|---|---|---|---|---|
| Miva | Jan. 1 | $6.2 million | 163,550 | $18.95 |
| Comet | March 22 | $25.2 million | 837,510 | $18.38 |
| Espotting | July 1 | $183.9 million | 6,999,995 | $22.15 |

**E.      "We Live and Die by the Quality of our Traffic": The Impact of Poor Quality Distribution Partners on FindWhat's Revenues**

40.      For pay-per-click search engines such as Findwhat, the raw traffic flow comes from affiliate sites and distribution partners and is then disbursed to advertisers.  Advertisers then guide visitors to their own websites, in hopes of converting them to buyers.  The higher the traffic quality, the less "leakage" of uninterested visitors who depart without making a purchase, and the greater rate of sales conversion.

41.      Findwhat relies heavily on an extended network of affiliates and search distribution partners to generate traffic.  One of the factors impacting the effectiveness of these relationships is their use of improper practices such as the use of "adware," "spyware" and other types of "click fraud" which result in dramatically lower sales conversions since the leads are false, and not consumers interested in purchasing the advertised products.  Ensuring the quality of distribution partners and eliminating these types of improper traffic for pay-per-click companies is extremely important.  As one executive at a competitor summarized: "[l]istening to our customers reports on the effectiveness of our partnerships is paramount to the success of our business.  ***We live and die by the quality of our traffic.***"[9]

42.      In addition to implementing distributor approval processes to ensure quality control, the legitimacy of all searches performed from affiliate sites must be checked, and affiliate activity has to be monitored.  As detailed in an August 2005 article published online in Pay Per Click Universe: ***"[i]n this industry, if you have bad traffic, it's a PR disaster, the word spreads like jungle fire."***  Bad traffic from one distribution partner can create a "domino effect" through the entire network, from advertisers to all of the affiliates.  Defendant Thune himself

---

[9]   *See Tools of the Trade, Part I*, available online at: http://www.sempo.org/articles/tools-p1.php

commented on the importance of high quality traffic to Findwhat and its revenues, explaining in the article why poor quality traffic could adversely impact companies:

> The reason is that if a distribution partner [sic] allows bad traffic on the word "toys" for example, the advertisers bidding for [that keyword] will be impacted, and may lower their bids or leave us. That obviously impacts our relationships with those advertisers, and it also impacts all of our other distribution partners, who make less money from searches on "toys" than they should, through no fault of their own.

43.     As detailed below, Findwhat's revenue is determined by the price it can get advertisers to bid for a click on the their ads and the number of high quality clicks Findwhat can direct to those ads. Because the price an advertiser is willing to pay per click is supported by the income it derives from the advertisement, the more advertiser paid clicks that do not result in any income for the advertiser, the lower the "conversion rate" of advertiser expenditure into income. Since the conversion rate directly impacts the advertisers' bid price, as the conversion rate drops, so too does the bid price. As a former Account Manager summarized, "it's a bidding model, so the customers are bidding on the traffic and if the traffic converts for them, the bids go up. If the traffic doesn't convert for them, the bids go down."

## IV.    DEFENDANTS' FRAUDULENT SCHEME

### A.    Defendants Fail to Reveal a Material Adverse Trend

44.     Because Findwhat's revenues from its core business declined during the Class Period, Defendants had no choice but to resort to poor quality traffic, despite the fact that it would cause bids to decline, at least until the Company could make up revenues through acquisitions or by changing the Company's business model. Indeed, a former Account Manager revealed that the Company's business model evolved after the MIVA acquisition because of "serious, serious bid deflation in [Findwhat's] network." Instead, the Company began to focus on more "private label deals" such as those with Lycos where Findwhat provides the customer

with its own pay-per-click, keyword-targeted advertisement to avoid the "serious, serious bid deflation in [Findwhat's] network."

45.     According to a former Senior Director of Business Development, Defendants Thune and Pisaris-Henderson hid the adverse trend the Company was experiencing in its revenue per click.  Specifically, because the Company had directed such an abundance of low quality (i.e. spyware and adware) traffic into its network that did not produce significant results for its advertisers/customers, the Company could no longer charge its advertisers the revenue per click it needed to attract high quality distribution partners (who shared in the Company's revenue).

46.     Indeed, according to a former employee, the Company found itself "getting the scraps that [were] left on the table that Google and Yahoo! passed on [as a result of] . . . their due diligence process in screening the [low quality] traffic."

47.     Nonetheless, according to a former Director of Business Development, despite the fact that Defendants knew of the low quality traffic, which drove down the average revenue per click ("RPC") and drove away advertisers, they did not want to eliminate the revenue from Dmitri and Saveli so they could "make revenue goals."  Thune was extremely focused on meeting these goals, as the former employee described "[i]ts Phillip's company, dollars and cents it's his company."

48.     Consequently, the Company found itself in a downward revenue spiral from where there was seemingly no legitimate recovery.  As this witness indicated, when he first began with the Company in early 2003, Findwhat achieved $0.20-$0.21 per click, however by June 2005 the Company's revenue per click had declined precipitously to approximately $0.12 per click.

49.    According to a former Director of Business Development, Findwhat shared 50% of the revenue generated per click with its distribution partners, minus 1.5 cents to Findwhat for costs associated with the transaction.  Essentially that means that if an advertiser bid $0.20 for a click, Findwhat would subtract 1.5 cent from the $0.20, reducing it to $0.185, and would then pay the distribution partner $0.0925 for that click.  Despite an industry standard of a 70% revenue share rate for distribution partners, Findwhat clung to its lower rate as a means of controlling costs - the obvious consequence of this decision was that higher quality traffic partners would gravitate to better financial opportunities.  As this witness stated, "The low RPC Findwhat offered affiliates drove away quality affiliates who could get more money from other pay per click services, and left the Company with "quick and greedy traffic." The low revenue sharing arrangements Findwhat employed contributed to the poor quality distribution partners, and as this witness opined is a sure "way to get you dead in the industry."

50.    Paying a competitive rate for traffic would have enabled the Company to develop healthy traffic, and because that would lead to a higher conversion rate, bid prices would rise. This former employee discussed the need to negotiate affiliate relationships with higher quality affiliates, but Defendants Pisaris-Henderson and Thune refused to let him go forward with these deals, which would have required a 60% split.  This witness stated that Defendants were concerned that the increased revenue sharing would lower short term revenue and prevent the Company from meeting Wall Street's expected numbers.  Since the relationships and quality of traffic did not improve, the Company's RPC went down, and it had a "devastating effect on revenue."  The lower RPC also made it more difficult to start relationships with higher quality affiliates who did not want to deliver traffic to Findwhat in exchange for 50% of $0.12 or $.015.

The former employee stated because "RPC is terrible, Company traffic is terrible, no one [distribution partners] cares about $0.07 [RPC] or even 70% of $0.15."

51.     Further, a former Marketing Manager stated that in the summer of 2005, he performed an analysis of the Company's affiliates or distribution partners and that his analysis revealed that 95 percent of the Company's click revenue came from its top 50 distribution partners – with the top two being two "young Russian kids" – Saveli Kossenko ("Saveli") and another individual known only as Dimitri. [10]  In short, by the summer of 2005, Defendants had created a distribution network that was, according to a former Marketing Manager, best described as a "house of cards . . . held together by a thread."

### B.     Defendants Knowingly Rely on Improper Methods to Boost Revenue

52.     This adverse trend was noted in a February 24, 2005 ThinkEquity analyst report which stated:

> The other key drive for the lower pricing relates to the lower conversion rate or quality of FWHT's traffic versus the large search engines. Our survey of media buyers indicates that FWHT's leads generally convert at less than half the rate of those provided by Overture or Google which explains why FWHT's price-per-click is roughly half that of the major search engines.

53.     Struggling with declining bid prices and the resulting declining revenue in its core business, as well as costly internal control issues and accounting deficiencies generated by integrating four companies during the first seven months of 2004 alone, Defendants knew they could only provide the results Wall Street had come to expect through improper means. Throughout the Class Period, Findwhat's two largest Internet traffic and revenue producing

---

[10] Saveli Kossenko, also known by his company name, Dimago Overseas Gmbh, and was identified internally at Findwhat by Affiliate ID No. 48078.  Similarly, Dmitri's internal corporate identity was HyperSpace Communications, Inc., and he was assigned Affiliate ID No. 47161.

distribution partners were Saveli and Dmitri, who the Company relied on to generate a material portion of their revenues.

54.     According to a former Business Development Manager, Saveli and Dmitri were "turn and burn guys" whose primary focus is driving in a lot of traffic, even if it is low quality traffic.

55.     Allegedly based in Montreal, Canada, unbeknownst to the investing public and according to several former Company employees (including one former Director of Business Development for the Company whose primary job responsibility was the development and maintenance of distribution partner relationships), these two individuals were personally responsible for generating almost *one third* of Findwhat's revenue during 2003, 2004 and 2005.

56.     In fact, Saveli and Dmitri generated approximately **36%** of all of Findwhat's click revenue and approximately 14.6% of total revenue for January 2005 – with Saveli generating $3,012,457.58 and Dmitri $1,076,240.92.  Not only should Defendants have disclosed the existing problems with two of its main distribution partners because of the negative impact of the relationships on traffic quality, Defendants were also required to disclose that these two distribution partners amounted to more than 10% of Findwhat's consolidated revenues.  Despite Defendant Pisaris-Henderson's assertion that none of the Company's distribution partners accounted for more than 10 percent of the Company's revenue on a recurring basis during 2004, two former managerial level employees and one former Senior Director in the Company's Business Development Unit have informed Plaintiffs that the two distribution partners Dmitri and Saveli – did, in fact, account for more than 10 percent of Findwhat revenue in 2004.

57.     The efforts of Saveli and Dmitri did not go unrewarded.  According to a former Manager of Business Development, Dmitri earned approximately $12 million a year as a click

traffic-generating partner for Findwhat.   However, unbeknownst to the investing public, Dmitri and Saveli employed unscrupulous and illicit means known as "click fraud" to create Internet traffic to Company advertisers.  In turn, this fraudulent click-through Internet traffic resulted in enormous revenue for themselves and Findwhat at the expense of unsuspecting advertisers.

58.    Click fraud has many forms and variations, but generally refers to the practice of clicking on an Internet advertisement for the sole purpose of forcing the advertiser to pay for the click.  Put differently, click fraud can be described as any click received from a PPC search engine that is generated artificially and is designed solely to increase the payable number of clicks ascribed to a given advertiser, since advertisers only pay when someone "clicks through" to their website.  The improper methods employed by Saveli and Dmitri included the use of "spyware" and "browser hijacking," as discussed further below.

59.    Click fraud can be as simple as a business competitor clicking on competitor ads to push the competitor's advertising costs up, or can be very sophisticated, such as using online robots, or "bots," programmed to click on advertisers' links automatically.  One form of click fraud employed by these two distribution partners involved the use of "spyware" or software that sabotages a computer's operation for the benefit of a third-party.  In this regard, similar to many computer viruses, spyware is designed to exploit infected computers for commercial gain through a variety of means such as:  the delivery of unsolicited pop-up advertisements; theft of personal or financial information (such as credit or bank card numbers); monitoring of Internet browsing activity for marketing purposes; or routing of HTTP requests to advertising sites.

60.    The use of distribution partners specializing in spyware and other illicit means enabled Findwhat to enhance its revenues with "non-human traffic" which vastly outpaces the traffic generated by actual consumers.  One way in which this is accomplished is through

computer programs such as "bots" or "spiders" to search the internet for revenue opportunities and click on those opportunities. For example, Findwhat's "Site Integration Agreement," which it used as early as October 2003 as its agreement with distribution partners, states: "A 'bot' or 'spider' shall be defined as a software program that executes searches or click throughs that were not initiated by unique Users of the Company's CKS." It is through methods like these that Saveli and Dmitri could generate more traffic than legitimate corporate partners on the Findwhat network.

61.    Another practice employed by the Russians was the use of "browser hijacking" to artificially boost revenues. According to several former employees who worked for the Company during the Class Period, it was commonly known within Findwhat that Dmitri and Saveli would often "hijack" the Internet browser of an unsuspecting and unknowing computer user and automatically direct the user to unsolicited advertisements, thereby creating a click (or revenue event for both the distribution partner and Findwhat).

62.    They also employed spyware to create what one former Business Development Director termed as "non-human traffic" because it is essentially automated ways to make it appear as if human users were clicking on an advertisement, when in fact, no prospective human customer was viewing those ads.

