**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION**

| | | |
|---|---|---|
| | ) | |
| **IN RE MIVA, INC.** | ) | **CIVIL ACTION FILE** |
| **SECURITIES LITIGATION** | ) | **NO. 2:05-cv-00201-FtM-29DNF** |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' RENEWED MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Gregory N. Woods
Florida Bar No. 0175500
Joseph G. Foster
Florida Bar No. 0301980

PORTER WRIGHT MORRIS
& ARTHUR LLP
5801 Pelican Bay Blvd.
Suite 300
Naples, FL  34108-2709
Telephone:  (239) 593-2900
Fax:  (239) 593-2990

Todd R. David
Georgia Bar No. 206526
Susan E. Hurd
Georgia Bar No. 379628

ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA  30309
Telephone:  (404) 881-7000
Fax:  (404) 881-7777

*Counsel for Defendants*

# TABLE OF CONTENTS

Page

I.    REQUEST FOR ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

II.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

III.  BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5

IV.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    10

      A.    Plaintiffs' "New" Allegations Fail to State a Claim. . . . . . . . . . . . .    10

      B.    Plaintiffs' Claims Are Barred By the *Santa Fe* Doctrine . . . . . . . . .    13

      C.    The Amended Complaint Fails To Plead Adequately a Material
            Misrepresentation or Omission of Existing Fact . . . . . . . . . . . . . . . .    15

            1.    *Allegations Regarding Dmitri And Saveli Are Inactionable* . .    17

            2.    *Plaintiffs' "Bid Erosion" Theory Fails To State A Claim* . . .    25

      D.    The Amended Complaint Fails To Meet The Heightened
            Requirements For Pleading Scienter Under The Reform Act . . . . . . . . .    28

            1.    *Plaintiffs Improperly Rely On "Motive And
                  Opportunity" Allegations* . . . . . . . . . . . . . . . . . . . . . . . . . . . .    29

                  (a)    Allegations Of An "Opportunity" To Commit
                         Fraud Based On Job Title Are Insufficient . . . . . . . . .    30

                  (b)    Alleged Motive To Engage In Insider Stock
                         Sales Fails To Give Rise To A Strong Inference
                         Of Scienter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    31

            2.    *Allegations Regarding Internal Controls Fail To Create A
                  Strong Inference Of Scienter* . . . . . . . . . . . . . . . . . . . . . . . . .    35

      E.    The Amended Complaint Improperly Attempts To Base
            Liability On Forward-Looking Statements . . . . . . . . . . . . . . . . . . . . .    36

      F.    The Amended Complaint Fails To Adequately Plead The
            Required Element Of Loss Causation . . . . . . . . . . . . . . . . . . . . . . . . . .    38

G.   The Complaint Does Not State A Cognizable Claim Against
     The Individual Defendants As "Controlling Persons" . . . . . . . . . . . .     39

V.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     40

## I.     REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 3.01(d), Defendants hereby request oral argument of one hour on their Renewed Motion to Dismiss Plaintiffs' First Amended Consolidated Class Action Complaint ("Amended Complaint" or "Am. Compl.").

## II.     INTRODUCTION

The Amended Complaint demonstrates once again that Plaintiffs failed to conduct a good faith investigation before filing suit and that their repeated efforts to state a cognizable claim are futile.  Although the document is called "Plaintiffs' First Amended Complaint," it is actually the third iteration of this lawsuit.  The time has come to dismiss the case with prejudice and to assess Plaintiffs with Defendants' attorneys' fees pursuant to Federal Rule of Civil Procedure 11 and the Private Securities Litigation Reform Act ("Reform Act").[1]

Indeed, this case illustrates the reasons Congress passed the Reform Act.  The initial Complaint, filed one day after the close of the alleged class period, accused Defendants of fraud based on goodwill impairment and internal controls issues.  When Defendants moved to dismiss that Complaint, Plaintiffs immediately sought leave to amend.  The fact that Plaintiffs were unwilling to defend their Complaint constituted a tacit admission that their one-day pre-suit "investigation" was inadequate.

The next Complaint, the Consolidated Class Action Complaint ("Consolidated Complaint"), largely abandoned the goodwill impairment and internal controls issues and focused on the alleged wrongful activities of two separate distribution partners ("Dmitri and

---

[1]     The Reform Act requires that, "upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion."  15 U.S.C. § 78u-4(c)(1).  If the court determines that Rule 11 has not been satisfied, the imposition of sanctions is mandatory.  15 U.S.C. § 78u-4(c)(3)(A).

Saveli").  The Court granted Defendants' Motion to Dismiss the Consolidated Complaint, and it allowed Plaintiffs leave to amend to attempt to cure its pleading deficiencies.

Now, in Plaintiffs' third bite at the apple, the Amended Complaint relegates the internal controls issues to makeweight paragraphs in the "Additional Scienter Allegations" section at the end.  (See Am. Compl. ¶¶ 113-16.)  The original allegations of alleged misstatements concerning goodwill have been deleted completely.  In other words, Plaintiffs have all but abandoned the claims that formed the very foundation of the initial Complaint.

The history of this case, thus, demonstrates that Plaintiffs have followed the "ready, fire, and aim later" pleading tactics the Reform Act was designed to prevent.[2]  They filed suit based solely on a stock price drop and have been searching in vain for a cognizable theory since then.  The Reform Act reflects Congress's conclusion that such lawsuits are harmful to the economy because they "unnecessarily increase the cost of raising capital and chill corporate disclosure, [and] are often based on nothing more than a company's announcement of bad news . . . ."[3]

For the Reform Act to be effective, Congress sought to encourage early dismissal of deficient securities complaints by "establish[ing] uniform and stringent pleading requirement[s] to curtail the filing of abusive lawsuits."[4]  Another important provision under the Reform Act is the "safe harbor" to protect forward-looking statements.[5]  Through these provisions and others, the Reform Act requires courts to dismiss deficient claims.  See Bryant

---

[2]    15 U.S.C. § 78u-4, et seq.
[3]    S. Rep. No. 104-98, at 4 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 683.
[4]    S. Rep. No. 104-98, at 15 (1995), reprinted in 1995 U.S.C.C.A.N. at 694.
[5]    15 U.S.C. § 78u-5(c).

v. Avado Brands, Inc. ("Bryant I"), 187 F.3d 1271, 1281-87 (11th Cir. 1999); Harris v. Ivax Corp., 182 F.3d 799, 803 (11th Cir. 1999).

The Amended Complaint fares no better than prior iterations. Rather than remedy the deficiencies noted in the Court's Order and Defendants' Motion to Dismiss, the Amended Complaint merely reshuffles the same allegations that the Court previously held were insufficient. Like the Consolidated Complaint, the Amended Complaint advances general theories of fraud related to two different distribution partners and a vague and unsupported theory related to alleged bid erosion.

The Court previously held the very same allegations insufficient to state a claim. (See Order at 5.) Other than quoting a few additional public statements by the Company and statements from third-party analysts, Plaintiffs offer no new allegations to attempt to satisfy their pleading burdens. Moreover, as to their "new" statements, Plaintiffs lack a sufficient explanation as to why they are false - - the very defect previously recognized by the Court. (See id.)

It is, moreover, particularly notable that Plaintiffs have done nothing meaningful to buttress their woefully inadequate scienter allegations. Scienter is a critically important element of a securities fraud claim, and the pleading requirements for scienter are highly demanding in the Eleventh Circuit.[6] The Amended Complaint, however, fails to add any allegation of note on the issue of scienter.

Similarly conspicuous is Plaintiffs' failure to satisfy the loss causation requirement. The Supreme Court and courts of this Circuit have emphasized the importance of this

---

[6]       See Bryant I, 187 F.3d at 1287.

mandatory requirement and found that the failure to satisfy this element requires dismissal of the complaint.[7]  Notwithstanding this binding precedent and the Court's directive to correct pleading deficiencies, the Amended Complaint makes only a passing reference to loss causation.  (See Am. Compl. ¶ 142.)  Thus, the lack of loss causation is a separate and insuperable bar to Plaintiffs' claims.

Like the Consolidated Complaint, the Amended Complaint is based largely on the same purported statements from disgruntled former employees[8] regarding internal management decisions about whether or when to revisit arrangements with certain distribution partners.  Plaintiffs' quarrels with these business decisions and/or their recitation of internal business discussions are not actionable under the securities laws.  There has been no restatement of the Company's reported financial results and the Company's outside auditors at the time, Ernst & Young LLP ("E&Y"), issued a clean audit opinion for 2003 and 2004.  That clean audit opinion has never been withdrawn or even revised and there has been no revelation that any prior financial statement or other statement of the Company was false when made.

Consequently, the Company's statements about the termination of certain relationships with distribution partners affected solely guidance as to **future** results.  Such forward-looking statements, however, are shielded from liability under the "safe harbor" established by the Reform Act.  FindWhat did exactly what Congress envisioned when it established the safe harbor for the express purpose of encouraging companies to make

---

[7]     See infra at 38-39.

