# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FT. MYERS DIVISION

In re MIVA, Inc. Securities Litigation | Civil Action No.: 2:05-CV-201-FtM-29DNF

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' RENEWED MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

**MILBERG WEISS BERSHAD & SCHULMAN LLP**
Maya Saxena (Fla. Bar No. 0095494)
Christopher S. Polaszek (Fla. Bar No. 0116866)
Kristi Stahnke McGregor (Fla. Bar No. 0732931)
Joseph E. White, III (Fla. Bar No. 0621064)
Tower One, Suite 600
5200 Town Center Circle
Boca Raton, FL 33486
Tel: (561) 361-5000
Fax: (561) 367-8400

**Lead Counsel for Plaintiffs**

**Table of Contents**

**Page**

PRELIMINARY STATEMENT ................................................................1

FACTUAL BACKGROUND ................................................................6

    I.     DEFENDANTS ACTIVELY CONCEAL FUNDAMENTAL DEFECTS
           IN FINDWHAT'S DISTRIBUTION NETWORK ................................6

          A.     "Serious, Serious Bid Deflation": Defendants Fail to Reveal a
                  Material Adverse Trend ................................................................6

          B.     FindWhat's Poor-Quality Distributors: A "House of Cards Held
                  Together By a Thread" ................................................................7

          C.     "We Cannot Continue to Whore Our Advertisers" to Dmitri and
                  Saveli: Defendants' Last-Ditch Effort to Legitimize FindWhat's
                  Distribution Partners ................................................................9

    II.    DEFENDANTS' OBSESSION WITH MEETING WALL STREET
           ESTIMATES................................................................10

    III.   THE TRUTH REGARDING FINDWHAT'S FRAUDULENT
           DISTRIBUTION NETWORK IS BELATEDLY REVEALED ..................10

ARGUMENT ................................................................12

    I.     LEGAL STANDARDS ................................................................12

    II.    DEFENDANTS' FALSE STATEMENTS ARE MATERIAL AND
           ACTIONABLE ................................................................15

          A.     Defendants' Failure to Disclose The Revenues Derived From
                  Dmitri and Saveli is Actionable Securities Fraud ........................16

          B.     Defendants Had a Duty To Disclose that Dmitri and Saveli
                  Accounted For Greater Than 10% of the Company's Revenue in
                  2004................................................................17

          C.     Defendants Failed to Disclose the Known, Material Adverse Trend
                  of "Bid Erosion" ................................................................20

          D.     Plaintiffs' Claims Allege Fraud, Not Mismanagement ..................21

    III.   THE COMPLAINT ADEQUATELY ALLEGES SCIENTER ..............23

          A.     Defendants Are Directly Confronted With The Truth ..................24

B.    Insiders Sold Company Stock While in Possession of Material
Non-Public Information Regarding the Improper Practices of the
Company's Distribution Partners.................................................................26

C.    Defendants Used Inflated Stock to Fund Their "Mad Buying
Binge" and Hide Dependence on Spyware Wielding Distribution
Partners .......................................................................................................28

D.    Defendants' Intense Focus on Meeting Wall Street's Quarterly
Numbers.......................................................................................................29

E.    Defendants' Internal Control Violations Provide Additional
Evidence of Scienter ...................................................................................30

IV.    DEFENDANTS' FALSE STATEMENTS ARE NOT PROTECTED BY
THE PSLRA'S SAFE-HARBOR PROVISION......................................................30

V.    PLAINTIFFS HAVE ADEQUATELY PLED LOSS CAUSATION ..................32

VI.    PLAINTIFFS HAVE ADEQUATELY PLED CONTROL PERSON
LIABILITY...............................................................................................................35

CONCLUSION...........................................................................................................................36

## PRELIMINARY STATEMENT

This case centers around FindWhat's affirmative misstatements and omissions concerning its key product - "pay-per-click" advertising services.  During the Class Period, Defendants assured investors that the Company provided "high-quality search results," and "high-quality advertising" with business partners who adhered to "lawful and ethical business practices."  (*See, e.g.*, ¶¶ 5, 65, 67, 69, 71, 73, 75.)[1]  Further, Defendants emphasized that: (1) revenues were increasing; (2) poor-quality distribution partners had been removed from FindWhat's network; and (3) no single distribution partner amounted to more than 10% of the Company's revenues during 2004.  (¶¶ 2, 13, 57, 75, 78, 87, 93.)

These statements were highly material to investors.  First of all, FindWhat's ability to sell advertising is dependant on the quality of Internet traffic generated by its search partners.  Indeed, there is a direct correlation between the quality of these distribution partners and FindWhat's revenue, since advertisers will "bid" higher for FindWhat's products if they know there is a strong likelihood that using FindWhat will bring interested consumers to their websites.  However, if the distribution partner does not provide authentic leads to advertisers, the bid price for FindWhat's services declines, and the Company's revenues decline.  (¶ 4.)  Since FindWhat was valued as a growth company, investors looked to the Company's distribution network as a key indicator for future revenues.  (¶¶ 9, 108, 109, 125, 126.)

What Defendants failed to disclose was that two distribution partners, who represented an astonishing 36% of FindWhat's revenues during the Class Period, used illicit tactics including "browser hijacking" and "spyware" to boost and sustain revenues.  (*See*, *e.g.*, ¶¶ 5, 7, 8, 75, 76.)  During a conference call on February 23, 2005, Defendants disclosed that they had removed two

---

[1]    Unless otherwise stated, all paragraph citations herein are to Plaintiffs' First Amended Consolidated Class Action Complaint ("Complaint").

poor-quality distribution partners, amounting to $70,000 of daily revenue, from the network.

Analysts and investors were shocked by this purported disclosure. For example, one analyst

noted the unexpected magnitude of the poor-quality traffic problem, stating: "*[w]e expected a*

*gardener using pruning shears. What we got was a lumberjack using a chainsaw.*" (¶ 107).

On May 5, 2005, the Company further revealed that it had been removing additional poor-quality

distribution partners, which represented "a meaningful percentage of daily click-through

revenue." As a result, the Company dramatically lowered its earnings expectations for 2005.

Yet again, the market was unprepared for the magnitude of Defendants' distribution

problems. For example, one analyst questioned management's credibility, noting that although

Defendants had assured investors that no one distribution partner amounted to more than 10% of

the Company's revenue, "*[t]he accuracy of this statement must also come under scrutiny as the*

*company just lowered the midpoint of its [2005] guidance by 27.9%.*" After the Company

partially revealed its reliance on poor-quality distribution partners, FindWhat's stock price fell to

$4.83 per share, a drop of nearly 90% from its Class Period high.

Defendants' Renewed Motion to Dismiss Plaintiffs' First Amended Consolidated Class

Action Complaint ("Def. Mem.") is replete with rhetoric concerning the evils of securities fraud

lawsuits. Indeed, Defendants spend several pages discussing the differences between the initially

filed complaint, the consolidated complaint, and the first amended complaint. (Def. Mem. at 1-

4.) However, Defendants fail to recognize that "an amended pleading completely supersedes the

original pleading, and once a pleading is 'amended,' the only issues before the Court are the ones

raised in the text of the amended pleading." *Angel v. United States of America,* Case No. 8:03-

CR-176-T-30MAP, 2005 U.S. Dist. LEXIS 29996 (M.D. Fla. Nov. 17, 2005). Here, the

Complaint was properly amended in response to this Court's December 28, 2005 Order.

2

On December 28, 2005, this Court dismissed Plaintiffs' Consolidated Class Action Complaint ("Complaint") without prejudice.  (DE#49).  In so doing, this Court noted that the Complaint failed to specify all of the allegedly false and misleading statements or omissions in a single section, and failed to specifically identify what makes specific statements or omissions false or misleading or material.  *Id.* at 5.  The Court also cautioned Plaintiffs that "generic reasons for falsity which are not alleged to relate to any specific statement are insufficient to comply with either Rule 9(b) or the PSLRA." *Id.* at 6.

Thus, in accordance with this Court's Order, to the extent that any such reasons lacked specificity or were generic, these allegations have been removed.   Plaintiffs have now specified all of the false and misleading statements in a single section, immediately followed by the reasons why the statements are false.  For example:

| **False Statement** | **Reasons for Falsity** |
|---|---|
| ¶73: "Our policy prohibits engaging agents or other third parties to do indirectly what we should not do…" | ¶74: The Company's two largest distribution partners used illicit means to generate fraudulent click traffic. |
| ¶78: … "[B]y June revenue was increasing and we believe that every one of our division can grow revenue from Q2 to Q3…" | ¶79: The Company was experiencing a material adverse trend of bid deflation which was required to be disclosed under SAB 101. |
| ¶93: … "[N]one of the traffic purchased from any of these distribution partners represented over 10% of consolidated revenue in 2004" | ¶94 (additional paragraph references omitted) The percentage of revenue generated by Dmitri and Saveli was 36% for 2004. |

The Complaint meets the particularity standards of Rule 9(b) and the PSLRA, which require that the complaint "set forth [which] statements or omissions were made in [which] documents or oral representations, the time and place of the statements or omissions; who made the statements, the content of the statement and the manner in which they misled the plaintiffs;

and what the defendant obtained as a consequence of the fraud." *Primavera Investors v. Liquidmetal Techs.,* 403 F. Supp. 2d 1151, 1159 (M.D. Fla 2005).

