UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

IN RE:

MIVA, INC., Securities Litigation

                    Case No.  2:05-cv-201-FtM-29DNF

_____

**OPINION AND ORDER**

This matter comes before the Court on Defendants' Renewed Motion to Dismiss Plaintiffs' First Amended Consolidated Class Action Complaint (Doc. #55) and Memorandum of Law in Support (Doc. #56). Plaintiffs filed a Memorandum of Law in Opposition (Doc. #61). Both parties filed Notices of Supplemental Authority (Docs. #80, #81, #83, #89) which the Court will consider only to the extent that they present additional case law.

**I.**

This is a securities class action lawsuit brought by investors of FindWhat.com, Inc. (now known as Miva, Inc.)[1] against the corporation and three of its officers or former officers. Plaintiffs allege that Defendants made false and misleading statements and material omissions in order to inflate the price of the corporation's stock in violation of the Securities and Exchange Act of 1934.

_____

[1]On June 6, 2005, FindWhat.com, Inc. changed its name to Miva, Inc. The Court will generally refer to the corporate Defendant as FindWhat.

The Court issued an Opinion and Order (Doc. #3) appointing lead plaintiff and lead counsel, and consolidating five related cases against FindWhat.com, Inc. n/k/a Miva, Inc., Craig Pisaris-Henderson, Phillip R. Thune, and Brenda Aguis.[2]    The Court subsequently entered an Order (Doc. #49) granting Defendants' Motion to Dismiss based upon deficient pleading, dismissing the Consolidated Class Action Complaint without prejudice, and granting leave to file an Amended Consolidated Class Action Complaint.

Plaintiffs filed a First Amended Consolidated Class Action Complaint (Doc. #50) (the Amended Complaint).  The 63-page Amended Complaint alleges two counts of securities fraud in violation of the Securities Exchange Act of 1934.  In Count I, Plaintiffs allege that all Defendants carried out a plan, scheme and course of conduct which was intended to, and did, deceive the investing public, artificially inflate and maintain the market price of the common stock, and cause Plaintiffs to purchase stock at artificially inflated prices during the class period, in violation of Section 10(b) and Rule 10b-5, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.  In Count II, Plaintiffs allege that the individual Defendants were controlling persons of FindWhat and had the power to control or influence policy, which resulted in the dissemination of statements that were false and misleading, in violation of

---

[2]The consolidated cases are: 2:05-cv-201-FTM-29DNF; 2:05-cv-213-FTM-29DNF;   2:05-cv-233-FTM-29DNF;   2:05-cv-236-FTM-29DNF; and 2:05-cv-271-FTM-29DNF.

Section 20(a), 15 U.S.C. § 78t(a).

**II.**

To state a claim under § 10(b) and Rule 10b-5, plaintiffs must show: (1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which plaintiffs justifiably relied (5) that proximately caused their injury. <u>Ziemba v. Cascade Int'l, Inc.</u>, 256 F.3d 1194, 1202 (11th Cir. 2001); <u>Theoharous v. Fong</u>, 256 F.3d 1219, 1224 (11th Cir. 2001); <u>Plotkin v. IP Axess Inc.</u>, 407 F.3d 690, 696 (5th Cir. 2005)(citation omitted).   To state a claim under § 20(a), plaintiffs must show: (1) that FindWhat.com violated § 10(b) and Rule 10b-5, (2) that each individual Defendant had the power to control the general business affairs of FindWhat.com, and (3) that each individual Defendant had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability. <u>Theohardous</u>, 256 F.3d at 1227; <u>Brown v. Enstar Group, Inc.</u>, 84 F.3d 393, 396 (11th Cir. 1996).

A claim brought under § 10(b) and Rule 10b-5 must satisfy the federal notice pleading requirements and the more specific fraud pleading requirements of Fed. R. Civ. P. 9(b), <u>Ziemba</u>, 256 F.3d at 1202, and the pleading requirements of the Private Securities Litigation Reform Act (PSLRA), <u>Phillips v. Scientific-Atlanta, Inc.</u>, 374 F.3d 1015, 1016 (11th Cir. 2004).   Under the notice pleading standards, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light

-3-

most favorable to the plaintiff." <u>Garfield v. NDC Health Corp.</u>, 466 F.3d 1255, 1261 (11th Cir. 2006)(quoting <u>Bryant v. Avado Brands, Inc.</u>, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999)). Rule 9(b) provides:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Rule 9(b) does not abrogate the concept of notice pleading, but requires a complaint to set forth (1) precisely what statements or omissions were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud. <u>Ziemba</u>, 256 F.3d at 1202 (citation omitted); <u>Garfield</u>, 466 F.3d at 1262. "Failure to satisfy Rule 9(b) is a ground for dismissal of a complaint." <u>Corsello v. Lincare, Inc.</u>, 428 F.3d 1008, 1012 (11th Cir. 2005).

Under the PSLRA, plaintiffs must meet a heightened pleading requirement when alleging that defendants "made an untrue statement of a material fact," or that defendants "omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading." 15 U.S.C. § 78u-4(b). When such allegations are

-4-

made, the PSLRA requires that:

> . . . the complaint shall specify each statement alleged
> to have been misleading, the reason or reasons why the
> statement is misleading, and if an allegation regarding
> the statement or omission is made on information and
> belief, the complaint shall state with particularity all
> facts on which the belief is formed.

15 U.S.C. § 78u-4(b)(1). Additionally, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2). Factual allegations may be aggregated to infer scienter, but scienter must be alleged with respect to each defendant and with respect to each alleged violation of the statute.  Phillips v. Scientific-Atlanta, Inc., 374 F.3d at 1016-18.  If these pleading requirements are not satisfied, the court "shall" dismiss the complaint.  15 U.S.C. § 78u-4(b)(3)(A).

