**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FT. MYERS DIVISION**

| |
|---|
| In re MIVA, Inc. Securities Litigation |

Civil Action No.:  2:05-cv-201-FtM-29DNF

**PLAINTIFFS' CONFORMING AMENDED CONSOLIDATED CLASS ACTION**
**COMPLAINT**

**SAXENA WHITE P.A.**
Maya Saxena
Joseph E. White III
Ariel Acevedo
2424 North Federal Highway, Suite 257
Boca Raton, FL  33431
Tel.: (561) 394-3399
Fax: (561) 394-3382

## TABLE OF CONTENTS

I.      NATURE AND SUMMARY OF THE ACTION .................................................1

II.     THE PARTIES ...........................................................................5

        A.    Lead Plaintiffs.................................................................5

        B.    Defendants....................................................................6

III.    FINDWHAT'S BUSINESS MODEL...............................................7

        B.    "We Live and Die by the Quality of Our Traffic": The Impact of Poor
              Quality Distribution Partners on FindWhat's Revenues ........................8

IV.     DEFENDANTS' FRAUDULENT SCHEME......................................9

        A.    Defendants Fail to Reveal a Material Adverse Trend............................9

        B.    Defendants Knowingly Rely on Improper Methods to Boost Revenue...............12

        C.    Defendants Are Directly Confronted with the Improper Techniques Used
              by Dmitri and Saveli and Refuse to Terminate the Relationship .........................16

        D.    The Spotlight Is Shined on Click Fraud and Defendants' Panic ...........................20

V.      FALSE AND MISLEADING STATEMENTS ...................................21

        B.    Fiscal Year 2003 False Statements and Reasons for Falsity ..............................21

        C.    Fiscal Year 2004 False Statements and Reasons For Falsity ..............................23

        D.    Fiscal Year 2005 False Statements and Reasons for Falsity ..............................26

VI.     THE TRUTH BEGINS TO EMERGE .............................................33

        A.    The Company Slowly Reveals the Truth .........................................33

        B.    Market Professionals React to the Company's Disclosures..................................38

VII.    POST CLASS PERIOD EVENTS...................................................39

VIII.   ADDITIONAL SCIENTER ALLEGATIONS ...................................40

        A.    Inadequate Internal Controls and Accounting Oversight.....................................40

        B.    Company Insiders Sell Stock in Suspicious Amounts and at Unusual
              Times...........................................................................42

    C.    The Company Fuels Its Acquisitions with Artificially Inflated Stock..................44

    D.    Defendants Had Access to Material Non-Public Information..............................48

COUNT I FOR VIOLATIONS OF SECTION 10(B) OF THE 1934 ACT AND RULE
        10B-5 PROMULGATED THEREUNDER AGAINST ALL
        DEFENDANTS ....................................................................................................48

COUNT II FOR VIOLATIONS OF SECTION 20(A) OF THE 1934 ACT AGAINST
        THE INDIVIDUAL DEFENDANTS ...................................................................51

IX.        JURISDICTION AND VENUE .........................................................................52

X.        CLASS ACTION ALLEGATIONS ...................................................................52

XI.        APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON
        THE MARKET DOCTRINE ............................................................................55

XII.        PRAYER FOR RELIEF....................................................................................57

    A.    Declaring this action to be a proper class action pursuant to Rule 23(a) and
        (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class
        defined herein; ....................................................................................................57

    B.    Awarding compensatory damages in favor of Lead Plaintiffs and the other
        Class members against all Defendants, jointly and severally, for all
        damages sustained as a result of Defendants' wrongdoing, in an amount to
        be proven at trial, including pre-judgment and post-judgment interest. ...............57

XIII.        JURY TRIAL DEMANDED............................................................................57

## I.     NATURE AND SUMMARY OF THE ACTION

1.     This federal securities fraud class action is brought on behalf of all persons or entities who purchased or otherwise acquired the publicly traded securities of FindWhat.com, Inc. ("FindWhat" or "the Company") between September 3, 2003 and May 4, 2005 inclusive, (the "Class Period"), seeking to recover damages caused by Defendants' violations of federal securities laws and to pursue remedies under the Securities Exchange Act of 1934.[1]

2.     FindWhat is an Internet commerce company which provides "pay-per-click" or keyword-targeted advertising services.   During the Class Period, Defendants issued public statements reporting seemingly unstoppable growth stemming from its primary pay-per-click business.  For example, on March 16, 2004, Defendant Pisaris-Henderson, the Company's Chief Executive Officer attributed the Company's success to a "proven and profitable business model." Pisaris-Henderson emphasized the Company's ability to meet Wall Street revenue goals, noting that the Company had seen "*seventeen straight quarters of sequential revenue growth and eleven straight quarters of sequential pre-tax income growth*."  In fact, prior to February 23, 2005, the Company met or exceeded analyst growth expectations in every single quarter during the Class Period – sometimes by as little as a penny.

3.     As a result of these positive statements, FindWhat's stock price soared to over $26 per share during the Class Period.  Behind the scenes, however, things were dramatically different - - FindWhat was a company in trouble.  By the start of the Class Period, the Company was experiencing a severe decline in revenues from its core business due to competition from major industry players like Google and Yahoo!

---

[1]     On June 6, 2005, FindWhat.com, Inc. changed its name to MIVA, Inc.  However, since the traded securities at issue here were known as FindWhat and MIVA was a division of FindWhat during the entire class period, Plaintiffs refer to FindWhat as "the Company." FindWhat recently changed its ticker symbol from "FWHT" to "MIVA."

4.      A key part of FindWhat's business required that the Company work with distribution partners to generate Internet traffic. There is a direct correlation between the quality of these distribution partners and FindWhat's revenue, since advertisers will "bid" higher for FindWhat's products if they know there is a strong likelihood that using FindWhat will bring interested consumers to their websites. However, if the distribution partner does not provide authentic leads to advertisers, the bid price for FindWhat services declines, and the Company's revenues decline.

5.      During the Class Period, despite outwardly professing their purported commitment to the generation of "quality" (i.e., real) Internet traffic, Defendants knew that two of the Company's primary revenue generating distribution partners were using illegal means to inflate revenues. Indeed, these two distribution partners, described as "two young Russian men" used illicit tactics described below, which included among other things, "browser hijacking" and "spyware" to boost and sustain Company revenues.

6.      The use of these illicit methods of creating Internet traffic, commonly referred to as "click-fraud," meant that advertisers were not forwarded legitimate leads from or by actual consumers interested in their products. As a result, advertisers refused to place high bids with FindWhat, causing the Company's revenue shortfall to worsen during the Class Period. As one former employee described it, the Company suffered from "serious, serious bid deflation." This erosion in bid price generated from Defendants' increasing reliance on poor quality distribution partners was a material adverse trend which Defendants were required to disclose under federal securities regulations – but did not.

7.      These two distribution partners were not inconsequential to the Company's bottom line – *they represented an astonishing 36% of FindWhat's revenues during the Class*

2

***Period.***  Thus, Defendants were legally required to, but chose not to, disclose that these two partners represented more than 10% of the Company's revenues under applicable SEC regulations.

8.    Defendants were well aware of their fraudulent distribution-partner network and resulting revenue declines because they were directly confronted with the problem by former employees.  Defendants sought to stem the floodgates by diversifying into other services and through the acquisitions of other companies.  In fact, Defendants' aggressive acquisition activity was characterized by a former employee as a "mad buying binge" calculated to make up for FindWhat's markedly declining revenues.

9.    At the same time that FindWhat was seeking to rebuild its revenue coffers, Defendants knew that FindWhat was a young, second-tier company struggling to gain market credibility in a business dominated by multi-billion dollar players.  As such, Defendants were intensely focused, if not obsessed, on meeting Wall Street's growth expectations, and knew what a missed quarter could do to the Company's stock price.  Defendants regularly reviewed reports showing the Company's falling profits.  Indeed, a Senior Vice President received calls from Defendants complaining that revenue was down, and telling him that he "needed to boost it" to meet Wall Street's expectations.  Driven by this desire, Defendants fomented the fraud "to make numbers at the expense of FindWhat's business."[2]

10.    Although Defendants knew that these two partners were adversely impacting the Company's long-term prospects with their fictitious traffic, they were, according to a former business development manager, "held hostage by these affiliates" because, although they were not generating high quality traffic, "they were bringing in so much revenue."  While Defendants

---

[2]        Source: A former FindWhat Marketing Manager, employed during the Class Period.

scrambled to diversify the Company's services and complete acquisitions, they became dependent upon these two partners to bridge the gap until Defendants could create new sources of business.

11.    However, the declining bid prices became so severe that Defendants knew they would have to take some action or risk losing even more advertisers who were fleeing to companies that promised higher-quality traffic.  According to a former Marketing Manager, during the Class Period there was "a big sense of desperation" and that "*FindWhat's [distribution] network is a house of cards*" which was "*held together by a thread*."  Defendants also feared that their practices would be exposed due to increased scrutiny of click fraud by government regulators, who had recently focused enforcement actions and legislation to curb these practices.  Defendants feared the "hammer would fall" and their own reliance on click fraud would be uncovered.

12.    Fearing imminent discovery of their distribution quality issues, insiders sold nearly $7 million worth of FindWhat stock in the fall and winter of 2004, at prices as high as $21.83 per share.  However, the "thread" holding the Company together, began to snap in February 2005.  Since the Company's bid price had declined so significantly, Defendants knew that the only way they could entice advertisers to pay more for FindWhat services was to assure the market that the quality of the Company's distribution network had improved.  Consequently, during a conference call on February 23, 2005, Defendants claimed that they had removed two poor quality distribution partners, amounting to $70,000 of daily revenue, from the network. Analysts and investors were shocked by this purported disclosure.  For example, one analyst noted the unexpected magnitude of the poor quality traffic problem, stating: "*[w]e expected a gardener using pruning shears.  What we got was a lumberjack using a chainsaw.*"

4

13.     On May 2, 2005, Defendants revealed that its auditor Ernst & Young LLP had resigned over a disagreement concerning the impairment of goodwill in connection with the Company's 2004 financial statements.  On May 5, 2005, the Company once again claimed that it had been removing additional poor-quality distribution partners, which represented "a meaningful percentage of daily click-through revenue."  As a result, the Company dramatically lowered its earnings expectations for 2005.

14.     Yet again, the market was unprepared for the magnitude of Defendants' distribution problems.  For example, one analyst questioned management's credibility, noting that although Defendants had assured investors that no one distribution partner amounted to more than 10% of the Company's revenue, "*[t]he accuracy of this statement must also come under scrutiny as the company just lowered the midpoint of its [2005] guidance by 27.9%.*"

15.     After the Company partially revealed its illicit reliance on distribution partners, FindWhat's stock price fell to $4.83 per share, a drop of nearly 90% from its Class Period high. The Company's stock price has not recovered and, as of January 2006, trades in the $5 range. The Company recently announced the hiring of an investment bank to explore alternatives to boost its lagging stock price, including a possible sale of the Company.

## II.     THE PARTIES

### A.     Lead Plaintiffs

16.     Y.P. and Sampurna Jain, Murtuza Tofafarosh and The David D. Berkey Trust (collectively "Lead Plaintiffs") were appointed by the Court on July 27, 2005 to serve as Lead Plaintiffs in this putative class action.

17.     Lead Plaintiffs purchased FindWhat common stock during the Class Period, as set forth in the certifications accompanying Lead Plaintiffs' motion for appointment as Lead Plaintiff, and were damaged thereby.

