```
              UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF FLORIDA
                  FORT MYERS DIVISION
```

IN RE:

MIVA, INC., Securities Litigation

                                              Case No.  2:05-cv-201-FtM-29DNF

_____

## OPINION AND ORDER

This matter comes before the Court on defendants' Renewed Motion to Dismiss Plaintiffs' First Amended Consolidated Class Action Complaint (Doc. #55) (Motion to Dismiss).  The Court initially issued an Opinion and Order (Doc. #91) addressing the defendants' Motion to Dismiss, however, the Court subsequently granted defendants' Motion for Reconsideration (Doc. #96) to the extent that it agreed to reexamine whether  scienter was adequately pled.  (Doc. #112.)  Pursuant to the Court's instructions, both plaintiff and defendants submitted supplemental memoranda on the issue of scienter.  (Docs. ## 116, 117.)

**I.**

This is a securities class action lawsuit brought by investors of FindWhat.com, Inc. (now known as Miva, Inc.) against the corporation and three of its officers or former officers. Plaintiffs allege that Defendants made false and misleading statements and material omissions in order to inflate the price of

the corporation's stock in violation of the Securities and Exchange Act of 1934. Specifically, plaintiff alleges that defendants violated Section 10(b) and Rule 10b-5, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 when they made eleven specific statements. The Court has already ruled that the first nine statements were not actionable for a variety of reasons. (Doc. #91.) The two statements which survived the defendants' Motion to Dismiss were:

**(1) February 23, 2005 Conference Call:** On February 23, 2005, Defendants Pisaris-Henderson and Agius participated in a conference call, where Pisaris-Henderson stated in part:

> Third, we believe that lead quality should be and is becoming increasingly important to advertisers, and recent press coverage has focused substantial attention on the click broad issue and how it effects lead quality. For several years, we have understood the issue and have been investing heavily in protecting the integrity of our networks through both automated and human systems, thereby limiting our exposure to the issue.
>
> That said, we believe that ultimately the value of a lead is best determined by whether that lead actually converts to a sale. Our recent acquisition of Miva empowers our visibility into the click stream, and for businesses with Miva storefronts, we are now able to track and add from the first click through to the point-of-sale. We don't need to employ intuition or advanced algorithms to determine whether traffic sources are good or bad. We are creating a single transparent platform that combines relevant advertising with the visibility to measure conversion rather than clicks alone, thereby giving us the ability to remove traffic sources from our networks that do not meet our high standard of conversion metrics, aligning our interest with those of our advertisers.
>
> **In fact, during Q4 we intentionally removed numerous traffic sources that would otherwise have produced approximately $70,000 of revenue per day.** This action further illustrates our long-term view towards

> maintaining high standards and delivering high-quality leads to our advertisers.
>
> **Let me repeat we have intentionally removed traffic sources from our distribution network that would otherwise have produced approximately $70,000 of revenue per day in topline revenue. Again, our focus is to deliver traffic that converts rather than just clicks alone.**
>
> Although in the short-term allowing this traffic within our network could reduce revenues, we believe we're best served in the long-term by leading the industry through the creation of a transparent platform that will further differentiate our Company within the performance-based marketing world.

(Doc. #50, ¶ 87); and

**(2) March 16, 2005 Form 10-K:** On March 16, 2005, FindWhat filed a Form 10-K with the SEC for the year ending December 31, 2004. The Form was signed by all individual Defendants and certified by Defendants Pisaris-Henderson and Thune pursuant to the Sarbanes-Oxley Act of 2002. Plaintiffs cite to the following portion of the Form:

> Additionally, the U.S. Congress and some state legislatures have introduced legislation designed to regulate "spyware," which has not been precisely defined, but which is often defined as software installed on consumers' computers without their informed consent and which is designed to gather and, in some cases, disseminate information about those consumers, including personally identifiable information, without the consumers' consent. **We do not rely on "spyware" for any purpose and it is not part of our product offerings**, but the definition of spyware or proposed legislation relating to spyware may be broadly defined or interpreted to include legitimate ad-serving software, including toolbar offerings currently provided by our Primary Traffic division. Currently, legislation has focused on providing Internet users with notification of and the ability to consent or decline the installation of such

software, but there can be no guarantee that future legislation will not provide more burdensome standards by which software can be downloaded onto consumers' computers. Currently all downloadable software that we distribute requires an express consent of the consumer and provides consumers with an easy mechanism to delete the software once downloaded.