63.    Evidence of this non-human traffic was readily apparent to Findwhat management, and although it came in various forms, one indicator is the origination of click throughs from a URL or internet address that is illogical for that particular advertisement. For example, an email anonymously provided to Lead Plaintiffs' counsel discussed Findwhat's detection of a large volume of traffic that produced revenue on non-adult keywords, but originated from internet addresses that are of an adult nature. The email, dated February 21,

2005, states: "There was a large increase in traffic coming thru Saveli, Hyperspace [Dmitri],

Chitika and Genieknows – Can we make sure that this additional traffic was valid?  Also here is

a list of outstanding issues we have with our affiliates:" The email then lists nineteen (19) adult

web sites from which Dmitri and Saveli generated non-adult click revenue, a practice a former

Director of Business Development confirmed was indicative of the employment of spyware.

64.    In this instance, the computer users were first brought to, among the 17 other

similar sites, "http://f***virginhole.com," by Dmitri and "http://www.pinkpussynet.com" by

Saveli before purportedly clicking on a non-adult advertisement posted on those web pages.

According to a former Manager of Business Development, this mode of operation, employed to

generate revenue producing clicks for the Company, was typical of the Internet traffic generated

by Saveli and Dmitri throughout the Class Period.

65.    As a former Business Development Manager explained:

The people who run the pornographic web-sites hide programs such as spyware,
and other bad computer programs behind pictures, and sometimes even include
disclaimers stating that anyone clicking on a picture agrees to accept software
from the pornographic web-site. Then after clicking on the picture, the user's
browser or computer is infected and is used to drive traffic to affiliates of pay per
click sites such as FindWhat.com. This process of hiding malignant code behind
pornographic web-sites, which then sends traffic to affiliates of the pornographic
web-site (often other pornographic web-sites) is known within the industry as a
"circle jerk."

**C.    Defendants' Are Directly Confronted With the Improper Techniques Used
by Dmitri and Saveli and Refuse to Terminate the Relationship**

66.    According to two former managerial level employees in Findwhat's Business

Development Department, which was responsible for the oversight and acquiring of new

distribution partners, it was common knowledge that Dmitri and Saveli employed these types of

surreptitious adware and spyware in order to artificially generate virtually unparalleled "non-

human" Internet traffic to the websites of unsuspecting Findwhat advertisers/customers, thereby generating incredible revenue for Findwhat quarter after quarter throughout the Class Period.

67.    Indeed, according to a Former Manager of Business Development, "War Reports" were provided to the Company's executive management team every Thursday by the Company's Business Development unit.  The Business Development unit then met every Friday at 10:00 a.m. to discuss executive management's response to the "War Report," pending deals, prospective deals and current relationship issues - i.e. unscrupulous Internet traffic generated by the Company's distribution partners.

68.    Defendants also maintained an internal computer system, described by one former Business Development Manager as "the Interface," from which the Company's executive-level management could access "real-time" information regarding the Company's (and its distribution partners') generation of Internet traffic for its advertisers and the corresponding click-through revenue generated by such traffic.

69.    Specifically, the "Interface" would display the quality (i.e. legitimate) Internet traffic generated by the Company in blue and filtered (i.e. illegitimate) Internet traffic in red. Accordingly, Defendants were well aware that their two primary Internet traffic-generating distribution partners (Saveli and Dmitri) were primarily generating illegitimate Internet traffic to the Company's advertisers in order to generate revenue.

70.    In fact, the issue of using the illicitly obtained revenues was frequently debated at high levels of the Company.  One former Senior Director of Business Development was present at a meeting during the Class Period, in the Company's 5th floor Executive Conference Room and attended by Defendant Pisaris, when growing internal concern over Dmitri and Saveli's Internet traffic and revenue generation "practices" was discussed.

71.    In June 2004, in a meeting attended by then Senior Vice President / General

Manager of the Private Label and Miva Network, Rick Szatkowski**,** and Findwhat Vice President

of Operations John Moran*, **the decision was made to terminate the Company's relationship**

**with Saveli and Dmitri because they were "basement operators" employing "spyware."***

According to a former Director of Business Development that attended the meeting, it was not a

question of whether to get rid of Saveli and Dmitri just "a question of when."

72.    Despite the Company's intentions to "fix the business" and terminate its

relationship with Saveli and Dmitri in June 2004, Defendants Pisaris-Henderson and Thune

would not permit such a drastic cut in Company revenues, despite their known use of click-fraud

to generate revenues, because they feared Wall Street's inevitable punishing reaction to any

revenue shortfalls.  In fact, according to a former Senior Director of Business Development,

Defendant Thune stated that the Company "had to replace the revenue it would lose [from Dmitri

and Saveli] before Findwhat would remove them."[11]

73.    What is even more troubling is that during the 4Q2004 when the Company was

supposedly reducing click-through-fraud partners, they actually increased compensation for them

in a last ditch effort to make their quarterly numbers.  During a cellular telephone conversation

between Dave Rae and Rick Szatkowski that occurred in a rental car while attending a

conference in San Francisco on November 15-17, 2004,  Szatkowski told Rae "We cannot

continue to whore our advertisers" to Dmitri and Saveli.  Rae then informed Szatkowski that

"Phil [Defendant Thune] and Craig [Defendant Pisaris-Henderson] are giving Phil [Neumann]

_____

[11] To put into context the enormous amount of Internet traffic (and therefore Company revenue)
Saveli and Dmitri generated, a former Senior Director of Business Development offered the
following comparison:  on average, the nation's most read newspaper's website, USA Today,
records 2 million unique visitors per month with users performing 1-1.5 million searches per
month, in contrast, astonishingly, Dmitri and Saveli processed a similar amount of Internet traffic
***in half of a day***.

the go-ahead to boost fourth quarter revenue."  Neumann's  plan was to increase the percentage

of revenue per click paid to partners other than Dmitri and Saveli from the usual 50% to 70%, in

the hopes that it would "dilute the bad traffic coming from Saveli and Dmitri" and increase

Company revenues in order to "meet 4Q2004 projections."  The Company was unable to meet its

projections without the assistance of Dmitri and Saveli, and, according to this former Business

Development Manager, ended up paying Dmitri and Saveli the same 70% for a period of time

before lowering it back to 50%.  Ironically, much of Findwhat's alleged revenue reduction due to

the removal of spyware partners was actually because of an increase in payments to them.

74.    In December 2004 or January 2005, a former director of Business Development

had a one-on-one meeting with Defendant Pisaris-Henderson in which Pisaris-Henderson asked

him point blank whether he thought FindWhat's traffic quality problems had to do with Saveli

and Dmitri.   When this witness answered affirmatively, Defendant Pisaris-Henderson "did not

really say anything in response" because he was "the type of CEO who tried to avoid 'knowing'

bad facts", in the hopes that if "he did not really know what was going on, he could not be held

accountable later."

75.    According to this Former Director of Business Development, certain Dmitri and

Saveli sub-affiliates were generating rates per click in excess of $0.40, when the Company's

average rate per click was approximately $0.12, with the only explanation for this discrepancy

being that their use of "surreptitious traffic (i.e. spyware, bots, adware)" to "cherry pick" the

highest value key words.  The Former Director of Business Development explained that this was

an immediate red flag for anyone monitoring the traffic because in order to achieve average per

click results so far above the statistic average of everyone else, these affiliates must have

restricted their spyware programs to generate clicks on only the highest bid keywords –

presenting an abnormal distribution that is inconsistent with human generated click traffic.

76.    In fact, Saveli and Dmitri weren't the only ones that employed "cherry picking" to

achieve higher per click results.  Based on the an internal Findwhat report anonymously provided

to Lead Plaintiffs' counsel, the following list of distribution partners produced average per click

results that a former Director of Business Development stated were well "outside the expected or

normal range" and indicative of "surreptitious traffic:"

| | | Revenue Per Click |
|---|---|---|
| 47360 | WhenU IDs [expand] | $0.33 |
| 47118 | Homepage – Israel | $0.34 |
| 48581 | Quigo Technologies, Inc. IDs [expand] | $0.44 |
| 48856 | Marc Flemming DBA Psyphire Production IDs [expand] | $0.48 |
| 49250 | Direct Revenue, LLC IDs [expand] | $0.33 |
| 48420 | ClickMagnet, Inc. | $0.44 |
| 49623 | bizjournals.com, Inc. IDs[expand] | $0.72 |
| 49090 | Spydercube, Inc. IDs [expand] | $0.43 |
| 47725 | Lukol.com IDs [expand] | $0.30 |
| 49078 | Milena Badjova dba Cashfiesta.com | $0.34 |
| 48980 | Targetpoint, Inc. | $0.38 |
| 49036 | W.D.I.A. Corporation | $0.32 |
| 49315 | TotalNet Marketing, LLC | $0.54 |
| 48828 | Intellim Research, Inc. (FW HTML) IDs [expand] | $0.32 |
| 48606 | Wonk Media, LLC | $0.69 |
| 49035 | Marija Posavec | $1.06 |
| 48792 | Prime Plan LLC | $0.73 |
| 48906 | Xu Daning DBA Exactseeks.com | $0.44 |
| 48922 | Origin Data, Inc. | $0.38 |
| 48829 | Marketing Essentials LLC | $0.79 |
| 48459 | Creative Development Partners, Inc. | $0.86 |
| 49049 | Traffic Strategies.com, LLC | $0.38 |
| 48279 | Michael Stark | $0.43 |
| 47976 | EZD Consulting, Inc. | $0.44 |
| 48434 | Anthony Torres DBA Alien | $0.41 |
| 48576 | Booyah Networks, Inc. | $0.33 |
| 48974 | The Wotch Network PTY Ltd. | $0.66 |
| | **FINDWHAT'S AVERAGE** | $0.17 |

**D.    The Spotlight is Shined on Click-Fraud and Defendants' Panic**

77.    During 2004 and 2005, increased scrutiny was focused on click fraud by state and federal regulators.  In April 2005, Elliot Spitzer, the Attorney General of the State of New York, enjoined Intermix, a spyware vendor based in Los Angeles, California, from engaging in similar activity as to what Findwhat relied on to generate one third of its revenue, and obtained a $7.5 million settlement for New York consumers who had been subjected to this type of abuse.[12]

78.    That said, suddenly Findwhat executives feared that "the shit was going to hit the fan . . . after the hammer came down on the [spyware] industry," and that they would find themselves next on Attorney General Spitzer's list of spyware targets.

79.    In addition, Defendants feared that new laws would be passed limiting the use of spyware and protecting consumers from the impact of these fraudulent practices, which would bring their practices under further examination.[13]  Accordingly, Defendants issued statements intended to assure the market - - as well as the government - - that Findwhat was being proactive in addressing these issues.  In fact, even the "disclosures" were lies.

80.    Generally speaking, Defendants Pisaris-Henderson and Thune, whenever questioned about the Company's distribution partners, refused to offer any insight into the

---

[12]    *See* press release of the Office of New York State Attorney General Eliot Spitzer, dated April 28, 2005.

[13] There are currently five bills pending in the House and Senate that deal with spyware:  the Spy Act, which was introduced into the House on January 4, 2005, passed by the House on May 23, 2005, and referred to the Senate Committee on May 24, 2005; the Internet Spyware (I-SPY) Prevention Act of 2005, which was introduced into the House on February 10, 2005, passed by the House on May 23, 2005, and referred to the Senate Committee on May 24, 2005; the Spy Block Act, which was introduced into the Senate on March 20, 2005; the Enhanced Consumer Protection Against Spyware Act of 2005, which was introduced into the Senate on May 11, 2005; and the U.S. Safe Web Act of 2005, which was introduced into the Senate on July 29, 2005.

relationships, choosing instead to conceal the truth from the public.  This representative

exchange occurred during the Company's November 1, 2004 earnings conference call:

> Question:  First of all, I was wondering if you could talk through any changes that
> occurred in your traffic partners or mix this quarter.  Can you give us some feel
> for what percentage of your traffic partners, particularly in the U.S., came from
> partners you signed over the last 6 months?
>
> * * *
>
> Craig Pisaris-Henderson:  As you are all aware, we don't breakout partners and
> we don't comment specifically on any of our relationships.  To the extent that we
> would have a partnership that would contribute over 10 percent on a recurring
> basis, obviously we would do that.  But that just is not the case.
>
> * * *
>
> Phillip Thune:  Again, I think we're not going to be able to give you too much
> insight.  We are bound by the confidentiality terms of that agreement.