[8]     As demonstrated below, courts in this Circuit have dismissed complaints under the Reform Act despite the existence of allegations from former employees.  (See infra at 17.)

forward-looking statements.  When the Company gave guidance regarding management's expectations for the future, these forward-looking statements were accompanied by meaningful cautionary language that informed investors of the various risks that might interfere with the Company's ability to achieve these goals.  When the Company later made the business decision to discontinue certain commercial relationships which would reduce its revenues going forward -- a fact that it had explicitly warned might occur -- it promptly issued revised guidance to reflect this new development.  Because there has been no restatement in this case, this business decision can be relevant only to the need to revise previously stated guidance.  Thus, this case is solely about this change in the guidance and, therefore, is foreclosed by the Reform Act for reasons developed below.

## III.   BACKGROUND

FindWhat's performance-based marketing service is an online marketplace that connects a business with prospects likely to make purchases or research potential purchases through the business's website.  Advertisements are rank-ordered through a competitive bidding process in which each advertiser's bid represents the amount they are willing to pay for each prospect the Company sends to that advertiser's website.  Advertisers then pay FindWhat for each "click-through" to their website.  (See SEC Form 10-K, dated March 16, 2005 ("2004 10-K"), at 9-10 (Exhibit C).)[9]

FindWhat has publicly disclosed its business model, and Plaintiffs do not allege that description is false.  As discussed in its SEC filings, the Company's revenues for its

---

[9]      Pursuant to communications with the Court's Chambers, citations to exhibits herein refer to the exhibits previously filed electronically and delivered in hard copy to the Court in connection with Defendants' prior Motion to Dismiss Plaintiffs' Consolidated Complaint.  Exhibits A-G may be found at Docket Number 39. Exhibits H-P may be found at Docket Number 40.  All previously filed exhibits are incorporated by reference herein.

performance-based marketing services come from payments made by its advertisers.  (See SEC Form 10-K/A, dated May 2, 2005 ("2004 10-K/A"), at 21 (Exhibit D).)  The advertisers are the Company's actual customers.  On the other hand, the Company pays its distribution partners for Internet traffic or "clicks" delivered to the websites of its advertiser clients.  (See id. at 43.)  The distribution partners are the Company's suppliers.  (See id.)  Thus, the Company's revenue is received directly from its advertiser customers.  The Company incurs as an expense fees paid to the distribution partners for supplying Internet traffic to the Company.  (See id.)

The entire Amended Complaint is based on the erroneous premise that the Company should have disclosed more about its distribution partners (suppliers).  But, under FAS 131 and Item 101 of Regulation S-K, the applicable rules, a company is required to disclose information only about **customers** if those **customers** comprise over 10% of the company's revenues.[10]  Thus, the Complaint confuses distribution partners (suppliers) with advertisers (customers).  The Complaint fails to cite any rule that purportedly requires disclosures associated with entities in the role of "supplier," like FindWhat's distribution partners.

On February 23, 2005, the Company announced its results for the fourth quarter of 2004 and issued its guidance for fiscal year 2005.  In a conference call with analysts that day, Mr. Pisaris-Henderson announced that the Company had removed certain Internet traffic sources that did not meet the Company's high standards of quality in terms of conversion into sales.  (See Am. Compl. ¶¶ 12, 87.)  Plaintiffs allege that "Defendants claimed that they had removed two poor quality distribution partners, amounting to $70,000 of daily revenue,

---

[10]       See infra at 20-21.

from the network." (Id. ¶ 12.)  At no time, however, did the Company state the names or

number of traffic sources removed, let alone that the traffic sources removed on this basis

were Dmitri and Saveli.  In fact, Plaintiffs' own allegations demonstrate this point.

Paragraph 87 of the Amended Complaint contains the relevant excerpt of the February 23

conference call.  During that call, Mr. Pisaris-Henderson stated that the Company had

intentionally removed "numerous" traffic sources.  (Id. ¶ 87.)  Thus, at no point did Mr.

Pisaris-Henderson state that two distribution partners had been removed.  Plaintiffs have

contorted Defendants' actual statements to attempt to squeeze those statements into their

faulty theory of liability regarding Dmitri and Saveli.  No statements on the identity or

number of removed traffic sources were made during the February 23 conference call

because, as noted above, the Company had no obligation to make such disclosures on

distribution partners (suppliers) and confidentiality concerns prevented such disclosures.

(See id. ¶ 81.)

On May 2, 2005, the Company made additional disclosures related to the completed

audit for fiscal year 2004 and the Sarbanes-Oxley requirement that management and the

auditors assess the adequacy of the Company's internal controls.  (See id. at ¶ 98.)

Specifically, the Company **repeated its earlier disclosure** found in the 2004 10-K that E&Y

had identified certain weaknesses in the Company's internal controls.  (See Ex. D, 2004 10-

K/A at 28-29, 58-59.)[11]  **E&Y, however, issued a clean audit opinion for the Company's**

---

[11] The only issue with internal controls that had not been disclosed two months earlier was that the Company had identified a weakness in the segregation of duties among internal accounting personnel.  (See Ex. D, 2004 10-K/A at 59.)  Plaintiffs do not ascribe any material significance to this one additional item.

**financial results for fiscal year 2004 and E&Y has never requested any restatement of those financials.**

On May 5, 2005, the Company issued a press release announcing its first quarter 2005 results. The Company also announced that it had removed other Internet traffic sources because it believed the traffic was derived from practices that did not meet the Company's business standards. (See Am. Compl. ¶ 102.) In essence, the Company took affirmative steps to enforce its view of ethical business practices, and Plaintiffs attempt to contort that fact into a fraud claim. No good deed goes unpunished.

A comparison of the February 23, 2005 disclosure and the May 5, 2005 press release, moreover, demonstrates that the changes in traffic sources disclosed on those dates occurred for different reasons. The traffic sources removed prior to February 23, 2005 were removed because the traffic generated was not of a high quality, i.e., leading to sales with an acceptable conversion ratio for the advertisers. (See id. ¶ 87.) The discontinuation of certain traffic sources discussed in the May 5, 2005 press release was due to the fact that the Company believed the methods employed to generate this traffic were not in compliance with the Company's guidelines. (See id. ¶ 102.) This distinction is important because the Company did not say anything to suggest that these announcements, made at separate times, pertained to the same set of distribution partners. Nor does the Amended Complaint contain any well-pled facts to support such an allegation.

The Company has thousands of distribution partners. (See Ex. D, 2004 10-K/A at 9.) The Company disclosed that it constantly evaluates the quality of the traffic sources provided by those distribution partners and frequently removes traffic sources for a variety of business

reasons, including because the traffic generated does not meet its standards of quality or those of its advertisers. (See Ex. D, 2004 10-K/A at 20.) For example, the Company disclosed the following in its conference call with analysts on May 5, 2005 following its announcement of a reduction in guidance:

> In the last several days, we removed certain distribution partners and subaffiliates of those partners that had developed methods for obtaining users that did not adhere to our distribution guidelines. As indicated in our earnings release and guidance, the removal of these partners and their subaffiliates will reduce revenue going forward. . . .
>
> Distribution partners and their subaffiliates are [] monitored and randomly scrutinized to ensure they continue to comply with our terms and conditions. In the event that we discover a partner has changed their content from what we had previously reviewed and approved, fails to comply with our terms and conditions or have resupplied our feed to a third party without our permission, then that partner or subaffiliate is subject to suspension or termination as we deem appropriate. Our recent removal of service partners and subaffiliates [is] indicative of our work [to] resolve on these issues.

(Transcript of May 5, 2005 conference call (Ex. F).)

The Company also disclosed on May 5, 2005 that it was adjusting downward its previously-issued guidance for the year 2005. **The Company, however, met its guidance for the first quarter of 2005.** (See Am. Compl. ¶ 102.) The Company disclosed, as noted above, that the guidance reduction for the remainder of 2005 was based on the Company's continuing efforts to ensure proper sourcing of its traffic. (See id.) The Company had previously informed investors that such changes in relationships with its distribution partners might occur and could have an adverse effect on revenues going forward.

IV.    **ARGUMENT**

A.    **Plaintiffs' "New" Allegations Fail to State a Claim**

The Court dismissed the Consolidated Complaint because it failed to comply with Fed. R. Civ. P. 9(b) and the Reform Act. The Amended Complaint suffers from the same defect. Plaintiffs have merely reshuffled prior paragraphs and added a few additional quotations from press releases or previously cited public filings that describe the Company's business model and two statements from third-party analysts.

In addition to correcting typographical errors and making consistent the use of certain abbreviations, Plaintiffs moved around many of the same paragraphs that the Court previously found to be insufficient. For example, Paragraphs 65 and 66 of the Amended Complaint were Paragraphs 95 and 99(a) of the Consolidated Complaint. Plaintiffs have simply moved up the conclusory allegation that the public statement at issue is false so that it follows the alleged false or misleading statement. Mere proximity, however, does not satisfy the Reform Act. Thus, rather than add the requisite supporting detail required by the Act to show exactly how and why Plaintiffs contend the statement is false or misleading, Plaintiffs have merely reordered the prior paragraphs already found to be deficient.