The Complaint also meets the remaining requirements of the PSLRA as the arguments raised in Defendants' Motion either improperly require the resolution of factual issues in Defendants' favor; or do not withstand scrutiny when compared to the detailed fraud allegations in the Complaint. In sum, Defendants argue that: (1) there are no material misrepresentations of existing fact; (2) the false and misleading statements identified in the Complaint are forward-looking and protected under the Reform Act's Safe Harbor; (3) scienter is not adequately pled; and (4) the requirement of loss causation has not been satisfied.

*First*, material, actionable statements such as Defendants' false assurance that no distribution partner amounted to more than 10% of FindWhat's revenue have been sufficiently alleged. (*See, e.g.,* ¶¶ 40, 41, 93, 94) *See also* Argument, Sec. II, below.

*Second,* in order to qualify for "Safe Harbor" protection, the statements must be forward-looking in nature, and accompanied by *meaningful* cautionary language. Here the "cautionary" language provided by Defendants was itself misleading, since the "risk" factors that Defendants purported to warn investors about *had already occurred. See* Argument, Sec. IV, below.

*Third, e*ven without the benefit of discovery, the Complaint amply satisfies the Reform Act's relevant pleading standards, and specifies facts giving rise to severe recklessness or actual knowledge. Contrary to Defendants' position, this is not a case of "mere" corporate mismanagement, but is rather a case about actionable securities fraud. Indeed, the Complaint does not merely allege that Defendants' practices were unwise or risky, but specifically alleges that Defendants intentionally, or with severe recklessness, made public statements that failed to disclose the truth about FindWhat's distribution partners. (*See*, *e.g.*, ¶¶ 5-8, 64-96.)

Further, while it is not necessary under the PSLRA to plead actual knowledge, the specifics of face-to-face meetings in which Defendants learned of problems with its key distributors are adequately detailed. (¶¶ 8, 58.) For example, reports called "War Reports" evidencing the amount and source of "bad traffic" are identified and detailed. (¶ 51.) Additionally, powerful motivating forces causing Defendants to continue concealment of the adverse facts are detailed, such as Defendants': (1) suspiciously timed insider sales; (2) desire to meet Wall Street estimates; and (3) insatiable need to acquire revenue-generating companies using artificially inflated FindWhat stock as the predominant currency for the transactions. (*See, e.g.*, ¶¶ 117-131.)

Finally, Plaintiffs clearly satisfy the loss causation requirement as the Complaint alleges, among other things, that between February 24, 2005 and May 5, 2005, Defendants issued a series of disclosures which led to a 64% stock price decline. Any challenge to the extent of damages that shareholders sustained, and are entitled to recover, cannot be properly resolved in a motion to dismiss.

For these reasons and as detailed more fully below, Plaintiffs respectfully submit that Defendants' Motion to Dismiss should be denied in its entirety.[2]

---

[2]    Defendants further argue that sanctions should be imposed pursuant to the PSLRA and Rule 11 due to Plaintiffs' failure to conduct a proper investigation. (Def. Mem. at 1). This suggestion is completely unfounded. The Complaint reflects a detailed and thorough investigation, citing to the testimony of numerous former employees who detailed FindWhat's ongoing fraudulent scheme. Rule 11 is only violated when it is "patently clear" that a claim has absolutely no chance of success. *Official Publications, Inc. v. Kable News Co.*, 884 F. 2d 664, 670 (2d Cir. 1989). This is not the case here, where Plaintiffs have filed a Complaint that details the extent of Defendants' fraud in great detail and also meets the standards of the PSLRA.

## FACTUAL BACKGROUND

**I.    DEFENDANTS ACTIVELY CONCEAL FUNDAMENTAL DEFECTS IN FINDWHAT'S DISTRIBUTION NETWORK**

Defendants argue that the Complaint's fraud claims are based on a fundamental misunderstanding of FindWhat's business model because the Company's revenues come from payments from its advertisers who are the "actual customers."  (Def. Mem. at 5-6.)  Defendants' attempt to suggest that there is no relationship between the Company's revenues and its distributors is belied by FindWhat's own SEC filings, which state: "[o]ur business is dependent upon our relationship with, and the success of, our distribution partners" and "[c]lick-through fraud, whether we detect it or not, could cause our revenues and business to suffer."  (Def. Mem. at 19.)

As Defendants' brief correctly concedes, there is a direct correlation between the quality of these distribution partners and FindWhat's revenue, since advertisers will "bid" higher for FindWhat's products if they know there is a strong likelihood that using FindWhat will bring interested consumers to their websites.  However, if the distribution partner does not provide authentic leads to advertisers, the bid price for FindWhat services declines, and the Company's revenues decline.  The importance of having distribution partners beyond reproach was well accepted in FindWhat's industry, to the point where one insider noted: "[w]e live and die by the quality of our traffic," and  "[i]n this industry, if you have bad traffic, it's a PR disaster, the word spreads like jungle fire."  (¶¶ 26-27.)  Defendant Thune himself conceded that if distribution partners were of low-quality, advertisers would cease working with the Company.

### A.    "Serious, Serious Bid Deflation": Defendants Fail to Reveal a Material Adverse Trend

FindWhat's Internet traffic was exactly the type of poor-quality traffic that they sought to conceal to avoid "a PR disaster," loss of advertisers, and the subsequent revenue shortfall.

FindWhat's revenue is determined by the price it can get advertisers to bid for a click on their ads and the number of high-quality clicks FindWhat can direct to those ads.  (¶ 28.) Because the price an advertiser is willing to pay per click is supported by the income it derives from the advertisement, the more advertiser paid clicks that do not result in any income for the advertiser, the lower the "conversion rate" of advertiser expenditure into income.  *Id.*  Since the conversion rate directly impacts an advertiser's bid price, as the conversion rate drops, so too does the bid price.  *Id.*  During the Class Period, Defendants experienced a material adverse trend described by former employees as: "serious, serious bid deflation in [FindWhat's] network"  that the Company was  "getting the scraps that [were] left on the table that Google and Yahoo! passed on [as a result of] . . . their due diligence process in screening the [low-quality] traffic," "creating a "devastating effect on revenue."  (¶¶ 6, 29, 31.)

The adverse trend stemming from FindWhat's network of low-quality and fraudulent distribution sources was clearly material.  In early 2003, FindWhat achieved $0.20-$0.21 per click, however, by June 2005 the Company's revenue per click had declined precipitously to approximately $0.12 per click.  (¶ 33.)

**B.**     **FindWhat's Poor-Quality Distributors: A "House of Cards Held Together By a Thread"**

Because of the low bid price, high-quality distribution partners (who shared in the revenue derived from advertisers on a percentage basis) did not want to work with FindWhat, forcing the Company to continue its reliance on low-quality distributors who used methods that were improper and in clear violation of the Company's stated guidelines for its distributors. (¶ 73-74).  Indeed, during the Class Period, the Company relied on two "young Russian kids" known as "Saveli and Dmitri" for a material portion of FindWhat's revenues.  (¶ 37.)  Dmitri and Saveli were "turn and burn guys" whose primary focus was driving in a lot of Internet traffic,

even if it was low-quality traffic.  (¶ 39.)  Dmitri and Saveli used improper means to drive

revenue, such as "click fraud" "spyware" and "browser hijacking," to create Internet traffic to

Company advertisers.  (¶¶ 37, 38, 39, 42, 43, 45, 46-49.)  These methods were in clear violation

of FindWhat's expressed (but selectively enforced) guidelines for its distribution partners.

The Company's reliance on poor-quality distributors was concealed as part of

Defendants' positioning of FindWhat as a maturing business worthy of investment.  Defendants

presented the Company as having an evolving, diverse source of Internet click traffic.  (¶¶ 12-14,

67, 69, 71, 75, 87, 95.)  Further, FindWhat's 2003 Form 10-K states that during 2002 two

distribution partners provided it with Internet traffic representing greater than 10% of total

revenue; however, according to the Company, this number decreased to just one partner in 2003

and by 2004, no one provided greater than 10% of total revenue.  (¶ 93.)  However, what

FindWhat executives knew, and hid from the public (and the market) during the Class Period, is

that the Company's two largest distribution partners, Dmitri and Saveli, produced approximately

36% of FindWhat's revenue during the Class Period.  (¶¶ 7, 40, 41.)  These two individuals

produced Internet traffic representing greater than 10% of FindWhat's total revenue for 2004 but

generated extremely low-quality traffic by employing the illicit means listed above.  (¶¶ 7, 38,

40-49.)

While Dmitri and Saveli were the distributors providing the Company's major source of

revenues during the Class Period through the use of click fraud, they were by no means the only

poor-quality distribution partners Defendants knew of.  In fact, the Complaint includes a

description of an internal FindWhat report which identifies by ID number, revenue per click, and

name, 27 additional distributors who were identified as using "surreptitious traffic" to generate

Internet traffic.  (¶ 60.)