## III.

Defendant FindWhat.com, Inc. (FindWhat), now known as MIVA, Inc., is a publicly traded internet commerce company headquartered in Fort Myers, Florida.  Defendant Craig Pisaris-Henderson is one of the founders of FindWhat, and has served as Chairman since June 2002 and as Chief Executive Officer since March 2001.  Defendant Brenda Agius was the Chief Financial Officer from July 2004 until she resigned on May 2, 2005.  Defendant Phillip R. Thune has been a Director since January 2002, served as President since July 2004, and served as Chief Operating Officer since November 2000.  From

April 2000 to June 2004, Thune served as the Chief Financial Officer.

As alleged in the Amended Complaint (Doc. #50), millions of people go online on the internet each day in search of products or information.  FindWhat develops and markets performance-based marketing and commerce services for the internet by targeting these online consumers and creating online marketplaces where the consumers are introduced to sellers (advertisers).  This introduction is based on a "bid-for-position" (the highest bidder for a particular keyword receives the first place position within the respective network, with all other bidders on that same keyword listed in descending bid order, and consumers will see the highest bidder's ad first within the FindWhat results), "pay-per-click" (an advertiser only pays when an internet consumer clicks on its ad and gets transferred to its website, the theory being that such consumers are more likely to make purchases since they presumably have some interest in the advertised product), or "keyword-targeted advertising service" (companies offering keyword advertising distribute the ads to numerous other websites, large portals and search engines where everyday users execute billions of searches. FindWhat has hundreds of these distribution partners).  The pay-per-click was FindWhat's primary business and is the focus of the allegations in the Amended Complaint.

FindWhat offers this service directly to advertisers through its network of affiliates.  Websites contract with FindWhat to find

advertisers for their sites; the advertisers bid on placement of their material through FindWhat, and pay FindWhat each time an internet user clicks on the ad.  FindWhat gives a portion of that revenue to the websites with whom it has contracts.

For a pay-per-click search engine such as FindWhat, this internet "traffic" flow comes from affiliate sites and distribution partners and is then disbursed to advertisers, who guide the users to their own websites in hopes of converting them into buyers.  The higher the quality of the traffic the greater the rate of sales conversion.  FindWhat relies heavily on an extended network of affiliates and search distribution partners to generate traffic. The effectiveness of these relationships is adversely impacted if the distribution partners use improper practices such as adware, spyware and other types of click fraud.  These improper practices result in dramatically lower sales conversions because the leads are false, and not really consumers interested in the advertised products.  Thus, ensuring the quality of distribution partners and eliminating these types of improper traffic is extremely important for pay-per-click companies.  It is therefore important to ensure quality control of distributors and to check the legitimacy of all searches performed from the affiliate sites and monitor affiliate activity.

FindWhat's revenue is determined by the price it can get advertisers to bid for a click on their ads and the number of high quality clicks FindWhat can direct to those ads.  The price an

advertiser is willing to pay per click is related to the income it derives from the advertisement. The more advertiser-paid clicks that do not result in income for the advertiser, the lower the conversion rate of advertiser expenditure to income. As the conversion rate for advertisers drop, so too does the price they are willing to bid.

Defendants aggressively marketed FindWhat as a growth stock with numerous opportunities due in part to its large network of quality distribution partners. In making recommendations, stock analysts relied upon FindWhat's growth rate. During the class period, Defendants issued public statements reporting seemingly unstoppable growth stemming from its primary pay-per-click business. As a result of these statements, FindWhat's stock price soared to over $26 per share during the class period. In actuality, Plaintiffs assert that FindWhat was a company in trouble, and by 2003 was experiencing a severe decline in revenues from its core business due to increased competition.

During the class period, two of FindWhat's main revenue generating distribution partners (Saveli Kossenko and Dmitri l/n/u), who represented 36% of FindWhat's revenues, were using illegal means to inflate revenues. This included the use of spyware, browser hijacking software, and "non-human traffic." The use of such illicit methods of creating internet traffic, commonly referred to as "click-fraud," meant that advertisers were not forwarded legitimate leads of consumers interested in acquiring

their products.  This resulted in advertisers refusing to place high bids with FindWhat, causing FindWhat's revenue shortfall to worsen during the class period.  This erosion in bid price generated from Defendants' increasing reliance on poor quality distribution partners was a material adverse trend.  The click fraud allowed FindWhat to report an uninterrupted string of quarter-by-quarter financial growth.

Defendants were aware of their fraudulent distribution partner network and resulting revenue declines.  At the same time, Defendants were intensely focused on meeting Wall Street's growth expectations and revenue goals; they knew that declining revenues needed to be boosted, and therefore allowed the fraud to continue. Defendants did meet the Wall Street expectations during the relevant time period.  Defendants thus became dependant on the high amount of revenue the two distribution partners were bringing in until Defendants could create new sources of business.

Defendants began diversifying into areas other than pay-per-click service and acquired four other companies for $223.5 million, in part using FindWhat's fraudulently inflated stock.  The first acquisition was announced on September 30, 2003 and concerned Miva Corporation.  Because FindWhat's revenues from its core business declined during the class period, Defendants resorted to poor quality traffic, even though it would cause bids to decline, until FindWhat could make up revenues through acquisitions thereby changing its business model.  Revenue decreased from about twenty

cents per click in early 2003 to twelve cents per click by June, 2005. FindWhat began to focus on more private label deals, where it provided the customer with its own pay-per-click, keyword-targeted advertisement.