**B.    Defendants**

18.    Defendant FindWhat is a Delaware corporation headquartered in this District at 5220 Summerlin Commons Boulevard, Suite 500, Fort Myers, Florida, 33907. FindWhat is a publicly traded company whose common stock is traded on the NASDAQ National Market System under the ticker symbol "MIVA."

19.    Defendant Craig Pisaris-Henderson ("Pisaris-Henderson") is one of the founders of the Company, and has served as the Company's Chairman since June 2002, and Chief Executive Officer since March 2001.

20.    Defendant Brenda Agius ("Agius") served as the Company's Chief Financial Officer from July 2004 until she was forced to resign on May 2, 2005. Defendant Agius was also a public accountant, first with Deloitte & Touche and then with Coopers & Lybrand. Since Agius was asked to leave in the midst of the Company's scandal, a former FindWhat Account Manager noted that Agius was made to "walk the plank when all this stuff went down" and was in "way over her head."[3]

21.    Defendant Phillip R. Thune ("Thune") has been a Director for the Company since January 2002, served as the Company's President since July 2004, and as Chief Operating Officer since November 2000. From April 2000 to June 2004, Defendant Thune served as the Company's Chief Financial Officer.

22.    Defendants Pisaris-Henderson, Agius, and Thune are referred to collectively herein as the "Individual Defendants."

---

[3]    All confidential witnesses are referred to in the masculine gender protect their identity.

III.    **FINDWHAT'S BUSINESS MODEL**

23.    FindWhat develops and markets performance-based marketing and commerce services for the Internet.  FindWhat targets online consumers who are actively shopping for goods and services or looking for information.  Its marketing division creates online marketplaces where buyers are introduced to sellers when they are searching for products and services on the Internet; this introduction is based on a bid-for-position,[4] pay-per-click[5] (U.S. only), or keyword-targeted advertising service.[6]

24.    Every day, millions go online to search for products or information.  The online patterns of Internet users are referred to as "traffic."[7]  Generally, websites contract with FindWhat to find advertisers for their sites.  The advertisers bid on placement of their ads and on placement in online search results through FindWhat, and pay the Company each time an

---

[4]    The highest bidder for a particular keyword receives the first place position within the respective network with all other bidders on that same keyword listed in descending bid order and will see their ad first within the FindWhat results.

[5]    An advertiser only pays when an Internet user clicks on their ad and gets transferred to their website.  These "clicks" are supposed to be highly qualified leads which could convert to a sale since if the user "clicked" on the ad intentionally, they presumably have some interest in the advertised product.

[6]    Companies offering keyword advertising then distribute the ads to numerous other websites, large portals and search engines where everyday users execute billions of searches. FindWhat has hundreds of these distribution partners where the keyword advertisements are delivered.  The FindWhat distribution network includes high quality sites, such as: CNET's Search.com, Excite, Webcrawler, NBCi, Dogpile, MetaCrawler, and Go2Net. In Q2 2002 there were, on average, 600,000 click-throughs each day on the FindWhat.com network.  *See* "The Evolution of Advertising" by FindWhat marketing employee, Karen Yagnesak, available online at http://www.active-marketer.com/2002/sept/25.html.

[7]    *See Pay Per Click Universe: Your Traffic Is Served. Do you Like the Taste?* 8/14/05 available online at: http://www.payperclickuniverse.com/pay-per-click-search-engines-articles.php?article_id=13

Internet user clicks on an ad.  The Company then gives a portion of that revenue to the websites it has contracts with.

      **B.**    **"We Live and Die by the Quality of Our Traffic": The Impact of Poor Quality Distribution Partners on FindWhat's Revenues**

      25.    For pay-per-click search engines such as FindWhat, the raw traffic flow comes from affiliate sites and distribution partners and is then disbursed to advertisers.  Advertisers then guide visitors to their own websites, in hopes of converting them into buyers.  The higher the traffic quality, the less "leakage" of uninterested visitors who depart without making a purchase, and the greater sales conversion rate.

      26.    FindWhat relies heavily on an extended network of affiliates and search distribution partners to generate traffic.  One of the factors impacting the effectiveness of these relationships is their use of improper practices such as the use of "adware," "spyware" and other types of "click fraud" which result in dramatically lower sales conversions since the leads are false, and not consumers interested in purchasing the advertised products.  Ensuring the quality of distribution partners and eliminating these types of improper traffic for pay-per-click companies is extremely important.  As one executive at a competitor summarized: "[l]istening to our customers' reports on the effectiveness of our partnerships is paramount to the success of our business.  *We live and die by the quality of our traffic.*"[8]

      27.    In addition to implementing distributor approval processes to ensure quality control, the legitimacy of all searches performed from affiliate sites must be checked, and affiliate activity has to be monitored.  As detailed in an August 2005 article published online in Pay Per Click Universe: ***"[i]n this industry, if you have bad traffic, it's a PR disaster, the word***

---

[8]    *See Tools of the Trade, Part I*, available online at: http://www.sempo.org/articles/tools-p1.php

*spreads like jungle fire."* Bad traffic from one distribution partner can create a "domino effect" through the entire network, from advertisers to all of the affiliates. Defendant Thune himself commented on the importance of high quality traffic to FindWhat and its revenues, explaining in the article why poor quality traffic could adversely impact companies:

> The reason is that if a distribution partner [sic] allows bad traffic on the word "toys" for example, the advertisers bidding for [that keyword] will be impacted, and may lower their bids or leave us. That obviously impacts our relationships with those advertisers, and it also impacts all of our other distribution partners, who make less money from searches on "toys" than they should, through no fault of their own.

28.    As detailed below, FindWhat's revenue is determined by the price advertisers bid for a click on their ads and the number of high quality clicks FindWhat can direct to those ads. Because the price an advertiser is willing to pay per click is supported by the income it derives from the advertisement, the more advertiser paid clicks that result in no income for the advertiser, the lower the "conversion rate" of advertiser expenditure into income. Since the conversion rate directly impacts the advertisers' bid price, as the conversion rate drops, so too does the bid price. As a former Account Manager summarized, "it's a bidding model, so the customers are bidding on the traffic and if the traffic converts for them, the bids go up. If the traffic doesn't convert for them, the bids go down."

## IV.    DEFENDANTS' FRAUDULENT SCHEME

### A.    Defendants Fail to Reveal a Material Adverse Trend

29.    Because FindWhat's revenues from its core business declined during the Class Period, Defendants had no choice but to resort to poor quality traffic, despite the fact that it would cause bids to decline, at least until the Company could make up revenues through acquisitions or by changing the Company's business model. Indeed, a former Account Manager

revealed that the Company suffered from "serious, serious bid deflation in [FindWhat's] network."

30.     According to a former Senior Director of Business Development, Defendants Thune and Pisaris-Henderson hid the adverse trend the Company was experiencing in its revenue per click.  Specifically, because the Company had directed such an abundance of low quality (i.e., spyware and adware) traffic into its network that did not produce significant results for its advertisers/customers, the Company could no longer charge its advertisers the revenue per click ("RPC") it needed to attract high quality distribution partners (who shared in the Company's revenue).

31.     Indeed, according to a former employee, the Company found itself "getting the scraps that [were] left on the table that Google and Yahoo! passed on [as a result of] . . . their [Google and Yahoo!] due diligence process in screening the [low quality] traffic."

32.     Nonetheless, according to a former Director of Business Development, despite the fact that Defendants knew of the low quality traffic, which drove down the average RPC and drove away advertisers, they did not want to eliminate the revenue from their largest Distribution Partners, Dmitri and Saveli, so they could "make revenue goals."  Thune was extremely focused on meeting these goals, as the former employee described "[i]ts Phillip's company, dollars and cents it's his company."

33.     Consequently, the Company found itself in a downward revenue spiral from which there was seemingly no legitimate recovery.  As this witness indicated, when he first began with the Company in early 2003, FindWhat achieved $0.20-$0.21 per click but by June 2005 the Company's RPC had declined precipitously to approximately $0.12 per click.

10

34.    According to a former Director of Business Development, FindWhat shared 50% of the RPC with its distribution partners, minus 1.5 cents per click to FindWhat for costs associated with the transaction.  By way of example, if an advertiser bids $0.20 for a click, FindWhat would subtract 1.5 cents from the $0.20, reducing it to $0.185, and would then pay the distribution partner $0.0925 for that click.  Despite an industry standard of a 70% revenue share rate for distribution partners, FindWhat clung to its lower rate as a means of controlling costs - the obvious consequence of this decision was that higher quality traffic partners would gravitate to better financial opportunities.  As this witness stated, the low RPC FindWhat offered affiliates drove away quality affiliates who could get more money from other pay-per-click services, and left the Company with quick, greedy, and unscrupulous traffic generation partners.  The low revenue sharing arrangements FindWhat employed contributed to the poor quality distribution partners, and as this witness opined, is a sure "way to get you dead in the industry."

35.    Paying a competitive rate for traffic would have enabled the Company to develop healthy traffic, and because that would lead to a higher conversion rate, bid prices would rise.  This former employee discussed the need to negotiate affiliate relationships with higher quality affiliates, but Defendants Pisaris-Henderson and Thune refused to let him go forward with those deals, which would have required a 60% split.  This witness stated that Defendants were concerned that the increased revenue sharing would lower short term revenue and prevent the Company from meeting Wall Street's expected earnings, revenue, and performance numbers.

36.    However, since the Company's relationships with its distribution partners and concomitant quality of its Internet traffic did not improve, the Company's RPC went down, which had a "devastating effect on revenue."  The lower RPC also made it more difficult to start relationships with higher quality affiliates who did not want to deliver traffic to FindWhat in

exchange for 50% of $0.12 or $.015. Consequently, the Company found itself in a horrible position, perhaps best summarized by a former employee, where "RPC is terrible, Company traffic is terrible, [and] no one [distribution partners] cares about $0.07 [RPC] or even 70% of $0.15."

37.     Further, a former Marketing Manager stated that in the summer of 2005, he performed an analysis of the Company's affiliates (distribution partners) and that his analysis revealed that 95 percent of the Company's click revenue came from its top 50 distribution partners – with the top two being two "young Russian kids" – Saveli Kossenko ("Saveli") and another individual known only as Dmitri.[9] In short, by the summer of 2005, Defendants had created a distribution network that was primarily fueled by illicit Internet traffic generating techniques, and, according to a former Marketing Manager, best described as a "house of cards ... held together by a thread."

### B.     Defendants Knowingly Rely on Improper Methods to Boost Revenue

38.     Struggling with declining bid prices, declining revenues, costly internal control issues, and accounting deficiencies,[10] Defendants knew they could only provide the results Wall Street had come to expect through improper means. As such, throughout the Class Period, FindWhat's two largest Internet traffic and therefore revenue producing distribution partners were Saveli and Dmitri, who the Company relied on to generate a material portion of their revenues.

---

[9]     Saveli Kossenko was also known by his company name, Dimago Overseas Gmbh, and was identified internally at FindWhat by Affiliate ID No. 48078. Similarly, Dmitri's internal corporate identity was HyperSpace Communications, Inc., and he was assigned Affiliate ID No. 47161.

[10]     Caused by the integrating four companies during the first seven months of 2004 alone.

39.    According to a former Business Development Manager, Saveli and Dmitri were "turn and burn guys" whose primary focus was simply driving in a lot of traffic, regardless of its quality.