. . .

We have implemented screening policies and procedures to minimize the effects of these fraudulent clicks. **We believe that these policies and procedures assist us in detecting fraudulent click-throughs, which are not billed to our advertisers**. However, it is difficult to detect all fraudulent clicks and detection may become more difficult in the future if third parties implement more sophisticated fraudulent click-through schemes. To the extent that we are unable to detect click-through fraud, we may refund revenue that our advertiser have paid to us that is later discovered to be attributed to these fraudulent click-throughs. If we find new evidence of past fraudulent clicks, we may have to issue refunds to advertisers retroactively for amounts previously paid to our FindWhat.com or Espotting Network distribution partners.

. . .

From time to time, we receive fraudulent clicks on our ads by persons seeking to increase the advertising fees paid to distribution partners within our FindWhat.com and Espotting Networks. Click-through fraud occurs when a person or program clicks on an advertisement displayed on a website for the purpose of generating a click-through payment to the FindWhat.com and Espotting Networks partner rather than to view the underlying content. **We have developed automated proprietary screening applications and procedures to minimize the effects of these fraudulent clicks**. Click-throughs received through the FindWhat.com and Espotting Networks and through our private label partners' networks are evaluated by these screening applications and procedures. We constantly evaluate the efficacy of our efforts to combat click-through fraud, and may adjust our efforts for specific distribution partners or in general, depending on our ongoing analysis. These changes impact the number of click-throughs we record and bill to our advertisers,

> the bid prices our advertisers are willing to pay us for click-throughs and the revenue we generate.
>
> . . .
>
> During 2004 and 2003, no advertiser account represented more than 10% of our total revenue. We purchase Internet traffic from our distribution partners. Expressed as a percentage of revenue, **none of the traffic purchased from any of these distribution partners represented over 10% of consolidated revenue in 2004.** Internet traffic purchases from one distribution partner in 2003 represented more than 10% of total revenue.
>
> . . .
>
> In the second half of the fourth quarter of 2004, we ceased displaying advertisements with distribution partners and affiliates of distribution partners whose traffic did not adequately convert to revenue for our advertisers in conjunction with our continued efforts to increase the quality of the Internet users accessing our customers' advertisements. Measured at the end of the fourth quarter, the removal of these distribution partners reduced our average click-through revenue by approximately $70,000 per day compared to what each such distribution partner had been producing on a daily basis immediately prior to removal. During 2003 and as a matter of ongoing business practice, we removed one or more distribution partners from our network at various times, however the impact to our revenue was not significant to the quarter or the year when they were removed. We plan to continue our efforts to provide our advertisers with high quality Internet traffic, an undertaking that may have short-term negative effects on our revenue, but which we believe will ultimately improve our click-through revenue in the long-term. We consider the removal of these distribution partners in the second half of the fourth quarter as ordinary to our business and in conformity with our long-stated goal of provided [sic] high quality traffic to our advertisers. In addition, although the Company admitted in the Form 10-K that it removed "one or more distribution partners from [its] network at various times" during 2003 "and as a matter of ongoing business practice," Defendants represented that "the impact to [the Company's] revenue was not significant to the quarter or the year when [the distribution partner(s)] were removed."

5

(Doc. #50, ¶¶ 89, 91, 93, 95)(emphasis in original).

**II.**

To state a claim under § 10(b) and Rule 10b-5, plaintiffs must show: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 128 S. Ct. 761, 768 (2008). The Court has already addressed elements one, three, four, five and six in its March 15, 2007 Opinion and Order (Doc. #91). The Court will now reexamine the issue of whether scienter is sufficiently pled in the Amended Complaint (Doc. #50).