81.     However, in the Fourth Quarter 2004, Defendants profoundly and falsely claimed

that they removed a substantial amount of low quality (i.e. click-fraud based) revenue from its

system, in an effort to lull investors into believing the Company was proactive and aggressive

about policing click fraud.

82.     During a Company conference call on February 23, 2005, Defendant Pisaris-

Henderson emphasized that the Company had voluntarily removed $70,000 per day of top-line

(i.e. fraudulent) revenue, stating:

> Third, we believe that lead quality should be and is becoming increasingly
> important to advertisers, and recent press coverage has focused substantial
> attention on the click broad issue and how it effects lead quality.  For several
> years, we have understood the issue and have been investing heavily in protecting
> the integrity of our networks through both automated and human systems, thereby
> limiting our exposure to the issue.
>
> That said, we believe that ultimately the value of a lead is best determined by
> whether that lead actually converts to a sale.  Our recent acquisition of Miva
> empowers our visibility into the click stream, and for businesses with Miva
> storefronts, we are now able to track and add from the first click through to the
> point-of-sale.  We don't need to employ intuition or advanced algorithms to

- 28 -

determine whether traffic sources are good or bad.  We are creating a single transparent platform that combines relevant advertising with the visibility to measure conversion rather than clicks alone, thereby giving us the ability to remove traffic sources from our networks that do not meet our high standard of conversion metrics, aligning our interest with those of our advertisers.

***In fact, during Q4 we intentionally removed numerous traffic sources that would otherwise have produced approximately $70,000 of revenue per day. This action further illustrates our long-term view towards maintaining high standards and delivering high-quality leads to our advertisers.***

***Let me repeat we have intentionally removed traffic sources from our distribution network that would otherwise have produced approximately $70,000 of revenue per day.  Again, our focus is to deliver traffic that converts rather than just clicks alone.***

83.    However, according to the Senior Director of Business Development responsible for the oversight and management of all distribution partners and affiliates, the fraudulent revenue sources were not removed, "no traffic was taken off line in the fourth quarter of 2004." He also stated that the announcement in the February conference call referred to Dmitri and Saveli who earned an averaged of $70,000 in revenue per day.  This was confirmed in an internal company report produced anonymously to Lead Plaintiffs' counsel.  The report, dated February 20, 2005, shows Dmitri and Saveli as the top two producers with a combined daily revenue average of $70,193.50.

| <u>ID</u> | <u>Affiliate</u> | <u>Clicks</u> | <u>Revenue</u> | <u>$$/Clicks</u> | <u>Clicks/Day</u> | <u>$$/Day</u> |
|---|---|---|---|---|---|---|
| 48078 | Saveli Kossenko – Dimago Overseas Gmbh IDs | 58,517,416 | $12,053,239.77 | $0.21 | 220,820.40 | $45,483.92 |
| 47161 | HyperSpace Communications, Inc. | 33,172,935 | $6,548,038.55 | $0.20 | 125,180.90 | $24,709.58 |

84.    Similarly, a former Marketing Manager also stated that it was "an open secret within the Company that Dmitri and Saveli were not taken off line in December 2004, and neither was anyone else."  Along these lines, the Former Senior Director of Business

Development referenced in the preceding paragraph stated that "the traffic referred to above could only have been Dmitri and Saveli…."

85.    In fact, according to an internal Findwhat report dated February 20, 2005, which is three (3) days before Defendant Pisaris-Henderson's comments above, **Saveli earned $800,000 more during January 2005 than he did in March 2004**, while Dmitri earned $540,000 in January 2005.

86.    Pisaris-Henderson went even further to mislead investors by continuing, "[t]hat being said as we continue to go through the quarter and quite frankly as we continue to go through Q1 as well, we are looking at various traffic sources, and if it is not converting at a very high-level, then we are removing it out of our network.  So I would not say things have necessarily changed.  We're just getting better and better visibility into all areas of our network."

87.    Despite Defendants' claims to have removed $70,000 in "questionable" distribution traffic, former employee testimony and documents anonymously produced to Lead Plaintiffs' counsel suggest otherwise.  Two internal reports comparing the results for Saturday, February 12, 2005 with Saturday, February 19, 2005 and Sunday, February 13, 2005 with the corresponding Sunday, February 20, 2005 prove that the Company did not disrupt the traffic generated by either Saveli or Dmitri.  In fact, these reports show a 36% percent increase for Dmitri [Hyperspace] during the February 19 weekend over the week before.  Clearly, they had not been turned off or had their traffic slowed in any way because their number of clicks and corresponding revenue is consistent with their 2004 average of $70,000 per day.

| ID | Name | Clicks | | | Revenue | | |
|---|---|---|---|---|---|---|---|
| | | 2/19/05 | 2/12/05 | Change | 2/19/05 | 2/12/05 | Change |
| 48078 | Saveli Kossenko – Dimago Overseas Cmbh IDs | 371,231 | 341,023 | 8.90% | $59,855.60 | $51,589.60 | 16.00% |
| | HyperSpace | | | | | | |

| 47161 | Communications, Inc. | 146,684 | 103,012 | 42.40% | $22,849.42 | $16,734.13 | 36.50% |
|---|---|---|---|---|---|---|---|
| | | **Clicks** | | | **Revenue** | | |
| **ID** | **Name** | **2/20/05** | **2/13/05** | **Change** | **2/20/05** | **2/13/05** | **Change** |
| 48078 | Saveli Kossenko – Dimago Overseas Cmbh IDs | 357,821 | 349,587 | 2.40% | $53,304.76 | $49,422.24 | 7.90% |
| 47161 | HyperSpace Communications, Inc. | 149,928 | 108,426 | 38.30% | $22,651.99 | $17,269.44 | 31.20% |

88.    Defendants alleged removal of low quality traffic from its network on February 23, 2005 not only mislead investors, but was also designed to entice advertisers to bid more on the belief that the networks traffic had improved in quality.  In what was basically a "bait and switch," Defendants told advertisers they had improved their traffic quality to attract higher bids when Defendants knew the quality of their traffic was still extremely poor.  According to a former manager of marketing.  During this period, one former employee stated that he had numerous meetings in the 5th floor executive conference room with Vice President of Operations, John Moran, where Moran repeatedly described the quality of Findwhat's traffic as "sub-par."

**E.    Additional Disclosures Regarding the "Quality" of the Company's Distribution Partners are Selectively Disclosed to Investors**

89.    Between February 24, 2005 through May 4, 2005, Defendants began to trickle out carefully selected adverse information in an attempt to lull investors into a false sense of security that the full truth about Findwhat's problems had been disclosed.  The Company's stock price lost 64% or its value between February 23, 2005, and May 5, 2005, falling from a closing price of $13.45 on February 23 to close at $4.83 on May 5, 2005.  As a result of these "disclosures" the price of Findwhat stock declined from $24.50 on September 3, 2003  to close at $4.83 on May 5, 2005, having dropped an astonishing *82.58%* from its Class Period high of $27.72 on September 16, 2003.

90.     On May 2, 2005, Defendants filed a Form 10-K/A with the SEC which revealed

that the Company was named as a defendant in an action entitled *Lane's Gift and Collectibles,*

*L.L.C., et al. v. Yahoo! Inc., et al.*  The disclosure revealed that Findwaht was a defendant in a

class action brought on behalf of its own advertising customers alleging that the Company

improperly billed them for clicks that Findwhat knew were not made by bona fide consumers in

violation of their contracts and actively concealed this practice from its advertising clients.  The

lawsuit was yet another indication that Findwhat's revenues were artificially inflated through the

use of improper methods.  That same day, the Company filed a Form 8-K with the SEC

announcing that Ernst and Young, its independent auditor, was resigning.  Then on May 5, 2005,

the Company disclosed that Defendant Agius had resigned as the Company's CFO, effective

May 4, 2005, and that the Company had been removing certain distribution partners who

represented a "meaningful percentage" of daily click-through revenue resulting in a negative

affect upon the Company's short-term financial performance.

91.     Each of these purported disclosures was met with shock by the investors and

analysts.  For example, after the February 23, 2005 conference call, RBC Capital Markets issued

a research report indicating that the "conference call only partially obscures slowly deteriorating

core business."  The analyst report noted:

> The company claimed it eliminated over $2m in gambling-related advertising
> revenue in the fourth quarter, and eliminated another $4m in clicks from partners
> whose conversion rate was lower than acceptable levels.  While each of these
> decisions makes some sense in and of itself, the combined $6m impact on the
> quarter was too great for investors to ignore.  We wished that management had
> told us in prior communications that such a large percentage of its traffic was low
> quality, low conversion traffic. . .

92.     This reaction was echoed by Craig-Hallum in a February 24, 2005 analyst report.

With respect to removing poor quality traffic, the report noted that:

- 32 -

"[w]e expected a gardener using pruning shears.  What we got was a lumberjack using a chainsaw."

93.    Similarly, Marquis Investment Research issued a report indicating that the main reasons investors would purchase Findwhat – due to its growth rates, had fundamentally changed.  The report noted that:

> The whole search industry has now reported, and Findwhat.com certainly performed the worst when compared to the consensus estimates.  We are downgrading the stock as we believe investors will likely look elsewhere for growth opportunities.  Organic growth of 15% doesn't sound like something that an Internet company should be having, so the lower growth expectations will likely carry a lower multiple as well.

94.    Analyst reaction to the May 5, 2005 conference call was even worse, after Defendants revealed that Findwhat had turned off additional distribution partners who accounted for a meaningful percentage of revenue.  For example, a May 9, 2005 report issued by Craig-Hallum noted that:

> We believe the bad partners were practitioners of malicious techniques such as browser hijacking and spyware.
>
> **Our Point of View**
>
> Findwhat is a middle man.  Their ability to sell advertising is dependant on the quality of traffic generated by their search partners.
>
> They have always screened the traffic for things like click fraud and Romanian IP addresses.  This action is in their best interest because if the traffic is fraudulent and results in no business for advertisers, advertisers will stop spending their budgets at Findwhat.
>
> Without user consent, these partners were downloading aggressive software onto unsuspecting users' PC's When those users surfed and searched, the hijacked browser presented them with Findwhat ads.
>
> Findwhat claims it became aware of the ill-gotten search traffic a few weeks ago and took immediate action to end the relationship.  We believe that the company reacted properly, but the admission adds a much higher risk to the investment case.
>
> We hope that the company is more proactive in the future.  Merely stating that "we stop doing business with bad people the minute we find out they are bad" is

- 33 -

an inappropriate business model. We assumed Findwhat had a more aggressive verification and monitoring process.

Also, one of the key elements of our original investment theses on Findwhat was that no distribution partner represented over 10 percent of revenue. The accuracy of this statement must also come under scrutiny as the company just lowered the midpoint of it guidance by 27.9 percent.

## V.    FALSE AND MISLEADING STATEMENTS

### 1.    Fiscal Year 2003 False Statements and Reasons For Falsity

95.    On September 3, 2003, Findwhat issued a press release announcing its merger

with Miva. In this press release, Defendants touted the Company's Internet business, as follows:

> Together with Miva, FindWhat.com would offer a more complete, comprehensive business solution to small-to-medium sized enterprises ("SMEs"). SMEs can utilize Miva Merchant software to create fully operational online storefronts with shopping cart capability and can purchase other complementary e-commerce services through Miva's additional plug-ins and modules. Through FindWhat.com, online marketers are able to cost-effectively promote their websites and <u>find highly qualified prospects</u> who have already expressed an interest in their product or service. (emphasis added)

96.    On October 30, 2003, the Company filed its Form 10-Q with the SEC for the

quarter ending September 30, 2003. The Form 10-Q was signed by Defendant Thune, and

included certifications from Defendants Pisaris-Henderson and Thune, as required by Section

906 of the Sarbanes-Oxley Act of 2002, that to the best of their knowledge, the quarterly report

"fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act

of 1934," and "the information contained in the Quarterly Report to which this certificate is an

exhibit fairly presents, in all material respects, the financial condition and results of operations of

the Company."

97.    The Form 10-Q highlighted the Company's distribution partners, but omitted its

most prominent ones:

> Along with our private label partner Terra Lycos's Lycos.com and HotBot, we distribute advertisements to millions of Internet users each day, often in direct

response to search or directory queries. The FindWhat.com Network includes hundreds of distribution partners, including search engines like CNET's Search.com, Excite, Webcrawler, MetaCrawler, Dogpile, and Microsoft Internet Explorer Auto Search.