Taken as a whole, the Amended Complaint adds a precious few "new" public statements. (See, e.g., Am. Compl. ¶¶ 67, 69, 71.) Plaintiffs primarily cite to portions of press releases that merely describe the Company's business model and are similar to passages quoted previously in the Consolidated Complaint. (See id.) These statements are alleged to be false and misleading because they fail to disclose that the Company was relying on Dmitri and Saveli to generate poor quality traffic. As explained below, claims based on

allegations of reliance on Dmitri and Saveli and alleged poor traffic quality are barred by the Santa Fe doctrine, fail to state a misrepresentation or omission of material existing fact, and fail to give rise to a strong inference of scienter.[12]

There are two other purported "new" statements of Defendants.  First, the Amended Complaint adds a quotation from the Company's 2003 Form 10-K, a public filing which was cited previously in the Consolidated Complaint, regarding the number of distribution partners in prior years whose Internet traffic purchases represented over 10% of the Company's total revenue.  (See Am. Compl. ¶ 75, cited in ¶ 101 of the Consolidated Complaint.)  As discussed below, these allegations fail because Defendants did not have a duty to disclose information on distribution partners and Plaintiffs have failed to identify a misrepresentation or omission of material fact.[13]  Second, the Amended Complaint adds a forward-looking statement from a conference call regarding the Company's expected revenue growth.  (See Am. Compl. ¶ 78.)  As explained below, the Company's forward-looking statements were accompanied by meaningful cautionary language, and, thus, are protected by the Reform Act's safe harbor.[14]

Plaintiffs' Amended Complaint also adds two statements from third-party analysts. (See id. ¶¶ 77, 83.)  The first reference is to an analyst report that merely repeats the Company's statement that, for the fiscal year 2003, Internet traffic purchased from one distribution partner represented over 10% of total revenue - - a fact which Plaintiffs have not shown was false or misleading.  (See id. ¶ 77.)  In the second citation, the analyst merely

---

[12]    See infra at 13-15 (Santa Fe doctrine), at 17-25 (lack of misrepresentation or omission of material fact), at 28-36 (lack of scienter).
[13]    See infra at 19-21 (no duty to disclose information on distribution partners).
[14]    See infra at 36-38 (safe harbor).

notes that the Company takes steps to remove poor quality traffic - - a fact that Plaintiffs do not and cannot dispute, given that it is the announcement of the removal of certain traffic sources on which they now purport to base their claims.  (See id. ¶ 83.)  Thus, no falsity is alleged.

Even if falsity were alleged, analysts' statements cannot be the support for a claim against FindWhat.  Securities analysts research companies and then issue forecasts or "expectations" regarding a company's future performance.  See, e.g., In re Caere Corp. Sec. Litig., 837 F. Supp. 1054, 1059 (N.D. Cal. 1993).  Public companies may be held liable for the statements of outside securities analysts only if a demanding test is satisfied - - i.e., facts showing that the Company was "entangled" with the statements of analysts or otherwise adopted them.  See Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 373-74 (5th Cir. 2004).  To plead "entanglement" adequately, plaintiffs must "plead with particularity . . . who supplied the information to the analyst, how the analyst received the information, and how the defendant was entangled with or manipulated the information and the analyst."  See id. at 373.  The Amended Complaint does not seriously attempt to satisfy that demanding pleading standard.

Further, it is undisputed that the Company's public filings contained detailed risk factors regarding click-through fraud and the removal of distribution partners.  (See infra at 18-19.)  Accordingly, even if the analysts' statements could be attributed to Defendants, Plaintiffs have not explained how and why they are false in light of the total mix of information available to investors that warned of these specific risks.

In sum, Plaintiffs' Amended Complaint presents nothing new or different from the

Consolidated Complaint other than inactionable statements describing the Company's

business and certain unremarkable statements of securities analysts. Accordingly, the Court

should dismiss the Amended Complaint as well.

**B.      Plaintiffs' Claims Are Barred By the *Santa Fe* Doctrine**

As the Supreme Court explained in <u>Santa Fe Industries, Inc. v. Green</u>, 430 U.S. 462

(1977), the securities laws do not provide a remedy for acts "which constitute no more than

internal corporate mismanagement." <u>Id.</u> at 479 (citation omitted); <u>see also</u> <u>Barr v. Matria</u>

<u>Healthcare, Inc.</u>, 324 F. Supp. 2d 1369, 1383 (N.D. Ga. 2004) (holding that the securities

laws regulate disclosure of information, not the management of a company). "Following

<u>Santa Fe</u>, courts have found that allegations constituting nothing more than assertions of

general mismanagement, or nondisclosures of mismanagement, cannot support claims under

[Section] 10(b) of the Exchange Act." <u>Portannese v. Donna Karan Int'l, Inc.</u>, No. 97-CV-

2011CBA, 1998 WL 637547, at *9 (E.D.N.Y. Aug. 14, 1998) (citations omitted). As

Magistrate Judge Wilson explained in another case from this District, "courts generally hold

that the failure to disclose possible corporate mismanagement does not state a federal

securities law claim." <u>Cutsforth v. Renschler</u>, 235 F. Supp. 2d 1216, 1242 (M.D. Fla. 2002).

At its core, the Amended Complaint is a critique of and/or a subjective disagreement

with the judgments and performance of management regarding how to run and manage this

business in the ever-evolving environment of Internet advertising. Plaintiffs are not

permitted to evade <u>Santa Fe</u> by using "artful legal draftsmanship" to bootstrap a claim arising

from an alleged act of corporate mismanagement into a cognizable claim under federal law.

See <u>Panter v. Marshall Field & Co.</u>, 646 F.2d 271, 287-88 (7th Cir. 1981).  Consider the

following allegations:

- The Company relied too heavily on revenue from traffic generated by Dmitri and Saveli (<u>see, e.g.</u>, Am. Compl. ¶¶ 38-42);

- The Company should not have been doing business with Dmitri and Saveli (<u>see, e.g.</u>, <u>id.</u> ¶¶ 5-7);

- The Company did not terminate its business relationship with Dmitri and Saveli (<u>see, e.g.</u>, <u>id.</u> ¶¶ 55-57);

- The Company's efforts to diversify its product offerings through acquisitions allegedly came too late to lessen the blow of removing improper traffic (<u>see, e.g.</u>, <u>id.</u> ¶¶ 8, 129-30);

- The Company relied too heavily on "low quality" traffic, which led to inadequate sales conversions and "bid erosion" (<u>see, e.g.</u>, <u>id.</u> ¶¶ 6, 29-37);

- The Company took "scraps" from competitors like Google and Yahoo! and, because of the low quality traffic being generated, had to charge rates per click lower than its competitors (<u>see, e.g.</u>, <u>id.</u> ¶¶ 30-31); and

- FindWhat's revenue share rate with its distribution partners was lower than the industry standard (<u>see, e.g.</u>, id. ¶ 34).

These allegations are not actionable because they allege only corporate

mismanagement, not fraud.  In <u>Cutsforth</u>, Magistrate Judge Wilson dismissed plaintiffs'

claims based on failure to disclose problems with computer systems, inadequate billing of

customers, claims of non-existent accounts and retaining known credit risks, and other

operational problems.  See <u>Cutsforth</u>, 235 F. Supp. 2d at 1243.  The court held as follows:

> These matters seem to be no more than common business failings and can
> hardly be characterized as mismanagement at the corporate level.  But even if
> they were viewed as corporate mismanagement, the failure to disclose such
> problems, as previously explained, would not amount to a violation of Rule
> 10b-5.  Certainly, there is nothing about those problems that would render

inapposite the general rule that allegations of nondisclosure of mismanagement do not state a federal securities law claim.

Id. at 1245 (citing Craftmatic Sec. Lit. v. Kraftsow, 890 F.2d 628, 640 (3d Cir. 1989).

Because the Amended Complaint here is similarly based on claims of alleged mismanagement, it is barred by Santa Fe and should be dismissed.

**C.    The Amended Complaint Fails To Plead Adequately a Material Misrepresentation or Omission of Existing Fact**

To state a claim under Section 10(b), a plaintiff must plead an actionable misrepresentation or omission of material fact.  See Robbins v. Koger Props., Inc., 116 F.3d 1441, 1447 (11th Cir. 1997).  Further, the Reform Act mandates that a plaintiff must "specify each statement alleged to have been misleading" and the "reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).  For allegations made "upon information and belief," the Reform Act requires a plaintiff to "state with particularity all facts on which that belief is formed."  Id.  If a plaintiff fails to satisfy any of these requirements, dismissal is mandatory.  See 15 U.S.C. § 78u-4(b)(3)(A).