C.    **"We Cannot Continue to Whore Our Advertisers" to Dmitri and Saveli: Defendants' Last-Ditch Effort to Legitimize FindWhat's Distribution Partners**

Defendants were regularly confronted with the fraudulent methods employed by Dmitri and Saveli, yet chose not to terminate the relationship due to their dependence on the incredible revenue they illicitly generated.  (¶¶ 50-58.)  The Company's reliance on this illegitimate source of revenue was no secret to Defendants.  Dmitri and Saveli and their improper practices were discussed in Company emails, debated at executive-level Company meetings, and Defendant Pisaris-Henderson himself was even directly questioned about Dmitri and Saveli's poor-quality traffic.  (¶¶ 45, 47-58.)  Because of the bid erosion created by utilizing these fictitious traffic sources, Defendants knew they would have to do something to convince advertisers to align with the Company.

Ultimately, the decision was made to terminate the Company's relationship with Saveli and Dmitri because they were "basement operators" employing "spyware."  (¶ 55.)  During a conference in San Francisco in November 2004, a former senior level FindWhat employee complained about the growing problem of Dmitri and Saveli noting: "[w]e cannot continue to whore our advertisers" to Dmitri and Saveli.  (¶ 57.)  In order to try to attract high-quality distribution partners, Thune and Pisaris-Henderson approved a plan to increase the percentage of revenue per click paid to partners other than Dmitri and Saveli from the usual 50% to 70%, in the hopes that it would "dilute the bad traffic coming from Saveli and Dmitri" and increase Company revenues in order to "meet 4Q2004 projections."  *Id.*  Indeed, Defendant Thune commanded that the Company "had to replace the revenue it would lose [from Dmitri and Saveli] before FindWhat would remove them."  (¶ 56.)  However, since Defendants were unable to generate sufficient revenue from other sources, they refused to allow the Company to cease its dubious relationship with Dmitri and Saveli.  (¶ 57.)

## II.    DEFENDANTS' OBSESSION WITH MEETING WALL STREET ESTIMATES

One of the reasons Defendants refused to permit the removal of the artificial revenue generated by partners like Dmitri and Saveli was to continue to meet earnings estimates. Defendants were intensely focused, if not obsessed, on meeting Wall Street's unforgiving growth expectations, and knew what a missed quarter could do to the Company's stock price. (¶¶ 9, 123-129.) Pisaris-Henderson repeatedly emphasized the Company's ability to meet Wall Street's revenue goals, noting that the Company had seen "seventeen straight quarters of sequential revenue growth and eleven straight quarters of sequential pre-tax income growth." (¶ 2.) In fact, prior to February 23, 2005, the Company met or exceeded analyst growth expectations in every single quarter during the Class Period – sometimes by as little as a penny. (¶¶ 2, 123-129.)

Defendants regularly reviewed reports showing the Company's falling profits, indeed a Senior Vice President received calls from Defendants complaining that revenue was down, and telling him that he "needed to boost it" to meet Wall Street's expectations. (¶¶ 9, 127.) Driven by this unyielding desire, Defendants allowed the fraud to continue "to make numbers at the expense of FindWhat's business." (¶ 9.)

## III.    THE TRUTH REGARDING FINDWHAT'S FRAUDULENT DISTRIBUTION NETWORK IS BELATEDLY REVEALED

In the face of increased government scrutiny regarding click fraud, FindWhat executives feared that "the sh*t was going to hit the fan . . . after the hammer came down on the [spyware] industry," and that they would find themselves next on Attorney General Spitzer's list of spyware targets. (¶¶ 61-62.) During the Fourth Quarter 2004, Defendants falsely claimed that they removed a substantial amount of low-quality (*i.e.* click-fraud based) revenue from its system, in an effort to lull investors and advertisers into believing the Company was proactive and aggressive about policing click fraud. (¶¶ 12, 87, 95.) During a Company conference call

on February 23, 2005, Defendant Pisaris-Henderson emphasized that the Company had

voluntarily removed $70,000 per day of top-line (*i.e.* fraudulent) revenue, stating:

> [W]e have intentionally removed traffic sources from our distribution network that would otherwise have produced approximately $70,000 of revenue per day in topline revenue. Again, our focus is to deliver traffic that converts rather than just clicks alone.  (¶ 87.)

According to former employees as well as an internal FindWhat report directly

referenced in the Complaint, this announcement referred to Dmitri and Saveli. [3]  (¶ 88.)

Defendants emphasized the alleged removal of low-quality traffic from its network on February

23, 2005 to convince advertisers that they had improved their traffic quality to attract higher bids

in an effort to stem the worsening bid erosion at FindWhat.  (¶¶ 88, 97.)  Despite the February

disclosure, in fact, Dmitri and Saveli were not removed from the network, and FindWhat's

distribution network continued to suffer from quality issues.

Between February 23, 2005 through May 4, 2005, Defendants began to trickle out

carefully selected adverse information.  (¶¶ 97-100, 102, 103.)  On May 2, 2005, Defendants

revealed that FindWhat was a defendant in a class action brought on behalf of its own advertising

customers alleging that the Company improperly billed them for clicks that FindWhat knew were

not made by bona fide consumers in violation of their contracts and actively concealed this

practice from its advertising clients.  (¶ 99.)  That same day, the Company filed a Form 8-K with

the SEC announcing that Ernst and Young, its independent auditor, was resigning.  (¶ 98.)  Then

on May 5, 2005, the Company disclosed that Defendant Aguis had resigned as the Company's

---

[3]    Defendants argue that Plaintiffs have pled no supporting facts that the February 23, 2005 announcement that certain distribution partners had been removed concerned Dmitri and Saveli. (Def. Mem. at 24.)  This argument is simply incorrect, as the Complaint references numerous statements indicating that Dmitri and Saveli were indeed the subject of this disclosure.  (¶ 88.) These detailed factual allegations must be accepted as true on a motion to dismiss.

CFO, effective May 4, 2005, and that the Company had been removing certain distribution partners who represented a "meaningful percentage" of daily click-through revenue resulting in a negative effect upon the Company's short-term financial performance.  (¶ 102.)  Analysts were shocked by the announcement, stating: "[W]e wished that management had told us in prior communications that such a large percentage of its traffic was low-quality, low conversion traffic. . . ."  (¶ 106.)  Another analyst shocked by the magnitude of the impact on revenues from the alleged removal of these fraudulent distribution partners noted: "[w]e expected a gardener using pruning shears.  What we got was a lumberjack using a chainsaw."  (¶ 107.)

Analyst reaction to the May 5, 2005 conference call was even worse, after Defendants revealed that FindWhat had turned off additional distribution partners who accounted for a meaningful percentage of revenue.  For example, a May 9, 2005 report issued by analyst Craig-Hallum noted that:

> Also, one of the key elements of our original investment theses on FindWhat was that no distribution partner represented over 10 percent of revenue.  The accuracy of this statement must also come under scrutiny as the company just lowered the midpoint of it guidance by 27.9 percent.  (¶ 109.)

The Company's stock price lost 64% or its value between February 23, 2005, and May 5, 2005, falling from a closing price of $13.45 on February 23 to close at $4.83 on May 5, 2005.  (¶¶ 15, 105.)  As a result of these "disclosures" the price of FindWhat stock declined from $24.50 on September 3, 2003 to close at $4.83 on May 5, 2005, having dropped an astonishing 82.58% from its Class Period high of $27.72 on September 16, 2003.  *Id.*

## ARGUMENT

### I.    LEGAL STANDARDS

In considering a motion to dismiss, the Court must construe the complaint in the light most favorable to plaintiffs.  A motion to dismiss must be denied unless it appears beyond a

doubt that the plaintiff can prove no set of facts which would entitle him to relief. *Lagrasta v. First Union Sec., Inc.*, No. 2:01-CV-251-FTM-29DNF, slip op. at 2 (M.D. Fla. Dec. 7, 2004) (Steele, J.); *McBride v. Vision Twenty-One Inc.*, No. 8:99-CV-138-T-27F, 2000 U.S. Dist. LEXIS 14742 at *5 (M.D. Fla. Aug. 21, 2000); *In re Paradyne Networks Inc. Sec Litig.,* 197 F. Supp. 2d 1349 (M.D. Fla. 2002); *In re UniCapital Corp. Sec. Litig.,* 149 F. Supp. 2d 1353, 1355 (S.D. Fla 2001); *In re Sensormatic Elec. Corp. Sec. Litig.*, No. 01-8346-CIV-HURLEY, 2002 U.S. Dist. LEXIS 10715, *7 (S.D. Fla. Jun. 10, 2002). Indeed, the "threshold is 'exceedingly low' for a complaint to survive a motion to dismiss for failure to state a claim." *In re Catalina Mktg. Sec. Litig.*, No. 8:03-CV-1582, 2005 U.S. Dist LEXIS 6107, at *1-2 (M.D. Fla. Mar. 31, 2005).

Importantly, a motion to dismiss is an inappropriate forum to resolve factual disputes. In the same manner in which they previously attempted to twist the Federal Rules of Civil Procedure in asking this Court to rule on a motion to dismiss despite the fact that Defendants had simultaneously filed an answer (DE #11), they now ask the Court to look well beyond the Complaint, and resolve questions of fact *in their favor*. Such an inquiry is clearly not proper on a motion to dismiss, when all reasonable inferences must be construed in *Plaintiff's* favor and all facts must be accepted as true. *See Sensormatic,* 2002 U.S. Dist. LEXIS 14742, at *6 ("In the context of a motion to dismiss directed to a securities fraud complaint, the court must limit its consideration to the pleadings . . . .").