The declining bid prices became so severe that Defendants knew some action would have to be taken or even more advertisers would flee to FindWhat's competitors. Defendants also feared that their click-fraud practices would be exposed. Further, FindWhat was plagued with serious internal control and accounting problems. Fearing imminent discovery of the accounting and distribution quality issues, FindWhat insiders sold almost $7 million of FindWhat stock in the fall and winter of 2004.

In February, 2005, in order to entice advertisers to pay more for FindWhat services, Defendants assured the market that the quality of its distribution network had improved. On February 23, 2005, Defendants disclosed that they had removed two poor quality distribution partners from the network. On May 2, 2005, Defendants disclosed that its auditor Ernst & Young LLP had resigned over a disagreement concerning the impairment of goodwill in connection with FindWhat's 2004 financial statements. On May 5, 2005, FindWhat disclosed that it had been removing additional poor quality distribution partners, and dramatically lowered its earnings expectations for 2005. FindWhat's stock thereafter fell nearly 90% from its class-period high.

The Amended Complaint alleges that "[d]espite these material problems with FindWhat's distribution network and operations, Defendants issued a series of false and misleading statements and omissions to the investing public." (¶ 64.)  Eleven false and misleading statements are alleged to have occurred from 2003 through 2004.

**IV.**

The Amended Complaint contains a section captioned "False and Misleading Statements" (Doc. #50 at pp. 21-38) which contain all the allegedly false or misleading statements or omissions to be considered.  The Court will address the sufficiency of the allegations individually.

**(1) September 3, 2003, Press Release:**  On September 3, 2003, FindWhat issued a press release to announce its merger with Miva Corporation.  The press release stated, in part:

> Through FindWhat.com, online marketers are able to cost-effectively promote their websites and **find highly qualified prospects** who have already expressed an interest in their product or service.

(¶ 65[3])(emphasis in original).  Plaintiffs assert that the highlighted portion of the press release was false because Defendants knew or were severely reckless in not knowing that the quality of their prospects was anything but high quality, since over one third of their prospects came from spyware distribution

---

[3] All paragraph references in this section will be to the Amended Complaint.  (Doc. #50.)

partners Saveli and Dmitri, who Defendants later referred to as "less than honorable." (¶66).

No factual allegations are made linking any of the individual Defendants and the issuance of the press release. The Eleventh Circuit has not decided whether the "group pleading doctrine" is viable under the PSLRA and Rule 9(b). Phillips, 374 F.3d at 1018-19. Therefore, the Court will assume for purposes of the motion that the individual Defendants can be liable for the contents of this press release.

The allegation that Defendants later referred to Saveli and Dmitri as "less than honorable" cannot support a claim that any Defendant knew of such a character trait as of the date of the press release. At its core, the issue becomes whether the statement "Through FindWhat.com, online marketers are able to . . . find highly qualified prospects who have already expressed an interest in their product or service" is rendered false or misleading because FindWhat [allegedly] knew that over a third of its prospects came from Saveli and Dmitri. Assuming such knowledge as to the source of the prospects, nowhere in the Amended Complaint do Plaintiffs allege facts to show that in September, 2003, FindWhat or any individual Defendant knew Saveli and Dmitri were using spyware or any type of click fraud.

The Court concludes that this allegedly false statement cannot form a basis of liability for any Defendant as to either count.

Therefore, the Motion to Dismiss will be granted as to this statement.

**(2)  September 19, 2003 Press Release**:  On September 19, 2003, FindWhat issued a press release entitled "FindWhat.com Renegotiating Merger with Espotting and Reiterating Q3 2003 and Full Year Guidance."  This press release touted a list of high profile distribution partners, stating in part:

> The FindWhat.com Network includes hundreds of distribution partners, such as CNET's Search.com, Excite, Webcrawler, MetaCrawler, Dogpile, and Microsoft Internet Explorer Autosearch. Advertisers bid against each other for particular keywords or phrases through an open, automated, bid-for-position system, where the advertisement of the website with the highest bid appears first, with all other advertisers listed in descending bid order. This cost-effective, pay-for-performance model allows Web advertisers to pay only for those prospects which click-through to their sites, and increase their potential for exposure through the millions of advertisements distributed throughout the network per day.

(¶ 67.)  Plaintiffs allege that the press release was false and misleading because Defendants knew that the promotion of high profile distribution partners misled investors as to the overall quality of FindWhat's distribution network.  This is so, Plaintiffs assert, because (a) the partners named represented only a fraction of the traffic produced by Saveli and Dmitri, and (b) FindWhat "relied on deceiving its advertisers into bidding and subsequently paying for, illicitly generated Saveli and Dmitri clicks."  (¶ 68.)

No allegations are made about individual Defendants, but the

Court will again assume that group pleading can apply.  The Court finds nothing false or misleading in the press release.  Stating that the FindWhat network "includes hundreds of distribution partners" and identifying seven of the well-known distribution partners says and implies nothing about the Saveli and Dmitri traffic.  The press release did not claim these distribution partners were representative of the others, and made no assertion as to the traffic attributed to any of them.  Plaintiffs also allege that the statement "allows Web advertisers to pay only for those prospects which click-through to their sites" was false because the clicks generated by Dmitri and Saveli were far in excess of any of the other partners and therefore had to be illicit.  Nothing in the Amended Complaint factually alleges that any Defendant knew or reasonably should have known of the click fraud as of the date of this press release, and generic allegations are not sufficient.  The Court concludes that the statements in the September 19, 2003, press release cannot form the basis of liability as to either count of the Amended Complaint.  Therefore the Motion to Dismiss is granted as to this statement.