40.    Allegedly based in Montreal, Canada, unbeknownst to the investing public and according to several former Company employees (including one former Director of Business Development primarily responsible for the development and maintenance of distribution partner relationships), these two individuals were personally responsible for generating almost *one third* of FindWhat's revenue during 2003, 2004 and 2005.

41.    For example, Saveli and Dmitri generated approximately **36%** of all of FindWhat's click revenue and approximately 14.6% of total revenue for January 2005 – with Saveli generating $3,012,457.58 and Dmitri $1,076,240.92.

42.    The efforts of Saveli and Dmitri did not go unrewarded.  According to a former Manager of Business Development, Dmitri earned approximately $12 million a year as a click traffic-generating partner for FindWhat.   However, unbeknownst to the investing public, Dmitri and Saveli employed unscrupulous and illicit means known as "click fraud" to create Internet traffic to Company advertisers, which created enormous revenue for themselves and FindWhat at the expense of unsuspecting advertisers.

43.    Click fraud has many forms and variations, but generally refers to the practice of clicking on an Internet advertisement for the sole purpose of forcing the advertiser to pay for the click.  Put differently, click fraud can be described as any click received from an Internet search engine that is generated artificially and is designed solely to increase the payable number of clicks ascribed to a given advertiser, since advertisers only pay when someone "clicks through"

to their website.  The improper methods employed by Saveli and Dmitri included the use of "spyware" and "browser hijacking," as discussed further below.[11]

44.    The use of distribution partners specializing in spyware and other illicit means enabled FindWhat to enhance its revenues with "non-human traffic" which vastly outpaces the traffic generated by actual consumers.  One way in which this is accomplished is through computer programs such as "bots" or "spiders" to search the Internet for revenue opportunities and click on those opportunities.  For example, FindWhat's "Site Integration Agreement," which it used as early as October 2003 with distribution partners, states: "A 'bot' or 'spider' shall be defined as a software program that executes searches or click throughs that were not initiated by unique Users of the Company's CKS."  It is through methods like these that Saveli and Dmitri could generate more traffic than legitimate corporate partners on the FindWhat network.

45.    Another practice employed by the Russians was the use of "browser hijacking" to artificially boost revenues.  According to several former employees who worked for the Company during the Class Period, it was commonly known within FindWhat that Dmitri and Saveli would often "hijack" the Internet browser of an unsuspecting and unknowing computer user and automatically direct the user to unsolicited advertisements, thereby creating a click (or revenue event for both the distribution partner and FindWhat).

46.    Similarly, Saveli and Dmitri also employed spyware to create what one former Business Development Director termed as "non-human traffic" because it is essentially an

---

[11]    One form of click fraud employed by these two distribution partners involved the use of "spyware" or software that sabotages a computer's operation for the benefit of a third-party. Similar to many computer viruses, spyware is designed to exploit infected computers for commercial gain through a variety of means, such as the delivery of unsolicited pop-up advertisements, theft of personal or financial information (such as credit or bank card numbers), monitoring of Internet browsing activity for marketing purposes, or routing of HTTP requests to advertising sites.

14

automated way to make it appear as if human users were clicking on an advertisement, when in fact, no prospective human customer was viewing those ads.

47.    Evidence of this non-human traffic was readily apparent to FindWhat management throughout the Class Period, and although it came in various forms, one indicator is the origination of click throughs from a URL or internet address that is illogical for that particular advertisement.  For example, an email anonymously provided to Lead Plaintiffs' counsel discussed FindWhat's detection of a large volume of traffic that produced revenue on non-adult keywords, but originated from Internet addresses that are of an adult nature.  The email, dated February 21, 2005, states: "There was a large increase in traffic coming thru Saveli, Hyperspace [Dmitri], Chitika and Genieknows – Can we make sure that this additional traffic was valid?  Also here is a list of outstanding issues we have with our affiliates:" The email then lists 19) adult websites from which Dmitri and Saveli generated non-adult click revenue, a practice a former Director of Business Development confirmed was indicative of the use of spyware.

48.    In this instance, computer users were first brought to, among the 17 other similar sites, "http://f**kvirginhole.com," by Dmitri and "http://www.pinkpussynet.com" by Saveli before purportedly clicking on a non-adult advertisement.  According to a former Manager of Business Development, this mode of operation, employed to generate revenue producing clicks for the Company, was typical of the Internet traffic generated by Saveli and Dmitri throughout the Class Period.

49.    As a former Business Development Manager explained, the people who run the pornographic websites hide programs such as spyware, and other bad computer programs behind pictures, and sometimes even include disclaimers stating that anyone clicking on a picture agrees

to accept software from the pornographic website.  Then after clicking on the picture, the user's browser or computer is infected and is used to drive traffic to affiliates of pay-per-click sites, such as FindWhat.com.  This process of hiding malignant code behind pornographic images to direct traffic to revenue-generating affiliates' websites, is known within the industry as a "circle jerk."

**C.    Defendants Are Directly Confronted with the Improper Techniques Used by Dmitri and Saveli and Refuse to Terminate the Relationship**

50.    According to two former managerial employees in FindWhat's Business Development Department, responsible for the oversight and acquisition of new distribution partners, it was common knowledge that Dmitri and Saveli employed these types of surreptitious adware and spyware to artificially generate virtually unparalleled "non-human" Internet traffic to the websites of unsuspecting FindWhat advertisers/customers, thereby generating incredible revenue for FindWhat quarter after quarter throughout the Class Period.

51.    Indeed, according to a Former Manager of Business Development, "War Reports" were provided to the Company's executive management team every Thursday by the Company's Business Development unit.  The Business Development unit then met every Friday at 10:00 a.m. to discuss executive management's response to the "War Report," pending deals, prospective deals and current relationship issues - i.e., unscrupulous Internet traffic generated by the Company's distribution partners.

52.    Defendants also maintained an internal computer system, described by one former Business Development Manager as "the Interface," from which the Company's executive managers could access "real-time" information regarding the Company's (and its distribution partners') generation of Internet traffic for its advertisers and the corresponding click-through revenue generated by such traffic.

53.     The "Interface" would display the quality (i.e., legitimate) Internet traffic generated by the Company in blue and filtered (i.e., illegitimate) Internet traffic in red. Accordingly, Defendants were well aware that their two primary Internet traffic-generating distribution partners (Saveli and Dmitri) were primarily generating illegitimate Internet traffic to the Company's advertisers to generate revenue.

54.     In fact, the inclusion of the illicitly obtained revenue was frequently debated at high levels of the Company.  One former Senior Director of Business Development was present at a meeting during the Class Period, in the Company's fifth floor Executive Conference Room and attended by Defendant Pisaris-Henderson, when growing internal concern over Dmitri and Saveli's Internet traffic and revenue generation practices were discussed.

55.     Further, in June 2004, in a meeting attended by then Senior Vice President/General Manager of the Private Label and Miva Network, Rick Szatkowski**,** and Vice President of Operations John Moran, *the decision was made to terminate the Company's relationship with Saveli and Dmitri because they were "basement operators" employing "spyware."*  According to a former Director of Business Development who attended the meeting, it was not a question of whether to get rid of Saveli and Dmitri, it was just "a question of when."

56.     Despite the Company's intentions to "fix the business" and terminate its relationship with Saveli and Dmitri in June 2004, Defendants Pisaris-Henderson and Thune would not permit such a drastic cut in revenues, despite their known use of click fraud, because they feared Wall Street's inevitable punishing reaction to any revenue shortfalls.  In fact, according to a former Senior Director of Business Development, Defendant Thune stated that the

17

Company "had to replace the revenue it would lose [from Dmitri and Saveli] before FindWhat would remove them."[12]

57.    Even more troubling, during the 4Q2004 when the Company was supposedly reducing click-through-fraud partners, the Company actually increased compensation to Saveli and Dmitri in a last-ditch effort to make their quarterly numbers.  During a cellular telephone conversation between Dave Rae and Rick Szatkowski that occurred in a rental car while attending a conference in San Francisco on November 15-17, 2004, Szatkowski told Rae "We cannot continue to whore our advertisers" to Dmitri and Saveli.  Rae then informed Szatkowski that "Phil [Defendant Thune] and Craig [Defendant Pisaris-Henderson] are giving Phil [Neumann] the go-ahead to boost fourth quarter revenue."  Neumann planned to increase the percentage of RPC paid to partners other than Dmitri and Saveli from the usual 50% to 70%, hoping to "dilute the bad traffic coming from Saveli and Dmitri" and increase Company revenues to "meet 4Q2004 projections."  The Company was unable to meet its projections without the assistance of Dmitri and Saveli, and, according to this former Business Development Manager, ended up paying Dmitri and Saveli the same 70% for some time before lowering it back to 50%.  Ironically, much of FindWhat's alleged revenue reduction due to the removal of spyware partners was actually because of an increase in payments to them.

58.    In December 2004 or January 2005, a former director of Business Development had a one-on-one meeting with Defendant Pisaris-Henderson in which Pisaris-Henderson asked him point blank whether he thought FindWhat's traffic quality problems had to do with Saveli

---

[12]    To put into context the enormous amount of Internet traffic (and therefore Company revenue) Saveli and Dmitri generated, a former Senior Director of Business Development offered the following comparison:  on average, the nation's most read newspaper's website, USA Today, records 2 million unique visitors per month with users performing 1-1.5 million searches per month; in contrast, astonishingly, Dmitri and Saveli processed a similar amount of Internet traffic **in half of a day**.

and Dmitri.  When this witness answered affirmatively, Defendant Pisaris-Henderson "did not really say anything in response" because he was "the type of CEO who tried to avoid 'knowing' bad facts", in the hopes that if "he did not really know what was going on, he could not be held accountable later."

59.     According to this former Director of Business Development, certain Dmitri and Saveli sub-affiliates were generating rates per click in excess of $0.40, when the Company's average rate per click was approximately $0.12.  The only explanation for this discrepancy was their use of "surreptitious traffic" (i.e., spyware, bots, adware) to "cherry pick" the highest value key words.  The former Director of Business Development explained that this was an immediate red flag for anyone monitoring the traffic because in order to achieve average per click results so far above the statistical average, these affiliates must have restricted their spyware programs to generate clicks on only the highest bid keywords – presenting an abnormal distribution that is inconsistent with human generated click traffic.