A claim brought under § 10(b) and Rule 10b-5 must satisfy the federal notice pleading requirements and the more specific fraud pleading requirements of FED. R. CIV. P. 9(b), Ziemba, 256 F.3d at 1202, and the pleading requirements of the Private Securities Litigation Reform Act (PSLRA), Phillips v. Scientific-Atlanta, Inc., 374 F.3d 1015, 1016 (11th Cir. 2004). Under the notice pleading standards, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." Garfield v. NDC Health Corp., 466 F.3d 1255, 1261 (11th Cir. 2006)(quoting Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n.1 (11th Cir. 1999)). Rule 9(b) provides:

6

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Rule 9(b) does not abrogate the concept of notice pleading, but requires a complaint to set forth (1) precisely what statements or omissions were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud. Ziemba, 256 F.3d at 1202 (citation omitted); Garfield, 466 F.3d at 1262. "Failure to satisfy Rule 9(b) is a ground for dismissal of a complaint." Corsello v. Lincare, Inc., 428 F.3d 1008, 1012 (11th Cir. 2005).

Under the PSLRA, plaintiffs must meet a heightened pleading requirement when alleging that defendants "made an untrue statement of a material fact," or that defendants "omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading." 15 U.S.C. § 78u-4(b). When such allegations are made, the PSLRA requires that:

> . . . the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed.

7

15 U.S.C. § 78u-4(b)(1). Additionally, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In analyzing whether the pleaded facts give rise to a strong inference of scienter, the court must take into account plausible opposing inferences. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2509 (2007). Thus, "a complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at. 2510. Factual allegations may be aggregated to infer scienter, but scienter must be alleged with respect to each defendant and with respect to each alleged violation of the statute. Phillips v. Scientific-Atlanta, Inc., 374 F.3d at 1016-18. However, "omissions and ambiguities count against inferring scienter." Tellabs, 127 S. Ct. at 2511. In determining whether a complaint is sufficiently pled pursuant to a motion to dismiss, the court may take judicial notice of public documents required to be filed with the Securities and Exchange Commission (SEC). See Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1278 (11th Cir. 1999); see also Universal Express, Inc. v. S.E.C., 177 Fed. Appx. 52 (11th Cir. 2006). If these pleading requirements are not satisfied, the court "shall" dismiss the complaint. 15 U.S.C. § 78u-4(b)(3)(A).

**III.**

**A.   Defendant Craig Pisaris-Henderson (Pisaris-Henderson)**

Defendants argue that the First Amended Consolidated Class Action Complaint (Doc. #50)(the Amended Complaint) fails to adequately plead scienter as to defendant Pisaris-Henderson. The defendants assert that there are "no compelling or cogent inferences possible from the vague allegations." (Doc. #117, p. 7.) Furthermore, defendants assert that the Pisaris-Henderson stock sales cannot be used to show scienter because: (1) they were made in October 2004, three months prior to the February 23, 2005 alleged misstatement; (2) the sales were done pursuant to a pre-established SEC Rule 10b5-1 plan; and (3) even after the sales, Pisaris-Henderson retained the majority of his holdings in the company. (Id. at p. 9.)

Plaintiffs counter that the remaining two allegations are properly attributed to Pisaris-Henderson. Plaintiffs assert that the Amended Complaint "describes a series of events that strongly demonstrate that these defendants, particularly, Pisaris-Henderson, knew of the fraudulent traffic source." (Doc. #116, p. 8.) In support of their assertions, plaintiffs cite to paragraphs 55-60 of the Amended Complaint. (Id.) Furthermore, they argue that defendants' suspiciously timed stock sales and obsession with meeting Wall Street estimates are evidence of their motive to conceal the truth about the click-fraud problem. (Doc. #116, p.

9

9.)   Finally, plaintiffs assert that the Amended Complaint's allegations at the very least establish that defendant acted with reckless disregard.  (Id. at p. 9.)