98.    On October 20, 2003, as part of Defendants' effort to conceal the emergence of a material adverse trend, Findwhat began to limit the information it provided investors about its average revenue per click.  Buried at the end of its 3Q2004 earnings press release was this statement, "FindWhat.com has discontinued the reporting of active advertiser accounts, paid click-throughs, and average revenue per click-through."  Unlike in every previous quarter, the Company suddenly ceased providing investors with its average revenue per click.  By withholding the average revenue per click, the total number of clicks, which the Company still provides, is meaningless.  Because 100 million clicks at $0.10 per click is the same as 25 million clicks at $0.40, in order for Findwhat's statements regarding total clicks not to be misleading, investors must be provided both factors in the equation.  Defendant Thune, who one former Marketing Director characterized as the "guardian" of the spyware secret, stated:  "As our business continues to mature, and we pursue additional revenue streams, we feel our historical key metrics are less indicative of the direction of our business than they have been in the past. As always, **we continue to focus on revenue and profits, as we believe they are the best gauges of our historical performance**, and are the figures we uniformly try to increase over the long-term."

99.    Defendants' statements above are false and misleading for the reasons stated throughout this Complaint, including that:

    a.    Defendants knew that the quality of their "prospects" were anything but high quality because over one third of their "prospects" came from spyware distribution partners

Saveli and Dmitri, who Defendants later referred to as "less than honorable," (*see* ¶¶ 56-58, 87-89);

           b.      Defendants promoting of high profile distribution partners misled investors as to the overall quality of Findwhat's distribution network. The partners cited provided only a fraction of the traffic provided by Saveli and Dmitri, who the Company has still never acknowledged exist, never mind produce one third of its revenue. For example, during a twelve month period when Saveli and Dmitri ranked 1st and 2nd, well known and respected CNET ranked 50th. To put the magnitude of the difference between the top two spots and 50th, during the period in this report, CNET generated 1,604,375 clicks for $124,769.18 in revenue; in contrast, Dmitri and Saveli combined for 91,690,351 clicks for $37,202,556.64 (*see* ¶83); and

           c.      Defendants failed to disclose the Company's reliance on improper revenue generating practices of its largest distribution partners and as a result falsely recognized revenue in violation of GAAP and SEC Regulations as discussed further in ¶¶142-170.

**2.**      **Fiscal Year 2004 False Statements and Reasons For Falsity**

100.    Touting its 17th quarter in a row of successive revenue growth, on February 9, 2004, FindWhat.com reported "record revenue in Q4 2003 of $21.0 million and $72.2 million for the year ending December 31, 2003."

101.    On March 5, 2004, the Company filed its Form 10-K with the SEC for fiscal year ending December 31, 2003. The Form 10-K was signed by all of the Individual Defendants, and included certifications from Defendants Pisaris-Henderson and Thune, as required by Section 906 of the Sarbanes-Oxley Act of 2002, that to the best of their knowledge, the quarterly report "fully complies with the requirements of Section 13(a) or 15(d), of the Securities Exchange Act of 1934," and "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

102.    The Form 10-K misled investors into believing that the Company primarily conducted business with law-abiding third parties:

> Business with Third Parties:  We expect that our consultants, agents, resellers, distributors, subcontractors, and other business partners will adhere to lawful and ethical business practices.  It is important to our company's reputation that we avoid doing business with companies which violate applicable laws or have reputations which could harm our business.  **Our policy prohibits engaging agents or other third parties to do indirectly what we as a company should not do under our own policies outlined in this code.**  [emphasis added]

103.    The statements above are false and misleading for the reasons stated throughout this Complaint, including:

a.    Defendants knew that they relied upon revenue generated from third parties employing methods, as described above, that violated the Company's stated policies for quality and ethics;

b.    Defendants knew, or recklessly ignored, the fact that the goodwill associated with the Miva acquisition was impaired because Miva was not selling software as the Company had anticipated and projected, failed to produce substantial revenue during the first or second quarter 2004, and as a result of these facts, it became clear that Findwhat had over-paid to acquire Miva.  According to a former VP of Marketing for Miva, Findwhat knew that Miva was not meeting its projected earnings estimates, was unable to sell its software as expected, and experienced tremendous difficultly with the unveiling of its new software product Miva Marketplace 2.0 in April 2004 because "it was plagued by bugs and lack of functionality."  He characterized this new software product as "at best tempermentally functional" and stated that the "ROI (Return on Investment) tool for advertisers never worked."  The same witness stated that Findwhat's revenue projections for Miva upon completing the acquisition were "so large as to be ridiculous and unreachable."  The Company's own statement on February 23, 2005, shows the Company was aware of Miva's revenue contribution by the first quarter in 2004:

- 37 -

In Q1 2004, Miva and Comet contributed less than $1 million to the Company's reported consolidated revenue; in Q2 Miva, Comet and B&B contributed less than $4 million; in Q3 2004, Miva, Comet and B&B contributed approximately $5 million; and in Q4, Miva, Comet and B&B contributed approximately $6 million to the reported consolidated revenue.

        c.      Investors of the Company had no reason to fear government regulation of spyware because Findwhat never told the public it was materially dependant upon spyware for one-third of its revenue; and

        d.      Defendants failed to disclose the Company's reliance on improper revenue generating practices of its largest distribution partners and as a result falsely recognized revenue in violation of GAAP and SEC Regulations as discussed further in ¶¶142-170.

104.     Once again promoting another quarter of revenue growth, on April 26, 2004, FindWhat reported "record revenue in Q1 2004 of $24.7 million, an increase of 56% versus Q1 2003 revenue of $15.8 million."

105.     On May 7, 2004, FindWhat filed with the SEC a Form 10-Q for the period ending March 31, 2004, repeating the information released to the market in the April 26, 2004 press release. The first quarter Form 10-Q was signed by Defendant Thune, and was certified by Defendants Thune and Pisaris-Henderson pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002.

106.     On July 26, 2004, FindWhat reported "record revenue in Q2 2004 of $27.8 million versus Q2 2003 revenue of $17.5 million. For the six months ended June 30, 2004, FindWhat reported record revenue of $52.5 million, an increase of 57% versus revenue of $33.4 million for the same period of 2003."

107.     On August 6, 2004, FindWhat filed with the SEC a Form 10-Q for the period ending June 30, 2004, containing the information released to the market in the July 26, 2004 press release. The second quarter Form 10-Q was signed by Defendant Agius, and was certified

by Defendants Aguis and Pisaris-Henderson pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002.  In Note C to the 2Q2004 Form 10-Q, the Company falsely listed the fair value of the goodwill associated with the Miva acquisition as $4.977 million.

108.     On November 1, 2004, FindWhat reported "record revenue in Q3 2004 of $58.3 million versus Q3 2003 revenue of $17.8 million.  For the nine months ended September 30, 2004, FindWhat.com reported record revenue of $110.7 million, an increase of 116% compared with revenue of $51.2 million for the same period in 2003."

109.     On November 1, 2004, FindWhat announced that it had "increased revenue sequentially for 20 consecutive quarters with its record revenue Q3 2004 results of $58.3 million versus Q3 2003 revenue of $17.8 million. For the nine months ended September 30, 2004, FindWhat reported record revenue of $110.7 million, an increase of 116% compared with revenue of $51.2 million for the same period in 2003."

110.     On November 9, 2004, FindWhat filed with the SEC a Form 10-Q for the period ending September 30, 2004, containing the information released to the market in the November 1, 2004 press release.  The third quarter Form 10-Q was signed by Defendant Brenda Agius, and was certified by Defendants Aguis and Pisaris-Henderson pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002. In Note C to the 3Q2004 Form 10-Q filed with the SEC on November 9, 2004, the Company listed the fair value of the goodwill associated with the Miva acquisition as $4.595 million.

111.     The 3Q2004 Form 10-Q also provided the following false and misleading statement, which the Company made for the first time in this document:

> Legislation has also been introduced in the U.S. Congress and some state legislatures that is designed to regulate spyware, which does not have a precise definition but is often known as software installed on consumers' computers without their informed consent that gathers and may disseminate information

about such consumers, including personally identifiable information, without the consumers' consent.

**Defendants and Company Insider Frederick E. Guest, II Engage in Unusual Trading**

112.     While in possession of the adverse material information detailed above, certain Defendants and Company Insiders (the "Selling Insiders") sold substantial amounts of company stock.

113.     In this instance, the transactions of Defendants and Frederick E. Guest, II are unusual in timing when taken in conjunction with the false statements the Company was making to the investing public at the time.  Specifically, the trades in question all occurred in 4Q2004 when Findwhat stock traded at nearly twice its trading price of that after the February 23, 2005 announcement of Findwhat's removal of certain distribution partners.

114.     Moreover, none of the Selling Insiders sold any stock in 2003 – not a single share – nor have they sold any since the 4Q2004. But while actively concealing from the investing public the material adverse trend in Findwhat's operations during the 4Q2004, Selling Insiders had the following transactions and proceeds:

| Company Insider | Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|
| F. GUEST | 10/5/2004 | 25,000 | $ 20.04 | $     501,000 |
| | 10/27/2004 | 48,000 | $ 21.83 | $ 1,047,840 |
| | 11/24/2004 | 48,000 | $ 18.14 | $     870,720 |
| | 12/29/2004 | 9,000 | $ 18.00 | $     162,000 |
| | 12/29/2004 | 5,000 | $ 18.00 | $       90,000 |
| | 12/29/2004 | 5,000 | $ 18.05 | $       90,250 |
| | 12/29/2004 | 5,000 | $ 18.20 | $       91,000 |
| | 12/29/2004 | 4,000 | $ 18.15 | $       72,600 |
| | 12/29/2004 | 3,000 | $ 18.01 | $       54,030 |
| | 12/29/2004 | 2,000 | $ 18.00 | $       36,000 |
| | 12/29/2004 | 2,000 | $ 18.18 | $       36,360 |
| | 12/29/2004 | 2,000 | $ 18.19 | $       36,380 |
| | 12/29/2004 | 1,976 | $ 18.01 | $       35,588 |
| | 12/29/2004 | 1,400 | $ 18.23 | $       25,522 |
| | 12/29/2004 | 1,000 | $ 17.90 | $       17,900 |

|  | 12/29/2004 | 1,000 | $ 17.95 | $ | 17,950 |
|  | 12/29/2004 | 1,000 | $ 17.97 | $ | 17,970 |
|  | 12/29/2004 | 1,000 | $ 17.98 | $ | 17,980 |
|  | 12/29/2004 | 1,000 | $ 18.02 | $ | 18,020 |
|  | 12/29/2004 | 800 | $ 18.19 | $ | 14,552 |
|  | 12/29/2004 | 715 | $ 18.14 | $ | 12,970 |
|  | 12/29/2004 | 665 | $ 18.36 | $ | 12,209 |
|  | 12/29/2004 | 444 | $ 18.09 | $ | 8,032 |
|  | 4Q2004 Totals: | 169,000 |  | $ | 3,286,873 |
| PISARIS-HENDERSON | 10/4/2004 | 25,000 | $ 20.00 | $ | 500,000 |
|  | 10/7/2004 | 130,000 | $ 20.51 | $ | 2,666,300 |
|  | 10/7/2004 | 130,000 | $ 20.51 | $ | 2,666,300 |
|  | 4Q2004 Totals | 155,000 |  | $ | 3,166,300 |
| P. THUNE | 10/4/2004 | 1,528 | $ 20.25 | $ | 30,942 |
|  | 10/6/2004 | 23,472 | $ 20.25 | $ | 475,308 |
|  | 4Q2004 Totals | 25,000 |  | $ | 506,250 |

115.    As a result of the unusual timing of the Selling Insiders' transactions above, Selling Insiders collectively profited just shy of $7 million during the last quarter in which outside investors were kept in the dark about Findwhat's "questionable" distribution partners.

### 3.    Fiscal Year 2005 False Statements and Reasons For Falsity

116.    On February 23, 2005, FindWhat announced its results for the fourth quarter and year end 2004.  The release stated that it had "increased revenue for 21 sequential quarters, with record Q4 2004 revenue of $59 million, an increase of 179% over Q4 2003 revenue of $21 million. For the year ended December 31, 2004, FindWhat.com achieved record revenue of $169 million, a 135% increase over full year 2003 revenue of $72 million."