To satisfy the requirements of the Reform Act, the Amended Complaint is required to plead specific facts showing that the allegedly undisclosed issues were in existence at the time the purported misstatements were made.  See Cutsforth, 235 F. Supp. 2d at 1235-36; Wenger v. Lumisys, Inc., 2 F. Supp. 2d 1231, 1240 (N.D. Cal. 1998); In re Advanta Corp. Sec. Litig., No. 97-CV-4343, 1998 WL 387595, at *6-*7 (E.D. Pa. July 9, 1998), aff'd, 180 F.3d 525 (3d Cir. 1999).  The Amended Complaint utterly fails to carry the Reform Act's pleading burdens.

Even before the Reform Act, a plaintiff could not allege a cognizable securities law claim by relying on "20-20 hindsight." In the landmark case of <u>Denny v. Barber</u>, 576 F.2d 465 (2d Cir. 1978), Judge Friendly explained that a complaint that alleges fraud by hindsight - - <u>i.e.</u>, "plaintiff has simply seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones" - - does not state a claim for securities fraud. <u>Id.</u> at 470. Thus, the securities laws require disclosure, not prescience. <u>Id.</u>

As the Seventh Circuit explained in a classic case on point,

> Investors seeking relief under Rule 10b-5 have to distinguish their situation from that of many others who are adversely affected by business reverses. . . .
>
> The story in this complaint is familiar in securities litigation. At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud. . . . Because only a fraction of financial deteriorations reflect fraud, plaintiffs may not proffer the different financial statements and rest. Investors must point to some facts suggesting that the difference is attributable to fraud.

<u>DiLeo v. Ernst & Young</u>, 901 F.2d 624, 627 (7th Cir. 1990).

This case exemplifies the type of pleading by hindsight that has long been held inadequate. The Amended Complaint, in essence, claims that Defendants **must** have committed fraud because the news in the May 2005 disclosures **must** have been known as early as September 2003. For example, the Amended Complaint assumes with no particularized supporting facts that the Company somehow knew <u>in 2003</u> that certain distribution partners <u>two years later</u> would choose to employ methods that the Company would come to believe did not follow its existing guidelines. Such pleading tactics are plainly inadequate even under pre-Reform Act case law and are conclusively barred under

the more exacting standards of the Reform Act.  See, e.g., Cutsforth, 235 F. Supp. 2d at 1235-36; DiLeo, 901 F.2d at 627-28; Denny, 576 F.2d at 470.

The Amended Complaint here also purports to contain statements from disgruntled former employees.  These statements are not sufficient to plead a material misrepresentation or omission of existing fact or, as discussed below, to give rise to the required strong inference of fraudulent intent or "scienter."  Courts in this District and Circuit have dismissed securities fraud complaints despite the existence of detail supposedly provided by former employees.  See, e.g., In re Sawtek, Inc. Sec. Litig., No. 603CV294ORL31DAB, 2005 WL 2465041, at *9 (M.D. Fla. Oct. 6, 2005); In re NDCHealth Corp., Inc. Sec. Litig., No. 1:04-CV-0970-WSD, slip op. at 36-37 (N.D. Ga. July 27, 2005) (Ex. H); Cutsforth, 235 F. Supp. 2d at 1261.

Here, as in Sawtek, NDCHealth , and Cutsforth, the former employees' statements add color, but not substance.  In sum, the issue is not whether the complaint provides some details, but rather whether those details satisfy the Reform Act's daunting requirements. Here, the Amended Complaint flunks that test for the very same reasons the Court dismissed the last iteration.

### 1.    *Allegations Regarding Dmitri And Saveli Are Inactionable*

The Amended Complaint alleges that statements regarding reported revenues were false and misleading because the Company failed to disclose that the traffic generated by Dmitri and Saveli was obtained through "illicit" means.  (See Am. Compl. ¶¶ 66, 68, 70, 72, 74, 76, 86, 90.)  Plaintiffs, however, do not and cannot allege that the methods at issue were

illegal[15] and, as discussed above, there has been no restatement of any previously-reported revenues. Accordingly, this purported omission is neither material nor linked to any loss.

Even if Dmitri and Saveli are assumed to have done something less than ideal, their actions are not attributable to Defendants. The Company has thousands of distribution partners (see Ex. D, 2004 10-K/A at 9) and disclosed to investors that it routinely makes business decisions to terminate or modify relationships with distribution partners for a variety of reasons.

> If we are not satisfied with the quality of Internet traffic delivered from our distribution partners we may take remedial action, including removal of the distribution partner from our networks. . . . [W]e have removed in the past and may continue in the future to remove all or a portion of the traffic generated by one or more distribution partners or terminate our relationships with distribution partners because the traffic generated does not meet our standards of quality or those of our advertisers, any of which could have a material adverse effect on our business, revenue and results of operations.

(See Ex. D, 2004 10-K/A at 20; see also Ex. E, cumulative exhibit of SEC Form 10-Q's.) Such business judgments do not mean that any previously reported revenues were inaccurate or should not have been booked and, thus, it is no surprise that there has been no restatement here. The Company's stated revenue recognition policy provides that revenue is recognized when a click-through occurs. (See Ex. D, 2004 10-K/A at 42.) Plaintiffs do not and cannot allege that the click-throughs, which led to the Company's revenues, did not occur, and Defendants disclosed that its future revenues may be affected by, among other things, termination or modification of relationships with distribution partners. (See id. at 19.)

---

[15]     Plaintiffs do not dispute this fact. Tellingly, they reference only **proposed** legislation to suggest that this conduct may be prohibited, restricted or otherwise controlled **in the future**. (See, e.g., Am. Compl. ¶ 63.)

The Company fully and timely disclosed the relevant issues and risks regarding its

distribution partners in SEC filings throughout the alleged class period, including, for

example, the following discussion:

> **Our business is dependent upon our relationship with, and the success of, our distribution partners.** . . .   These partners provide their users with our services on their websites or otherwise direct traffic to our paid listings. . . . Difficulties may arise in our relationships with distribution partners for a number of reasons, some of which are out of our control. . . . Additionally, our agreements with our distribution partners vary in duration and generally are not long-term agreements.  Our distribution agreements are generally terminable upon the occurrence of certain events, including our failure to meet certain service levels, general breaches of agreement terms and changes in control in certain circumstances.
>
> **Click-through fraud, whether we detect it or not, could cause our revenues and business to suffer.**  From time to time, we receive fraudulent clicks on our ads by persons seeking to increase the advertising fees paid to distribution partners within our FindWhat.com and Espotting Networks . . . . We have implemented screening policies and procedures to minimize the effects of these fraudulent clicks.  We believe that these policies and procedures assist us in detecting fraudulent click-throughs, which are not billed to our advertisers.  However, it is difficult to detect all fraudulent clicks and detection may become more difficult in the future if third parties implement more sophisticated fraudulent click-through schemes. . . .

(Id. at 19-20; see also SEC Form 10-K, dated March 5, 2004, at 15-16 (Exhibit I); Ex.

E, cumulative exhibit of SEC Form 10-Q's.)  In light of the above and other

disclosures, Plaintiffs cannot base a fraud claim on the notion that the Company

misrepresented the effect that its distribution partners and their practices could have

on its business.

Further, as discussed below, the Company was under no obligation to disclose the

specific identities of its distribution partners or the amount of revenue to the Company that

specific traffic sources ultimately generated through payments by advertisers.  Although the

Company from time to time would provide examples of the numerous distribution partners with which it worked (see Am. Compl. ¶¶ 67, 69, 71), the Company never purported to provide an exhaustive list of the distribution partners and, it never stated that any of the enumerated distribution partners were its top traffic producers.  (See, e.g., id.)  Plaintiffs do not and cannot allege any such disclosure requirement.  And, in any event, as acknowledged by the Amended Complaint, confidentiality concerns surrounding the distribution partner agreements would have prevented such disclosures.  (See id. ¶ 81.)

The Amended Complaint relies on the incorrect premise that distribution partners, like Dmitri and Saveli, were providing revenue directly to the Company.  (See, e.g., id. ¶¶ 5, 7, 10.)  As demonstrated above, Plaintiffs misunderstand the Company's business model and its corresponding disclosure requirements.  Dmitri and Saveli were distribution partners (i.e., suppliers), not advertisers (i.e., customers).  (See Ex. D, 2004 10-K/A at 43.)  The Company's source of revenue is from its advertisers.  (See id.)  Accordingly, the allegation that the Company was required to disclose that Dmitri and Saveli comprised over 10% of the Company's revenues is unsupported by any relevant factual allegations.  The Company is required to disclose information about significant advertisers (customers).

Item 101 of Regulation S-K, the applicable disclosure rule promulgated by the SEC, provides as follows:

> The name of any customer and its relationship, if any, with the registrant or its subsidiaries shall be disclosed if sales to the customer by one or more segments are made in an aggregate amount equal to 10 percent or more of the registrant's consolidated revenues and the loss of such customer would have a material adverse effect on the registrant and its subsidiaries taken as a whole. The names of other customers may be included, unless in the particular case the effect of including the names would be misleading.  For purposes of this

paragraph, a group of customers under common control or customers that are affiliates of each other shall be regarded as a single customer.