Despite this clear standard, Defendants ask the Court to disregard the Complaint's well-pled allegations and instead accept and construe their account of the following alleged "facts" as truths:

- ■ That Dmitri and Saveli only amounted to 4% and 7% of revenues during the first quarter of 2005. (Def. Mem. at 23-24);

13

■    That the analyst who challenged Defendants' statements that "no distribution partner represented over 10% of revenue" is simply wrong. (Def. Mem. at 22);

■    That the February 23, 2005 disclosure did not relate to the removal of Dmitri and Saveli.  (Def. Mem. at 24-25);

■    That "bid erosion" and artificially inflated revenues cannot logically coexist.  (Def. Mem. at 27);

■    That Defendants' insider trading is not suspicious because it was made pursuant to a Rule 10b 5-1 trading plan.  (Def. Mem. at 33-34);

■    That shareholders are still benefiting from Dmitri and Saveli's click fraud and have not been damaged (despite a massive 82% class period stock price drop) because the Company is still reporting these fraudulent revenues.  (Def. Mem. at 38-39); and

■    That FindWhat provided sufficient "cautionary language"[4] in their SEC filings to warn investors of the risks associated with click fraud and poor-quality distributors.  (Def. Mem. at 19, 36-38.)

The Court should ignore Defendants' improper attempt to resolve factual issues or spin the facts in their favor.  *See Catalina,* 2005 U.S. Dist LEXIS 6107, at *1-2 ("Defendants' efforts to recast the factual allegations, drawing inferences to their benefit, are inapposite and will not be considered at this stage.").  Should the Court consider these factual arguments, Fed. R. Civ. P. 12(b)(6) requires that "the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material pertinent to such a motion by Rule 56."  *Jones v. Auto. Insur. Co. of Hartford*, 917 F.2d 1528, 1530 (11th Cir. 1990); *Scelta v. Deli. Support Servs., Inc.*, 57 F. Supp. 2d 1327, 1356 (M.D. Fla. 1999).

---

[4]    The question whether any cautionary language is sufficiently "meaningful" raises fact issues that are improperly resolved on this motion to dismiss.  *See Fecht v. Price Co.*, 70 F.3d 1078, 1080 (9th Cir. 1995.)

Not only do Defendants ask the Court to accept their factual conclusions as the truth, they ask the Court to go even further and subvert the jury's role in assessing the credibility of witnesses. In fact, the crux of Defendants' arguments regarding scienter ask the Court to assume that the statements of high-level former employees, including a former Director of Business Development and a former marketing manager, should be disregarded because in their opinion, these witnesses are "disgruntled." (Def. Mem. at 4, 17.) However, Defendants' questions regarding the reliability of witness statements must be resolved by the trier of fact. *Fitzer v. Security Dynamics Techs., Inc.*, 119 F. Supp. 2d 12, 21 (D. Mass. 2000) (questions concerning the credibility of unnamed sources "are questions that go to the weight of the [] evidence"); s*ee also In re Xerox Corp. Sec. Litig.*, No. 3:99-CV-02374 (AWT), 2001 U.S. Dist. LEXIS 16361, at *10 (D. Conn. Sept. 28, 2001) ("The task of the court in ruling on a Rule 12(b)(6) motion is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.").

When Defendants' motion is stripped of its improper foundation of factual and credibility challenges, the legal arguments simply cannot stand.

## II.    DEFENDANTS' FALSE STATEMENTS ARE MATERIAL AND ACTIONABLE

Defendants argue that the statements in the Complaint fail to plead a material misrepresentation of existing fact because the: (1) allegations regarding Dmitri and Saveli are inactionable; (2) "bid erosion" theory fails to state a claim; (3) Complaint alleges mismanagement, not fraud. (Def. Mem. at 10-25.) Unable to test the sufficiency of the Complaint on legal grounds, Defendants again base their arguments on challenges to the factual information provided by witnesses and the credibility of those witnesses. (Def. Mem. at 17) ("The Amended Complaint here also purports to contain statements from disgruntled former

employees.  These statements are not sufficient to plead a material misrepresentation. . .").
These arguments are simply wrong.

**A.    Defendants' Failure to Disclose The Revenues Derived From Dmitri and Saveli is Actionable Securities Fraud**

Defendants argue that any omission or misstatement regarding Dmitri and Saveli is inactionable because there is no duty to disclose the identity or quality of FindWhat's distribution partners.  Here, the duty to disclose was created by Defendants themselves, who chose to specifically address the issue of revenues derived from distribution partners and chose to affirmatively misrepresent this material information.

The Eleventh Circuit has stated that "[a] duty to disclose may . . . be created by a defendant's previous decision to speak voluntarily.  Where a defendant's failure to speak would render the defendant's own prior speech misleading or deceptive, a duty to disclose arises." *Sherleigh Assocs., LLC v. Windmere-Durable Holdings, Inc.*, 178 F. Supp. 2d 1255, 1270 (S.D. Fla. 2000) (quoting *Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1043 (11th Cir. 1986)); *accord Roeder v. Alpha Indus. Inc.,* 814 F.2d 22, 26 (1st Cir. 1987) ("If . . . a company chooses to reveal relevant, material information even though it had no duty to do so, it must disclose the whole truth.") (quoting *Grossman v. Waste Mgmt., Inc.*, 589 F. Supp. 395, 409 (N.D. Ill. 1984)); *see also In re Town Servs., Inc. Sec. Litig.*, 184 F. Supp. 2d 1308, 1329 (N.D. Ga. 2001) (duty to disclose arose when Company experienced higher than ordinary customer cancellations and disruption of data lines.)

Here, Defendants repeatedly stated that no distribution partner contributed over 10% of the Company's 2004 revenues.  For example, during a conference call with analysts on November 1, 2004, Defendant Pisaris-Henderson stated, "[A]s you are all aware, we don't breakout partners and we don't comment specifically on any of our relationships.  To the extent

16

that we would have a partnership that would contribute over 10 percent on a recurring basis, obviously we would do that. But that just is not the case." (¶ 81.)

After choosing to speak on this subject in order to convince advertisers, investors, and the market of the purported quality of their distribution network, Defendants had an affirmative obligation to reveal the truth. Despite Defendants' attempts to cloak themselves in the technicalities of precisely which GAAP or SEC rule was violated, this duty to disclose arises independently as a result of Defendants' own prior speech.

**B.    Defendants Had a Duty To Disclose that Dmitri and Saveli Accounted For Greater Than 10% of the Company's Revenue in 2004**

In addition to long-standing Eleventh Circuit precedent which requires Defendants to reveal the truth once they have chosen to speak, Defendants had a duty to disclose the amount of revenue derived from Dmitri and Saveli under applicable SEC and GAAP rules.

Defendants argue that "the Company had no obligation to speak on its distribution partners," including Dmitri and Saveli, because the Company's distribution partners are suppliers and not customers. (Def. Mem. at 19-21.) Defendants' focus on the distinction between "suppliers" versus "customers" is a coy attempt to skirt the Company's obligations under GAAP. GAAP does in fact require that the Company disclose information regarding its suppliers. SEC Statement of Position 94-6 ("SOP 94-6"), Disclosure of Certain Significant Risks and Uncertainties, provides:

> .21    Financial statements should disclose the concentrations described in paragraph .22 if, based on information known to management prior to issuance of the financial statements, all of the following criteria are met:
>
> a. The concentration exists at the date of the financial statements.
>
> b. The concentration makes the enterprise vulnerable to the risk of a near-term severe impact.

c.  It is at least reasonably possible that the events that could cause the severe impact will occur in the near term.

.22    Concentrations, including known group concentrations, described below require disclosure if they meet the criteria of paragraph .21. (Group concentrations exist if a number of counterparties or items that have similar economic characteristics collectively expose the reporting entity to a particular kind of risk.) Some concentrations may fall into more than one category.

a.  Concentrations in the volume of business transacted with a particular customer, supplier, lender, grantor, or contributor.  The potential for the severe impact can result, for example, from total or partial loss of the business relationship. For purposes of this SOP, it is always considered at least reasonably possible that any customer, grantor, or contributor will be lost in the near term.

SOP 94-6 (emphasis added).  The SEC Division of Corporate Finance Accounting Disclosure Rules and Practices' 2000 Edition Overview Training Manual further provides:

(b) FRR Section 503.02 requires registrants to disclose the names of significant customers and suppliers that exceed 10% of sales and purchases. This disclosure generally is not required in the notes to the financial statements but must appear in the description of the business section of the document.

(emphasis added).

Despite this clear disclosure requirement, the Company's 2004 Form 10-K/A stated under the heading "Revenue" for the years ended December 31, 2004 and 2003, that:

Expressed as a percentage of revenue, ***none of the traffic purchased from any of these distribution partners represented over 10% of consolidated revenue in 2004.***  Internet traffic purchases from one distribution partner in 2003 represented more than 10% of total revenue.