(3)  **October 20, 2003 Press Release:**  On October 20, 2003, FindWhat issued a press release announcing results for the period ending September 30, 2003, containing the following statements:

> The FindWhat.com Network includes hundreds of distribution partners, including search engines like CNET's Search.com, Excite, Webcrawler, MetaCrawler, Dogpile, and Microsoft Internet Explorer Autosearch. FindWhat.com recognizes 100% of the revenue from paid

click-throughs on the sites in its network, and then shares that revenue with those sites. FindWhat.com only recognizes its share of the revenue generated from third-party initiatives which are powered by FindWhat.com. With both the FindWhat.com Network and the third-party offerings, FindWhat.com's services are a source of revenue and **relevant keyword-targeted listings for its partners**, while providing its managed advertisers with exposure to potential customers across the Internet. **As with the Yellow Pages in the offline world, FindWhat.com's managed advertisers get their message in front of prospects at the exact time they are looking for the advertisers' products and services. Unlike the Yellow Pages, advertisers only pay for those visitors that "walk" into their virtual stores.**

(¶ 69.)(emphasis in original.)   Plaintiffs allege that these statements were materially false and misleading because Saveli and Dmitri were not generating relevant keyword-targeted listings and were not directing visitors or consumers to walk into the advertisers' virtual stores.   Rather, defendants were "merely orchestrating a scheme to generate increased click traffic in an effort to enhance revenue without the burden of paying for a distribution partner capable of generating high quality leads." (¶ 70.)

The Amended Complaint contains no factual allegations that the Defendants knew, or were reckless in not knowing, of the alleged revenue generating scheme at the time of this press release.   The earliest possible date which can be ascertained from the Amended Complaint was June 2004, when a meeting took place to discuss the termination of Saveli and Dmitri[4].   (¶55.)

_____

   [4] The Court notes that there is no indication whether any of
                                                    (continued...)

Even if the Defendants were aware of the scheme at the time of the press release, or should have been aware, the above statements are not misleading or materially false. FindWhat did provide relevant keyword-targeted listings for its partners, and its advertisers only paid for the traffic diverted to their respective websites from FindWhat partners. The press release does not address the quality of the referrals. The Court concludes that this press release cannot form the basis of liability as to either count. Therefore the Motion to Dismiss is granted as to this statement.

**(4) December 10, 2003 Press Release:** On December 10, 2003, FindWhat issued a press release entitled "FindWhat.com Raises Full Year 2003 Estimates: Projects Q4 2003 Revenue Will Increase 14% Versus Q3 2003" stating that:

> **FindWhat.com operates online marketplaces that connect the consumers and businesses that are most likely to purchase specific goods and services with the advertisers that provide those goods and services.** Online advertisers determine the per-click fee they will pay for their advertisements, which FindWhat.com and its private-label partners such as Terra Lycos's Lycos.com and HotBot distribute to millions of Internet users. The FindWhat.com Network includes hundreds of distribution partners, such as CNET's Search.com, Excite, Webcrawler, MetaCrawler, Dogpile, and Microsoft Internet Explorer Autosearch. Advertisers bid against each other for particular keywords or phrases through an open, automated, bid-for-position system, where the advertisement of the website with the highest bid appears first, with all other advertisers listed in descending

---

(...continued)
   the named Defendants was present at that meeting, but again
   the Court will assume that such an allegation is unnecessary.

bid order. **This cost-effective, pay-for-performance model allows Web advertisers to pay only for those prospects which click-through to their sites, and increase their potential for exposure through the millions of advertisements distributed throughout the network per day.**

(¶ 71.)(emphasis in original.)  Plaintiffs allege that the press release was false and misleading because Defendants knew that their reliance on non-human traffic from Saveli and Dmitri could not possibly connect consumers to advertisers and business because consumers were illusory participants in the fraudulent transactions; that the non-human generated clicks were far from cost effective methods for advertisers to pay only for those prospects which click through to their sites; and that Defendants knew that a substantial amount of click traffic produced by Saveli and Dmitri was of no value to its advertisers.  (¶ 72.)

While the Amended Complaint alleges that the Defendants knew of the reliance on non-human traffic at the time of this press release, their citations to various paragraphs throughout the Amended Complaint do not support this assertion.  As noted above, the earliest possible date this Court could ascertain from the Amended Complaint was the June 2004 meeting (¶55.)  The Court concludes that this press release cannot form the basis of liability as to either count.  Therefore the Motion to Dismiss is granted as to this statement.

**(5) March 5, 2004 10-K Form:**  On March 5, 2004, FindWhat filed its 10-K Form with the United States Securities and Exchange

Commission (SEC) for fiscal year ending December 31, 2003. The
Form was signed by all individual Defendants and certified by
Defendants Pisaris-Henderson and Thune pursuant to the Sarbanes-
Oxley Act of 2002. Plaintiffs point out the following relevant
statements in the Form:

> Business with Third Parties: We expect that our
> consultants, agents, resellers, distributors,
> subcontractors, and other **business partners will adhere
> to lawful and ethical business practices**. It is important
> to our company's reputation that we avoid doing business
> with companies which violate applicable laws or have
> reputations which could harm our business. **Our policy
> prohibits engaging agents or other third parties to do
> indirectly what we as a company should not do under our
> own policies outlined in this code**. [Emphasis added].
>
> . . .
>
> The FindWhat.com Network is dedicated to delivering high-
> quality keyword ads as a result of an Internet user's
> search query. As such, we have written and strictly
> enforce advertising guidelines to try to ensure high
> relevancy standards.
>
> . . .
>
> We are dedicated to delivering high-quality traffic to
> our advertisers' websites. We employ an integrated system
> of numerous automated and human processes that
> continually monitor traffic quality, often eliminating
> any charges for low quality traffic proactively from the
> advertisers' accounts. We enforce strict guidelines with
> our Network partners to ensure the quality of traffic on
> the system.
>
> . . .
>
> We purchase Internet traffic from our distribution
> partners. Expressed as a percentage of revenue, Internet
> traffic purchases from one distribution partner
> represented over 10% of total revenue for each of fiscal
> 2003 and 2001 and Internet purchases from two individual
> distribution partners represented over 10% of total

revenue for fiscal 2002.