60.     In fact, Saveli and Dmitri were not the only ones that used "cherry picking" to achieve higher per click results.  Based on the an internal FindWhat report anonymously provided to Lead Plaintiffs' counsel, the following list of distribution partners produced average per click results that a former Director of Business Development stated were well "outside the expected or normal range" and indicative of "surreptitious traffic:"

| ID | Distribution Partner | Revenue Per Click |
|---|---|---|
| 47360 | WhenU IDs [expand] | $0.33 |
| 47118 | Homepage – Israel | $0.34 |
| 48581 | Quigo Technologies, Inc. IDs [expand] | $0.44 |
| 48856 | Marc Flemming DBA Psyphire Production IDs [expand] | $0.48 |
| 49250 | Direct Revenue, LLC IDs [expand] | $0.33 |
| 48420 | ClickMagnet, Inc. | $0.44 |
| 49623 | bizjournals.com, Inc. IDs[expand] | $0.72 |

| 49090 | Spydercube, Inc. IDs [expand] | $0.43 |
| 47725 | Lukol.com IDs [expand] | $0.30 |
| 49078 | Milena Badjova dba Cashfiesta.com | $0.34 |
| 48980 | Targetpoint, Inc. | $0.38 |
| 49036 | W.D.I.A. Corporation | $0.32 |
| 49315 | TotalNet Marketing, LLC | $0.54 |
| 48828 | Intellim Research, Inc. (FW HTML) IDs [expand] | $0.32 |
| 48606 | Wonk Media, LLC | $0.69 |
| 49035 | Marija Posavec | $1.06 |
| 48792 | Prime Plan LLC | $0.73 |
| 48906 | Xu Daning DBA Exactseeks.com | $0.44 |
| 48922 | Origin Data, Inc. | $0.38 |
| 48829 | Marketing Essentials LLC | $0.79 |
| 48459 | Creative Development Partners, Inc. | $0.86 |
| 49049 | Traffic Strategies.com, LLC | $0.38 |
| 48279 | Michael Stark | $0.43 |
| 47976 | EZD Consulting, Inc. | $0.44 |
| 48434 | Anthony Torres DBA Alien | $0.41 |
| 48576 | Booyah Networks, Inc. | $0.33 |
| 48974 | The Wotch Network PTY Ltd. | $0.66 |
| | **FINDWHAT'S AVERAGE** | $0.17 |

**D.    The Spotlight Is Shined on Click Fraud and Defendants' Panic**

61.    During 2004 and 2005, increased scrutiny was focused on click fraud by state and federal regulators.  For example, In April 2005, Elliot Spitzer, the Attorney General of New York, enjoined Intermix, a spyware vendor based in Los Angeles, California, from engaging in activity similar to what FindWhat relied on to generate one third of its revenue, and obtained a $7.5 million settlement for New York consumers who had been subjected to this type of abuse.[13]

62.    Suddenly, FindWhat executives feared that, as former Senior Director of Business Development bluntly stated, "the shit was going to hit the fan ... after the hammer came down on the [spyware] industry," and that they would find themselves next on Attorney General Spitzer's list of spyware targets.

---

[13]    *See* press release of the Office of New York State Attorney General Eliot Spitzer, dated April 28, 2005.

63.    In addition, Defendants feared that new laws would be passed limiting the use of spyware and protecting consumers from the impact of these fraudulent practices, which would bring their practices under further examination.  Accordingly, beginning in February 2005, Defendants began issuing statements intended to assure the market - - and the government that FindWhat was being proactive in addressing these issues.  However, as demonstrated more fully below, in fact, even the Company's purported "disclosures" were lies.

## V.    FALSE AND MISLEADING STATEMENTS

64.    Despite the material problems with FindWhat's distribution network and operations, Defendants issued a series of false and misleading statements and omissions to the investing public.  These statements are detailed below.

### B.    Fiscal Year 2003 False Statements and Reasons for Falsity

65.    [DELETED PER THE COURT'S ORDER OF APRIL 25, 2007]

66.    The above statement is materially false and misleading because Defendants knew, or were severely reckless in not knowing, that the quality of their "prospects" were anything but high quality because over one third of their "prospects" came from spyware distribution partners Saveli and Dmitri, who Defendants later referred to as "less than honorable." (*See also* ¶¶ 5, 7, 8, 10, 38-43, 45-47, 50-54).

67.    [DELETED PER THE COURT'S ORDER OF APRIL 25, 2007]

68.    The above statement is materially false and misleading because Defendants knew, or were severely reckless in not knowing, that Defendants' promotion of high profile distribution partners misled investors as to the overall quality of FindWhat's distribution network.  The partners cited above provided only a fraction of the traffic of Saveli and Dmitri, who the Company has never acknowledged exist, let alone provided one third of its revenue.  For example, during a twelve month period when Saveli and Dmitri were ranked first and second in

click revenue production, well known and respected CNET ranked 50th. To illustrate the difference between their respective rankings, CNET generated 1,604,375 clicks for $124,769.18 in revenue; in contrast, Dmitri and Saveli combined for 91,690,351 clicks for $37,202,556.64. Further, the above statement is false and misleading because, contrary to the Company's statement, in order to meet its projections and foster the illusion of continued growth, the Company relied on deceiving its advertisers into bidding and subsequently paying for, illicitly generated Savilli and Dmitri clicks. (*See also* ¶¶ 5, 7, 8, 10, 38, 40, 41, 43-48, 50-54, 56).

69.    [DELETED PER THE COURT'S ORDER OF APRIL 25, 2007]

70.    The above statement is materially false and misleading because Defendants knew, or were severely reckless in not knowing that their largest distribution partners (Saveli and Dmitri) were not generating "relevant keyword-targeted listings," nor were they directing visitors or consumers to "walk into their [advertisers'] virtual stores" as the Company touted. Rather, Defendants were merely orchestrating a scheme to generate increased click traffic in an effort to enhance revenue without the burden of paying for a distribution partner capable of generating high quality leads. In reality, during the Class Period, Defendants relied on Saveli and Dmitri to generate approximately one third of their revenue through the use of illicit means, such as spyware and adware, to generate non-human traffic that would often "hijack" the Internet browsers of unsuspecting computer users and automatically direct those users to unsolicited advertisements, thereby creating a click or revenue event for both the distribution partner and FindWhat. (*See also* ¶¶ 5, 7, 8, 10, 38, 40, 41, 43-48, 50-54, 56).

71.    [DELETED PER THE COURT'S ORDER OF APRIL 25, 2007]

72.    The above statement is materially false and misleading because Defendants knew, or were severely reckless in not knowing, that the Company's reliance on non-human generated

click traffic from its two largest distribution partners could not possibly "connect" consumers and businesses because consumers were illusory participants in the fraudulent transaction. These non-human generated clicks were far from "cost effective" methods for advertisers to "pay only for those prospects which click through to their sites." In fact, Defendants knew, as revealed in the Company's internal "War Reports" and "Interface," that a substantial amount of click traffic produced by its largest distribution partners was of no value to its advertisers, and later declared these illicit methods as "less than honorable." (*See also* ¶¶ 5, 7, 8, 10, 38, 40-41, 43-48, 50-54, 56).

### C.     Fiscal Year 2004 False Statements and Reasons For Falsity

73.     [DELETED PER THE COURT'S ORDER OF APRIL 25, 2007]

74.     The above statement is materially false and misleading because Defendants knew, or were severely reckless in not knowing, that the Company's two largest distribution partners (i.e., revenue generators), during the Class Period unethically, and in violation of the Company's stated policy, employed illicit means, as described throughout this Complaint, to generate fraudulent click traffic to unsuspecting advertisers' websites. (*See also* ¶¶ 5, 7, 8, 38-41, 43-48, 50-54, 56).

75.     [DELETED PER THE COURT'S ORDER OF APRIL 25, 2007]

76.     The above statements are materially false and misleading because Defendants knew, or were severely reckless in not knowing, that almost one third of the Company's 2003 revenue came from traffic generated illegitimately by only two distribution partners, Saveli and Dmitri. According to several former Company employees, the percentage of revenue generated by these two distribution partners exceeded the ten percent threshold discussed in the above statement, yet neither Saveli's nor Dmitri's material revenue contribution was disclosed. Further, the Company did not enforce strict guidelines regarding Saveli and Dmitri with respect

to the quality of the traffic they generated. Rather, Defendants simply turned a blind eye and even encouraged the use of illicit means to generate click traffic to ensure that Defendants would meet Wall Street's projected revenue targets. (*See also* ¶¶5, 7, 8, 38, 40-41, 43-48, 50-54, 56).

77.    Defendants' statements concerning the diversified and high-quality nature of its distribution partners were relied on by analysts who returned favorable recommendations for FindWhat stock. For example, on July 15, 2004, Pacific Growth issued a research report stating:

> **Business diversification**    According to the Company's management, only one traffic partner (likely CNET Networks' (CNET:NASDAQ, Not Rated) Search.com or, perhaps, Excite/Infospace (INSP:NASDAQ, Not Rated) has contributed 10% or more of total revenue in recent quarters and no advertiser now represents more than 3% of total revenue. This contrasts rather markedly with Overture in Q2:03 (its last as a public company), when Yahoo! and Microsoft combined to account for nearly 70% of its total revenue.

78.    [DELETED PER THE COURT'S ORDER OF APRIL 25, 2007]

79.    Defendants' statements characterizing FindWhat's revenue trends as "increasing" were false. In fact, by this time the Company was suffering from a material **adverse** trend of bid deflation, as a result of the low quality traffic which in turn drove down the average RPC. (*See also* ¶¶ 4, 6, 29-37). The fact that FindWhat's RPC had declined significantly was a material fact required to be disclosed. Specifically, The SEC's Staff Accounting Bulletin ("SAB") 101 states:

> Management's Discussion and Analysis (MD&A) requires a discussion of liquidity, capital resources, results of operations and other information necessary to an understanding of a registrant's financial condition, changes in financial condition, and results of operations. This includes unusual or infrequent transactions, known trends or uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue, operating income or net income and the relationship between revenue and the costs of the revenue. Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease. The Commission stated in Financial Reporting Release (FRR) 36 that MD&A

24

should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future." Examples of such revenue transactions or events that the staff has asked to be disclosed an discuss in accordance with FRR 36 are:

• Changing trends in shipments into, and sales from, a sales channel or separate class of customer that could be expected to have a significant effect on future sales or sales returns.

• An increasing trend toward sales to a different class of customer, such as a reseller distribution channel that has a lower gross profit margin than existing sales that are principally made to end users. Also, increasing service revenue that has a higher profit margin than product sales.

• Seasonal trends or variations in sales.

80. Since FindWhat had already experienced a decline in RPC due to the predominance of low quality traffic, this trend should have been disclosed.

81. [DELETED PER THE COURT'S ORDER OF APRIL 25, 2007]

82. The above statement is materially false and misleading because Defendants knew, or were severely reckless in not knowing, that FindWhat derived almost one third of its revenue during this period from just two distribution partners. Defendants Thune and Pisaris-Henderson's refusal to respond to the analyst's question illustrates their desire to keep what two former managerial and one Senior Director employed by the Company during the Class Period admitted – that Dmitri and Saveli accounted for more than 10 percent of Company revenue in 2004. (*See also* ¶¶ 5, 7, 8, 38, 40-41, 43-48, 50-54, 56).

83. [DELETED PER THE COURT'S ORDER OF APRIL 25, 2007]

84. The statements in the December 16, 2004 analyst report, prepared after the analyst reviewed FindWhat's publicly available information and after discussions with FindWhat

management, were false.  The statement that FindWhat's editorial team removes invalid clicks and culls traffic to ensure a high quality of traffic was false because Defendants knew that FindWhat's two primary traffic-generating partners were generating illegitimate traffic to the Company's advertisers.  For example, by June of 2004, Dmitri and Saveli were openly discussed and a decision was made to remove them because of their use of spyware and other improper methods.  Defendants Thune and Pisaris-Henderson who vetoed this decision, informing a former employee that the Company would have to replace the revenue from Dmitri and Saveli before they could be removed as partners, so that the Company could meet Wall Street revenue projections.  (*See also* ¶¶ 57-60).