The Amended Complaint contains the following allegations that are directly relevant to the analysis of whether Pisaris-Henderson acted with the requisite level of scienter:

> According to a former Senior Director of Business Development, Defendants Thune and Pisaris-Henderson hid the adverse trend the Company was experiencing in its revenue per click.
>
> . . .
>
> One former Senior Director of Business Development was present at a meeting during the Class Period . . . attended by defendant Pisaris-Henderson, when growing internal concern over Dmitri and Saveli's internet traffic and revenue generation practices were discussed.
>
> . . .
>
> Despite the Company's intentions to "fix the business" and terminate its relationship with Saveli and Dmitri in June 2004, Defendants Pisaris-Henderson and Thune would not permit such a drastic cut in revenues despite their known use of click fraud because they feared Wall Street's inevitable punishing reaction to any revenue shortfalls.  In fact, according to a former Senior Director of Business Development, Defendant Thune stated that the Company 'had to replace the revenue it would lose [from Dmitri and Saveli] before FindWhat would remove them.'
>
> . . .
>
> In December 2004, January 2005, a former director of Business Development had a one-on-one meeting with Defendant Pisaris-Henderson in which Pisaris-Henderson asked him point blank whether he thought FindWhat's traffic quality problems had to do with Saveli and Dimitri.  When this witness answered affirmatively [].
>
> . . .

> According to the Senior Director of Business Development . . . no traffic was taken off line in the fourth quarter of 2004. He also stated that the announcement in the February conference call referred to Dmitri and Saveli who earned an average of $70,000 in revenue per day.

(Doc. #50, ¶¶ 30, 54, 56, 58, 88(b).) The Amended Complaint also alleges that Pisaris-Henderson sold a total of 155,000 shares of company stock worth approximately $3.1 million in October 2004. (Doc. #50, p. 51.)

As a preliminary matter, the Court notes that Pisaris-Henderson's stock sales have no direct impact on the Court's analysis. They were done pursuant to a Rule 10b5-1 Trading Plan[1] and his remaining holdings of company stock were substantial, thus rebutting any possible inference of scienter from the stock sales. (Docs. ## 39-5, p. 30; 40-7, pp. 2-4.)  See, e.g., In re Advanta

---

[1] Rule 10b5-1 was adopted by the SEC to allow company executives to trade in company stock through a pre-determined method. It provides in relevant part that:

> A person's purchase or sale is not "on the basis of" material nonpublic information if the person making the purchase or sale demonstrates that:
>
> (A) Before becoming aware of the information, the person had:
>   (1) Entered into a binding contract to purchase or sell the security,
>   (2) Instructed another person to purchase or sell the security for the instructing person's account, or
>   (3) Adopted a written plan for trading securities.

17 C.F.R. § 240.10b5-1.

11

Corp. Sec. Litig., 180 F.3d 525, 541 (3d Cir. 1999)(finding that the sale of company stock by insiders who continue to retain a large number of shares of company stock after the sale does not support a strong inference of scienter.) Even without considering the stock sales, the Court finds that the four allegations above raise a strong inference of scienter. While any one of these allegations, standing alone, may be insufficient to meet the pleading requirements of the PSLRA, read together they create a cogent and compelling inference of scienter. The allegations demonstrate that Pisaris-Henderson was directly confronted several times with the traffic quality problems generated by Dmitri and Saveli. Furthermore, the Amended Complaint alleges that Pisaris-Henderson directly lied to analysts during the February 2005 conference call when he stated that the company had removed traffic sources which generate $70,000 of revenue per day. (Doc. #50, ¶¶ 87, 88(a).) Therefore, upon reconsideration the Motion to Dismiss (Doc. #55) remains denied as to defendant Pisaris-Henderson.

**B.   Defendant Phillip Thune (Thune)**

The Court notes that defendants' arguments as to Thune are identical to those made on behalf of Pisaris-Henderson. (Doc. #117, pp. 6-11.)  The Amended Complaint contains the following allegations that are directly relevant to the analysis of whether Thune acted with the requisite level of scienter:

> According to a former Senior Director of Business Development, Defendants Thune and Pisaris-Henderson hid