117.    On the same date the Company also issued its guidance for the first quarter and full year of fiscal year 2005.  Specifically, the Company projected first quarter 2005 revenue at $55 - $59 million, and total fiscal year 2005 revenue at $250 - $270 million.  Defendants further projected first quarter 2005 EBITDA between $8 and $10 million, fiscal year 2005 EBITDA between $45 and $54 million, first quarter 2005 adjusted earnings per share at $0.12 - $0.85,

fiscal year 2005 earnings per share at $0.69 - $0.85, first quarter 2005 GAAP-basis earnings per share at $0.08 - $0.11, and fiscal year 2005 GAAP-basis earnings per share at $0.53 and $0.69.

118.    On the same date, Defendants Pisaris-Henderson and Agius participated in a conference call with analysts, wherein Defendant Agius reiterated the Company's guidance for fiscal year 2005: "For full-year 2005, we project revenue between 250 and 270 million, EBITDA between 45 and 54 million, adjusted EPS between 59 and 85 cents, and GAAP EPS between 53 and 69 cents. Our full-year 2005 diluted shares are estimate at 34 million."

119.    Defendant Pisaris-Henderson fielded a question from ThinkEquity analyst Stewart Barry regarding the "correlation between higher quality traffic and paying higher TAC rates to distribution partners," as follows:

> We actually do have relationships with various distribution partners where we go and incentivize them with a higher TAC so to speak or higher revenue share if they produced more quality traffic. And that is really the advantage. That is the point of our second phase. We are now in the position to look at distribution partner A and distribution partner B. We are in the past in our other systems. All we really measure them by were how many clicks they delivered.

> (technical difficulty) – we don't look at those partners anymore. Now we say distribution partner A. We see the quality of your traffic from a convergence perspective. We're willing to give you 50 percent TAC. For distribution partner B, you are at 45 percent now. If you can increase your quality, we maybe willing to give you additional revenue share, possibly incentivize you by an additional 5 percent if you can exceed a certain quality metric or volumetric based on again quality traffic.

120.    Defendant Pisaris-Henderson also expanded upon the Company's quality of advertisement, revealing that the Company had, during the fourth quarter of 2005, removed numerous non-quality traffic sources that had been deriving substantial revenue each day, in the Company's attempt to "deliver traffic that converts rather than just clicks alone," as follows:

> Third, we believe that lead quality should be and is becoming increasingly important to advertisers, and recent press coverage has focused substantial attention on the click broad issue and how it effects lead quality. For several

years, we have understood the issue and have been investing heavily in protecting the integrity of our networks through both automated and human systems, thereby limiting our exposure to the issue.

That said, we believe that ultimately the value of a lead is best determined by whether that lead actually converts to a sale. Our recent acquisition of Miva empowers our visibility into the click stream, and for businesses with Miva storefronts, we are now able to track and add from the first click through to the point-of-sale. We don't need to employ intuition or advanced algorithms to determine whether traffic sources are good or bad. We are creating a single transparent platform that combines relevant advertising with the visibility to measure conversion rather than clicks alone, thereby giving us the ability to remove traffic sources from our networks that do not meet our high standard of conversion metrics, aligning our interest with those of our advertisers.

**In fact, during Q4 we intentionally removed numerous traffic sources that would otherwise have produced approximately $70,000 of revenue per day.** This action further illustrates our long-term view towards maintaining high standards and delivering high-quality leads to our advertisers.

**Let me repeat we have intentionally removed traffic sources from our distribution network that would otherwise have produced approximately $70,000 of revenue per day in topline revenue. Again, our focus is to deliver traffic that converts rather than just clicks alone.**

Although in the short-term allowing this traffic within our network could reduce revenues, we believe we're best served in the long-term by leading the industry through the creation of a transparent platform that will further differentiate our Company within the performance-based marketing world. [Emphasis added]

121.    On March 16, 2005, the Company filed with the SEC its Form 10-K for the year

ending December 31, 2004. The Form 10-K was signed by each of the Individual Defendants,

and included certifications from Defendants Pisaris-Henderson and Thune, as required by

Section 906 of the Sarbanes-Oxley Act of 2002, that to the best of their knowledge, the quarterly

report "fully complies with the requirements of Section 13(a) or 15(d), of the Securities

Exchange Act of 1934," and "the information contained in the Report fairly presents, in all

material respects, the financial condition and results of operations of the Company."

122.    The Form 10-K misled investors into believing that the Company did not rely on the use of "spyware for any purpose" in its business, and included a definition of "spyware," as follows:

> Additionally, the U.S. Congress and some state legislatures have introduced legislation designed to regulate "spyware," which has not been precisely defined, but which is often defined as software installed on consumers' computers without their informed consent and which is designed to gather and, in some cases, disseminate information about those consumers, including personally identifiable information, without the consumers' consent. **We do not rely on "spyware" for any purpose and it is not part of our product offerings**, but the definition of spyware or proposed legislation relating to spyware may be broadly defined or interpreted to include legitimate ad-serving software, including toolbar offerings currently provided by our Primary Traffic division. Currently, legislation has focused on providing Internet users with notification of and the ability to consent or decline the installation of such software, but there can be no guarantee that future legislation will not provide more burdensome standards by which software can be downloaded onto consumers' computers. **Currently all downloadable software that we distribute requires an express consent of the consumer and provides consumers with an easy mechanism to delete the software once downloaded**. However, if future legislation is adopted which makes the consent, notice or uninstall procedures more onerous, we may have to develop new technology or methods to provide our services or discontinue those services in some jurisdictions or altogether. There is no guarantee we will be able to develop this new technology at all or in a timely fashion or on commercially reasonable terms. [Emphasis added]

> *        *        *

> Legislation has also been introduced in the U.S. Congress that some state legislatures that is designed to regulate spyware, which does not have a precise definition but is often known as software installed on consumers' computers without their informed consent that gathers and may disseminate information about such consumers, including personally identifiable information, without the consumers' consent.

123.    The Form 10-K also suggested that the Company took great care to assure that it was minimizing click-through fraud, and represented that the Company would readily issue refunds for any such fraudulent clicks, as follows:

> We have implemented screening policies and procedures to minimize the effects of these fraudulent clicks. **We believe that these policies and procedures assist us in detecting fraudulent click-throughs, which are not billed to our**

**advertisers.**  However, it is difficult to detect all fraudulent clicks and detection may become more difficult in the future if third parties implement more sophisticated fraudulent click-through schemes.  To the extent that we are unable to detect click-through fraud, we may refund revenue that our advertiser have paid to us that is later discovered to be attributed to these fraudulent click-throughs.  If we find new evidence of past fraudulent clicks, we may have to issue refunds to advertisers retroactively for amounts previously paid to our FindWhat.com or Espotting Network distribution partners. [Emphasis added]

*      *      *

From time to time, we receive fraudulent clicks on our ads by persons seeking to increase the advertising fees paid to distribution partners within our FindWhat.com and Espotting Networks.  Click-through fraud occurs when a person or program clicks on an advertisement displayed on a website for the purpose of generating a click-through payment to the FindWhat.com and Espotting Networks partner rather than to view the underlying content.  **We have developed automated proprietary screening applications and procedures to minimize the effects of these fraudulent clicks**.  Click-throughs received through the FindWhat.com and Espotting Networks and through our private label partners' networks are evaluated by these screening applications and procedures. We constantly evaluate the efficacy of our efforts to combat click-through fraud, and may adjust our efforts for specific distribution partners or in general, depending on our ongoing analysis.  These changes impact the number of click-throughs we record and bill to our advertisers, the bid prices our advertisers are willing to pay us for click-throughs and the revenue we generate.

124.    Moreover, although Defendants revealed that "Internet traffic purchases from one distribution partner represented over 10% of total revenue" in 2002 and 2003, the 2004 Form 10-K misled investors to believe that no traffic purchased from any distribution partner represented over 10% of consolidated revenue in 2004, as follows:

During 2004 and 2003, no advertiser account represented more than 10% of our total revenue.  We purchase Internet traffic from our distribution partners. Expressed as a percentage of revenue, **none of the traffic purchased from any of these distribution partners represented over 10% of consolidated revenue in 2004.**  Internet traffic purchases from one distribution partner in 2003 represented more than 10% of total revenue.  [Emphasis added]

125.    In addition, although the Company admitted in the Form 10-K that it removed "one or more distribution partners from [its] network at various times" during 2003 "and as a matter of ongoing business practice," Defendants represented that "the impact to [the

Company's] revenue was not significant to the quarter or the year when [the distribution

partner(s)] were removed."

126.    Lastly, the Form 10-K revealed that an impairment existed for Miva's goodwill,

and that Defendants were taking a goodwill impairment charge of $1.1 million, as follows:

> During 2004, Miva's operating performance and resulting cash flow from
> operations did not meet expectations. Based on these trends, Miva's earnings
> forecast was revised in the fourth quarter of 2004. We undertook our normal
> annual assessment of goodwill and indefinite-lived intangible assets under the
> provisions of FASB Statement No. 142, *Goodwill and Other Intangible Assets*
> during the fourth quarter of 2004, and **determined that an impairment existed.**
> Accordingly, we completed the step two analysis as prescribed by FASB
> Statement No. 142, **resulting in a goodwill impairment of $1.1 million that was
> recorded in the fourth quarter of 2004.** [Emphasis added]

127.    Defendants' statements above are false and misleading for the reasons stated

throughout this Complaint, including that:

a.    Contrary to their representations that the Company did not rely on

"spyware" for any purpose, defendants were well aware – and in fact had been directly

confronted with Saveli and Dmitris use of click fraud to bolster revenues. Despite defendants'

assurances in the 10-K that Findwhat had a rigorous screening policy to prevent click fraud, they

knew that the majority of their distribution network was reliant on click-fraud.

b.    The estimates above were false and misleading when made because

Defendants knew that a significant portion of their revenue was derived from questionable

sources. Moreover, Defendants knew that the "questionable sources" of traffic they allegedly

shut off during the 4Q2004 were still producing questionable revenue that inflated the

Company's revenue for the reasons stated above.

c.    Defendants failed to disclose the Company's reliance on improper revenue

generating practices of its largest distribution partners and as a result falsely recognized revenue

in violation of GAAP and SEC Regulations as discussed further in ¶¶142-170.

## VI.     DEFENDANTS' OMISSIONS AND FAILURE TO REVEAL THE TRUTH

128.     In addition to the false and misleading statements described in detail throughout this Complaint, Defendants also failed to disclose the truth regarding Findwhat's financial condition.  Specifically, and in addition to the other omissions described in this Complaint, Defendants failed to tell the public that: a) the Company was materially dependent upon distribution partners employment of spyware to generate fraudulent revenue as described throughout this Complaint; b) the Company was experiencing a material adverse trend in its revenue per click which directly impacted the Company's revenue; and c) Miva was not performing to expectations and as a result, required an impairment of the goodwill associated with its acquisition.  These omissions, which were required to be disclosed, rendered Findwhat's public statements and SEC Filings materially false and misleading.

### A.     THE TRUTH BEGINS TO EMERGE

129.     On February 23, 2005, the Company during its earnings conference call partially disclosed that it was experiencing problems with the quality of traffic its distribution partners were generating.  As a result of the disclosure of the problem with low quality traffic as detailed above, the price of Findwhat stock dropped from its previous close of $13.45 per share to $10.95 per share, or 19 percent.

130.     On May 2, 2005, FindWhat.com filed a Form 8-K with the SEC announcing that its independent auditor, Ernst and Young LLP ("E&Y"), had resigned.  The filing stated in relevant part:

> • On April 26, 2005, E&Y reported to the Company and its Audit Committee chairman that **the Company and E&Y had a disagreement with respect to the need to recognize an impairment of goodwill in connection with the Company's 2004 consolidated financial statements**. The Company recorded an adjustment in its 2004 consolidated financial statements, which resolved the matter to the satisfaction of E&Y. The Company's Audit Committee has

discussed this matter with E&Y and has authorized E&Y to respond fully to the inquiries of the successor accountant concerning the subject of the disagreement.