17 C.F.R. § 229.101(c)(vii).  Paragraph 39 of FAS 131,[16] the applicable GAAP

disclosure rule, provides as follows:

> **Information about Major Customers.**    An enterprise shall provide information about the extent of its reliance on its major customers.   If revenues from transactions with a single external customer amount to 10 percent or more of an enterprise's revenues, the enterprise shall disclose that fact, the total amount of revenues from each such customer, and the identity of the segment or segments reporting the revenues.   The enterprise need not disclose the identity of a major customer or the amount of revenues that each segment reports from that customer.

Thus, the allegations that the Company was required to disclose anything

about Dmitri or Saveli are unsupported by the applicable disclosure rules as set forth

above.  Also, Plaintiffs have now abandoned the GAAP provisions cited previously in

the Consolidated Complaint, which Plaintiffs erroneously argued gave rise to such a

disclosure obligation.  (See, e.g., Consolidated Compl. ¶ 168.)  This deletion is a tacit

admission that there is no duty to disclose these issues.

Even though the Company had no obligation to speak on its distribution

partners, the Company chose to disclose to investors during the alleged class period

whether traffic purchased from any individual distribution partner represented over

10% of its consolidated revenue.  The number of distribution partners that represented

over 10% of consolidated revenue varied over time.[17]  At the end of fiscal year 2004,

the Company disclosed the following:

---

[16]    FAS 131 is entitled "Disclosures about Segments of an Enterprise and Related Information" and establishes standards for the way that public business enterprises report information.
[17]    The Company regularly disclosed in its SEC Form 10-Q's and 10-K's, filed every quarter and annually, how many (if any) of its distribution partners were generating traffic that led to over 10% of

> During 2004 and 2003, no advertiser account represented more than 10% of our total revenue.  We purchase Internet traffic from our distribution partners. Expressed as a percentage of revenue, **none of the traffic purchased from any of these distribution partners represented over 10% of consolidated revenue in 2004**."

(Ex. D, 2004 10-K/A at 43 (emphasis added).)

The Amended Complaint points to one analyst's conclusion that the statement on distribution partners was somehow false because the Company reduced its 2005 guidance by 27.9 percent.  (See Am. Compl. ¶ 14.)  Plaintiffs (and the analyst) again confuse distribution partners with customers.  To be included in the Company's above disclosure regarding distribution partners, the Company would have had to purchase traffic from either Dmitri or Saveli that led to over 10 percent of the Company's **consolidated** (on a global basis) revenue in 2004 of $169 million.  (See Ex. J, Feb. 23, 2005 press release.)  There is nothing in the Complaint to suggest that the traffic accumulated by either Dmitri or Saveli led to over $16.9 million in revenue received from advertisers in 2004 and, in fact, no distribution partner accumulated more that $16.9 million in consolidated revenue for FindWhat in 2004, as the Company disclosed.

Equally fatal to the Amended Complaint is its failure to allege with specificity how any of the Company's prior statements that, for fiscal year 2004, no one distribution partner contributed over 10% of revenue were materially false or misleading.  In fact, the allegations in the Complaint are **inconsistent** with such a theory.  Plaintiffs' theory is entirely dependent

---

consolidated revenue.  (See Ex. E, compiling relevant excerpts from quarterly filings.)  The Company disclosed that, expressed as a percentage of revenue, Internet traffic purchases from one distribution partner represented over 10% of total revenue for each of fiscal years 2003 and 2001 and Internet purchases from two individual distribution partners each represented over 10% of total revenue for fiscal year 2002.  (See Am. Compl. ¶ 75.)

on the notion that Dmitri and Saveli are somehow related and they conclude that Dmitri and

Saveli **combined** must have generated traffic contributing over 10% of revenue.  (See Am.

Compl. ¶¶ 75-76.)  There are absolutely no facts in the Amended Complaint to support a

reasonable inference that Dmitri and Saveli are related.  Indeed, even Plaintiffs' own

references to supposed internal Company documents always list them separately.  (See, e.g.,

id.. ¶¶ 88.)  As shown below, this is a fatal flaw in Plaintiffs' theory of liability because,

when Dmitri and Saveli are considered separately as they must be, Plaintiffs' revenue

numbers do not add up to the 10% benchmark.

Plaintiffs' own allegations about the revenue supposedly generated by Dmitri and

Saveli rebut their theory.  Paragraph 88 of the Amended Complaint contains a chart from a

purported internal Company report dated February 20, 2005, which shows that Saveli

accounted for $45,483.92 in revenue per day and Dmitri accounted for $24,709.58 in revenue

per day.  As Plaintiffs concede, the Company's total quarterly revenue for the first quarter of

2005 (a figure which is a matter of public record, has been reviewed by the Company's

outside auditors, and has not been restated or revised) was $58.2 million.  (See id. ¶ 102.)

Dividing $58.2 million by the number of days in the first quarter of 2005 (90 days), the

Company had revenue of approximately $647,000 per day.  For Plaintiffs' theory to be

correct that Dmitri or Saveli accounted for over 10% of the Company's revenues that quarter,

either Dmitri or Saveli would have had to generate traffic **independently** that led to $64,700

in revenue per day (10% of $647,000).  Instead, using the figures alleged by Plaintiffs, Saveli

accounted for approximately 7% of revenue per day ($45,483.92 divided by $647,000).

Dmitri's figure was even lower -- $24,709.58 divided by $647,000 is approximately 4%.

Accordingly, even the revenue figures for Dmitri and Saveli cited by Plaintiffs do not support their theory that Dmitri or Saveli individually contributed over 10% of revenue and, thus, on the face of the Amended Complaint, Plaintiffs have not pled a material misrepresentation of fact on this issue.[18]

The Amended Complaint wrongly alleges that the Company announced the termination of Dmitri and Saveli in February 2005, but did not, in fact, alter the arrangements with these individuals at that time.  (See id. ¶ 96.)  As discussed above, the decision whether or when to modify relationships with distribution partners is an ordinary business decision that cannot support a securities fraud claim.[19]  In any event, this claim fails for independent reasons.  Plaintiffs confuse two separate announcements concerning changes in relationships with different sets of distribution partners.

On February 23, 2005, the Company announced that it had terminated or modified arrangements with certain distribution partners because they had failed to generate high quality traffic, i.e., traffic that consistently led to sales conversions for advertisers.  (See id. ¶ 87.)  Plaintiffs assume with no supporting facts that the February 23 announcement concerned Dmitri and Saveli, despite the fact that the Company did not identify the partners at issue as being Dmitri and Saveli.  On May 5, 2005, the Company announced that it had decided to terminate or modify relationships with certain other distribution partners and/or their sub-affiliates for a different reason, i.e., because the Company believed that they had used means to accumulate traffic that did not comport with the Company's standards.  (See

---

[18]      Plaintiffs also cite a report dated February 19, 2005 which purportedly shows that Saveli generated $59,885.60 in revenue per day.  (See Am. Compl. ¶ 88.)  This figure is still less than the necessary $64,700 per day needed to reach the 10% benchmark.

[19]      See supra at 13-15.

id. at ¶ 102.)  Thus, as revealed by the face of the Amended Complaint, the February

announcement dealt with a different issue than was discussed in May.  Accordingly,

Plaintiffs have also failed to plead a misrepresentation or omission of fact with regard to the

alleged timing of any distribution partner-related announcements.

### 2. *Plaintiffs' "Bid Erosion" Theory Fails To State A Claim*

The Amended Complaint alleges that the "bid erosion" brought on by a purported

over-reliance on Dmitri and Saveli was a material adverse trend that was known to

Defendants earlier and should have been disclosed to investors.  (See id. ¶¶ 6, 29-37.)  The

Complaint describes bid erosion as follows:

> FindWhat's revenue is determined by the price advertisers bid for a click on
> their ads and the number of high quality clicks FindWhat can direct to those
> ads.  Because the price an advertiser is willing to pay per click is supported by
> the income it derives from the advertisement, the more advertiser paid clicks
> that result in no income for the advertiser, the lower the "conversion rate" of
> advertiser expenditure into income.  Since the conversion rate directly impacts
> the advertisers' bid price, as the conversion rate drops, so too does the bid
> price.

(Id. ¶ 28.)

According to the Amended Complaint, because Dmitri and Saveli were

directing low quality traffic to advertisers, the advertisers' bids were eroding and so

were the Company's revenues.  (See id. ¶ 32.)  Plaintiffs allege that the Company

should have disclosed this known material adverse trend and that the Company's

reported increase in revenues was misleading as a result.  (See id. ¶¶ 79-80.)  There

are no particularized facts in the Complaint to support such a claim.