(Def. Mem. Ex. D, 2004 10-K/A at 42) (emphasis added).  The 2004 Form 10-K/A does not include a note to financial statements regarding "concentrations," where the Company is required to disclose supplier concentrations under SOP 94-6.

The Complaint alleges that Dmitri and Saveli accounted for more than 10% of FindWhat's revenue in 2004; that Dmitri and Saveli generated approximately one-third of FindWhat's revenue during 2003, 2004 and 2005; and that Dmitri and Saveli generated approximately 36% of all of FindWhat's click revenue (¶¶ 7, 40-42, 75, 76, 81, 82, 87, 88.)  The financial statements were required to disclose the concentration of revenues provided by Dmitri and Saveli, as the loss of revenue from Dmitri and Saveli would severely impact the company with a loss of one-third of the Company's revenues.  Had this concentration been properly disclosed, analysts and the market would not have been taken by surprise by the Company's May 5, 2005 announcement lowering 2005 guidance by nearly 30%.  (¶¶ 97-109.)

Faced with clear statements from former employees who confirmed that Dmitri and Saveli accounted for more than 10% of FindWhat's revenue, Defendants again attempt to draw factual inferences in their favor.  For example, Defendants cite to ¶88 of the Complaint, which contains a chart dated February 20, 2005 that shows that on one particular day, Saveli accounted for $45,483.92 in revenue and Dmitri accounted for $24,709.58 in revenue.  (Def. Mem. at 23.)  Defendants then assume that this revenue per day figure remained constant during the quarter, and therefore, they calculate based on first quarter revenues that Saveli only accounted for 7% of revenue, and Dmitri accounted for 4%.  (Def. Mem. at 23-24.)

Defendants cannot build an argument based on assumptions and inferences.  The chart included in the Complaint shows only one day of revenue and several former employees emphasized that Dmitri and Saveli amounted for more than one-third of revenue during 2003-2005.  (¶¶ 7, 40-42, 88.)  These facts must be accepted as true on a motion to dismiss.  In the alternative, Plaintiffs respectfully submit that the motion to dismiss should be converted to a

motion for summary judgment, and Plaintiffs should be permitted to request discovery on this issue.

### C.    Defendants Failed to Disclose the Known, Material Adverse Trend of "Bid Erosion"

Defendants had a duty to disclose the material adverse trend existing in its core operations, which Defendants knew existed, or were reckless in not knowing. Indeed, FindWhat's dependency on low-quality distribution partners and the erosion of advertisers' bids that resulted, is a material adverse trend requiring disclosure. (¶¶ 29-37.) Despite Defendants' contention to the contrary (Def. Mem. at 25-28), Plaintiffs have pled facts in sufficient detail to establish that Defendants knew, or were reckless in disregarding, the material adverse trend occurring in FindWhat's core business. For example:

- According to a former Account Manager, FindWhat's network suffered from "serious, serious bid deflation." (¶ 29.)

- According to a former Director of Business Development, in early 2003 FindWhat achieved $0.20-$0.21 per click, however by June 2005, revenue per click had dropped an astonishing 45% to $0.12 per click. (¶ 93.)

- During the 4Q 2004, Defendants' knowledge of this adverse trend is clear from the affirmative steps FindWhat took to counter diminishing revenue per click, including offering higher revenue share percentages to attract quality distribution partners. (¶ 57.)

Many cases have upheld complaints alleging that defendants failed to disclose a material, adverse trend as Defendants did here. *See, e.g., In re Scholastic Corp. Sec. Litig.,* 252 F. 3d 63, 76 (2d Cir. 2001); *In re Next Level Syst. Inc.*, No. 97-C-7362, 1999 U.S. Dist. LEXIS 5653 at *12 (N.D. Ill. Mar. 31, 1999); *In re Computer Assocs. Class Action Secs. Litig.,* 75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999); *Manavazian v. Atec Group,* 160 F. Supp. 2d 468, 480 (E.D. N.Y. 2001); *In re Campbell Soup Co. Sec. Litig.,* 145 F. Supp. 2d 574, 590 (D.N.J. 2001); *Sensormatic*, 2002 U.S. Dist. LEXIS 10715 at *8-12.

### D.    Plaintiffs' Claims Allege Fraud, Not Mismanagement

Hoping to avoid liability (or even responsibility) for their blatant fraud and glaring failure to disclose material problems with the Company's financial condition that Defendants attempted to conceal through their fraudulent scheme to boost revenues, Defendants would re-cast their fraudulent acts as merely bad business decisions.  Defendants suggest that at its core, the Complaint is nothing more than "a critique of and/or a subjective disagreement with the judgments and performance of management regarding how to run and manage this business in the ever-evolving environment of Internet advertising."  (Def. Mem. at 13.)  Contrary to Defendants' bald assertions, Plaintiffs' claims are not about bad business decisions.[5]

Defendants went far beyond mere mismanagement.  Instead, Defendants concealed the effects of their fraudulent scheme from investors by affirmatively boasting about the Company's high-quality distribution partners and the fact that none of these partners amounted to more than 10% of revenues.  When plaintiffs plead that defendants knowingly entered into a scheme to defraud, such allegations clearly fall within the scope of the federal securities laws.  *See, e.g.*, *Kennedy v. Tallant*, 710 F.2d 711, 718-19 (11th Cir. 1983) ("Appellants were charged with specific acts of intentional fraud in the sale of securities, not mere corporate mismanagement.").

The Complaint is not devoid of "allegations of deception, misrepresentation, or nondisclosure," which brings the complaint outside of the realm of claims for mere mismanagement.  *See First Am. Bank & Trust v. Frogel*, 726 F. Supp. 1292, 1296 (S.D. Fla. 1989) ("***Absent*** allegations of deception, misrepresentation, or nondisclosure, claims of a breach of fiduciary duty and internal corporate mismanagement are not actionable under § 10(b) of the

---

[5]    Defendants also misleadingly cite to statements in support of their mismanagement argument which are not even alleged to be false or misleading.  (*See, e.g.*, Def. Mem. at 14, referencing paragraphs 30-31, and 34 of the Complaint).  These statements merely provide background information and are not alleged to be false statements.

Securities Act."). (Emphasis added). Here, Plaintiffs plead that Defendants knowingly entered into a scheme to defraud and these "allegations [fall] within the scope of the federal securities laws." *See id.; see also, e.g.*, (¶¶ 29-96.)

Defendants' reliance on numerous cases for the proposition that claims for breach of fiduciary duty and internal corporate mismanagement are not actionable under § 10(b), *see* Def. Mem. at 13-14 (citing *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977); *Barr v. Matria Healthcare, Inc.*, 324 F. Supp. 2d 1369, 1383 (N.D. Ga. 2004); *Portannese v. Donna Karan Int'l, Inc.*, No. 97-CV-2011CBA, 1998 WL 637547, at *9 (E.D.N.Y. Aug. 14, 1998); *Panter v. Marshall Field & Co.*, 646 F.2d 271, 289 (7th Cir. 1981); *Cutsforth v. Renschler*, 235 F. Supp. 2d 1216, 1242 (M.D. Fla. 2002); *In re Northern Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 459-60 (S.D.N.Y. 2000), is misplaced because Defendants overlook that the key to whether a claim is based on securities fraud or mismanagement is whether there are allegations of deception or misrepresentation – as sufficiently alleged in the Complaint here.

Further, Defendants' reliance on this Court's opinion in *Cutsforth v. Renschler*, 235 F. Supp. 2d 1216 (M.D. Fla. 2002) is equally meritless. (Def. Mem. at 13-15.) This case is easily distinguishable from *Cutsforth* for several reasons. The plaintiffs in *Cutsforth* alleged that defendants' statements about the consummation of a merger were rendered misleading due to operational problems arising from the merger. *Cutsforth*, 235 F. Supp. 2d at 1242. The Court held the allegations amounted to mismanagement, not fraud. Significantly, however, in *Cutsforth*, the allegations of mismanagement did not also carry adverse consequences that were not disclosed to investors. *Cutsforth*, 235 F. Supp. 2d at 1244. To the contrary, the mismanagement claims focused on unspecified sales representatives taking handwritten orders in unspecified markets, monthly sales goals being set too high in two markets, a regional sales

manager that set expected revenues at a high level, and company re-established business with a company that had a bad credit history. *Id.* at 1245. Here, by contrast, Plaintiffs allege Defendants concealed and misrepresented numerous adverse facts regarding Defendants' improper operational and financial practices and distribution partners that ultimately and severely impacted the Company's financial health and that, had these facts been disclosed to investors, Plaintiffs would not have purchased FindWhat shares at artificially inflated prices. (¶¶ 5-7, 10, 65-105, 135, 136, 140.)

Further, Plaintiffs allege, among other things, that Defendants misrepresented both the quality and concentration of the Company's distribution partners, the quality of its Internet traffic, and dependence on spyware. The Complaint does not merely allege that Defendants' practices were simply unwise or risky, but specifically alleges that Defendants intentionally or with severe recklessness made public statements that inadequately and misleadingly disclosed or omitted material information. (*See, e.g.*, ¶¶ 95-126, 128, 139-141, 150, 152-155, 165-166, 169.) Accordingly, these claims clearly establish actionable securities fraud, not "mere" mismanagement.