. . . .

During the years ending December 31, 2003, 2002, and
2001, no advertiser represented more than 10% of the
Company's total revenue. The Company purchases Internet
traffic from distribution partners. Expressed as a
percentage of revenues for the year ending December 31,
2003, Internet traffic purchases from one distribution
partner represented over 10% of total revenue, for the
year ending December 31, 2002, Internet traffic purchases
from two distribution partners each represented over 10%
of total revenue, and in the year ending December 31,
2001, Internet traffic purchases from one distribution
partner represented over 10% of total revenue. However,
none of these distribution partners represented more than
15% of total revenue during the three-year period ended
December 31, 2003.

(¶¶ 73, 75.) Plaintiffs allege that the first quoted paragraph was

materially false and misleading because Defendants knew that its

two largest distribution partners had unethically and in violation

of Findwhat's stated policy employed the illicit method described

in the Amended Complaint to generate fraudulent click traffic to

unsuspecting advertisers' websites. (¶ 74.) The other statements

were false and misleading because almost one third of Findwhat's

2003 revenues came from traffic illegitimately generated by the two

Russian distribution partners; because the percentage of revenue

generated by these two distribution partners exceeded the ten

percent threshold discussed in the statements but was not

disclosed; and that Defendants did not enforce strict guidelines

with respect to the quality of traffic these two distribution

partners generated, but simply turned a blind eye and even

encouraged the use of illicit means to generate the traffic.  (¶ 76.)

Statements expressing an expectation of associating with ethical and lawful third-parties does not mean that FindWhat warrants that it does not have current questionable associations. Additionally, a dedication to high-quality keyword ads and traffic is not inconsistent with the existence of low-quality keyword ads and traffic.  FindWhat accurately stated that two distribution partners represent <u>over</u> 10% of the revenue, and this is not contrary to the established facts.  Additionally, the Court notes that the Form consists of mostly forward-looking statements, protected by the safe harbor provisions of Section 78u-5(c), and that the statements are accompanied by cautionary statements, <u>i.e.</u>, "If we are unable to attract additional advertisers to use our services or fail to maintain relationships with our current advertisers, it could have a material adverse effect on our business, prospects, financial condition and results of operations."  (Doc. #40-3, Exh. I at p. 4.)

The Court concludes that the March 2004 Form 10-K cannot form the basis of liability as to either count.  Therefore the Motion to Dismiss is granted as to this statement.

**(6) July 26, 2004 Conference Call:**  On July 26, 2004, "Defendants" conducted a conference call wherein Defendant Thune commented on revenue trends which Plaintiffs characterize as false. Plaintiff does not individually name the other participants, but

the Court will again assume group pleading is appropriate.
Defendant Thune stated:

> Let me now comment on revenue trends in the first half of
> the year. Revenue from the two divisions that we have
> owned since January 1, the FindWhat.com NetworkTM/Private
> Label division, and our Merchant Services division, was
> basically flat from Q1 to Q2. Meanwhile, Espotting's
> revenue declined from Q1 to Q2. In both cases, this was
> the result of a very strong January, which we believe
> skewed the comparison between Q1 and Q2.
>
> While both our revenue and Espotting's revenue in April
> was down versus January, **by June revenue was increasing.
> And we believe that every one of our divisions can grow
> revenue from Q2 to Q3,** despite the seasonal softness
> typical in the summer months, when individual Internet
> usage usually declines. **In part, this revenue growth will
> come from executing on opportunities created by the four
> transactions we have completed this year.**

(¶ 78.)(emphasis in original.)  Plaintiffs allege that Defendant
Thune's comments that FindWhat's revenue trends were "increasing"
were false, and that by this time there was a material adverse
trend of bid deflation as a result of the low quality of traffic,
which in turn drove down the RPC.  (¶ 79.)  Plaintiffs also assert
that the significant decline in FindWhat's RPC was a material fact
requiring disclosure under SEC Staff Accounting Bulletin (SAB) 101.
(¶ 79.)

The Court assumes that FindWhat was suffering from bid
deflation at the time of the conference call, as the Amended
Complaint asserts.  This, however, does not demonstrate that the
statement that "by June revenue was increasing" was false.  The
Amended Complaint does not assert that revenue had not increased by

June, and therefore this statement cannot support liability as to either count.

Plaintiffs also allege that FindWhat had an obligation to disclose the bid deflation trend.  While disclosure of the bid deflation trend may have been required in filings with the SEC under SAB 101 in the Management's Discussion and Analysis (MD&A), there is no mandatory obligation to disclose such a trend in a conference call.  See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1432 (3d Cir. 1997)("Except for specific periodic reporting requirements . . . there is no general duty on the part of a company to provide the public with all material information.") Courts have long recognized, however, that once a company or individual begins to speak, they have an obligation to speak truthfully about all material facts.  See Ackerman v. Schwartz, 947 F.2d 841, 846 (7th Cir. 1991).  The statements above only discussed general revenue projections, and did not go into detail of the revenue sources so as to warrant a discussion of the bid erosion trend.  Finding the statements not to be false or misleading, the Motion to Dismiss will be granted as to the conference call as to both counts.