> **D.    Fiscal Year 2005 False Statements and Reasons for Falsity**

85.    [DELETED PER THE COURT'S ORDER OF APRIL 25, 2007]

86.    The above statements are materially false and misleading because Defendants knew at the time the statements were made, that the projected revenue for the first quarter and year end 2005 could only be achieved through the inclusion of revenue derived from illegitimate distribution partners who employed tactics, such as the "circle jerk," to fraudulently enhance Company revenues.  As the Company has since admitted, almost 27 percent of its revenue was derived from these "less than honorable" distribution partners whose affiliation with the Company violated FindWhat's own policies for ethical business practices.  Moreover, Defendants knew that the "questionable sources" of traffic they allegedly shut off during the 4Q2004 were still producing questionable revenue that inflated the Company's revenue and rendered the projections unreliable.

87.    On the same date, Defendants Pisaris-Henderson and Agius participated in a conference call with analysts, wherein Defendant Agius reiterated the Company's guidance for fiscal year 2005.  Defendant Pisaris-Henderson also expanded upon the Company's quality of

advertisement, stating that the Company had, during the fourth quarter of 2005, purportedly removed numerous non-quality traffic sources that generated substantial revenue, in the Company's attempt to "deliver traffic that converts rather than just clicks alone," as follows:

Third, we believe that lead quality should be and is becoming increasingly important to advertisers, and recent press coverage has focused substantial attention on the click broad issue and how it effects lead quality. For several years, we have understood the issue and have been investing heavily in protecting the integrity of our networks through both automated and human systems, thereby limiting our exposure to the issue.

That said, we believe that ultimately the value of a lead is best determined by whether that lead actually converts to a sale. Our recent acquisition of Miva empowers our visibility into the click stream, and for businesses with Miva storefronts, we are now able to track and add from the first click through to the point-of-sale. We don't need to employ intuition or advanced algorithms to determine whether traffic sources are good or bad. We are creating a single transparent platform that combines relevant advertising with the visibility to measure conversion rather than clicks alone, thereby giving us the ability to remove traffic sources from our networks that do not meet our high standard of conversion metrics, aligning our interest with those of our advertisers.

**In fact, during Q4 we intentionally removed numerous traffic sources that would otherwise have produced approximately $70,000 of revenue per day**. This action further illustrates our long-term view towards maintaining high standards and delivering high-quality leads to our advertisers.

**Let me repeat we have intentionally removed traffic sources from our distribution network that would otherwise have produced approximately $70,000 of revenue per day in topline revenue. Again, our focus is to deliver traffic that converts rather than just clicks alone.**

Although in the short-term allowing this traffic within our network could reduce revenues, we believe we're best served in the long-term by leading the industry through the creation of a transparent platform that will further differentiate our Company within the performance-based marketing world. [Emphasis added]

88.    The above statements are materially false and misleading because Defendants knew, or were severely reckless in not knowing, that:

a.    According to the Senior Director of Business Development responsible for the oversight and management of all distribution partners and affiliates, the fraudulent revenue sources were not removed.  Indeed, "no traffic was taken off line in the fourth quarter of 2004." He also stated that the announcement in the February conference call referred to Dmitri and Saveli who earned an averaged of $70,000 in revenue per day.  This was confirmed in an internal company report produced anonymously to Lead Plaintiffs' counsel.  The report, dated February 20, 2005, shows Dmitri and Saveli as the top two producers with a combined daily revenue average of $70,193.50.

| ID | Affiliate | Clicks | Revenue | $$/Clicks | Clicks/Day | $$/Day |
|----|-----------|--------|---------|-----------|-----------|--------|
| 48078 | Saveli Kossenko – Dimago Overseas Gmbh IDs | 58,517,416 | $12,053,239.77 | $0.21 | 220,820.40 | $45,483.92 |
| 47161 | HyperSpace Communications, Inc. | 33,172,935 | $6,548,038.55 | $0.20 | 125,180.90 | $24,709.58 |

b.    Similarly, a former Marketing Manager also stated that it was "an open secret within the Company that Dmitri and Saveli were not taken off line in December 2004, and neither was anyone else."  Along these lines, the former Senior Director of Business Development referenced in the preceding paragraph stated that "the traffic referred to above could only have been Dmitri and Saveli…."

c.    In fact, according to an internal FindWhat report dated February 20, 2005, which is three days before Defendant Pisaris-Henderson's comments above, **Saveli earned $800,000 more during January 2005 than he did in March 2004**, while Dmitri earned $540,000 in January 2005.

28

d.      Despite Defendants' claims to have removed $70,000 in "questionable" distribution traffic, former employee testimony and documents anonymously produced to Lead Plaintiffs' counsel suggest otherwise.  Two internal reports comparing the results for Saturday, February 12, 2005 with Saturday, February 19, 2005 and Sunday, February 13, 2005 with the corresponding Sunday, February 20, 2005 prove that the Company did not disrupt the traffic generated by either Saveli or Dmitri.  In fact, these reports show a 36% percent increase for Dmitri [Hyperspace] during the February 19 weekend over the week before.  Clearly, they had not been turned off or had their traffic slowed in any way because their number of clicks and corresponding revenue is consistent with their 2004 average of $70,000 per day.

| ID | Name | Clicks | | | Revenue | | |
|----|------|--------|--------|--------|---------|--------|--------|
| | | 2/19/05 | 2/12/05 | Change | 2/19/05 | 2/12/05 | Change |
| 48078 | Saveli Kossenko – Dimago Overseas Cmbh IDs | 371,231 | 341,023 | 8.90% | $59,855.60 | $51,589.60 | 16.00% |
| 47161 | HyperSpace Communications, Inc. | 146,684 | 103,012 | 42.40% | $22,849.42 | $16,734.13 | 36.50% |
| ID | Name | Clicks | | | Revenue | | |
| | | 2/20/05 | 2/13/05 | Change | 2/20/05 | 2/13/05 | Change |
| 48078 | Saveli Kossenko – Dimago Overseas Cmbh IDs | 357,821 | 349,587 | 2.40% | $53,304.76 | $49,422.24 | 7.90% |
| 47161 | HyperSpace Communications, Inc. | 149,928 | 108,426 | 38.30% | $22,651.99 | $17,269.44 | 31.20% |

e.      Defendants' alleged removal of low quality traffic from the Company's network on February 23, 2005 not only mislead investors, but was also designed to entice advertisers to bid more on the belief that the network's traffic had improved in quality.  According to a former manager of marketing, Defendants essentially employed a "bait and switch" tactic by telling advertisers they had improved their traffic quality to attract higher bids when, in reality, Defendants knew the quality of their traffic was still extremely poor.  Further, during this period, one former employee stated that he had numerous meetings in the fifth floor

executive conference room with Vice President of Operations, John Moran, where Moran repeatedly described the quality of FindWhat's traffic as "sub-par."

89.    On March 16, 2005, the Company filed with the SEC its Form 10-K for the year ending December 31, 2004.  The Form 10-K was signed by each of the Individual Defendants, and included certifications from Defendants Pisaris-Henderson and Thune, as required by Section 906 of the Sarbanes-Oxley Act of 2002.  The Form 10-K misled investors into believing that the Company did not rely on the use of "spyware for any purpose" in its business, and that its distribution partners "generated targeted prospects," as follows:

> Additionally, the U.S. Congress and some state legislatures have introduced legislation designed to regulate "spyware," which has not been precisely defined, but which is often defined as software installed on consumers' computers without their informed consent and which is designed to gather and, in some cases, disseminate information about those consumers, including personally identifiable information, without the consumers' consent.  **We do not rely on "spyware" for any purpose and it is not part of our product offerings**, but the definition of spyware or proposed legislation relating to spyware may be broadly defined or interpreted to include legitimate ad-serving software, including toolbar offerings currently provided by our Primary Traffic division.  Currently, legislation has focused on providing Internet users with notification of and the ability to consent or decline the installation of such software, but there can be no guarantee that future legislation will not provide more burdensome standards by which software can be downloaded onto consumers' computers. Currently all downloadable software that we distribute requires an express consent of the consumer and provides consumers with an easy mechanism to delete the software once downloaded. [Emphasis added].

90.    The above statement is materially false and misleading because Defendants knew, or were severely reckless in not knowing, that as illustrated by the internal "War Reports" and the "Interface," the Company's two largest distribution partners (Saveli and Dmitri) in 2003, 2004 and 2005, did in fact rely upon spyware to generate the bulk of their fraudulent click traffic. (*See also* ¶¶ 5, 7, 8, 38, 40-41, 43-48, 50-54, 56).

91.     The 2004 Form 10-K also suggested that the Company took great care to assure that it was minimizing click-through fraud, and represented that the Company would readily issue refunds for any such fraudulent clicks, as follows:

> We have implemented screening policies and procedures to minimize the effects of these fraudulent clicks. **We believe that these policies and procedures assist us in detecting fraudulent click-throughs, which are not billed to our advertisers**. However, it is difficult to detect all fraudulent clicks and detection may become more difficult in the future if third parties implement more sophisticated fraudulent click-through schemes.   To the extent that we are unable to detect click-through fraud, we may refund revenue that our advertiser have paid to us that is later discovered to be attributed to these fraudulent click-throughs. If we find new evidence of past fraudulent clicks, we may have to issue refunds to advertisers retroactively for amounts previously paid to our FindWhat.com or Espotting Network distribution partners. [Emphasis added]
>
> * * *
>
> From time to time, we receive fraudulent clicks on our ads by persons seeking to increase the advertising fees paid to distribution partners within our FindWhat.com and Espotting Networks.   Click-through fraud occurs when a person or program clicks on an advertisement displayed on a website for the purpose of generating a click-through payment to the FindWhat.com and Espotting Networks partner rather than to view the underlying content. **We have developed automated proprietary screening applications and procedures to minimize the effects of these fraudulent clicks**.   Click-throughs received through the FindWhat.com and Espotting Networks and through our private label partners' networks are evaluated by these screening applications and procedures.   We constantly evaluate the efficacy of our efforts to combat click-through fraud, and may adjust our efforts for specific distribution partners or in general, depending on our ongoing analysis.   These changes impact the number of click-throughs we record and bill to our advertisers, the bid prices our advertisers are willing to pay us for click-throughs and the revenue we generate.

92.     The above statement is materially false and misleading because Defendants knew, or were severely reckless in not knowing, that despite asserting that the Company had implemented policies and procedures to minimize fraudulent clicks, Defendants (who were

repeatedly confronted with Saveli and Dmitri's use of click fraud tactics) knew that the majority

of their distribution network relied on click fraud.  (*See also* ¶¶ 5, 7, 8, 40-41, 43-48, 50-54, 56).

93.    Moreover, although Defendants revealed that "Internet traffic purchases from one

distribution partner represented over 10% of total revenue" in 2002 and 2003, the 2004 Form 10-

K misled investors to believe that no traffic purchased from any distribution partner represented

over 10% of consolidated revenue in 2004, as follows:

> During 2004 and 2003, no advertiser account represented more
> than 10% of our total revenue.  We purchase Internet traffic from
> our distribution partners.  Expressed as a percentage of revenue,
> **none of the traffic purchased from any of these distribution
> partners represented over 10% of consolidated revenue in
> 2004.**  Internet traffic purchases from one distribution partner in
> 2003 represented more than 10% of total revenue.  [Emphasis
> added]

94.    The above statements are materially false and misleading because Defendants

knew, or were severely reckless in not knowing, that almost one third of the Company's 2004

revenue came from traffic generated illegitimately by only two distribution partners, Saveli and

Dmitri.  According to several former Company employees, the percentage of revenue generated

by these two distribution partners exceeded the ten percent threshold discussed in the above

statement, yet neither Saveli's nor Dmitri's material revenue contribution was disclosed.  (*See*

*also* ¶¶ 5, 7, 8, 40-41, 43-48, 50-54, 56).