12

> the adverse trend the Company was experiencing in its revenue per click.
>
> . . .
>
> Nonetheless, according to a former Director of Business Development, despite the fact that Defendants knew of the low quality traffic, which drove down the average RPC and drove away advertisers, they did not want to eliminate the revenue from their largest Distribution Partners, Dmitri and Saveli, so they could "make revenue goals." Thune was extremely focused on meeting these goals, as the former employee described "[i]ts Phillip's company, dollars and cents it's his company.
>
> . . .
>
> Despite the Company's intentions to "fix the business" and terminate its relationship with Saveli and Dmitri in June 2004, Defendants Pisaris-Henderson and Thune would not permit such a drastic cut in revenues despite their known use of click fraud because they feared Wall Street's inevitable punishing reaction to any revenue shortfalls.  In fact, according to a former Senior Director of Business Development, Defendant Thune stated that the Company 'had to replace the revenue it would lose [from Dmitri and Saveli] before FindWhat would remove them.'
>
> . . .
>
> According to a former FindWhat Marketing Manager, the senior management at FindWhat were micromanagers who refused to delegate authority to managers to make decisions . . . [f]or example, Thune was so intimately involved in the fraud that he was referred to by a former Marketing Director as the "guardian" of the spyware secret.

(Doc. #50, ¶¶ 30, 32, 56, 133.)  The Amended Complaint also alleges that Thune sold a total of 25,000 shares of company stock worth approximately $506,250 in October 2004.  (Doc. #50, p. 51.)

The Court finds that the Amended Complaint fails to attribute the February 2005 conference call to Thune.  There are no

13

allegations that Thune participated in the conference call. Furthermore, the group pleading doctrine does not apply to the February 2005 conference call because the group pleading doctrine is not applicable to oral statements.  See e.g., In re AOL Time Warner, Inc. Securities and "ERISA" Litig., 381 F. Supp. 2d 192, 220 (S.D.N.Y. 2004); D.E. & J L.P. v. Conaway, 284 F. Supp. 2d 719, 732 (E.D. Mich. 2003).  Therefore, upon reconsideration, the Motion to Dismiss is further granted as to Thune with regards to the February 2005 conference call.

As to the Form 10-K, the Court finds that plaintiffs have alleged sufficient information as to Thune from which a reasonable person can derive a strong inference of scienter with regards to the statements made therein.  For example, the Amended Complaint alleges that Thune became known within the company as the "guardian" of the spyware, and yet he certified the company's Form 10-K in which the company represented that they "do not rely on 'spyware' for any purpose . . ."  (Doc. #50, ¶¶ 89, 133.)  Thus, upon reconsideration, the Motion to Dismiss remains denied as to defendant Thune with regards to the statements in the Form 10-K. (Doc. #55.)

**C.   Defendant Brenda Agius (Agius)**

Defendants assert that the Amended Complaint contains no allegations from which any scienter can be inferred as to Agius. Specifically, the Amended Complaint contains no indication as to

14

when Agius knew of the quality of the traffic generated by the two Russians. Furthermore, there are no allegations that Agius sold any of her stock holdings in the company. (Doc. #117, pp. 4-5.)

Plaintiffs respond asserting that the Court has already found that the February 23, 2005 conference call can be attributed to Agius because she was a participant. Furthermore, Agius signed the Form 10-K. (Doc. #116, p. 8.) Plaintiffs assert that the Amended Complaint contains sufficient allegations that all the defendants had actual knowledge of the fraud. (Doc. #116, p. 9.)

The Court finds that plaintiffs have failed to sufficiently plead scienter as to defendant Agius with regards to either the February 2005 conference call or the Form 10-K. Upon close examination of the Amended Complaint, the Court finds no allegations as to when Agius would have known of the poor quality of traffic generated by the Russians. Furthermore, there are no allegations that Agius sold any stock, or that anyone within the company spoke to her directly about the quality of traffic or that she attended any meetings where the Russians were discussed. Therefore, upon reconsideration, the Motion to Dismiss (Doc. #55) is further granted as to defendant Agius with regards to both statements.

Accordingly, having previously granted reconsideration on the limited issue of scienter (Doc. #112), it is now

**ORDERED:**

That defendants' Renewed Motion to Dismiss Plaintiffs' First Amended Consolidated Class Action Complaint (Doc. #55) is further **GRANTED** as follows:

    a.   Defendant Phillip Thune is dismissed with regards to the February 2005 conference call; and

    b.   Defendant Brenda Agius is **dismissed in all respects**.

The motion is otherwise **DENIED**.

**DONE AND ORDERED** at Fort Myers, Florida, this __15th__ day of February, 2008.

_____
JOHN E. STEELE
United States District Judge


Copies:
Counsel of record

16