From the date of E&Ys engagement on March 18, 2003 through the date of its resignation notification to the Company on April 26, 2005, there were no reportable events described under Item 304(a)(1)(v) of Regulation S-K, within either of the past two fiscal years ended December 31, 2004 and December 31, 2003 and for the subsequent period through the date hereof, except as described below:

• In the Company's Amendment No. 1 to its Annual Report on Form 10-K/A, which the Company filed with the SEC on May 2, 2005, managements Annual Report on the Internal Control over Financial Reporting stated, and **E&Ys report on internal controls stated, that because of the material weaknesses disclosed in those reports, the Company's internal control over financial reporting was not effective as of December 31, 2004**, based on the COSO criteria. E&Y advised the Company of six material weaknesses in the Company's system of internal control over financial reporting, which are disclosed in those reports, and these matters relate to (i) purchase accounting, (ii) goodwill impairment, (iii) revenue recognition for private label agreements and other revenue agreements, excluding those related to FindWhat.com Network revenue, (iv) personnel resources and technical accounting expertise, (v) quarterly and year-end financial statement close and review process, and (vi) segregation of duties.  [emphasis added]

131.    That same day the Company filed a Form 10-K/A with the SEC, amending its

previously filed Form 10-K for fiscal year 2004.

132.    The Form 10-K/A revealed that during the second half of the fourth quarter of

2004, Defendants finally "ceased displaying advertisements with distribution partners and

affiliates of distribution partners whose traffic did not adequately convert to revenue for our

advertisers in conjunction with our continued efforts to increase the quality of the Internet users

accessing our customers' advertisements."  As calculated at the end of the fourth quarter, "the

removal of these distribution partners reduced [the Company's] average click-through revenue

by approximately $70,000 per day compared to what each such distribution partner had been

producing on a daily basis immediately prior to removal."  Defendants again revealed that,

during fiscal year 2003, the Company "removed one or more distribution partners from [its]

network at various times, however the impact to our revenue was not significant to the quarter or the year when they were removed.

133.    Immediately following the Company's release, FindWhat.com's stock plummeted, on usually high trading volume of 5.8 million shares, from its closing price of $7.75 on May 2, 2005, to a closing price of $5.71 on May 3, 2005.

134.    On May 5, 2005, before the market opened, the Company announced its first quarter 2005 results.  The press release issued that day, the relevant parts of which appear below, also announced the resignation of the Defendant Agius as FindWhat's CFO.

**The Company announced that it has accepted the resignation of Brenda Agius as the Company's chief financial officer, effective as of May 4, 2005.**

With respect to the Company's results, Mr. Pisaris-Henderson said, "We are pleased with our first quarter 2005 results, especially given the steps we took in the fourth quarter of 2004 to remove traffic sources that did not meet our standards in terms of conversions and return on investment for our advertisers. Moving forward, we remain committed to developing a global, full service platform for small and medium-sized businesses that delivers high-quality leads, maximizes monetization opportunities for our partners, and enables advertisers to measure returns through conversion analytics, helping them grow their businesses."

FindWhat.com also said that in recent weeks it has been removing certain distribution partners, representing a meaningful percentage of daily click-through revenue thereby negatively affecting the Company's short-term financial performance. The Company believes these partners and/or their sub-affiliates had developed methods for obtaining new users that did not follow the Company's distribution guidelines.

Mr. Pisaris-Henderson said, "Undeniably, it is difficult to turn off partners that had produced substantial revenue for our Company. Nevertheless, we remain committed to leading this industry in the implementation of, and adherence to, best practices with respect to delivering high quality prospects from trusted sources to our advertisers. To this end, we will continue to strive to work with our partners to ensure that we foster and maintain high standards in this area. We believe this is absolutely critical for the end users of our services and for our own long-term prospects."

<u>First Quarter Results</u>

Revenue was $58.2 million in Q1 2005, an increase of 136% over Q1 2004 revenue of $24.7 million. GAAP net income was $3.2 million, or $0.10 per diluted share, in Q1 2005, compared to $3.8 million, or $0.16 per diluted share, for the same period in 2004. EBITDA was $8.4 million, an increase of 23% over Q1 2004 EBITDA of $6.8 million. Adjusted EPS was $0.14 per diluted share in Q1 2005, compared to $0.16 per diluted share for the same period in 2004. Amortization expense in Q1 2005 was $2.0 million, compared to $189,000 for the same period in 2004. The increase in non-cash amortization expense from Q1 2004 to Q1 2005 reflects amortization of intangible assets resulting from 2004 mergers and acquisitions.

The Company's Q1 2005 revenue and expenses increased substantially versus the same period in 2004, primarily due to the inclusion of operating results from the mergers and acquisitions completed in 2004. Results for the first quarter of 2004 include Miva for the entire period and Comet from its acquisition on March 22, 2004.

2005 Guidance

As previously reported, in the first half of 2005, the Company's EBITDA is being impacted by several factors including new or expanded investments associated with its global marketing and FAST search technology initiatives, rising legal fees resulting from its patent litigation with Overture and significantly higher accounting fees associated with its audit, financial reviews and Sarbanes-Oxley Act compliance. FindWhat.com expects the impact of these factors to decline in the second half of the year.

After taking into consideration the Company's efforts with respect to the sourcing of its traffic, and excluding any potential impact of the outcome of the Overture litigation, FindWhat.com expects Q2 2005 revenue to be between $40 and $50 million, and anticipates full year 2005 revenue to be between $175 and $200 million.

135.    Later that day, Defendants Thune and Pisaris-Henderson participated in a conference call with analysts and investors.  During this call, Defendant Pisaris-Henderson finally revealed to the public that "a couple" of the Company's distribution partners had been employing "capabilities…to get additional traffic that just simply don't adhere to our standards." Defendants were fully aware that these two partners, identified as Dmitri and Saveli by four former managerial level employees with personal knowledge, not only utilized these means of obtaining additional traffic since before the start of the Class Period, but also accounted for a material portion of Findwhat revenue.

136.    Defendant Pisaris-Henderson emphasized that the Company still employed a "rigorous process of evaluating a partner," as follows:

> But in terms of our manual processes that we walk through, we are told on a pretty regular basis that we are probably the toughest, one of the toughest if not the toughest, companies so to speak that goes through a rigorous process of evaluating a partner.  So, that being said, **we are very confident that the practices we have in place are very effective and in making sure that we do not have the partners that startup, if you will, with a negative or a less than honorable intention**, if you will.  [emphasis added]

137.    Defendant Thune clarified the timing of the discovery of the "less than honorable" distribution partners as in "recent days or last couple of weeks."

138.    On May 5, 2005, in response to the news, the stock price plummeted from a closing price of $6.16 on May 4, 2005, to close at $4.83 on May 5, 2005 - a one-day drop of 21.6%.

## VII.    POST CLASS PERIOD EVENTS

139.    Even after the end of the class period, Defendant Thune could not resist another opportunity to mislead the investing public.  Thune offered the following quote in the *Wall Street Journal* on May 11, 2005:  "We will not have our software sneak onto somebody's computer, and they don't know it's happening."  According to three former managerial employees with personal knowledge that were employed with the Company during this period, Savelli was the number one volume leader in terms of revenue and traffic for May 2005 and he continues to produce spyware generated revenue for Findwhat to this day.  Apparently, like they did in the 4Q2004, Defendants are using the removal of questionable traffic as a scapegoat for their declining revenues.

140.    Then, on August 15, 2005, the Company filed its Form 10-Q for 2Q05 with the SEC, in which the Company stated that it would be taking an estimated $119 million non-cash

impairment charge related to goodwill and other intangible assets. The Company set forth the

reasons for the impairment charge as follows:

> During the second quarter of 2005, our earnings forecasts were updated for each
> of our divisions to reflect events that occurred during the quarter that changed our
> expected business prospects including reduced traffic generated by our
> distribution partners, and lower-than-expected profitability at our MIVA Direct
> and MIVA Small Business divisions. In addition, during the second quarter of
> 2005, our stock price declined significantly resulting in our market capitalization
> falling below the amount of our recorded equity. As a result of these indicators,
> we performed a test to determine if the carrying amount of goodwill and other
> indefinite-lived intangibles were impaired.

These tests in fact indicated that "the carrying amount of the reporting units exceeded their fair

value," leading the Company to conclude that its goodwill was impaired. However, the $119

million is only an estimated figure, as the Company has not yet finalized this amount, and as

such, the actual charge may be even higher.

## VIII.  FINDWHAT'S FINANCIAL STATEMENTS AND FINANCIAL DISCLOSURES DURING THE CLASS PERIOD WERE MATERIALLY FALSE AND MISLEADING

141.    At all relevant times during the Class Period, FindWhat represented that its

financial statements were prepared in accordance with Generally Accepted Accounting

Principles ("GAAP").[14]  These representations were materially false and misleading because

FindWhat employed improper accounting practices which violated GAAP and the SEC's

accounting and disclosure rules and regulations and materially distorted the Company's true

operating performance during the Class Period.

---

[14] GAAP are those principles recognized by the accounting profession as the conventions, rules
and procedures necessary to define accepted accounting practice at a particular time.  Generally
Accepted Auditing Standard ("GAAS") §AU 411.02.  Regulation S-X [17 C.F.S §210.4-
01(a)(1)] states that financial statements filed with the SEC that are not prepared in conformity
with GAAP are presumed to be misleading and inaccurate.

A.    **FindWhat's Financial Statements During the Class Period Did Not Conform with GAAP**

142.    Defendants had the obligation to assure that the financial information disseminated by FindWhat, including those in its press releases and in its financial statements filed with the SEC, were fairly stated in conformity with GAAP.

143.    During the Class Period, FindWhat disclosed the following with respect to its revenue recognition policy:

> Revenues are generated primarily through click-throughs on our managed advertisers' paid listings (ad). When an Internet user clicks on a sponsored advertisement in the FindWhat.com Network, revenues are recognized in the amount of the advertiser's bid price. Revenues are also generated from the Company's private label service and are recognized in accordance with the contractual revenue share payment agreement as the services are rendered.  In accordance with the guidance of Emerging Issue Task Force No. 99-19, "Reporting Revenue Gross as a Principal Versus Net as an Agent," the Company records FindWhat.com Network click-through revenues gross and private label revenues net.

144.    GAAP provides that revenue should not be recognized until it is realized or realizable and earned.  The conditions for revenue recognition ordinarily are met when persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the seller's price is fixed or determinable, collectibility of the sales price is reasonably assured and when the entity has substantially performed the obligations which entitle it to the benefits represented by the revenue.  SEC SAB Nos. 101 and 104;[15] FASB Concept Statement Nos. 2 and 5; FASB Statement of Financial Accounting Standards ("SFAS") No. 48; Accounting

---

[15] In December 2003, SAB No. 101 was superceded by SAB No. 104, which updated portions of SAB No. 101 to make it consistent with then current authoritative accounting guidance.  The principal revisions to SAB No. 101 included the deletion of certain interpretive guidance because of the issuance of private sector U.S. GAAP, and the incorporation of certain sections of the SEC's Staff's interpretation of "Revenue Recognition in Financial Statements "Frequently Asked Questions and Answers" into SAB No. 101.

Research Bulletin ("ARB") No. 43; APB Opinion No. 10; and American Institute of Certified Public Accountants ("AICPA") Statement of Position ("SOP") 97-2.[16]

145.    As noted in detail here, FindWhat reported tens of millions of dollars in revenues from improper spyware and adware practices during the Class Period.  FindWhat's recognition and reporting of revenue from such practices violated GAAP because such revenues were not earned at the time they were recognized.  In fact, numerous witnesses have stated that it was widely understood at FindWhat that a material amount of the Company's reported revenues were the result of sham computer techniques employed by Dmitri and Saveli and that such techniques were designed solely to generate falsely inflated click-through results.

146.    In fact, confidential witnesses have stated that FindWhat reported as much as $70,000 *a day* from such fraudulent practices during the Class Period.  Defendants knew or recklessly ignored, FindWhat's recognition and reporting of revenue from such fraudulent practices was improper and materially inflated the Company's reported operating results during the Class Period because the Company did not perform bone-fide services entitling it to the benefits of its reported revenue.  As a result, FindWhat's revenues were not earned at the time they were recognized.

147.    Indeed, the Defendants' intent to inflate the Company's reported revenue is otherwise evidenced by the fact that the SEC issued numerous statements during the Class Period warning its registrants to be ever vigilant about the bone-fides of their revenue recognition practices.

---

[16] SOP 97-2 was amended in 1998 by SOP 98-4 and further amended more recently by SOP 98-9.  In addition, the AICPA publishes Technical Practice Aids ("TPA") which provide answers to technical questions about software revenue recognition.

148.    Moreover, the Company's improper revenue recognition practices provided it with a means, albeit a false one, to improperly delay the recognition of its impaired goodwill.