As an initial matter, Plaintiffs cite no authority for the proposition that there is

a specific duty to disclose or update granular information regarding fluctuations in the

Company's bid prices.  Rather, Plaintiffs allege that the general provisions of SAB
101 would apply here.  (See id. ¶ 79.)  SAB 101 requires a company to discuss
"known trends or uncertainties that have had, or might reasonably be expected to
have, a favorable or unfavorable material effect on revenue . . . ."  (Id.)

Plaintiffs' claims regarding the alleged failure to disclose this supposed adverse trend
should be dismissed because they are conclusory and not pled with the requisite detail.  (See
id. ¶¶ 30, 32, 35.)  Courts before and after the Reform Act have dismissed claims similar to
those here, where the plaintiffs merely conclude without factual support that a supposed
adverse trend existed and was known to all defendants.  See, e.g., San Leandro Emergency
Med. Group Profit Sharing Plan v. Phillip Morris Companies, Inc., 75 F.3d 801, 812 (2d Cir.
1996); In re NBTY, Inc. Sec. Litig., 224 F. Supp. 2d 482, 492 (E.D.N.Y. 2002).  In NBTY,
the plaintiffs alleged that the company failed to disclose the adverse trend that demand for its
products was weakening.  See id. at 492.  Because the allegations were conclusory and not
grounded in any supportive facts, the court dismissed the complaint for failure to plead fraud
with particularity.  See id. at 494.

Similar allegations to those in the Amended Complaint were also rejected in Sawtek.
The plaintiffs alleged that the company failed to disclose the known adverse trend that its
customers were "choking" on excess inventory.  Sawtek, 2005 WL 2465041, at *8.  The
court held that these allegations failed to give rise to a strong inference of scienter because
the plaintiffs simply repeated the statement that the company failed to disclose the known
adverse trend, but had no supporting detail.  The court rejected the plaintiffs' known adverse

trend theory because "[s]uch allegations are not the particularized facts required by the Reform Act, and they are not supported by such particularized facts." Id.

Moreover, Plaintiffs' theory cannot stand for an additional reason. It makes no economic sense. Under the Reform Act, Plaintiffs must allege detailed facts creating a "strong inference" of scienter, and implausible theories cannot create such a strong inference. See Bryant v. Avado Brands, Inc. ("Bryant II"), 100 F. Supp. 2d 1368, 1376 (M.D. Ga. 2000), rev'd on other grounds sub nom., Bryant v. Dupree, 252 F.3d 1161 (11th Cir. 2001)

If the bids would naturally erode over time as Plaintiffs allege, Defendants would not have been able to rely on Dmitri and Saveli to maintain or increase their revenues as the Amended Complaint alleges. As described in that Complaint, the Company's business model had built into it a mechanism to correct for significant numbers of click-throughs that did not involve customers who were legitimately interested in acquiring the advertiser's products. (See Am. Compl. ¶ 38.) In other words, if the quality of the traffic diminished and, thus, did not lead to a satisfactory ratio of sales conversions, the advertisers regularly monitored and knew this fact and their bids for the click-through services would be lowered as a result. (See id. ¶¶ 4, 28.) In fact, the Amended Complaint alleges that this is precisely what happened. (See id. ¶ 36 (alleging that, during the class period, "the Company's RPC [revenues per click] went down, and it had a 'devastating effect on revenue.'").) Thus, Plaintiffs' theory that bid erosion and revenue inflation existed simultaneously makes no sense. As the Sawtek Court noted in dismissing the plaintiffs' claim, "[i]t defies logic to suggest that an entity could successfully operate in such a fashion." Sawtek, 2005 WL 2465041, at * 13.

Moreover, Plaintiffs claim bid erosion was causing FindWhat's revenue to **decline** during the class period. In fact, FindWhat's revenue **increased** during the class period. Revenue for every quarter was higher than the corresponding quarter in the prior year by at least 50%, and there has been no revision or restatement of that revenue.[20] Some of this increase in revenue was due to the inclusion of results of companies that FindWhat acquired during the first six months of 2004, and FindWhat publicly disclosed how much of its increases in revenue were due to acquired companies for each quarter of 2004. Thus, excluding the revenue from the newly-acquired businesses, revenue for FindWhat's original business was higher than the corresponding quarter in the prior year by at least 10%.[21] Thus, assuming Plaintiffs have pled adequately that a known "trend" existed (which they have not), they have not shown how that "trend" was adverse to the Company in any material respect. Such implausible or illogical theories fail to state a claim for securities fraud. See Phillips v. LCI Int'l, Inc., 190 F.3d 609, 623 (4th Cir. 1999); Bryant II, 100 F. Supp. 2d at 1376.

For all the reasons shown above, the Amended Complaint here fails to plead a material misrepresentation or omission of existing fact. Accordingly, Defendants' Renewed Motion to Dismiss should be granted.

### D.  The Amended Complaint Fails To Meet The Heightened Requirements For Pleading Scienter Under The Reform Act

Arguably the most compelling reason for dismissing this case with prejudice is Plaintiffs' total failure to add meaningfully to the previously rejected scienter allegations. Scienter, of course, is a critical element of any securities fraud claim. "[I]n the Eleventh

---

[20]    See Ex. J.
[21]    See id.

Circuit, a securities fraud plaintiff must plead scienter with particular facts that give rise to a strong inference that the defendant acted in a severely reckless manner." Bryant I, 187 F.3d at 1287. This showing must be made as to each individual defendant and as to each alleged act or omission. See In re Smith Gardner Sec. Litig., 214 F. Supp. 2d 1291, 1301 (S.D. Fla. 2002). The Amended Complaint here fails to allege any facts that would give rise to the required "strong inference" that any of the Defendants acted with severe recklessness or engaged in conscious misconduct.

Courts look for certain indicia of scienter in securities cases. For example, courts will often look at whether a corporate defendant has restated prior period financial statements. See, e.g., Druskin v. Answerthink, Inc., 299 F. Supp. 2d 1307, 1323 (S.D. Fla. 2004); Sawtek, 2005 WL 2465041, at *9. A restatement alone would not satisfy the scienter standard, but it would be at least a somewhat relevant fact. Here, however, the Amended Complaint does not (nor could it) allege that the Company restated any prior results. Courts in this Circuit have recognized that a strong inference is not pled concerning alleged accounting manipulations where there had been no restatement of any prior financial statement. See, e.g., In re iXL Enters., Inc. Sec. Litig., No. 1:00-CV-2347-CC, slip op. at 2-3 (N.D. Ga. Feb. 27, 2002) (Ex. K).

### 1. Plaintiffs Improperly Rely On "Motive And Opportunity" Allegations

Like the Consolidated Complaint, the Amended Complaint improperly relies on "motive and opportunity" allegations. The Eleventh Circuit has instructed that allegations of motive and opportunity to commit fraud, standing alone, are insufficient to establish scienter. See Bryant I, 187 F.3d at 1285-86. In the face of this precedent, Plaintiffs nevertheless

attempt to meet their burden of raising a strong inference of scienter as to **each** defendant simply by relying on such commonplace allegations.

(a)      **Allegations Of An "Opportunity" To Commit Fraud Based On Job Title Are Insufficient**

Plaintiffs claim that Defendants must have known of the alleged adverse facts concerning FindWhat's business because of their positions as executives in the Company and the fact that they supposedly had access to material, non-public information by virtue of these positions.  (See, e.g., Am. Compl. ¶ 132.)  In advancing that theory, the Amended Complaint relies on highly generalized and conclusory assertions, which are insufficient under the Reform Act.  Consider the following example:

> By virtue of their high level positions within the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's internal reports, press releases, War Reports, Interface, public filings and other statements alleged by Plaintiffs to be misleading . . . .

(Id. ¶ 144.)

These are the same conclusory allegations that the Court has already held to be inadequate.  Plaintiffs fail to provide any new detail to explain what Defendants supposedly knew or when or how they knew it.  See In re Theragenics Corp. Sec. Litig., 105 F. Supp. 2d 1342, 1348 (N.D. Ga. 2000).  Merely pleading that a defendant held a high-level position cannot establish a "strong inference" of fraudulent intent because, among other reasons, it is a standard that will be met in virtually every securities case.  See, e.g., In re Criimi Mae, Inc.

Sec. Litig., 94 F. Supp. 2d 652, 661 (D. Md. 2000); see also Smith Gardner, 214 F. Supp. 2d at 1303.

The Amended Complaint's allegations concerning supposedly adverse internal information similarly fail.  (See Am. Compl. ¶¶ 50-60.)  Such "conclusory allegations as to internal reports are the type of conclusory allegations Congress sought to prevent from sustaining a securities fraud action under the [Reform Act]."  In re Rexall Sundown, Inc. Sec. Litig., No. 98-8798-CIV-DIMITROULEA, 2000 WL 33539428, at *3 (S.D. Fla. Mar. 29, 2000).