## III.    THE COMPLAINT ADEQUATELY ALLEGES SCIENTER

A securities fraud complaint adequately pleads scienter when it pleads "facts that give rise to a strong inference that the defendant acted in a severely reckless manner." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271 (11th Cir. 1999)*, 1287. The Eleventh Circuit has held that, even if facts on their own would not support an inference of scienter, courts should look at the facts supporting an inference of scienter in the aggregate. *Phillips v. Scientific Atlanta, Inc. et al.*, 374 F.3d 1015 (11th Cir. 2004). Further, allegations of motive and opportunity, while insufficient alone to plead scienter, are relevant as a component of severe recklessness. *Bryant*, 187 F.3d at 1285-86; *In re Spear & Jackson Secs. Litig.*, 399 F. Supp. 2d 1350 (S.D. Fla. 2005).

23

Here, Plaintiffs plead actual knowledge of the fraud, thus far exceeding the Eleventh Circuit's scienter requirement of "severe recklessness." These allegations, by themselves, are more than sufficient to plead scienter. Nonetheless, Plaintiffs also allege additional factors, which show that Defendants were powerfully motivated to conceal the truth from investors. These factors include Defendants': (1) suspiciously timed insider selling;[6] (2) obsession with meeting Wall Street estimates to foster the impression that FindWhat was a growth company; (3) use of FindWhat stock as currency to complete numerous Class Period acquisitions; and (4) internal control violations.

### A.     Defendants Are Directly Confronted With The Truth

The Complaint details several ways in which Defendants obtained actual knowledge of the poor-quality of their distribution network, yet failed to disclose the problem to investors:

- A former Director of Business Development discussed the need to negotiate affiliate relationships with higher quality affiliates, but Defendants Pisaris-Henderson and Thune refused to let him go forward with these deals. (¶ 35.)

- Defendant Pisaris-Henderson was present at a meeting during the Class Period, in which the growing internal concern over Dmitri and Saveli's Internet traffic and revenue generation "practices" were discussed. (¶ 54.)

- In a June 2004 meeting, certain members of management decided to terminate the Company's relationship with Saveli and Dmitri because they were "basement operators" employing "spyware," but Defendants Pisaris-Henderson and Thune refused to permit the termination because of the impact it would have had on revenues. (¶¶ 55-57.)

- Defendants Thune and Pisaris-Henderson gave the go-ahead to increase the percentage of revenue per click paid to partners other than Dmitri and Saveli in order to dilute the bad traffic coming from Saveli and Dmitri. (¶ 57.)

---

[6]     Insider selling is by no means a prerequisite to a finding of scienter. Indeed, courts in the Eleventh Circuit have routinely found sufficient scienter in securities cases where no insider trading is alleged. *See, e.g.*, *PSS World Medical*, 250 F. Supp. 2d 1335; *In re Sunbeam*, 89 F. Supp. 2d 1326.

- During a one-on-one meeting with a former Director of Business Development in December 2004 or January 2005, Defendant Pisaris-Henderson asked the former Director of Business Development point blank whether he thought FindWhat's traffic quality problems had to do with Saveli and Dmitri, to which the former Director of Business Development answered affirmatively. (¶ 58.)

- Defendants and the Company's executive management team received "War Reports," every Thursday from the Company's Business Development unit, "which detailed traffic from fraudulent distribution partners and the revenue derived from these partners." (¶ 51.) The Business Development unit then met every Friday to discuss the War Reports. *Id.*

- Defendants maintained an internal computer system, described as the "Interface," from which executive-level management had "real-time" access to the Company's (and its distribution partners') generation of Internet traffic for its advertisers and the corresponding click-through revenue generated by such traffic. (¶ 52.) It displayed the quality (*i.e.,* legitimate) Internet traffic generated in blue and filtered (*i.e.,* illegitimate) Internet traffic in red. (¶ 53.)

The fact that numerous employees confronted Defendants with the fraud supports a strong inference of scienter. *See, e.g., Catalina*, 2005 U.S. Dist. LEXIS 6107, at *9 (scienter found where individual defendants confronted by employees and had had access to internal information demonstrating the falsity of their public statements).[7]

Despite the sampling of detailed facts summarized above, Defendants contend that Plaintiffs' allegations are merely conclusory and Plaintiffs are required to provide even more details of the reports and meetings cited in the Complaint. (Def. Mem. at 31.) However, Plaintiffs are not required to plead evidence prior to discovery. *See Scholastic,* 252 F.3d at 72; *accord Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir. 2001) ("Inferences must be reasonable

---

[7]    *See also Zuckerman v. Smart Choice Auto Group, Inc.*, 2000 U.S. Dist. LEXIS 13489, (M.D. Fla. Aug. 29, 2000) (finding strong inference of scienter where employee told CEO about improper practices); *In re Hamilton Bankcorp, Inc. Sec. Litig.*, 194 F. Supp. 2d 1353, 1358 (S.D. Fla. 2002) (fraud being brought to management's attention contributed to inference of scienter); *Sunbeam,* 89 F. Supp. 2d, at 1338 (finding strong inference of scienter where complaint pled defendants were directly confronted by employees about the company's revenue recognition practices and statements made to securities analysts).

and strong--but not irrefutable.").[8]  All of the facts alleged in the Complaint and summarized

above, taken together, support a strong inference that Defendants either knew, or were reckless

in not knowing that the Company's largest distributors' illicit practices resulted in improper

revenue generation for the Company.

As explained in the Complaint, quality of traffic is everything in FindWhat's business.

(¶¶ 26-27.)  Dmitri and Saveli, two distributors who were known to be using improper click

generating practices, accounted for more than one-third of the Company's revenues during the

Class Period.  (¶¶ 7, 40-42.)  The Complaint clearly alleges a strong inference of scienter, where,

as here, the allegations of fraud go to the very core of the Company's business (and business

practices) and account for such a significant percentage of the Company's revenue.[9]

### B.    Insiders Sold Company Stock While in Possession of Material Non-Public Information Regarding the Improper Practices of the Company's Distribution Partners

Facts showing unusual insider trading during the Class Period are the classic "motive and

opportunity" allegations in a securities fraud case.  *SEC v. Adler*, 137 F.3d 1325, 1340 (11th Cir.

---

[8]    Plaintiffs here have pled far more detail than the plaintiffs in the cases cited by Defendants.  (Def. Mem at 17.)  The former employee statements in *In re NDC Health Corp., Inc. Sec. Litig.*, No. 1:04-CV-0970WSJ, slip op. (N.D. Ga. July 27, 2005) (Defs Mem. Exhibit H) and *Cutforth v. Renschler*, 253 F. Supp. 2d 1216, (M.D. Fla. 2002) do not rise nearly to the level of detail indicating Defendants' knowledge, or recklessness, as the former employee statements cited above.  Furthermore, *NDC Health* is currently on appeal to the Eleventh Circuit. In *Cutsforth*, former employees simply described computer integration problems the company was having, and the Court found such statements did not support fraud.  253 F. Supp. 2d at 1244.  Finally, in *In re Rexall Sundown, Inc. Sec. Litig.*, No.989798-CIV-DIMITROULEAS, 2000 WL 33539428, at *3 (S.D. Fla. Mar. 29, 2000), plaintiffs did not specify the internal reports.

[9]    *See In re Clarus Corp. Sec. Litig.*, 201 F. Supp. 2d 1244, 1251 (N.D. Ga. 2002) ("when a single transaction accounts for in excess of one-third of quarterly revenue, it would be an extreme departure from the standard of ordinary care for corporate officers and insiders charged with the control of corporate information not to be familiar with the nature and terms of the transaction."); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271 (11th Cir. 1999); *In re Complete Mgmt. Sec. Litig.*, 153 F. Supp. 2d 314, 325-26 (S.D.N.Y. 2001).

1998).  Stock sales can also constitute circumstantial evidence that Defendants knew the

Company's stock price was artificially inflated and support a strong inference of scienter where

the stock sales were unusual or out of the ordinary.  *In re Theragenics Corp. Sec. Litig.*, 105 F.

Supp. 2d 1342, 1361 (N.D. Ga. 2000).  "Insider trading is suspicious when it is dramatically out

of line with prior trading practices at times calculated to maximize the personal benefit from

undisclosed inside information."  *Sensormatic*, 2002 U.S. Dist. LEXIS 10715 at *19.

Defendants Pisaris-Henderson and Thune, as well as Frederick E. Guest, II ("Guest"), a

FindWhat director and member of the audit committee, sold almost ***$7 million*** of Company stock

during the last quarter before FindWhat disclosed the existence of its "questionable" distribution

partners.  (¶¶ 117-120.)[10]  During the last quarter of 2004, Defendant Pisaris-Hendersen sold

155,000 shares of FindWhat stock for proceeds of $3,166,300, Defendant Thune sold 25,000

shares for proceeds of $506,250, and Guest sold 169,000 shares for proceeds of $3,286,873.

(¶ 119.)  Defendants' and Guest's fourth quarter sales occurred just before the Company first

disclosed its traffic quality problems.  Defendants and Guest's sales were also unusual in nature

because they not only had no sales during 2003, but have not sold any stock since the fourth

quarter of 2004.  (¶¶ 117-120.)