**(7) November 1, 2004 Conference Call:**  On November 1, 2004, Defendants Pisaris-Henderson and Thune conducted another conference call, as follows:

> MARIANNE WOLK: First of all, I was wondering if you could talk through any changes that occurred in your traffic partners or mix this quarter. Can you give us some feel

> for what percentage of your traffic partners,
> particularly in the U.S., came from partners you signed
> over the last 6 months?
>
> CRAIG PISARIS-HENDERSON: As you are all aware, we don't
> breakout partners and we don't comment specifically on
> any of our relationships. To the extent that we would
> have a partnership that would contribute over 10 percent
> on a recurring basis, obviously we would do that. But
> that just is not the case.
>
> PHILLIP THUNE: Again, I think we're not going to be able
> to give you too much insight. We are bound by the
> confidentiality terms of that agreement. There's still a
> relationship there.

(¶ 81.) Plaintiffs argue that this is false and misleading because defendants knew that FindWhat derived almost one third of its revenue during this period from just two distribution partners, and the refusal to respond to the question demonstrates a motive to hide the far-greater than ten percent of revenue stemming from the two distributors. (¶ 82.)

The Court finds nothing false or misleading in these statements. The two Defendants specifically and clearly refused to answer the question. This does not subject them to liability, whatever their motive may have been. The Motion to Dismiss will be granted as to this statement.

**(8) December 16, 2004 Research Report:** On December 16, 2004, "Jefferies" issued a research report stating in pertinent part:

> FindWhat has two product offerings, 1) FindWhat.com, its
> paid placement distribution network and 2) its private-
> label service, which allows portals to sell their own
> branded paid placement program using FindWhat's back-end
> infrastructure. FindWhat's distribution service is very
> similar to Overture's, in that advertisers "bid" against
> one another to be ranked high for popular terms on a

search result page. **The company's editorial team reviews keywords to ensure relevancy, while its systems cull traffic to remove invalid clicks derived from bots and crawlers, and malicious clicks from competing advertisers to ensure a high quality of traffic. Advertisers fund accounts up front and are charged on a CPC basis. Typically, FindWhat's CPC is less than half of those found at Overture, providing advertisers with an opportunity to acquire quality traffic at very desirable price points.**

(¶ 83.)(emphasis in original.) Plaintiffs allege that the statements in this analyst report were prepared after review of public information and discussion with FindWhat's management, and were false because Defendants knew that FindWhats two primary distribution partners were generating illegitimate traffic to its advertisers. (¶ 84.)

This statement was made by Jefferies, which is not named as a defendant or otherwise identified in the Amended Complaint. "Generally, securities issuers are not liable for statements or forecasts disseminated by securities analysts or third parties unless they have sufficiently entangled [themselves] with the analysts' forecasts [so as] to render those predictions attributable to [the issuers]." In re Navarre Corp. Sec. Litig., 299 F.3d 735, 743 (8th Cir. 2002) (internal citations omitted). No such entanglement is pled in this case. Another alternative is for investors to allege that the Defendants used the analysts as a conduit for making false and misleading statements to a third party with the intent that the third party communicate those statements to the market. Cooper v. Pickett, 137 F.3d 616, 624 (9th Cir.

1998); see also Navarre, 299 F.3d at 743.  Again, no such

allegations are pled.  The Motion to Dismiss will be granted as to

the research report by Jefferies.

 **(9) February 23, 2005 Press Release:**  On February 23, 2005,

FindWhat issued a press release entitled "FindWhat.com, Inc.

Announces Record Fourth Quarter and Full Year Results."  The press

release stated, in part:

> ### 2005 Guidance
>
> The Company's preliminary guidance for projected Q1 and
> full year 2005 revenue, EBITDA, Adjusted EPS and GAAP-
> basis EPS are listed below. Full year 2005 guidance
> excludes any effects of any changes in accounting for
> stock-based compensation, which may be effective for
> periods reported after July 1, 2005.
>
> ### 2005 Revenue
> Q1 2005 estimated: $55 - $59 million
> Total 2005 estimated: $250 - $270 million
>
> ### 2005 EBITDA
> Q1 2005 estimated: $8 - $10 million
> Total 2005 estimated: $45 - $54 million
>
> ### 2005 Adjusted EPS
> Q1 2005 estimated: $0.12 - $0.15 (assumes 33 million
> diluted shares outstanding)
> Total 2005 estimated: $0.69 - $0.85 (assumes 34 million
> average diluted shares outstanding)
>
> ### 2005 GAAP-basis EPS
> Q1 2005 estimated: $0.08 - $0.11 (assumes 33 million
> diluted shares outstanding)
> Total 2005 estimated: $0.53 - $0.69 (assumes 34 million
> average diluted shares outstanding)

(¶ 85.)  Plaintiffs allege that the press release was false and

misleading because the projected revenue could only be achieved by

including revenue derived from the two distribution partners who

employed illicit tactics, and that defendants knew that the "questionable sources" of traffic they had allegedly shut off during 4Q2004 were still producing questionable revenue that inflated FindWhat's revenue, rendering projections unreliable. (¶ 86.)

The Court notes that the numbers are under the heading "2005 Guidance," the numbers are projected and "estimated," and at the end of the press statement there is standard cautionary language. (Doc. #40-4, Exh. J at pp. 36-37.) The Eleventh Circuit stated in Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1276 n.7 (11th Cir. 1999)(statutory citations omitted) that:

> The Reform Act's safe harbor protects "forward-looking statements" from serving as a basis of liability in private securities fraud suits if the statements qualify as "forward-looking", and meet any one of the statutory conditions. 15 U.S.C. § 78u-5(i)(1) defines "forward-looking statements" as encompassing, *inter alia,* projections of revenues, such as EPS estimates, and statements regarding future economic performance.