95.    The 2004 Form 10-K also falsely stated:

> In the second half of the fourth quarter of 2004, we ceased
> displaying advertisements with distribution partners and affiliates
> of distribution partners whose traffic did not adequately convert to
> revenue for our advertisers in conjunction with our continued
> efforts to increase the quality of the Internet users accessing our
> customers' advertisements.  Measured at the end of the fourth
> quarter, the removal of these distribution partners reduced our
> average click-through revenue by approximately $70,000 per day
> compared to what each such distribution partner had been
> producing on a daily basis immediately prior to removal.  During

2003 and as a matter of ongoing business practice, we removed one or more distribution partners from our network at various times, however the impact to our revenue was not significant to the quarter or the year when they were removed. We plan to continue our efforts to provide our advertisers with high quality Internet traffic, an undertaking that may have short-term negative effects on our revenue, but which we believe will ultimately improve our click-through revenue in the long-term. We consider the removal of these distribution partners in the second half of the fourth quarter as ordinary to our business and in conformity with our long-stated goal of provided [sic] high quality traffic to our advertisers. In addition, although the Company admitted in the Form 10-K that it removed "one or more distribution partners from [its] network at various times" during 2003 "and as a matter of ongoing business practice," Defendants represented that "the impact to [the Company's] revenue was not significant to the quarter or the year when [the distribution partner(s)] were removed."

96.     The above statement is materially false and misleading because Defendants knew, or were severely reckless in not knowing, that no distribution partners were taken off line in the fourth quarter of 2004. (*See also* ¶¶ 61-64, 87).

## VI.    THE TRUTH BEGINS TO EMERGE

### A.     The Company Slowly Reveals the Truth

97.     Between February 23, 2005 through May 4, 2005, Defendants began to trickle out carefully selected adverse information in an attempt to lull investors into a false sense of security that the full truth about FindWhat's problems had been disclosed. During the Company's February 23, 2005 earnings conference call, Defendants partially disclosed that FindWhat was experiencing problems with the quality of traffic its distribution partners were generating. As a result of the disclosure of the problem with low quality traffic as detailed above, the price of FindWhat stock dropped 19% from its previous close of $13.45 per share to $10.95 per share.

98.   On May 2, 2005, FindWhat.com filed a Form 8-K with the SEC announcing that

its independent auditor, Ernst and Young LLP ("E&Y"), had resigned.  The filing stated in

relevant part:

> From the date of E&Ys engagement on March 18, 2003 through
> the date of its resignation notification to the Company on April 26,
> 2005, there were no reportable events described under Item
> 304(a)(1)(v) of Regulation S-K, within either of the past two fiscal
> years ended December 31, 2004 and December 31, 2003 and for
> the subsequent period through the date hereof, except as described
> below:
>
> • In the Company's Amendment No. 1 to its Annual Report on
> Form 10-K/A, which the Company filed with the SEC on May 2,
> 2005, managements Annual Report on the Internal Control over
> Financial Reporting stated, and **E&Ys report on internal controls
> stated, that because of the material weaknesses disclosed in
> those reports, the Company's internal control over financial
> reporting was not effective as of December 31, 2004**, based on
> **the COSO criteria. E&Y advised the Company of six material
> weaknesses in the Company's system of internal control over
> financial reporting, which are disclosed in those reports, and
> these matters relate to (i) purchase accounting, (ii) goodwill
> impairment, (iii) revenue recognition for private label
> agreements and other revenue agreements, excluding those
> related to FindWhat.com Network revenue, (iv) personnel
> resources and technical accounting expertise, (v) quarterly and
> year-end financial statement close and review process, and (vi)
> segregation of duties.**  [Emphasis added].

99.   That same day, the Company filed a Form 10-K/A with the SEC, amending its

previously filed Form 10-K for fiscal year 2004, which revealed that the Company was named as

a defendant in an action entitled *Lane's Gift and Collectibles, L.L.C., et al. v. Yahoo! Inc., et al.*

The disclosure revealed that FindWhat was a defendant in a class action brought on behalf of its

own advertising customers alleging that the Company improperly billed them for clicks that

FindWhat knew were not made by bona fide consumers in violation of their contracts and

actively concealed this practice from its advertising clients.  The lawsuit was yet another

34

indication that FindWhat's revenues were artificially inflated through the use of improper methods.

100.    The Form 10-K/A also revealed that during the second half of the fourth quarter of 2004, Defendants finally "ceased displaying advertisements with distribution partners and affiliates of distribution partners whose traffic did not adequately convert to revenue for [FindWhat's] advertisers in conjunction with [FindWhat's] continued efforts to increase the quality of the Internet users accessing [FindWhat's] customers' advertisements."  As calculated at the end of the fourth quarter, "the removal of these distribution partners reduced [the Company's] average click-through revenue by approximately $70,000 per day compared to what each such distribution partner had been producing on a daily basis immediately prior to removal."  Defendants again revealed that, during fiscal year 2003, the Company "removed one or more distribution partners from [its] network at various times, however the impact to our revenue was not significant to the quarter or the year when they were removed."

101.    Immediately following the Company's release, FindWhat's stock plummeted, on usually high trading volume of 5.8 million shares, from its closing price of $7.75 on May 2, 2005, to a closing price of $5.71 on May 3, 2005.

102.    On May 5, 2005, before the market opened, the Company announced its first quarter 2005 results.  The press release issued that day, the relevant parts of which appear below, also announced the resignation of the Defendant Agius as FindWhat's CFO.

> **The Company announced that it has accepted the resignation of Brenda Agius as the Company's chief financial officer, effective as of May 4, 2005.**
>
> With respect to the Company's results, Mr. Pisaris-Henderson said, "We are pleased with our first quarter 2005 results, especially given the steps we took in the fourth quarter of 2004 to remove traffic sources that did not meet our standards in terms of conversions and return on investment for our advertisers. Moving

forward, we remain committed to developing a global, full service platform for small and medium-sized businesses that delivers high-quality leads, maximizes monetization opportunities for our partners, and enables advertisers to measure returns through conversion analytics, helping them grow their businesses."

FindWhat.com also said that in recent weeks it has been removing certain distribution partners, representing a meaningful percentage of daily click-through revenue thereby negatively affecting the Company's short-term financial performance. The Company believes these partners and/or their sub-affiliates had developed methods for obtaining new users that did not follow the Company's distribution guidelines.

Mr. Pisaris-Henderson said, "Undeniably, it is difficult to turn off partners that had produced substantial revenue for our Company. Nevertheless, we remain committed to leading this industry in the implementation of, and adherence to, best practices with respect to delivering high quality prospects from trusted sources to our advertisers. To this end, we will continue to strive to work with our partners to ensure that we foster and maintain high standards in this area. We believe this is absolutely critical for the end users of our services and for our own long-term prospects."

First Quarter Results

Revenue was $58.2 million in Q1 2005, an increase of 136% over Q1 2004 revenue of $24.7 million. GAAP net income was $3.2 million, or $0.10 per diluted share, in Q1 2005, compared to $3.8 million, or $0.16 per diluted share, for the same period in 2004. EBITDA was $8.4 million, an increase of 23% over Q1 2004 EBITDA of $6.8 million. Adjusted EPS was $0.14 per diluted share in Q1 2005, compared to $0.16 per diluted share for the same period in 2004. Amortization expense in Q1 2005 was $2.0 million, compared to $189,000 for the same period in 2004. The increase in non-cash amortization expense from Q1 2004 to Q1 2005 reflects amortization of intangible assets resulting from 2004 mergers and acquisitions.

The Company's Q1 2005 revenue and expenses increased substantially versus the same period in 2004, primarily due to the inclusion of operating results from the mergers and acquisitions completed in 2004. Results for the first quarter of 2004 include Miva for the entire period and Comet from its acquisition on March 22, 2004.

2005 Guidance

As previously reported, in the first half of 2005, the Company's EBITDA is being impacted by several factors including new or expanded investments associated with its global marketing and FAST search technology initiatives, rising legal fees resulting from its patent litigation with Overture and significantly higher accounting fees associated with its audit, financial reviews and Sarbanes-Oxley Act compliance. FindWhat.com expects the impact of these factors to decline in the second half of the year.

After taking into consideration the Company's efforts with respect to the sourcing of its traffic, and excluding any potential impact of the outcome of the Overture litigation, FindWhat.com expects Q2 2005 revenue to be between $40 and $50 million, and anticipates full year 2005 revenue to be between $175 and $200 million.

103.    Later that day, Defendants Thune and Pisaris-Henderson participated in a conference call with analysts and investors.  During this call, Defendant Pisaris-Henderson finally revealed to the public that "a couple" of the Company's distribution partners had been employing "capabilities…to get additional traffic that just simply don't adhere to our standards." Defendants were fully aware that these two partners, identified as Dmitri and Saveli by four former managerial employees with personal knowledge, not only utilized these means of obtaining additional traffic since before the start of the Class Period, but also accounted for a material portion of FindWhat revenue.

104.    On May 5, 2005, in response to the news, the stock price plummeted from a closing price of $6.16 on May 4, 2005, to close at $4.83 on May 5, 2005 - a one-day drop of 21.6%.

105.    The Company's stock price lost 64% or its value between February 23, 2005, and May 5, 2005, falling from a closing price of $13.45 on February 23 to close at $4.83 on May 5, 2005.  As a result of these "disclosures" the price of FindWhat stock declined from $24.50 at the start of the Class Period to close at $4.83 on May 5, 2005, having dropped an astonishing *82.58%* from its Class Period high of $27.72 on September 16, 2003.

### B.    Market Professionals React to the Company's Disclosures

106.    Each of these purported disclosures was met with shock by the investors and analysts.  For example, after the February 23, 2005 conference call, RBC Capital Markets issued a research report indicating that the "conference call only partially obscures slowly deteriorating core business."  The analyst report noted:

> The company claimed it eliminated over $2m in gambling-related advertising revenue in the fourth quarter, and eliminated another $4m in clicks from partners whose conversion rate was lower than acceptable levels.  While each of these decisions makes some sense in and of itself, the combined $6m impact on the quarter was too great for investors to ignore.  We wished that management had told us in prior communications that such a large percentage of its traffic was low quality, low conversion traffic. . .

107.    This reaction was echoed by investment bank Craig-Hallum in a February 24, 2005 analyst report.  With respect to removing poor quality traffic, the report noted that:

> [w]e expected a gardener using pruning shears.  What we got was a lumberjack using a chainsaw.

108.    Similarly, Marquis Investment Research issued a report indicating that the main reasons investors would purchase FindWhat – due to its growth rates, had fundamentally changed.  The report noted that:

> The whole search industry has now reported, and FindWhat.com certainly performed the worst when compared to the consensus estimates.  We are downgrading the stock as we believe investors will likely look elsewhere for growth opportunities.  Organic growth of 15% doesn't sound like something that an Internet company should be having, so the lower growth expectations will likely carry a lower multiple as well.

109.    Analyst reaction to the May 5, 2005 conference call was even worse, after Defendants revealed that FindWhat had turned off additional distribution partners who accounted for a meaningful percentage of revenue.  For example, a May 9, 2005 report issued by Craig-Hallum noted that:

We believe the bad partners were practitioners of malicious techniques such as browser hijacking and spyware.