149.    GAAP, in SFAS No. 142, provides that goodwill is to be tested for impairment on an annual basis and whenever indicators of impairment arise.[17]

150.    In furtherance of Defendants' on-going scheme to inflate the Company's operating results during the Class Period, FindWhat improperly delayed recording an impairment in the value of its reported goodwill during the Class Period.  Indeed, FindWhat's fraudulently reported revenues provided it with a ruse to allow its impaired goodwill to go unrecorded. Ultimately, however, after the end of the Class Period, FindWhat reported a $119 million impairment in the value of its goodwill and its common stock declined considerably as a result.

**B.    FindWhat's Financial Disclosures during the Class Period Were Materially False and Misleading**

151.    GAAP, as noted in §503.02.b of the SEC's Codification of Financial Reporting Policies ("CFRP"), requires SEC registrants to **name** each customer and its "relationship to registrant" when a potential loss of  "a single or few customers" would have an adverse effect on the registrant and its subsidiaries taken as a whole.  The above noted CFRP states that the disclosure of "the names of certain customers has been required for a number of years" and that "the Commission believes this information is material to investors."

152.    In violation of the above SEC mandate, FindWhat's filings made with the SEC failed to identify Saveli and Dmitri as its major customers or the nature of their relationship with

---

[17] Pursuant to SFAS No, 142, goodwill is tested for impairment using a two-step approach.  The first step is to make a comparison of the fair value of a reporting unit, including goodwill, to its carrying amount.  If the fair value of the reporting unit is greater than its carrying amount, goodwill is not considered impaired and the second step is not required.  However, if the fair value of the reporting unit is less than its carrying amount, the second step of the impairment test must be performed to measure the amount of the impairment loss, if any.  If the carrying amount of goodwill exceeds its implied fair value, an impairment loss is recognized equal to that excess.

FindWhat during the Class Period. As a result, investors were precluded from determining the true quality of FindWhat's earnings in that they were unable to assess whether the Company's major customers were established, industry leading entities or just two "young Russian kids."

> **C.** **FindWhat's False and Misleading Reporting and Certifications of Disclosure and Internal Controls**

153.     As a result of the rash of recent corporate accounting scandals, Congress enacted the Sarbanes-Oxley Act ("SOX") in 2002, in part, to heighten the responsibility of public company directors and senior managers associated with the quality of financial reporting and disclosures made by their companies. As a result, FindWhat's 2003 Form 10-K, which included the Company's false and misleading financial statements and/or financial information for the year then ended, included the following statement:

> Under the supervision and with the participation of our management, ***including our Chief Executive Officer and Chief Financial Officer, we evaluated the effectiveness of the design and operation of our disclosure controls and procedures*** (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")). Based on that evaluation, our ***Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of the period covered by this report, our disclosure controls and procedures are adequately designed to ensure that information required to be disclosed by us*** in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the applicable rules and forms. During the period covered by this Annual Report on Form 10-K, there was no change in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) that materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. [emphasis added]

154.     Subsequently, in its interim 2004 Forms 10-Q filed with the SEC, FindWhat disclosed:

> As of the end of the period covered by this report, we carried out an evaluation, under the supervision and with the participation of ***our principal executive officer and principal financial officer***, of the effectiveness of the design and operation of our disclosure controls and procedures. ***Based on this evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures as of the end of the period covered by this report are***

*effective to provide reasonable assurance that our disclosure controls and procedures will timely alert them to material information required to be included in our periodic SEC reports.*

As of the end of the period covered by this report, there has been no change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15(d)-15(f) of the Securities Exchange Act of 1934, as amended) during the quarter to which this report relates that has materially affected or is reasonably likely to materially affect, our internal control over financial reporting.  [emphasis added]

155.    Evidencing their intent to mislead investors, the above materially false and

misleading disclosures were falsely and misleadingly certified as follows in all material respects

by Defendants Pisaris-Henderson, Agius and Thune:

I have reviewed this . . . report on Form . . . of FindWhat.com, Inc.;

Based on my knowledge, this . . . *report does not contain any untrue statement of a material fact or omit to state a material fact* necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

Based on my knowledge, *the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;*

*The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures* (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over the financial reporting (as defined in Exchange Act rules 13a-15(f) and 15d-15(f)), for the registrant and have:

a)    *Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others* within those entities, particularly during the period in which this report is being prepared;

b)    *Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements* for external purposes in accordance with generally accepted accounting principles;

c)    *Evaluated the effectiveness of the registrant's disclosure controls and procedures* and presented in this report our conclusions about the

- 57 -

effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.  [emphasis added]

**D.      Internal Control Deficiencies**

156.    Near the end of the Class Period, FindWhat, in its fiscal 2004 Form 10-K, admitted that its representations about its internal and disclosure controls during the early part of Class Period, and defendants Pisaris-Henderson, Agius and Thune certifications thereon, were materially false and misleading in, at least, the following respects:

a.      FindWhat had insufficient controls over the determination and application of generally accepted accounting principles with respect to revenue recognition for its private label agreements and other revenue agreements;

b.      FindWhat had insufficient controls over the determination and application of generally accepted accounting principles with respect to evaluating and measuring impairment of goodwill;

       c.     Findwhat had insufficient controls over the determination and application of generally accepted accounting principles with respect to purchase accounting for certain 2004 acquisitions;

       d.     FindWhat had insufficient personnel resources and technical accounting expertise within the accounting function to resolve non-routine or complex accounting matters; and

       e.     Findwhat had insufficient controls over and review of the quarterly and year-end financial statement close and review process.

157.    In addition, FindWhat's fiscal 2004 Form 10-K disclosed that:

We, and our independent registered public accounting firm, have not completed the documentation, testing or assessment of all of the items required by Section 404 of the Sarbanes-Oxley Act of 2002 and we will avail ourselves of the 45-day exemptive order to complete such assessment provided under SEC Release No. 34-50754. Therefore, as permitted by the SEC exemptive order, we have not included in this Annual Report on Form 10-K our Management's Annual Report on Internal Control Over Financial Reporting or the related Attestation Report of our Independent Registered Public Accounting Firm. However, we have identified material weaknesses in our internal control over financial reporting based on the procedures completed to date.  As defined by the Public Company Accounting Oversight Board ("PCAOB") in Auditing Standard No. 2, a material weakness is a significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. Because we have material weaknesses, we will not be able to conclude in our Management's Annual Report on Internal Control Over Financial Reporting that our internal control over financial reporting is effective.

***These weaknesses affected several financial* statement *accounts, including accounts receivable and allowance for doubtful accounts, goodwill, deferred revenue***, accrued expenses, stockholders' equity, ***revenues*** and various expense accounts.

The identification of these material weaknesses is based on findings to date.  ***Due to the incomplete status of all procedures***, we cannot be certain that either we or our independent registered public accounting firm will not identify additional material weaknesses between the date of this Annual Report and the date our Management's Annual Report on Internal Control Over Financial Reporting is filed.

Based on our evaluation to date, we do not believe that these material weaknesses materially impacted the financial information for prior periods. Accordingly, we currently do not expect that we will be required to restate our financial statements for any prior periods.

In addition, we elected to exclude our wholly-owned subsidiary, Espotting, which we acquired on July 1, 2004 from the scope of the 2004 evaluation of our internal control over financial reporting, as permitted by the SEC's June 23, 2004 implementation guidance to issuers relating to the SEC's final rules on internal control over financial reporting. As of December 31, 2004, Espotting represented $240.4 million of our total assets, $207.0 million of our net assets, $57.3 million of revenues and $3.4 million of net income. Neither we, nor our independent registered public accounting firm, have evaluated the internal controls of Espotting and therefore our conclusions and those of our independent registered public accounting firm will not extend to the internal control over financial reporting of Espotting. Accordingly, we may have material weaknesses, significant deficiencies or deficiencies in Espotting's operations which will not be assessed or identified by management or our independent registered public accounting firm this year.  [emphasis added]

### E.    Disclosure Control Deficiencies

158.    During the Class Period, Defendants' disclosures associated with FindWhat's disclosure controls were repeatedly false and misleading because:

a.    FindWhat's revenue recognition policy with respect to its spyware and adware practices violated GAAP;

b.    FindWhat failed to disclose its significant customers in accordance with SEC reporting requirements;

c.    FindWhat failed to disclose the numerous internal control deficiencies;

d.    Defendants Pisaris-Henderson, Agius and Thune failed to design and evaluate the effectiveness of FindWhat's disclosure controls and procedures; and

e.    Defendants Pisaris-Henderson, Agius and Thune falsely certified FindWhat's representations concerning its internal and disclosure controls.

**F.    FindWhat's Additional Violations of GAAP and SEC Financial Reporting Standards**

159.    During the Class Period, Defendants had the responsibility to select generally accepted accounting principles that were appropriate to reflect FindWhat's business activities in accordance with Section 13 of the Exchange Act of 1934.

160.    In violation of such responsibility, Defendants allowed improper and fraudulent accounting practices to go uncorrected thereby materially distorting FindWhat's operating performance during the Class Period.  In addition to the accounting improprieties stated above, FindWhat presented its financial statements during the Class Period in a manner which also violated at least the following provisions of GAAP:

a.    The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (Concepts Statement No. 1, ¶34);

b.    The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. 1, ¶40);

c.    The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, ¶50);

d.    The concept that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts Statement No. 1, ¶42);

e.    The concept that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, ¶¶58-59);

f.    The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, ¶79); and

g.    The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, ¶95, ¶97).

161.    In failing to file financial statements with the SEC which conformed to the requirements of GAAP, FindWhat disseminated financial statements that were presumptively misleading and inaccurate.  The Company's Class Period Forms 10-Q filed with the SEC were also materially false and misleading in that they failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a material adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations, as required by Item 303 of Regulation S-K.

G.    **Violations of SEC Regulations**

162.    Item 7 of Form 10-K and Item 2 of Form 10-Q, Management's Discussion and

Analysis of Financial Condition and Results of Operations ("MD&A") require the issuer to

furnish information required by Item 303 of Regulation S-K [17 C.F.R. 229.303].  In discussing

results of operations, Item 303 of Regulation S-K requires the registrant to:

> [d]escribe any known trends or uncertainties that have had or that the registrant
> reasonably expects will have a material favorable or unfavorable impact on net
> sales or revenues or income from continuing operations.

163.    The Instructions to Paragraph 303(a) further state:

> The discussion and analysis shall focus specifically on material events and
> uncertainties known to management that would cause reported financial
> information not to be necessarily indicative of future operating results. . .

164.    In addition, the SEC, in its May 18, 1989 Interpretive Release No. 34-26831, has

indicated that registrants should employ the following two-step analysis in determining when a

known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item

303 of Regulation S-K:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty
> is both presently known to management and is reasonably likely to have a
> material effect on the registrant's financial condition or results of operations.

165.    Nonetheless, FindWhat's Class Period Forms 10-K and 10-Q failed to disclose

that the Company's internal control system deficiencies, "pattern" of aggressive accounting for

the purpose of inflating FindWhat's operating results, including the employment of certain

practices that defrauded its customers by charging for PPC advertising traffic which was not

made or generated by bona fide transactions, which was reasonably likely to have a material

adverse effect on FindWhat's operating results, which was necessary for a proper understanding

and evaluation of the Company's operating performance and an informed investment decision.

**H.    FindWhat's Improper Failure To Disclose Contingent Liabilities And Significant Risks And Uncertainties**

166.    The FindWhat Defendants' attempt to deceive investors during the Class Period is also evidenced by the failure of FindWhat financial statements to disclose its contingent liabilities in conformity with GAAP.  GAAP requires that financial statements disclose contingencies when it is at least reasonably possible (i.e., a greater than slight chance) that a loss may have been incurred.  Statement of Financial Accounting Standards ("SFAS") No. 5 Accounting for Contingencies, ¶ 10 (March 1975).  The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss, a range of loss, or state that such an estimate cannot be made.  Id.

167.    The SEC considers the disclosure of loss contingencies to be so important to an informed investment decision that it issued Article 10-01 of Regulation S-X [17 C.F.R. § 210.10-01], which provides that disclosures in interim period financial statements may be abbreviated and need not duplicate the disclosure contained in the most recent audited financial statements, except that "where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred."

168.    In addition, GAAP requires that financial statements disclose significant risks and uncertainties associated with an entity's business.  See Statement of Position No. 94-6, Disclosure of Risks and Uncertainties (December 1994).