(b)    <b>Alleged Motive To Engage In Insider Stock Sales Fails To<br>Give Rise To A Strong Inference Of Scienter</b>

Perhaps the most glaring example of the Amended Complaint's inability to allege scienter is Plaintiffs' attempt to rely on stock sales made by Messrs. Pisaris-Henderson and Thune.  It is particularly telling that, despite now having had more time to investigate, Plaintiffs have no new allegations on this issue.  Indeed, the allegations are woefully inadequate.  For example, the Amended Complaint discusses stock sales made by Mr. Frederick Guest, an outside director, who is not named as a defendant in the Complaint.  (See Am. Compl. ¶ 119.)  Sales by a non-defendant such as Mr. Guest cannot possibly be relevant to the scienter analysis for those Defendants in the case because, inter alia, (1) scienter must be pled as to each defendant separately and (2) Plaintiffs do not allege with the required specificity that Mr. Guest was in possession of any material adverse information at the time his sales took place.  See In re Premiere Techs., Inc. Sec. Litig., No. 1:98-CV-1804-JOF, 2000 WL 33231639, at *11 (N.D. Ga. Dec. 8, 2000); see also Carol Gamble Trust 86 v. E-Rex, Inc., No. 03-15032, 2004 WL 43216, at *2 (9th Cir. Jan. 5, 2004).

To be sure, under certain circumstances, stock sales of a named defendant may contribute to cognizable scienter allegations (although insider stock sales alone cannot satisfy the scienter standard).  See, e.g., Smith Gardner, 214 F. Supp. 2d at 1304; Hal Bloomberg Trust v. Gencor Industries, Inc., No. 6:99-cv-106-ORL-19B, slip op. at 18 n.11 (M.D. Fla. May 10, 2000) (Ex. L).  In this Complaint, however, the insider stock sales allegations have not been made in good faith.

For stock sales to have any relevance to the scienter analysis, a complaint must detail specific facts rendering those sales "suspicious and unusual" in timing or amount.  See, e.g., Druskin, 299 F. Supp. 2d at 1335; Smith Gardner, 214 F. Supp. 2d at 1303; Theragenics, 105 F. Supp. 2d at 1361.  There is, thus, no inference of fraudulent intent possible "from the mere fact that some officers sold stock."  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1424 (3d Cir. 1997).

In this case, the Amended Complaint fails to demonstrate that the stock sales were suspicious and unusual in any respect.  In fact, Messrs. Pisaris-Henderson and Thune retained the majority of their holdings in FindWhat stock during and after the alleged class period -- a fact which Plaintiffs do not dispute.  Mr. Pisaris-Henderson sold only 155,000 shares out of 1,680,586 shares he beneficially owned during the alleged class period.  Mr. Thune sold only 25,000 shares out of 648,750 shares he beneficially owned during the alleged class period. (See Ex. D, 2004 10-K/A at 73.)[22]  Courts have held that a defendant's retention of

---

[22]    Figures on the Defendants' total holdings as of March 31, 2005 can be found in the Company's 2004 10-K/A.  Plaintiffs concede that Messrs. Pisaris-Henderson or Thune did not sell any stock during 2005 and, thus, these Defendants still held the same number of shares a few months later at the close of the class period. A person is considered to "beneficially own" any shares with respect to which "he or she exercises sole or shared voting or investment power or of which he or she has the right to acquire the beneficial ownership within

substantial holdings in the company's stock rebuts any inference of scienter from stock sales. See, e.g., In re Advanta Corp. Sec. Litig., 180 F.3d 525, 541 (3d Cir. 1999) (holding that, because defendants retained significant amounts of stock, "they had every incentive to keep [the Company] profitable"); In re Credit Acceptance Corp. Sec. Litig., 50 F. Supp. 2d 662, 677 (E.D. Mich. 1999) (holding that retention of shares can rebut an inference of fraud and dismissing complaint notwithstanding the fact that two individuals sold shares worth over $60 million).  Moreover, because information about a defendant's retained holdings is critical to determining whether the sales at issue were unusual or suspicious, Plaintiffs' failure to include this information is fatal to their scienter allegations.  See Duncan v. Pencer, No. 94 CIV. 0321 (LAP), 1996 WL 19043, at *11-*12 (S.D.N.Y. Jan. 18, 1996) (failure to particularize amount of shares retained after allegedly unusual sales was fatal to plaintiffs' attempt to plead a strong inference of scienter); see also In re Peritus Software Servs., Inc. Sec. Litig., 52 F. Supp. 2d 211, 225 (D. Mass. 1999); Blum v. Semiconductor Packaging Materials Co., No. C.A. 97-7078, 1998 WL 254035, at *4 (E.D. Pa. May 5, 1998); Greebel v. FTP Software, Inc., 182 F.R.D. 370, 375 (D. Mass. 1998), aff'd, 194 F.3d 185 (1st Cir. 1999).

Another factor makes the allegations regarding stock sales particularly specious.  The stock sales by Defendants that are discussed in the Amended Complaint were made pursuant to pre-established trading programs under SEC Rule 10b5-1.  (See Ex. M.)  SEC Rule 10b5-1 provides as follows:

---

60 days."  (See Ex. D, 2004 10-K/A at 73.)  These figures, therefore, include both shares held outright and fully vested options that could be exercised and sold immediately.  (See id.)

[A] person's purchase or sale is not "on the basis of" material nonpublic information if the person making the purchase or sale demonstrates that:

> (A) Before becoming aware of the information, the person had:
>
> > (1) Entered into a binding contract to purchase or sell the security,
> >
> > (2) Instructed another person to purchase or sell the security for the instructing person's account, or
> >
> > (3) Adopted a written plan for trading securities.

17 C.F.R. 240.10b5-1(c)(A). The SEC adopted Rule 10b5-1 so that executives and directors could trade in company stock via a pre-determined method that would be immune to second-guessing: "the rule also sets forth several affirmative defenses . . . to permit persons to trade in certain circumstances where it is clear that the [nonpublic] information was not a factor in the decision to trade." Selective Disclosure and Insider Trading, 65 Fed. Reg. 51716-01 (Aug. 24, 2001) (codified at 17 C.F.R. pts. 240, 243, 249). In light of the above, it is not appropriate for the Amended Complaint to assert that Defendants' stock sales under Rule 10b5-1 plans can satisfy the scienter standard.

Perhaps even more notable, however, is the fact that Ms. Agius, the Company's Chief Financial Officer, never sold a single share of stock during the class period. Ms. Agius, as CFO, was responsible for all accounting decisions, and, thus, would have been an instrumental and presumably indispensable player in any alleged accounting fraud. Yet Plaintiffs tender the improbable theory that Ms. Agius purportedly agreed to commit fraud without deriving any personal benefit from her alleged participation and knowing that her own personal stock holdings would decline substantially in value (like the putative class

members) when the "truth" was allegedly revealed.[23]  **The lack of insider sales by one of the Company's highest-ranking executives undercuts and actually negates any inference of scienter possible from the stock sales**.  See, e.g., iXL Enters., slip op. at 2-3; In re Sunterra Corp. Sec. Litig., 199 F. Supp. 2d 1308, 1330 (M.D. Fla. 2002); Bryant II, 100 F. Supp. 2d at 1385; In re E. Spire Commc'ns, Inc. Sec. Litig., 127 F. Supp. 2d 734, 743 n.9 (D. Md. 2001).

 2. *Allegations Regarding Internal Controls Fail To Create A Strong Inference of Scienter*

As noted above, Plaintiffs have relegated the discussion of internal control issues found in earlier Complaints to four paragraphs in the section entitled "Additional Scienter Allegations."  (See Am. Compl. ¶¶ 113-16.)  Plaintiffs no longer attempt to state an independent claim for securities fraud based on a purported failure to disclose earlier certain internal controls issues.  Rather, they rely on these allegations only as supposed support for their argument that scienter has been pled here.  (See id.)

As Plaintiffs' acknowledge, the internal controls issues identified by the Company's auditors at the time (E&Y) and disclosed by FindWhat related to "(a) purchase accounting, (b) goodwill impairment, (c) revenue recognition, (d) personnel resources and technical accounting expertise, (e) quarterly and year-end financial statement close and review process, and (f) segregation of duties."  (Am. Compl. ¶ 115.)[24]  Plaintiffs fail to allege any particularized facts linking these internal controls issues to the activities of the Company's distribution partners, much less their theory of illicit activities by Dmitri and Saveli and

---

[23]        As of March 31, 2005, Ms. Agius beneficially owned 61,250 shares.  (See Ex. D, 2004 10-K at 73.)
[24]        The revenue recognition issues pertained to private label agreements and other revenue agreements related to a product line not at issue in this case.

related bid erosion.  This failure to provide the requisite link between these internal controls issues and the newest iteration of their theory of liability means that these allegations are wholly irrelevant to and cannot assist Plaintiffs in attempting to plead a strong inference of scienter.