Defendants next argue that because their insider sales were made pursuant to a Rule

10b5-1 plan, they cannot support an inference of scienter.  (Def. Mem. at 33-34.)  However, Rule

10b5-1 is an affirmative defense, and Defendants have the burden of proof of establishing its

elements.  S*ee Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1291 (11th Cir. 2005); 17

---

[10]      Defendants argue that sales by non-defendant Guest are not relevant to scienter analysis.
(Def. Mem. at 31.)  However, courts often consider non-defendant insider sales in finding a
strong inference of scienter of the Company.  *See*, *e.g.*, *In re Peritus Software Servs., Inc.*, 52
F.Supp. 2d 211 (D. Mass. 1999) (a court may consider sales of company insiders not named as
defendants to establish an inference or scienter).  The two cases cited by Defendants do not hold
otherwise.  (*See* Def. Mem. at 31.)

C.F.R. 240.10b5-1.  Dismissal on a motion to dismiss based on an affirmative defense is only

appropriate if that affirmative defense is clear from the face of the complaint.  *See La Grasta v.*

*First Union Secs., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004).  "[P]laintiffs [are] not required to

negate an affirmative defense in [their] complaint."  *Id.*

Defendants' alleged affirmative defense of Rule 10b5-1(c) is not clear from the face of

the Complaint because in order for it to qualify Defendants must prove that the plan was entered

into in good faith and before the insider became aware of material nonpublic information.  *See*

SEC Release No. 34-43154, 17 C.F.R. §240.10b5-1(c)(1)(i) & (ii).  Defendants must also prove

that the plan:  (1) expressly specifies the amount, price and date of sales; (2) provides a "written

formula or algorithm, or computer program, for determining the amount," price and date of sales;

or (3) prohibits the insider from exercising "any subsequent influence over how, when, or

whether to effect purchases or sales; provided, in addition, that any other person who" did

exercise such influence was not aware of the material nonpublic information when doing so.  *See*

SEC Release No. 34-43154, 17 C.F.R. §240.10b5- 1(c)(1)(i)(B)(1)-(3).  Since the date and

details of the purported plan are not alleged in the Complaint (and not included in the SEC

filings cited by Defendants), the Court cannot determine whether the affirmative defense applies.

Therefore, the affirmative defense is not clear from the face of the Complaint and does not defeat

allegations of insider sales as supporting a strong inference of scienter.

### C.   Defendants Used Inflated Stock to Fund Their "Mad Buying Binge" and Hide Dependence on Spyware Wielding Distribution Partners

A strong inference of scienter is also supported by allegations in the Complaint that the

Company used inflated FindWhat stock to fund four acquisitions during the Class Period.

(¶ 123-131.)  *See Complete Mgmt.*, 153 F. Supp. 2d at 326; *In re Envoy Corp. Sec. Litig.*, 133 F.

Supp. 2d 647, 662 (M.D. Tenn. 2001); *Gross v. Medaphis*, 977 F. Supp. 1463 (N.D.Ga. 1997).

Defendants' strategy to diversify FindWhat's dependence on spyware wielding distribution partners depended on the success of their acquisitions. Indeed, since Defendants were aware of the material adverse trend of bid erosion in its core business, the revenue stream provided by these acquisitions was the Company's virtual life blood. (¶¶ 29-37.) This deterioration was noted by an analyst who stated: "In short, we believe that FindWhat's core US business is deteriorating, albeit slowly. While the company refuses to acknowledge that publicly, the acquisition-driven expansion strategy makes it clearer."

### D.    Defendants' Intense Focus on Meeting Wall Street's Quarterly Numbers

FindWhat went public in 1999 by merging with an inactive public company based in Nevada. (¶ 123.) FindWhat quickly positioned itself as an aggressive growth stock to investors, based in part on what Defendant Pisaris-Henderson characterized as a proven and profitable business model, and what investment analysts understood to be a "projected 3-year organic growth rate of at least 20-30%." (¶¶ 2, 125, 126.) Company executives emphasized in March 2004 that FindWhat had seen "seventeen straight quarters of sequential revenue growth and eleven straight quarters of sequential pre-tax income growth." (¶ 2.) Despite the fact that Defendants knew of the low-quality traffic, which drove down the average revenue per click and drove away advertisers, they did not want to eliminate the revenue from Dmitri and Saveli so they could "make revenue goals." (¶ 32.) Thune was extremely focused on meeting these goals, as the former employee described "[i]ts Phillip's company, dollars and cents it's his company." *Id.* Such allegations that Defendants were motivated to conceal the truth in order to meet Wall Street estimates support a strong inference of scienter. *See In re AFC Enter. Sec. Litig.* 348 F. Supp. 2d 1363, 1375 (N.D. Ga. 2004) (CFO likely to know about manipulation of company's earnings to meet market expectations); *In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d 529 (D.N.J. 2002) (finding scienter where plaintiffs alleged defendants partook in unlawful practices

in order to meet analysts expectations); *Zuckerman v. Smart Choice Auto Group, Inc.*, No. 6:99-CV-237-Orl-99A, 2000 U.S. Dist. LEXIS 14676, *3-4 (M.D. Fla. May 19, 2000) (allegations that defendants were also motivated to conceal the truth from investors in order to post "a few good quarters" and attract analyst attention constituted strong circumstantial evidence that defendants acted with severe recklessness.); *Campbell Soup,* 145 F. Supp. 2d at 597 (finding allegations that the company's new management was determined to continue to meet Wall Street's expectations support a strong inference of scienter).

> **E.    Defendants' Internal Control Violations Provide Additional Evidence of Scienter**

In addition to the strong indicia of scienter discussed above, the Complaint details numerous internal control violations.  (¶¶ 113-116).  It was this lack of internal control which enabled Defendants to continue their heavy reliance on Dmitri and Saveli to boost revenues. *See, Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 19-20 (D. Mass. 2004) (failure to maintain adequate internal controls may help establish scienter); *In re Lattice Semiconductor Corp. Secs. Litig.*, CV-04-1255-AA, 2006 U.S. Dist. LEXIS *50-51 (D. Or. Jan. 3, 2006) ("Sarbanes-Oxley certifications give rise to an inference of scienter because they provide evidence that defendants knew . . . that the controls they attested to were inadequate.").

## IV.    DEFENDANTS' FALSE STATEMENTS ARE NOT PROTECTED BY THE PSLRA'S SAFE-HARBOR PROVISION

Defendants point to the Company's risk disclosures in its SEC filings such as: (1) "our business is dependant upon our relationship with, and the success of, our distribution partners" and (2) click-through fraud, whether we detect it or not, could cause our revenues and business to suffer.  (Def. Mem. at 19.)  Defendants then argue that several of the statements alleged to be false are "forward-looking" and when accompanied by purported "cautionary language" such as the language referenced above, are sheltered from liability under the PSLRA's safe-harbor.

(Def. Mem. at 36-39.)  However, Defendants' false statements are not immunized by the safe-harbor.

The safe harbor provides "no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re Prudential Sec. Ltd. P'ship Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996); *Powers v. Eichen*, 977 F. Supp. 1031, 1043-44 (S.D. Cal. 1997).  Here, the "cautionary language" relied on by Defendants could not have served to warn investors, because the "risks" listed in the SEC filings *had already occurred.*  For example, at the time Defendants warned that click-through fraud could cause revenues and business to suffer, Defendants already knew that the Company's distribution partners were engaging in click-fraud.  *See Sec. III infra.; In re Xiropharma, Inc. Sec. Litig.*, 2003 U.S. Dist. LEXIS 5623, at *29 (E.D. Pa. Apr. 3, 2003) ("[A] defendant may not use cautionary language to protect himself when he is already aware that the risks he is cautioning against have come to fruition."); *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 515 (9th Cir. 1991) ("To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they already occurred is deceit.").

Further, the PSLRA's safe harbor does not shield Defendants from liability because most of the alleged misstatements are statements of current or historical fact.  15 U.S.C. § 78u-5(c)(1)(A); *Holmes v. Baker*, 166 F. Supp. 2d 1362, 1381 (S.D. Fla. 2001) (safe harbor inapplicable to misrepresentations of historical or current facts).  Of the statements that Plaintiffs allege to be false and misleading, the vast majority cannot be considered forward-looking, as they are statements of current fact.  To the extent any of the statements can be construed as forward-looking, the safe-harbor provides no protection since the statements were made with

actual knowledge of their falsity.  *See,* Argument, Sec. IV, *infra; Tropical Sportwear*, 2005 U.S.

Dist. LEXIS 6129, at *23 ("A defendant remains liable, even for a forward-looking statement if

the plaintiff shows the defendant knew at the time of the statement of false and misleading

content and thus lacked a reasonable basis for making the statement.") (citations and quotations

omitted); *Catalina,* 2005 U.S. Dist. LEXIS 6107 at *15 ("The safe harbor does not apply . . . to

forward-looking statements made with 'actual knowledge. . .that the statement was false or

misleading'") (citing 15 U.S.C. § 78u-5(c)(1)(B)).  Thus, the PSLRA's safe harbor provision is

inapplicable in this case.