> Thus, statements in the nature of economic forecasts, such as those listed above, are considered "forward-looking" and may garner the protection of the statutory safe harbor, if they are identified as forward-looking statements and are accompanied by the appropriate cautionary language.

The Court finds that the projected earnings meet the definition of "forward looking statements" articulated by the United States Code and the Eleventh Circuit, and that the press release contained the appropriate cautionary language. Therefore, the Motion to Dismiss will be granted as to this press release.

**(10) February 23, 2005 Conference Call:**  On the same day, February 23, 2005, Defendants Pisaris-Henderson and Agius participated in a conference call, where they stated in part:

> Third, we believe that lead quality should be and is becoming increasingly important to advertisers, and recent press coverage has focused substantial attention on the click broad issue and how it effects lead quality. For several years, we have understood the issue and have been investing heavily in protecting the integrity of our networks through both automated and human systems, thereby limiting our exposure to the issue.
>
> That said, we believe that ultimately the value of a lead is best determined by whether that lead actually converts to a sale. Our recent acquisition of Miva empowers our visibility into the click stream, and for businesses with Miva storefronts, we are now able to track and add from the first click through to the point-of-sale.  We don't need to employ intuition or advanced algorithms to determine whether traffic sources are good or bad. We are creating a single transparent platform that combines relevant advertising with the visibility to measure conversion rather than clicks alone, thereby giving us the ability to remove traffic sources from our networks that do not meet our high standard of conversion metrics, aligning our interest with those of our advertisers.
>
> **In fact, during Q4 we intentionally removed numerous traffic sources that would otherwise have produced approximately $70,000 of revenue per day.** This action further illustrates our long-term view towards maintaining high standards and delivering high-quality leads to our advertisers.
>
> **Let me repeat we have intentionally removed traffic sources from our distribution network that would otherwise have produced approximately $70,000 of revenue per day in topline revenue. Again, our focus is to deliver traffic that converts rather than just clicks alone.**
>
> Although in the short-term allowing this traffic within our network could reduce revenues, we believe we're best served in the long-term by leading the industry through the creation of a transparent platform that will further

> differentiate our Company within the performance-based
> marketing world.

(¶ 87.)(emphasis in original.)  Plaintiffs allege that these statements are false because the fraudulent revenue sources were not removed, according to the former Senior Director of Business Development, a former Marketing Manager, anonymous reports given to Plaintiffs' lead counsel, and an internal FindWhat report. (¶ 88.) The Court finds these allegations to be sufficient.

The Court also finds that Plaintiffs have adequately pled the basis on which their belief is based.  Specifically, they have indicated that several former employees and internal corporate reports can substantiate the allegation.  Therefore, the motion to dismiss will be denied as to this statement.  See *infra* Section V for the loss causation analysis.

**(11) March 16, 2005 Form 10-K:**  On March 16, 2005, FindWhat filed a Form 10-K with the SEC for the year ending December 31, 2004.  The Form was signed by all individual Defendants and certified by Defendants Pisaris-Henderson and Thune pursuant to the Sarbanes-Oxley Act of 2002.  Plaintiffs cite to the following portion of the Form:

> Additionally, the U.S. Congress and some state legislatures have introduced legislation designed to regulate "spyware," which has not been precisely defined, but which is often defined as software installed on consumers' computers without their informed consent and which is designed to gather and, in some cases, disseminate information about those consumers, including personally identifiable information, without the consumers' consent. **We do not rely on "spyware" for any**

**purpose and it is not part of our product offerings,** but
the definition of spyware or proposed legislation
relating to spyware may be broadly defined or interpreted
to include legitimate ad-serving software, including
toolbar offerings currently provided by our Primary
Traffic division. Currently, legislation has focused on
providing Internet users with notification of and the
ability to consent or decline the installation of such
software, but there can be no guarantee that future
legislation will not provide more burdensome standards by
which software can be downloaded onto consumers'
computers. Currently all downloadable software that we
distribute requires an express consent of the consumer
and provides consumers with an easy mechanism to delete
the software once downloaded.

. . .

We have implemented screening policies and procedures to
minimize the effects of these fraudulent clicks. **We
believe that these policies and procedures assist us in
detecting fraudulent click-throughs, which are not billed
to our advertisers.** However, it is difficult to detect
all fraudulent clicks and detection may become more
difficult in the future if third parties implement more
sophisticated fraudulent click-through schemes. To the
extent that we are unable to detect click-through fraud,
we may refund revenue that our advertiser have paid to us
that is later discovered to be attributed to these
fraudulent click-throughs. If we find new evidence of
past fraudulent clicks, we may have to issue refunds to
advertisers retroactively for amounts previously paid to
our FindWhat.com or Espotting Network distribution
partners.

. . .

From time to time, we receive fraudulent clicks on our
ads by persons seeking to increase the advertising fees
paid to distribution partners within our FindWhat.com and
Espotting Networks. Click-through fraud occurs when a
person or program clicks on an advertisement displayed on
a website for the purpose of generating a click-through
payment to the FindWhat.com and Espotting Networks
partner rather than to view the underlying content. **We
have developed automated proprietary screening
applications and procedures to minimize the effects of
these fraudulent clicks.** Click-throughs received through

-29-

the FindWhat.com and Espotting Networks and through our private label partners' networks are evaluated by these screening applications and procedures. We constantly evaluate the efficacy of our efforts to combat click-through fraud, and may adjust our efforts for specific distribution partners or in general, depending on our ongoing analysis. These changes impact the number of click-throughs we record and bill to our advertisers, the bid prices our advertisers are willing to pay us for click-throughs and the revenue we generate.