**Our Point of View**

FindWhat is a middle man. Their ability to sell advertising is dependant on the quality of traffic generated by their search partners.

They have always screened the traffic for things like click fraud and Romanian IP addresses. This action is in their best interest because if the traffic is fraudulent and results in no business for advertisers, advertisers will stop spending their budgets at FindWhat.

Without user consent, these partners were downloading aggressive software onto unsuspecting users' PC's When those users surfed and searched, the hijacked browser presented them with FindWhat ads.

FindWhat claims it became aware of the ill-gotten search traffic a few weeks ago and took immediate action to end the relationship. We believe that the company reacted properly, but the admission adds a much higher risk to the investment case.

We hope that the company is more proactive in the future. Merely stating that "we stop doing business with bad people the minute we find out they are bad" is an inappropriate business model. We assumed FindWhat had a more aggressive verification and monitoring process.

Also, one of the key elements of our original investment theses on FindWhat was that no distribution partner represented over 10 percent of revenue. The accuracy of this statement must also come under scrutiny as the company just lowered the midpoint of it guidance by 27.9 percent.

## VII.    POST CLASS PERIOD EVENTS

110.    Even after the end of the class period, Defendant Thune could not resist another opportunity to mislead the investing public. Thune offered the following quote in *The Wall Street Journal* on May 11, 2005: "We will not have our software sneak onto somebody's computer, and they don't know it's happening." According to three former managerial employees with personal knowledge that were employed with the Company during this period,

39

Savelli was the number one volume leader in terms of revenue and traffic for May 2005 and he continues to produce spyware generated revenue for FindWhat to this day. Like they did in the 4Q2004, Defendants used the alleged removal of questionable traffic as a scapegoat for their declining revenues.

111.    Then, on August 15, 2005, the Company filed its Form 10-Q for 2Q05 with the SEC, in which the Company stated that it would be taking an estimated $119 million non-cash impairment charge related to goodwill and other intangible assets. The Company set forth the reasons for the impairment charge as follows:

> During the second quarter of 2005, our earnings forecasts were updated for each of our divisions to reflect events that occurred during the quarter that changed our expected business prospects including reduced traffic generated by our distribution partners, and lower-than-expected profitability at our MIVA Direct and MIVA Small Business divisions. In addition, during the second quarter of 2005, our stock price declined significantly resulting in our market capitalization falling below the amount of our recorded equity. As a result of these indicators, we performed a test to determine if the carrying amount of goodwill and other indefinite-lived intangibles were impaired.

112.    These tests in fact indicated that "the carrying amount of the reporting units exceeded their fair value," leading the Company to conclude that its goodwill was impaired. However, the $119 million is only an estimated figure, as the Company has not yet finalized this amount, and as such, the actual charge may be even higher.

## VIII.    ADDITIONAL SCIENTER ALLEGATIONS

### A.    Inadequate Internal Controls and Accounting Oversight

113.    Throughout the Class Period, Defendants knew, or were reckless in not knowing, that the Company's internal controls suffered material weaknesses. Defendants knew of their responsibilities to ensure adequate internal controls. Indeed, FindWhat identified in its quarterly filings for Q1 and Q2 2004 the following as a business risk:

If we fail to maintain an effective system of internal controls, we may not be able to accurately report our financial results or prevent fraud, which could harm our brand and operating results.

Effective internal controls are necessary for us to provide reliable and accurate financial reports and effectively prevent fraud. In addition, Section 404 under the Sarbanes-Oxley Act of 2002 requires that we assess and our auditors to attest to the design and operating effectiveness of our controls over financial reporting. If we cannot provide reliable and accurate financial reports or prevent fraud, our brand and operating results could be harmed. If we cannot provide the necessary documentation and demonstrate the effectiveness of our controls, we could be deemed to have deficiencies, significant deficiencies or material weaknesses that would need to be addressed. We have in the past discovered, and may in the future discover, areas of our internal controls that need improvement. We are continuing to work to improve our internal controls, including areas of access and security. We cannot be certain that these measures will ensure that we design, implement and maintain adequate controls over our financial processes and reporting in the future. Any failure to implement necessary new or improved controls, or difficulties encountered in their implementation or operation, could harm our operating results or cause us to fail to meet our financial reporting obligations. Inferior controls could also cause investors to lose confidence n our reported financial information, which could have a negative effect on the trading price of our stock and access to capital.

114.    Moreover, the Individual Defendants falsely certified to the public on numerous occasions that they evaluated the Company's internal controls and disclosure policies and procedures and that they were effective.

115.    To the contrary, on May 2, 2005, the Company admitted that Ernst & Young, the Company's former independent auditors, "advised the Company of six material weaknesses in the Company's system of internal control over financial reporting" with respect to: (a) purchase accounting, (b) goodwill impairment, (c) revenue recognition, (d) personnel resources and technical accounting expertise, (e) quarterly and year-end financial statement close and review process, and (f) segregation of duties.

116.    Thus, the failure to establish and implement proper internal controls, which could have detected and prevented the improper activities described herein, gives rise to a strong inference that Defendants acted with scienter.

**B.    Company Insiders Sell Stock in Suspicious Amounts and at Unusual Times**

117.    While in possession of the adverse material information detailed above, certain Defendants and Company insiders (the "Selling Insiders") sold substantial amounts of Company stock at artificially inflated prices during the Class Period.  Defendants Pisaris-Henderson and Thune, and Frederick E. Guest, II ("Guest") made these sales while they were in possession of the undisclosed, material, adverse information about the Company described herein.

118.    In that instance, the transactions of Guest and Defendant Pisaris-Henderson and Thune were unusual in timing when taken in conjunction with the false statements the Company was making to the investing public at the time.  The trades in question occurred in 4Q2004 when FindWhat stock traded at nearly twice its trading price after the February 23, 2005 announcement of FindWhat's purported removal of certain distribution partners.

119.    Moreover, none of the Selling Insiders sold any stock in 2003 – not a single share – nor have they sold any since the 4Q2004. But while actively concealing from the investing public the material adverse trend in FindWhat's operations during the 4Q2004 Selling Insiders had the following transactions and proceeds:

| Company Insider | Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|
| GUEST | 10/5/2004 | 25,000 | $ 20.04 | $ 501,000 |
| | 10/27/2004 | 48,000 | $ 21.83 | $ 1,047,840 |
| | 11/24/2004 | 48,000 | $ 18.14 | $ 870,720 |
| | 12/29/2004 | 9,000 | $ 18.00 | $ 162,000 |
| | 12/29/2004 | 5,000 | $ 18.00 | $ 90,000 |
| | 12/29/2004 | 5,000 | $ 18.05 | $ 90,250 |
| | 12/29/2004 | 5,000 | $ 18.20 | $ 91,000 |
| | 12/29/2004 | 4,000 | $ 18.15 | $ 72,600 |
| | 12/29/2004 | 3,000 | $ 18.01 | $ 54,030 |
| | 12/29/2004 | 2,000 | $ 18.00 | $ 36,000 |
| | 12/29/2004 | 2,000 | $ 18.18 | $ 36,360 |
| | 12/29/2004 | 2,000 | $ 18.19 | $ 36,380 |
| | 12/29/2004 | 1,976 | $ 18.01 | $ 35,588 |
| | 12/29/2004 | 1,400 | $ 18.23 | $ 25,522 |
| | 12/29/2004 | 1,000 | $ 17.90 | $ 17,900 |
| | 12/29/2004 | 1,000 | $ 17.95 | $ 17,950 |
| | 12/29/2004 | 1,000 | $ 17.97 | $ 17,970 |
| | 12/29/2004 | 1,000 | $ 17.98 | $ 17,980 |
| | 12/29/2004 | 1,000 | $ 18.02 | $ 18,020 |
| | 12/29/2004 | 800 | $ 18.19 | $ 14,552 |
| | 12/29/2004 | 715 | $ 18.14 | $ 12,970 |
| | 12/29/2004 | 665 | $ 18.36 | $ 12,209 |
| | 12/29/2004 | 444 | $ 18.09 | $ 8,032 |
| | 4Q2004 Totals: | 169,000 | | $ 3,286,873 |
| PISARIS-HENDERSON | 10/4/2004 | 25,000 | $ 20.00 | $ 500,000 |
| | 10/7/2004 | 130,000 | $ 20.51 | $ 2,666,300 |
| | 10/7/2004 | 130,000 | $ 20.51 | $ 2,666,300 |
| | 4Q2004 Totals | 155,000 | | $ 3,166,300 |
| THUNE | 10/4/2004 | 1,528 | $ 20.25 | $ 30,942 |
| | 10/6/2004 | 23,472 | $ 20.25 | $ 475,308 |
| | 4Q2004 Totals | 25,000 | | $ 506,250 |

120.    As a result of the unusual timing of the Selling Insiders' transactions above, Selling Insiders collectively reaped almost $7 million during the last quarter in which outside investors (and the public) were kept in the dark about FindWhat's "questionable" distribution partners.

121.    Furthermore, the majority of Guest's sales occurred towards the end of 4Q 2004. Guest, as a member of the Company's Audit Committee, would have been aware of disagreements between the Company and E&Y during this time, and would have been involved in the Company's search for new independent auditors, which began as early as January 2005.

122.    In sum, as highlighted by the chart above, the Individual Defendants and Guest sold FindWhat.com stock in unusual amounts and of suspect timing because they knew that the market would respond negatively to the eventual revelation of FindWhat's false and misleading statements and omissions.

### C.    The Company Fuels Its Acquisitions with Artificially Inflated Stock

123.    FindWhat went public through a merger with an inactive public company based in Nevada in 1999.  The Company was considered a "Tier Two" company, with companies like Overture (which was later acquired by industry giant Yahoo!) and Google representing the lion's share of search listing providers.  Defendant Pisaris-Henderson's goal was to position FindWhat as a smaller, cheaper version of Overture.  In an effort to capitalize on Overture's enormous initial public offering, FindWhat started trading publicly through the merger with the Nevada shell company at about the time that Overture went public.

124.    However, FindWhat's transition to a public company failed to capture the market attention that Defendants yearned for.  As Defendant Pisaris-Henderson noted in a December 9, 2004 interview with New Media Age magazine:

> People discredited us. They said we must not be good enough to be able to go public legitimately so we had to do a reverse takeover. That impression of us stuck all the way through to 2002.

125.    In an effort to distance the Company from its rocky start, Defendants began aggressively marketing the Company as a growth stock with numerous opportunities ahead due in part to its large network of quality distribution partners.  During the Class Period, it appeared

to investors that the Company's aggressive growth strategy had paid off.  On October 21, 2004, the Company announced that it was named as one of the fastest growing companies in North America on the "Deloitte Technology Fast 500" with a growth rate of "just under 16,000%" due to "solid execution of its business strategy."

126.    Indeed, one of the key factors analysts relied on in giving FindWhat positive recommendations, was its growth rate.  For example, a February 23, 2005 analyst report issued by Pacific Growth Equities noted that with a "history of solid execution" and a "projected 3-year 'organic' growth rate of at least 20-30%" that "multiple expansion" was likely in the price of FindWhat stock.  Defendants' plan to attract institutional and market interest paid off.  In a May 20, 2004 article in The News-Press entitled "FindWhat Speakers to hit Investor Sessions" Pisaris-Henderson commented gleefully "[i]nstitutional investors are very excited about us."  In fact, Defendants' Class Period statements were highly positive, emphasizing strong financial results and expectations.  During May 2004, after a barrage of positive statements about the Company's strong distribution network and robust revenues, the stock reached over $23 per share.