169.    In violation of GAAP, FindWhat's Class Period financial statements improperly failed to disclose that it engaged in certain practices that defrauded its customers by charging for PPC advertising traffic which was not made or generated by bona fide customers, exposing it to certain risks and uncertainties, including the risk of litigation.  For example, a class action complaint filed on February 17, 2005 against FindWhat and other PPC providers alleges that the:

- "Defendants overcharged Plaintiffs for internet PPC advertising"

- "Defendants knowingly and intentionally overcharged Plaintiffs"

- "Defendants and all others in the chain of advertising and/or revenue sharing scheme are liable for overcharging which may have been committed in whole or in part by third parties"

Nonetheless, FindWhat's financial statements, in violation of GAAP, failed to disclose the existence of these practices or the potential adverse consequences ensuing from such practices.

## COUNT I

### FOR VIOLATIONS OF SECTION 10(B) OF THE 1934 ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

170.    Lead Plaintiffs repeat and reallege the allegations set forth in the paragraphs above as though fully set forth herein.  This claim is asserted against all Defendants.

171.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of MIVA's publicly traded common stock; and (c) cause Lead Plaintiffs and other members of the Class to purchase MIVA stock at artificially inflated prices during the Class Period.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

172.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort

to maintain artificially high market prices for MIVA common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

173.    In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly-traded securities would be based on truthful, complete and accurate information.

174.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of MIVA as specified herein.

175.    Further, Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of MIVA's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about MIVA and its business, operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more

particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of MIVA securities during the Class Period.

176.    At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of MIVA, which were not disclosed by these Defendants, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their MIVA securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

177.    By virtue of the foregoing, Defendants have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

178.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

## <u>COUNT II</u>

### FOR VIOLATIONS OF SECTION 20(A) OF THE 1934 ACT AGAINST THE <u>INDIVIDUAL DEFENDANTS</u>

179.    Lead Plaintiffs repeat and reallege the allegations set forth in the paragraphs above as if set forth fully herein.  This claim is asserted against the Individual Defendants.

180.    The Individual Defendants acted as controlling persons of MIVA within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had

the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

181.    In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

182.    As set forth above, all Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. However, by virtue of their controlling position, the Individual Defendants are also liable pursuant to Section 20(a) of the Exchange Act.

183.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## IX.    CLASS ACTION ALLEGATIONS

184.    Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "Class") consisting of all persons or entities who purchased or otherwise acquired the common stock of MIVA between September 3, 2003 and May 4, 2005, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and/or directors of the Company, at all relevant times, members of their immediate families, any entity in which any Defendant has a controlling interest, and the

legal affiliates, representatives, heirs, controlling persons, successors, and predecessors in interest or assigns of any such excluded party.

185.    Because MIVA has millions of shares of common stock outstanding, and because the Company's common stock was actively traded on the NASDAQ National Market during the Class Period, members of the Class are so numerous that joinder of all members is impracticable. Indeed, as of August 9, 2005, MIVA had 30.7 million shares of common stock outstanding.[18] While the exact number of Class members can only be determined by appropriate discovery, Lead Plaintiffs believe that Class members number at least in the thousands and that they are geographically dispersed.  Nonetheless, record owners and other members of the Class may be identified from records maintained by Findwhat or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities fraud class actions.

186.    Lead Plaintiffs' claims are typical of the claims of the members of the Class, because Lead Plaintiffs and all of the Class members sustained damages arising out of Defendants' wrongful conduct, and in violation of the federal securities laws, identified herein.

187.    Lead Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel who are experienced and competent in class action and securities fraud litigation.  Further, Lead Plaintiffs have no interests that are contrary to or in conflict with the members of the Class that Lead Plaintiffs seek to represent.

188.    Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that Defendants have acted on

---

[18] Source: Bloomberg L.P.

grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

          i.      whether the federal securities laws were violated by Defendants' acts as alleged herein;

          ii.      whether the Company's annual and quarterly reports filed with the SEC contained material misstatements or omissions;

          iii.      whether the Company's other publicly disseminated releases and statements during the Class Period omitted and/or misrepresented material facts and whether Defendants breached any duty to convey material facts or to correct material facts previously disseminated;

          iv.      whether Defendants participated in and pursued the fraudulent scheme or course of business complained of;

          v.      whether Defendants acted willfully, with knowledge or recklessly, in omitting and/or misrepresenting material facts;

          vi.      whether the market prices of MIVA common stock during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

          vii.      whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

189.    In sum, a class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the

Class individually to redress the wrongs done to them.  There will be no difficulty in the

management of this action as a class action.

## X.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

190.   Plaintiffs will rely, in part, upon the presumption of reliance established by the

fraud-on-the-market doctrine in that, among other things, at all relevant times:

a.   Defendants made public misrepresentations or failed to disclose facts

during the Class Period;

b.   The omissions and misrepresentations were material;

c.   MIVA securities traded in an open and efficient market;

d.   The misrepresentations alleged would tend to induce a reasonable investor

to misjudge the value of the Company's securities; and

e.   Lead Plaintiffs and the other members of the Class purchased MIVA

securities between the time Defendants misrepresented or failed to disclose material facts and the

time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

191.   Indeed, at all relevant times, the market for MIVA securities was an open and

efficient market for the following reasons, among others:

a.   MIVA securities were listed and actively traded during the Class Period

on the NASDAQ national exchange, an open, highly efficient and automated market;

b.   As a regulated issuer, MIVA regularly made public filings, including its

Forms 10-K, Forms 10-Q and related press releases, with the SEC;

c.   MIVA was followed by securities and investment analysts from major

brokerages including:   Kaufman Bros. Equity Research, RBC Capital Markets, Marquis

Investment Research, Jeffries & Company, Inc., Adams Harknes, Craig-Hallum Capital

Croup LLC and Pacific Growth Equities. These securities and investment analysts wrote reports regarding Findwhat which were distributed to the brokerages' sales force, their customers, and the public at large; and

d.    MIVA regularly communicated with public investors via established market communication mechanisms, including the Company's website, regular disseminations of press releases on the major news wire services, and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

192.    As a result of the foregoing, the market for MIVA securities digested current information regarding the Company from the publicly available sources described above and reflected such information in the prices of MIVA's securities.

193.    Further, as would be expected where a security is traded in an efficient market, material news concerning MIVA's business had an immediate effect on the market price of MIVA's securities, as evidenced by the rapid decline in the market price in the immediate aftermath of MIVA's corrective disclosures as described herein. Under these circumstances, all purchasers of MIVA's securities during the Class Period suffered similar injury due to the fact that the price of MIVA securities was artificially inflated throughout the Class Period.

194.    Moreover, at the times they purchased or otherwise acquired MIVA's securities, Lead Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts. As a result, the presumption of reliance applies. Plaintiffs will also rely, in part, upon the presumption of reliance established by a material omission.

## XI.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Lead Plaintiffs, on their own behalf and on behalf of the Class, pray for judgment as follows:

A.        Declaring this action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.        Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest.

C.        Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including all counsel fees and expert fees; and

D.        Awarding such other relief as the Court may deem just and proper.

## XII.    <u>JURY TRIAL DEMANDED</u>

Plaintiffs demand a trial by jury.

Dated: August 16, 2005                    Respectfully submitted,

                                          **MILBERG WEISS BERSHAD &**
                                          **SCHULMAN LLP**


                                          By:  _s/ Maya Saxena_____
                                               Maya Saxena
                                               Fla. Bar No. 0095494
                                               msaxena@milbergweiss.com
                                               Christopher S. Polaszek
                                               Fla. Bar No. 0116866
                                               cpolaszek@milbergweiss.com
                                               Joseph E. White III
                                               Fla. Bar No. 0621064
                                               jwhite@milbergweiss.com
                                               Tower One, Suite 600
                                               5200 Town Center Circle
                                               Boca Raton, FL 33486
                                               Tel: (561) 361-5000
                                               Fax: (561) 367-8400

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on the 16th day of August, 2005, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system. I further certify that on the same date I mailed the foregoing document to counsel of record on the attached Service List.

s/ *Maya Saxena*
Milberg Weiss Bershad & Schulman LLP
5200 Town Center Circle
Tower One, Suite 600
Boca Raton, FL 33486
Tel: (561) 361-5000
Fax: (561) 367-8400

**Attorney for Plaintiff**

## Service List

| | |
|---|---|
| Gregory N. Woods<br>**PORTER WRIGHT MORRIS & ARTHUR, P.A.**<br>5801 Pelican Bay Blve., Suite 300<br>Naples, FL  34108<br>Tel:  (239) 593-2900<br>Fax:  (239) 593-2990<br><br>*Attorney for Defendants Findwhat.com, Craig Pisaris-Henderson, Brenda Agius, Frederick E. Guest and Phillip R. Thune* | Susan Hurd<br>Todd R. David<br>**ALSTON & BIRD, LLP**<br>1201 W. Peachtree St., N.E.<br>Atlanta, GA  30309-3424<br>Tel:  (404) 881-7000<br>Fax:  (404) 881-7777<br><br>*Attorneys for Defendants Findwhat.com, Craig Pisaris-Henderson, Brenda Agius, Frederick E. Guest and Phillip R. Thune* |
| Chris A. Barker<br>**BARKER, RODEMS & COOK P.A.**<br>300 W. Platt St., Suite 150<br>Tampa, FL  33606<br>Tel:  (813) 489-1001<br>Fax:  (813) 489-1008<br><br>*Attorney for Plaintiff Sunanda Desai* | Brian Murray<br>Eric J. Belfi<br>**MURRAY FRANK & SAILER, LLP**<br>275 Madison Avenue, Suite 801<br>New York, NY  10016<br>Tel:  (212) 682-1818<br>Fax:  (212) 682-1892<br><br>*Attorney for Plaintiff Jason Kohut* |
| William S. Lerach<br>Darren J. Robbins<br>**LERACH COUGHLIN STOIA GELLER RUDMAN ROBBINS LLP**<br>401 B St., Suite 1700<br>San Diego, CA  92101<br>Tel:  (619) 231-1058<br>Fax:  (619) 231-7423<br><br>*Attorney for Plaintiff Jason Kohut* | David George<br>Stephen R. Astley<br>**LERACH COUGHLIN STOIA GELLER RUDMAN ROBBINS LLP**<br>197 S. Federal Highway, Suite 200<br>Boca Raton, FL  33432<br>Tel:  (561) 750-3000<br>Fax:  (561) 750-3364<br><br>*Attorney for Plaintiff Jason Kohut* |
| Charles Piven<br>**LAW OFFICES OF CHARLES J. PIVEN, P.A.**<br>World Trade Center, Suite 2525<br>401 E. Pratt St.<br>Baltimore, MD  21202<br>Tel:  (410) 332-0030<br>Fax:  (410) 685-1300<br><br>*Attorney for Plaintiff Vision Wealth Management* | Marc A. Topaz<br>Richard A. Maniskas<br>Tamara Skvirsky<br>**SCHIFFRIN & BARROWAY, LLP**<br>280 King of Prussia Road<br>Radnor, PA 19087<br>Tel: (610) 667-7706<br>Fax: (610) 667-7056<br><br>*Counsel for Plaintiff Sunanda Desai* |

| | |
|---|---|
| Kenneth J. Vianale<br>Julie Prag Vianale<br>**VIANALE & VIANALE LLP**<br>2499 Glades Road, Suite 112<br>Boca Raton, FL  33431<br>Tel:  (561) 392-4750<br>Fax:  (561) 392-4775<br><br><br>*Attorney for Plaintiff Vision Wealth*<br>*Management and Jacques Habra* | Michael J. Pucillo<br>Marc J. Greenspon<br>Wendy H. Zoberman<br>**BERMAN DEVALERIO, PEASE,**<br>**TABACCO, BURT & PUCILLO**<br>222 Lakeview Avenue, Suite 900<br>West Palm Beach, FL  33401<br>Tel:  (561) 835-9400<br>Fax:  (561) 835-0322<br><br>*Attorney for Plaintiff Jacques Habra, Vision*<br>*Wealth Group* |
| Jayne Arnold Goldstein<br>**MAGER WHITE & GOLDSTEIN LLP**<br>2825 University Dr., Suite 350<br>Coral Springs, FL  33065<br>Tel:  (954) 341-0844<br>Fax:  (954) 341-0855<br><br><br>*Attorney for Plaintiff Richard L. Hershatter* | |