Moreover, the undisputed facts show that FindWhat disclosed all but one of the control issues **prior to** the close of the class period.  Where a defendant makes a disclosure on the relevant issues, no strong inference of scienter can arise.  See In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1425 (9th Cir. 1994); Sturm v. Marriott Marquis Corp., 26 F. Supp. 2d 1358, 1370 (N.D. Ga. 1998).

**E.    The Amended Complaint Improperly Attempts To Base Liability On Forward-Looking Statements**

Defendants' forward-looking statements are independently protected by the Reform Act's "safe harbor" provision, which provides that a defendant shall not be liable for an oral or written forward-looking statement if it is identified as a forward-looking statement and is accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially."  15 U.S.C. § 78u-5(c)(1)(A)(i).  If a statement is accompanied by cautionary language, the claims are barred and the court need not consider whether the defendant acted with the requisite state of mind.  See Harris v. IVAX, 182 F.3d 799, 803 (11th Cir. 1999).  Thus, when the cautionary language exists, a defendant is per se not liable under the safe harbor.  See Ehlert v. Singer, 245 F.3d 1313, 1320 (11th Cir. 2001).

Even if a forward-looking statement is not accompanied by cautionary language, a defendant cannot be liable unless the statement "**was made with actual knowledge**" **that it** "**was false or misleading**."  15 U.S.C. § 78u-5(c)(1)(B) (emphasis added); Theoharous v.

Fong, 256 F.3d 1219, 1226 (11th Cir. 2001).  Further, Plaintiffs must plead with **particularity** facts giving rise to a strong inference of such actual knowledge.  They have not done so here.  See Harris, 182 F.3d at 803; see supra at 28-36.

The safe harbor provision has been liberally construed to effectuate its purpose of encouraging companies to make more forward-looking statements.  For that reason, the cautionary language at issue need not identify the specific factor that ultimately negates a forward-looking statement.  Harris, 182 F.3d at 807.  "[W]hen an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward."  Id.

Plaintiffs here seek to impose liability for a wide variety of optimistic, forward-looking statements regarding  management's expectations for future financial results and new business prospects.  (See, e.g., Am. Compl. ¶¶ 78, 85, 95.)  Each of the forward-looking statements on which the Amended Complaint seeks to rely was identified as being a "forward-looking statement" and was accompanied at the time it was made by meaningful cautionary language as required by the Reform Act.  (See Ex. C, 2004 10-K at 17-34; Ex. D, 2004 10-K/A at 17-34.)

Because the forward-looking statements here were accompanied by meaningful cautionary language, the safe harbor applies and the Court need not reach the issue of scienter.  See Harris, 182 F.3d at 803; Sawtek, 2005 WL 2465041, at *11.  Further, even if the forward-looking statements were not accompanied by meaningful cautionary language, Plaintiffs could establish a claim only by pleading in detail actual knowledge of falsity.  See

<u>Theoharous</u>, 256 F.3d at 1226 (affirming dismissal regarding forward-looking statements where plaintiff failed to allege particular facts creating a strong inference that defendant knew statements were false).  Plaintiffs do not even attempt to do so.

    **F.**    <u>**The Amended Complaint Fails To Adequately Plead The Required Element Of Loss Causation.**</u>

The Reform Act requires that "the plaintiff shall have the burden of proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4); <u>see also</u> <u>Robbins v. Koger Props., Inc.</u>, 116 F.3d 1441, 1447 (11th Cir. 1997).  The Supreme Court and courts of this Circuit have emphasized the importance of this requirement and found that the failure to satisfy this element requires dismissal of the complaint.  <u>See</u> <u>Dura Pharm., Inc. v. Broudo</u>, 125 S. Ct. 1627, 1634-35 (2005); <u>Barr v. Matria Healthcare, Inc.</u>, 324 F. Supp. 2d 1369, 1380 (N.D. Ga. 2004).

Here, the Amended Complaint contains no well-pled allegations whatsoever to provide the necessary causal connection between the alleged misstatements and the purported losses at issue.  Plaintiffs state only that, "[a]s a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period."  (Am. Compl. ¶ 142.)  This is precisely the type of generalized allegations of putative loss that the Supreme Court found were insufficient to plead loss causation in <u>Dura Pharmaceuticals</u>.  125 S. Ct. at 1634-35.

The central omission about which Plaintiffs complain is the Company's decision to do business with Dmitri and Saveli.  (<u>See</u> Am. Compl. ¶¶ 5-8.)  Plaintiffs cannot allege any loss related to that omission because there has been no restatement of the revenues generated

from the traffic of Dmitri and Saveli.  Thus, the shareholders of FindWhat were benefited

(not harmed) by the Company's relationship with Dmitri and Saveli.  Further, the Amended

Complaint alleges that Messrs. Thune and Pisaris-Henderson vetoed the decision to terminate

Dmitri and Saveli.  (See id. ¶ 84.)  Thus, to the extent that the Company's stock price was

inflated based on revenues associated with traffic generated by Dmitri and Saveli, this

inflation was never removed from the market price of the stock and, according to the

Amended Complaint, would persist to this day.  Plaintiffs, therefore, cannot demonstrate that

the activities of Dmitri and Saveli caused any loss to them.  See Dura Pharm., 125 S. Ct. at

1634 (holding that a plaintiff must show more than an artificially inflated stock price to show

loss causation).

         In Dura Pharmaceuticals, the Supreme Court recognized that merely pleading an

inflated price during the alleged class period is insufficient because the later lower price on

which the plaintiff attempts to state claim "may reflect, not the earlier [alleged]

misrepresentation, but changed economic circumstances, changed investor expectations, new

industry-specific or firm-specific facts, conditions, or other events, which taken separately or

together account for some or all of that lower price."  Id. at 1632.  Plaintiffs have pled no

facts to support a plausible theory that the alleged misstatements described in the Amended

Complaint caused their putative injury.  Dismissal is, therefore, required for this independent

reason.

         G.     **The Amended Complaint Does Not State A Cognizable Claim Against
                 The Individual Defendants As "Controlling Persons"**

         As shown above, the Amended Complaint fails to state a claim for a primary

violation of the securities laws against FindWhat.  For this reason, there can be no claim for

"controlling person" liability under Section 20(a) with respect to the Individual Defendants. See, e.g., Theoharous v. Fong, 256 F.3d 1219, 1227 (11th Cir. 2001). "In this [C]ircuit, a defendant is liable as a controlling person under section 20(a) if he or she 'had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws . . . [and] had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability.'" Brown v. Enstar Group, Inc., 84 F.3d 393, 396 (11th Cir. 1996). The Amended Complaint does not contain any well-pled facts that sufficiently allege control person status. Rather, Plaintiffs make insufficient, conclusory allegations that merely restate the legal standard for control person liability, which cannot prevail on a motion to dismiss.

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that their Renewed Motion to Dismiss be granted and that the Court dismiss with prejudice Plaintiffs' Amended Complaint. Pursuant to 15 U.S.C. § 78u-4(c)(3), Defendants also respectfully request that the Court award them attorneys' fees and costs.

Respectfully submitted, this 9th day of February, 2006.

                 /s/ Joseph G. Foster
Gregory N. Woods
Florida Bar No. 0175500
Joseph G. Foster
Florida Bar No. 0301980

Porter Wright Morris & Arthur LLP
5801 Pelican Bay Blvd.
Suite 300
Naples, FL  34108-2709
Tel:  (239) 593-2900
Fax:  (239) 593-2990

Todd R. David
Georgia Bar No. 206526
Susan Hurd
Georgia Bar No. 379628

ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309
Tel:  (404) 881-7000
Fax:  (404) 881-7777

Counsel for Defendants

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION**

|  |  |
|---|---|
| ) | **CIVIL ACTION FILE** |
| **IN RE MIVA, INC.** ) | **NO. 2:05-cv-00201-FtM-29DNF** |
| **SECURITIES LITIGATION** ) | |
| ) | |

**CERTIFICATE OF SERVICE**

This is to certify that I have this day served a true and correct copy of the within and

foregoing **DEFENDANTS' RENEWED MOTION TO DISMISS PLAINTIFFS' FIRST**

**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** and

**MEMORANDUM OF LAW IN SUPPORT THEREOF,** upon the following counsel of

record by United States mail, addressed as follows:

> Kristi Stahnke McGregor
> Joseph E. White, III
> MILBERG WEISS BERSHAD & SCHULMAN LLP
> Tower One, Suite 600
> 5200 Town Center Circle
> Boca Raton, FL  33486
>
> Steven C. Schulman
> MILBERG WEISS BERSHAD & SCHULMAN LLP
> One Pennsylvania Avenue
> 49th Floor
> New York, N.Y.  10119-0165
>
> Laurence Paskowitz
> PASKOWITZ & ASSOCIATES
> 60 E. 42nd Street
> Suite 4600
> New York, New York 10165

This 9th day of February, 2006.

                    /s/ Josesph G. Foster
Joseph G. Foster
Florida Bar No. 0301980