## V.    PLAINTIFFS HAVE ADEQUATELY PLED LOSS CAUSATION

The Supreme Court's holding in *Dura* did not change the Eleventh Circuit's standard for

pleading loss causation.  Rather, it simply brought the Ninth Circuit back in line with the loss

causation pleading standards of most Circuits – including the Eleventh.  *Dura Pharm., Inc. v.

Broudo*, 1255 S.Ct. 1627, 1630 (U.S. 2005) (citing *Robbins v. Koger Properties, Inc*., 116 F.3d

1441, 1447 (11th Cir. 1997) (a "plaintiff must show that 'the misrepresentation touches upon the

reasons for the investment's decline in value.'")

In analyzing the "pleading" requirements, the *Dura* Court applied Rule 8(a)(2) to

pleading loss causation in securities fraud cases and declined to adopt a more stringent

particularity requirement of Rule 9(b), stating "neither the Rules nor the securities statutes

impose any special further requirement in respect to the pleading of proximate causation or

economic loss."  *Dura*, 125 S. Ct. at 1634.  Thus, to successfully plead loss causation, a plaintiff

must simply provide "fair notice" by alleging a "short and plain statement" of the loss and "some

indication" of the causal connection to the misrepresentations "that the plaintiff has in mind."

*Dura*, 125 S. Ct. at 1634.

Here, the Complaint puts Defendants on notice of the gradual leaking of the truth and sufficiently demonstrates the causal connection between the revelation of the truth and the damages suffered by Plaintiffs and the Class.  For example, on February 23, 2005, in response to some of the truth leaking out, the price of FindWhat's common stock tumbled 19% to $10.95 per share.  (¶ 97.)  Then, on May 2, 2005, FindWhat announced that its independent auditor, Ernst and Young LLP, had resigned and filed a Form 10-K/A with the SEC disclosing that it had removed certain distribution partners resulting in a loss of $70,000 per day in click-through revenue.  (¶¶ 98-100.)  Those disclosures resulted in an additional drop in FindWhat's stock price from $7.75 on May 2, 2005 to $5.71 on May 3, 2005.  (¶ 101.)

Then, on May 5, 2005, FindWhat disclosed that it had accepted the resignation of its CFO Brenda Aguis and Defendants Thune and Pisaris-Henderson participated in a conference call where it was revealed that certain distribution partners had been utilizing techniques to generate traffic that did not meet with FindWhat's standards.  (¶ 102-103.)  FindWhat's stock dropped further, going from $6.16 on May 4, 2005 to $4.83 on May 5, 2005 - a one day drop of 21.6%.  (¶ 104.)  The chart below depicts the impact of these disclosures on FindWhat's stock price:



Remarkably, in the face of these massive stock price declines which led to a 70%

decrease in FindWhat's market capitalization, Defendants argue that shareholders are *benefiting*

from Defendants' fraud since the Company is still doing business with Dmitri and Saveli.  (Def.

Mem. at 38-39.)  This argument is illogical.  Shareholders were damaged as a result of

Defendants' disclosure regarding the high concentration of poor-quality traffic in FindWhat's

distribution network.  By analogy, if a Company was recognizing fictitious revenues, then later

announced the need for a restatement and yet continued to commit accounting fraud in order to

minimize the impact of the disclosures and report seemingly stable growth, clearly investors

would suffer damages as a result of any associated stock price declines.

Moreover, *Dura* did not alter the fact that the *extent* to which shareholders have been

damaged is not appropriate for resolution on a motion to dismiss.  *See Robbins*, 116 F.3d at 1447

34

n.5 ("in determining recoverable damages, [ ] contributing [market] forces must be isolated and removed.  This is often done, as it was here, with the help of an expert witness"); *Sunbeam*, 176 F. Supp. 2d at 1331 ("proof of damages in a securities fraud case is always difficult and requires expert testimony").  Indeed, presumably in all securities fraud cases, there will generally exist some shareholders who have not suffered any damages at all, and some who have suffered significant damages.  However, these issues simply cannot be resolved on a motion to dismiss. *See In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491, 506 (W.D. Pa. 2003) ("In sum, proof of the Class's damages is a complex matter for which expert testimony would almost certainly be required"); *In re Greenwich Pharm. Sec. Litig.*, No. 92-3071, 1995 U.S. Dist. LEXIS 5717, *11 (E.D. Pa. Apr. 27, 1995) ("expert testimony is almost always necessary to establish the amount -- and indeed the existence -- of actual damages").

## VI.   PLAINTIFFS HAVE ADEQUATELY PLED CONTROL PERSON LIABILITY

In the Eleventh Circuit, to plead control person liability under Section 20(a) of the Exchange Act, a plaintiff need only allege that the defendant had the power to control the: (1) general affairs of the primary violator; and (2) specific corporate policy that resulted in the primary violation.  *See, e.g., Brown v. Enstar Group, Inc.* 84 F.3d 393, 396 (11th Cir. 1996).[11] The regulations promulgated under Section 20(a) define control as "the possession, direct or indirect, of the power to direct or cause the direction of management and policies of a person, whether through the ownership of voting securities, by contract or otherwise."  17 C.F.R. §230.405.  The Individual Defendants' active participation in the day-to-day affairs of the Company, and their direct involvement in the preparation, review, execution and dissemination

---

[11]    Control person liability need not be pled with particularity.  *See In re IPO Sec., Litig.*, 241 F. Supp. 2d 281, 396 (S.D.N.Y. 2003).

of the misrepresentations alleged throughout the Complaint strongly suggest they were in control of the primary violator.  (*See, e.g.* ¶¶ 9, 19-21, 32, 35, 51-60, 78, 81, 87, 144-46.)

Further, Defendants' assertion that FindWhat's Chief Executive Officer, Chief Financial Officer and President/Chief Operating Office were not in control of FindWhat is disingenuous given their direct involvement in the operation of the Company as pled throughout the Complaint.  In addition, top management was extremely hands on and directed the day-to-day activities of FindWhat.  According to a former employee, the senior management at FindWhat were micromanagers who refused to delegate authority to managers to make decisions, and the "C-level Team [referring to Thune, Aguis and Pisaris-Henderson] was very controlling about little decisions."  *See Liquidmetal*, 403 F. Supp. 2d 1151 (Complaint alleged sufficient facts to support an inference of scienter against individual defendants where Complaint alleged CEO was "hands-on" and involved in the "nuts and bolts" of Company operations); *In re Spear & Jackson Secs. Litig.*, 399 F. Supp. at 1350 (plaintiffs sufficiently pled facts to satisfy Section 20(a) against a CEO who quoted in press releases and signed financial statements).

Consequently, Plaintiffs have sufficiently alleged a claim founded on Section 20(a).

## **<u>CONCLUSION</u>**

For the reasons stated above, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss.

Dated: February 28, 2006        Respectfully submitted,

**MILBERG WEISS BERSHAD &
SCHULMAN LLP**

By: _s/ Christopher S. Polaszek_
Maya Saxena
Fla. Bar No. 0095494
msaxena@milbergweiss.com
Christopher S. Polaszek
Fla. Bar No. 0116866
cpolaszek@milberweiss.com
Kristi Stahnke McGregor
Fla. Bar No. 0732931
kmcgregor@milbergweiss.com
Joseph E. White, III
Fla. Bar No. 0621064
jwhite@milbergweiss.com
Tower One, Suite 600
5200 Town Center Circle
Boca Raton, FL 33486
Tel: (561) 361-5000
Fax: (561) 367-8400
    - and -
Steven G. Schulman
One Pennsylvania Avenue, 49th Floor
New York, NY 10119-0165
Tel: (212) 594-5300
Fax: (212) 868-1229

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 28th day of February, 2006, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system.  I further certify that on the same date I mailed the foregoing document to counsel of record on the attached Service List.

s/*Christopher S. Polaszek*
Christopher S. Polaszek
Bar No. 0116866
cpolaszek@milbergweiss.com
Milberg Weiss Bershad & Schulman LLP
5200 Town Center Circle
Tower One, Suite 600
Boca Raton, FL  33486
Tel:  (561) 361-5000
Fax:  (561) 367-8400

**Lead Counsel for Plaintiffs**

## Service List

| | |
|---|---|
| Gregory N. Woods<br>gwoods@porterwright.com<br>Joseph Foster<br>jfoster@porterwright.com<br>**PORTER WRIGHT MORRIS & ARTHUR, P.A.**<br>5801 Pelican Bay Blvd., Suite 300<br>Naples, FL  34108<br>Tel:  (239) 593-2900<br>Fax:  (239) 593-2990<br><br>*Attorney for Defendants Findwhat.com, Craig Pisaris-Henderson, Brenda Aguis, Frederick E. Guest and Phillip R. Thune* | Susan Hurd<br>shurd@alston.com<br>Todd R. David<br>tdavid@alston.com<br>**ALSTON & BIRD, LLP**<br>1201 W. Peachtree St., N.E.<br>Atlanta, GA  30309-3424<br>Tel:  (404) 881-7000<br>Fax:  (404) 881-7777<br><br>*Attorneys for Defendants Findwhat.com, Craig Pisaris-Henderson, Brenda Aguis, Frederick E. Guest and Phillip R. Thune* |