. . .

During 2004 and 2003, no advertiser account represented more than 10% of our total revenue. We purchase Internet traffic from our distribution partners. Expressed as a percentage of revenue, **none of the traffic purchased from any of these distribution partners represented over 10% of consolidated revenue in 2004**. Internet traffic purchases from one distribution partner in 2003 represented more than 10% of total revenue.

. . .

In the second half of the fourth quarter of 2004, we ceased displaying advertisements with distribution partners and affiliates of distribution partners whose traffic did not adequately convert to revenue for our advertisers in conjunction with our continued efforts to increase the quality of the Internet users accessing our customers' advertisements. Measured at the end of the fourth quarter, the removal of these distribution partners reduced our average click-through revenue by approximately $70,000 per day compared to what each such distribution partner had been producing on a daily basis immediately prior to removal. During 2003 and as a matter of ongoing business practice, we removed one or more distribution partners from our network at various times, however the impact to our revenue was not significant to the quarter or the year when they were removed. We plan to continue our efforts to provide our advertisers with high quality Internet traffic, an undertaking that may have short-term negative effects on our revenue, but which we believe will ultimately improve our click-through revenue in the long-term. We consider the removal of these distribution partners in the second half of the fourth quarter as ordinary to our business and in conformity with our long-stated goal of provided [sic] high quality traffic to our advertisers. In addition,

-30-

although the Company admitted in the Form 10-K that it
removed "one or more distribution partners from [its]
network at various times" during 2003 "and as a matter of
ongoing business practice," Defendants represented that
"the impact to [the Company's] revenue was not
significant to the quarter or the year when [the
distribution partner(s)] were removed."

(¶¶ 89, 91, 93, 95.)(emphasis in original.)

Plaintiffs allege that statements made in the Form, "[w]e do
not rely on 'spyware' for any purpose and it is not part of our
product offering," were false and misleading because the two
largest distribution partners did in fact rely upon spyware. (¶¶
89-90.) Additionally, statements made in the Form assuring that
FindWhat was implementing screening policies and procedures to
minimize fraudulent clicks were allegedly false and misleading
because Defendants knew or should have known that the majority of
their distribution network relied on click fraud, (¶¶ 91-92);
statements made that "none of the traffic purchased from any of
these distribution partners represented over 10% of consolidated
revenue in 2004" were false and misleading because the percentage
of revenue generated by two distribution partners exceeded the
threshold without disclosure, (¶¶ 93-94); and statements that
distribution partners were taken off line in the fourth quarter of
2004 were untrue. (¶ 96.)

The PSLRA requires Plaintiffs to state with particularity all
facts on which they base their belief that the statements are false
or misleading. The Court finds that Plaintiffs have met their
burden under the PSLRA by alleging enough facts to support their

belief.  Therefore, the motion to dismiss will be denied as to this statement.  See *infra* Section V for the loss causation analysis.

**V.**

The Supreme Court recently ruled in <u>Dura Pharm., Inc. V. Broudo</u>, 544 U.S. 336, 347 (2005), that an "artificially inflated purchase price is not itself a relevant economic loss."  The Supreme Court went on to state that the complaint should provide the defendant with "notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation."  <u>Id.</u>  In order to establish loss causation, the complaint must allege "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, ie. that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  <u>Lentell v. Merrill Lynch & Co.</u>, 396 F.3d 161, 173 (2d Cir. 2005)(internal citations omitted), <u>cert. denied</u>, 126 S. Ct. 421 (2005).  In the present case, the Amended Complaint contains two paragraphs addressing loss causation.  They state:

> At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of MIVA, which were not disclosed by these Defendants, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their MIVA securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have

> done so at the artificially inflated prices which they
> paid.
>
> . . .
>
> As a direct and proximate result of Defendants' wrongful
> conduct, Lead Plaintiffs and the other members of the
> Class suffered damages in connection with their
> respective purchases of the Company's securities during
> the Class Period.

(¶¶ 140, 142.)

While these two paragraphs standing alone would not meet the PSLRA requirements for pleading loss causation, the Court finds that these two paragraphs, read in conjunction with others spread throughout the Amended Complaint, satisfy the requirements of 15 U.S.C. § 78u-4(b)(4). For example, the Amended Complaint states that "Immediately following the Company's release [on May 3, 2005 of the 10K/A,] FindWhat's stock plummeted . . . from its closing price of $7.75 on May 2, 2005 to a closing price of $5.71 on May 3, 2005." (¶ 101.) The Amended Complaint contains several paragraphs addressing price drops following various announcements, including paragraphs 97, 104 and 105. While not all the price drops in the Amended Complaint may be actionable, the allegations are sufficient at the pleading stage as to whether the alleged misstatements or omissions contained in statements ten and eleven are the proximate cause of the price drop. Therefore, the motion to dismiss is denied as to statements ten and eleven.

Accordingly, it is hereby

**ORDERED AND ADJUDGED:**

-33-

Defendants' Renewed Motion to Dismiss Plaintiffs' First Amended Consolidated Class Action Complaint (Doc. #55) is **GRANTED** as to statements one through nine, contained in paragraphs 65, 67, 69, 71, 73, 75, 78, 81, 83, 85, and **DENIED** as to statements ten and eleven, contained in paragraphs 87, 89, 91, 93, 95.

**DONE AND ORDERED** at Fort Myers, Florida, this __15th__ day of March, 2007.


_____
JOHN E. STEELE
United States District Judge


Copies:
Counsel of record

-34-