127.    Defendants were keenly aware of the importance of meeting Wall Street's insatiable revenue goals.  Throughout 2004, Senior VP/General Manager of the Private Label and Miva Network Rick Szatkowski got calls from Thune and Pisaris-Henderson complaining that revenue was down and Szatkowski "needed to boost it" to meet Wall Street's demanding expectations.

128.    Defendants succeeded in meeting Wall Street's expectations during this time as illustrated on the following chart:

| PERIOD | Company's Actual EPS | Wall Street's Consensus EPS Estimates | Percentage By Which Company Exceeded Wall Street Expectations |
| --- | --- | --- | --- |
| 2Q05 | -.010 | .025 | -60.00% |
| 1Q05 | .100 | .137 | -27.01% |
| 4Q04 | .180 | .163 | 10.43% |
| 3Q04 | .150 | .136 | 10.29% |
| 2Q04 | .150 | .146 | 2.74% |
| 1Q04[14] | .27 | .22 | 22.73% |
| 4Q03 | .15 | .14 | 7.14% |
| 3Q03 | .12 | .11 | 9.09% |

129.    However, internal and external pressures threatened to jeopardize Defendants' seemingly unstoppable growth streak.  During the Class Period, the smaller companies such as FindWhat were squeezed by dominant players like Google and Yahoo!, which had extremely strong brands and growing networks of affiliates.  *See* "Why Little Search Engines Can't": *TheStreet.com*, May 6, 2005.  To compensate for declining revenues during the Class Period, Defendants embarked on an acquisition spree – purchasing four companies for a total of $223.5 million in part through using Company stock as currency.  A former FindWhat Account Manager characterized the Company's activity as a "mad buying binge" which was needed in order to bring "earnings to the table as FindWhat's earnings were declining."  An analyst report issued by RBC Capital Markets on February 24, 2005 noted the decline in the Company's core business, stating:

---

[14]    These figures for 1Q04 represent undiluted EPS figures.

> In short, we believe that FindWhat's core US business is deteriorating, albeit slowly. While the company refuses to acknowledge that publicly, the acquisition-driven expansion strategy makes it clearer.

130.    On September 3, 2003, the Company publicly announced plans to acquire privately-owned Miva Corporation, "a leading supplier of e-commerce software and services to small and medium-sized businesses, for $5.5 million, plus the assumption of approximately $2.5 million in notes and other liabilities." This acquisition, the first of four to be announced in the next nine months, begins FindWhat's "mad buying binge" and course to transform its business away from its secret dependence on spyware wielding distribution partners. Like several additional acquisitions to follow, the currency predominantly used by Defendants to fund this acquisition was the Company's fraudulently inflated common stock. Indeed, the following table illustrates the number and value of FindWhat's inflated shares used to complete each acquisition.

| Acquired Company | Date | Total Cost of Acquisition | FindWhat Shares Transferred | Per Share Value of Transferred Shares |
|---|---|---|---|---|
| Miva | Jan. 1 | $6.2 million | 163,550 | $18.95 |
| Comet | March 22 | $25.2 million | 837,510 | $18.38 |
| Espotting | July 1 | $183.9 million | 6,999,995 | $22.15 |

131.    The reason that Defendants chose to fuel their acquisitions primarily through artificially inflated stock was simple - - the more that FindWhat's stock was worth, the fewer shares the Company would have to exchange in any acquisition financed with Company stock. Thus, the desire to exchange as few shares as possible gives rise to a strong inference that Defendants acted with scienter to artificially inflate the value of FindWhat's stock during the Class Period.

**D.      Defendants Had Access to Material Non-Public Information**

132.    The Individual Defendants also had access to material adverse non-public information concerning FindWhat, as discussed in detail below.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.  Specifically:

- Defendants received "War Reports" weekly which detailed traffic from fraudulent distribution partners and the revenue derived from these partners; and

- Defendant used an internal software system "the Interface" which showed the amount of illegitimate Internet traffic in red.

133.    According to a former FindWhat Marketing Manager, the senior management at FindWhat were micromanagers who refused to delegate authority to managers to make decisions, and the "C-level Team [referring to Thune, Angius and Pisaris-Henderson] was very controlling about little decisions."  For example, Thune was so intimately involved in the fraud that he was referred to by a former Marketing Director as the "guardian" of the spyware secret.

**COUNT I**
**FOR VIOLATIONS OF SECTION 10(B) OF THE 1934 ACT AND RULE 10B-5**
**PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS**

134.    Lead Plaintiffs repeat and reallege the allegations set forth in the paragraphs above as though fully set forth herein.  This claim is asserted against all Defendants.

135.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of MIVA's publicly traded common stock; and (c) cause Lead Plaintiffs and other members of the Class to purchase MIVA stock at artificially inflated prices during the Class

Period.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

136.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for MIVA common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

137.    In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 *et seq.*) and S-K (17 C.F.R. § 229.10 *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly-traded securities would be based on truthful, complete, and accurate information.

138.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of MIVA as specified herein.

139.    Further, Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of MIVA's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about MIVA and its business, operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of MIVA securities during the Class Period.

140.    At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of MIVA, which were not disclosed by these Defendants, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their MIVA securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

141.    By virtue of the foregoing, Defendants have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

142.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

## COUNT II
## FOR VIOLATIONS OF SECTION 20(A) OF THE 1934 ACT AGAINST THE
## INDIVIDUAL DEFENDANTS

143.    Lead Plaintiffs repeat and reallege the allegations set forth in the paragraphs above as if set forth fully herein.  This claim is asserted against the Individual Defendants.

144.    The Individual Defendants acted as controlling persons of MIVA within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's internal reports, press releases, War Reports, Interface, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

145.    In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

146.    As set forth above, all Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  However, by virtue of their controlling position, the Individual Defendants are also liable pursuant to Section 20(a) of the Exchange Act.

147.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## IX.    JURISDICTION AND VENUE

148.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§ 78j(b), 78t(a)), and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5 (17 C.F.R. § 240.10b-5).

149.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §1331.

150.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and (c).  Many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of false and misleading information, occurred in this District.  In addition, during the Class Period, FindWhat maintained its principal executive offices in this District at 5220 Summerlin Commons Boulevard, Suite 500, Fort Myers, Florida, 33907.

151.    In connection with the acts, conduct and other wrongs complained of herein, Defendants used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications and the facilities of national securities exchanges.

## X.    CLASS ACTION ALLEGATIONS

152.    Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the "Class" which consists of all persons or entities who purchased or otherwise acquired the common stock of MIVA between September 3, 2003 and May 4, 2005, inclusive, and who were damaged thereby.  Excluded from the Class are

Defendants, the officers and/or directors of the Company, at all relevant times, members of their immediate families, any entity in which any Defendant has a controlling interest, and the legal affiliates, representatives, heirs, controlling persons, successors, and predecessors in interest or assigns of any such excluded party.

153.    Because MIVA has millions of shares of common stock outstanding, and because the Company's common stock was actively traded on the NASDAQ National Market during the Class Period, members of the Class are so numerous that joinder of all members is impracticable. Indeed, as of August 9, 2005, MIVA had 30.7 million shares of common stock outstanding.[15] While the exact number of Class members can only be determined by appropriate discovery, Lead Plaintiffs believe that Class members number at least in the thousands and that they are geographically dispersed.  Nonetheless, record owners and other members of the Class may be identified from records maintained by FindWhat or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities fraud class actions.

154.    Lead Plaintiffs' claims are typical of the claims of the members of the Class, because Lead Plaintiffs and all of the Class members sustained damages arising out of Defendants' wrongful conduct, and in violation of the federal securities laws, identified herein.

155.    Lead Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel who are experienced and competent in class action and securities fraud litigation.  Further, Lead Plaintiffs have no interests that are contrary to or in conflict with the members of the Class that Lead Plaintiffs seek to represent.

---

[15]        Source: Bloomberg L.P.

156.    Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that Defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

i.      whether the federal securities laws were violated by Defendants' acts as alleged herein;

ii.     whether the Company's annual and quarterly reports filed with the SEC contained material misstatements or omissions;

iii.    whether the Company's other publicly disseminated releases and statements during the Class Period omitted and/or misrepresented material facts and whether Defendants breached any duty to convey material facts or to correct material facts previously disseminated;

iv.     whether Defendants participated in and pursued the fraudulent scheme or course of business complained of;

v.      whether Defendants acted willfully, with knowledge or recklessly, in omitting and/or misrepresenting material facts;

vi.     whether the market prices of MIVA common stock during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

vii.    whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

157.    In sum, a class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.

Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.  APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

158.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things, at all relevant times:

a.    Defendants made public misrepresentations or failed to disclose facts during the Class Period;

b.    The omissions and misrepresentations were material;

c.    MIVA securities traded in an open and efficient market;

d.    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

e.    Lead Plaintiffs and the other members of the Class purchased MIVA securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

159.    Indeed, at all relevant times, the market for MIVA securities was an open and efficient market for the following reasons, among others:

a.    MIVA securities were listed and actively traded during the Class Period on the NASDAQ national exchange, an open, highly efficient and automated market;

b.    As a regulated issuer, MIVA regularly made public filings, including its Forms 10-K, Forms 10-Q and related press releases, with the SEC;

c.          MIVA was followed by securities and investment analysts from major brokerages including:  Kaufman Bros. Equity Research, RBC Capital Markets, Marquis Investment Research, Jeffries & Company, Inc., Adams Harknes, Craig-Hallum Capital Group LLC and Pacific Growth Equities.  These securities and investment analysts wrote reports regarding FindWhat which were distributed to the brokerages' sales force, their customers, and the public at large; and

d.          MIVA regularly communicated with public investors via established market communication mechanisms, including the Company's website, regular dissemination of press releases on major news wire services, and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

160.     As a result of the foregoing, the market for MIVA securities digested current information regarding the Company from the publicly available sources described above and reflected such information in the prices of MIVA's securities.

161.     Further, as would be expected where a security is traded in an efficient market, material news concerning MIVA's business had an immediate effect on the market price of MIVA's securities, as evidenced by the rapid decline in the market price in the immediate aftermath of MIVA's corrective disclosures as described herein.  Under these circumstances, all purchasers of MIVA's securities during the Class Period suffered similar injury due to the fact that the price of MIVA securities was artificially inflated throughout the Class Period.

162.     Moreover, at the times they purchased or otherwise acquired MIVA's securities, Lead Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.  As a

result, the presumption of reliance applies. Plaintiffs will also rely, in part, upon the presumption of reliance established by a material omission.

## XII.     **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs, on their own behalf and on behalf of the Class, pray for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.     Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest.

C.     Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including all counsel fees and expert fees; and

D.     Awarding such other relief as the Court may deem just and proper.

## XIII.  **JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury.

Dated: May 2, 2007

Respectfully submitted,

**SAXENA WHITE P.A.**

By:  *s/ Joseph White*
  Maya Saxena
  Fla. Bar No. 0095494
  msaxena@saxenawhite.com
  Joseph E. White III
  Fla. Bar No. 0621064
  jwhite@saxenawhite.com
  Ariel Acevedo
  Fla. Bar No. 946001
  aacevedo@saxenawhite.com
  2424 North Federal Highway, Suite 257
  Boca Raton, FL 33431
  Tel.: (561) 394-3399
  Fax: (561) 394-3382

  **Attorneys for Plaintiffs**