**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

|  |  |  |
|---|---|---|
| IN RE MIVA, INC. | ) | CIVIL ACTION FILE |
| SECURITIES LITIGATION | ) | NO. 2:05-cv-00201-FtM-29DNF |
|  | ) |  |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION _IN LIMINE_**
**TO EXCLUDE THE TESTIMONY AND EXPERT REPORT**
**OF DR. LAURA E. SIMMONS**

Joseph G. Foster
Florida Bar No. 0301980

PORTER WRIGHT MORRIS & ARTHUR LLP
5801 Pelican Bay Blvd.
Suite 300
Naples, FL  34108-2709
Tel:  (239) 593-2900
Fax:  (239) 593-2990

-and-

Todd R. David
Georgia Bar No. 206526
Susan E. Hurd
Georgia Bar No. 379628

ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309
Tel:  (404) 881-7000
Fax:  (404) 881-7777

_Counsel for Defendants_

Defendants submit this Opposition to Plaintiffs' Motion *In Limine* to Exclude the Testimony and Expert Report of Dr. Laura E. Simmons ("Plaintiffs' Motion" or "Pls.' Mot.") and request that the Court deny Plaintiffs' Motion.

## I.    INTRODUCTION

Defendants' expert, Dr. Laura E. Simmons, is highly qualified to offer opinions in this case on loss causation and damages issues. She has performed event studies and analyzed damages in countless securities class actions over the years.[1] She is an Assistant Professor at the College of William & Mary and a widely published author and speaker on economic issues concerning securities litigation.[2] Prior to joining the faculty at William & Mary, Dr. Simmons worked for twelve years at Cornerstone Research, Inc., where she analyzed a wide variety of financial and economic issues arising in the context of business litigation.[3]

Plaintiffs mount an attack on Dr. Simmons' opinions in a hollow tactical effort to distract from the palpable flaws in the testimony of their expert, Scott D. Hakala ("Hakala"). Playing with semantics, Plaintiffs take out of context one statement made by Dr. Simmons during her deposition regarding her fields of expertise. As explained below, Dr. Simmons did in fact state that she did not consider herself to be an overall "expert" in the subspecialty of statistics.[4] What Plaintiffs fail to point out to the Court, however, is that Dr. Simmons testified that she had an "expertise in statistics, especially

---

[1]    *See* Expert Report of Laura E. Simmons dated December 10, 2008 ("Simmons Report") at Ex. 1 (attached to Plaintiffs' Motion as Exhibit A); *see also* Deposition of Laura E. Simmons taken on February 20, 2009 ("Simmons Dep.") at 24:6-13; 68:22-69:5. The relevant excerpts from Dr. Simmons' deposition are attached hereto as Exhibit A.
[2]    Simmons Report at Ex. 1; Simmons Dep. at 12:14-19.
[3]    Simmons Report at Ex. 1.
[4]    Simmons Dep. at 22:19-25.

statistics as applied to [the] analysis of financial issues."[5]  Whether or not Dr. Simmons

considers herself to be an expert in statistics in the world of academia is not, however, the

test for admissibility of her opinions in this case.

The legal test for admissibility of Dr. Simmons' opinions is whether she is

qualified to testify in this case based on her knowledge, skill, experience, training or

education.  *See* Fed. R. Evid. 702; *see also United States v. Majors*, 196 F.3d 1206, 1215

(11th Cir. 1999).  She clearly meets this standard on many levels as evidenced by her

curriculum vitae, as well as her recent deposition testimony.  Plaintiffs' Motion does not

raise any credible challenge to Dr. Simmons' opinions under *Daubert v. Merrell Dow

Pharmaceuticals., Inc.,* 509 U.S. 579 (1993), but instead criticizes her educational

qualifications based on semantics.

Thus, Plaintiffs' Motion can be seen for what it is -- a diversionary tactic to

deflect attention from the shortcomings of Plaintiffs' own expert whose opinions have

been excluded and criticized by numerous courts.  Indeed, Plaintiffs' Motion reads like a

defense of Hakala rather than an attempted critique of Dr. Simmons.  For these and other

reasons described below, Plaintiffs' Motion should be denied.

## II.    ARGUMENT AND ANALYSIS

### A.    Dr. Simmons' Educational and Professional Background.

Dr. Simmons has a doctoral and undergraduate degree in accounting in addition to

her M.B.A.  (Simmons Dep. at 10:23-11:17.)  In order receive her doctoral degree, Dr.

Simmons was required to take numerous courses in finance and economics.  (*Id.* at 21:3-

11.)  As she explained during her deposition,

---

[5]    *Id.* at 22:21-22.

> [o]ne common misperception about a doctoral degree in accounting is that it is about the study of more advanced [generally accepted accounting principles] or more advanced accounting rules. However, a doctoral degree in accounting is actually quite similar to a degree in finance. And as such, . . . one enrolled in a doctoral program takes similar courses . . . [to] one who is seeking a finance Ph.D or even an economics Ph.D. We take many of the same courses and so receive much of the same training.

(*Id.*)[6] Dr. Simmons' doctoral dissertation also pertained to securities class actions and specifically analyzed the determinates of securities litigation outcomes. (Simmons Report at Ex. 1; Simmons Dep. at 11:18-12:12.) Dr. Simmons explained that, in preparing her dissertation, she conducted a number of tests to determine what factors explain dismissals of securities litigation, as well as settlements. (Simmons Dep. at 11:23-12:1.) This analysis required Dr. Simmons to employ "a regression analysis" as her "primary statistical tool" to evaluate these securities litigation outcomes. (*Id.* at 12:8-12.)

Upon receiving her degree, Dr. Simmons joined Cornerstone Research and, for twelve years, worked as a consultant on liability and damages issues in numerous securities cases as well as other types of business litigation. (Simmons Report at Ex. 1; *see also* Simmons Dep. at 24:6-13.) Dr. Simmons explained during her deposition that, "for many, many cases [while at Cornerstone], I engaged in analysis related to issue[s] of damages, as well as loss causation in cases involving common stock and preferred stock . . . ." (Simmons Dep. at 24:6-13.)

Further, over the course of her employment with Cornerstone, Dr. Simmons gained extensive experience in event study methodology and testified that she performed

---

[6]    Plaintiffs criticize Dr. Simmons for not remembering the specific names of the courses she took as part of her doctoral program. (Pls.' Mot. at 5-6.) The important point is, however, that Dr. Simmons testified that she did take courses in econometrics for her doctoral degree as well as other advanced economics courses. (*See* Simmons Dep. at 21:16-24.) Given that Dr. Simmons completed this course work almost fourteen years ago, her inability to recall specific course titles is entirely understandable. (*Id.*)

an event study analysis in the majority of securities cases she handled. (*Id.* at 68:22-69:5.) She "would put that number [of cases at] somewhere between dozens and a hundred cases." (*Id.* at 69:4-5.) Also, while at Cornerstone, Dr. Simmons developed that firm's research on securities case settlements and related settlement prediction models, which necessarily required Dr. Simmons to continually assess and apply various damages theories and methodologies. (Simmons Report at Ex.1; Simmons Dep. at 24:14-17.) In addition, Dr. Simmons has analyzed potential damages in countless securities cases over the years. (Simmons Dep. at 69:8-13.)

From 2007 to 2008, Dr. Simmons taught at Old Dominion University and, in September of 2008, she joined the faculty at William & Mary. (Simmons Report at Ex. 1; Simmons Dep. at 12:14-19.) Dr. Simmons has also published extensively on damages and settlement statistics pertaining to securities class actions and presently has several work-in-progress articles on securities litigation issues. (Simmons Report at Ex. 1.) Dr. Simmons regularly speaks on economic issues related to securities litigation, including damages theories, among other topics. (*Id.*; *see also* Simmons Dep. at 20:4-13; 25:18-26:3.)

### B.    Dr. Simmons Is Unquestionably Qualified To Render Opinions On Loss Causation And Damages In This Case.

The main thrust of Plaintiffs' Motion is an attack on Dr. Simmons' qualifications, which is based on semantics. Further, Plaintiffs articulate an improper standard for expert qualifications that does not comport with the relevant case law and would necessarily require the exclusion of their own expert. But in any event, the important point here is that Plaintiffs have failed to raise any legitimate concerns regarding Dr. Simmons' qualifications to testify in this case.

Rule 702 takes a liberal view of expert witness qualifications.  *See In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 855-56 (3d Cir. 1990).  Indeed,

> [w]here the expert's qualifications are challenged, the test for exclusion is a strict one, and the purported expert must have neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered.  One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion.

*Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) (internal citations and quotations omitted).  Rule 702 expressly recognizes five potential bases for qualifying an expert: "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  As shown above, Dr. Simmons is well-qualified to testify under all five bases.

Plaintiffs play word games and attack Dr. Simmons on two disingenuous grounds.  First, Plaintiffs argue that she is not an expert in statistics.  (Pls.' Mot. at 6.)  As shown below, Dr. Simmons has worked extensively with statistics.  Plaintiffs also rely on the fact that Dr. Simmons stated that she would not consider herself to be an "expert" in statistics in the world of academia, which is not the test for admissibility of her opinions here.  (*Id.;* Simmons Dep. at 22:19-25.)

It is common knowledge that an expert is not required to have a separate Ph.D in every subspecialty potentially relevant to their work.  *See, e.g., Smith v. BMW N. Am., Inc.*, 308 F.3d 913, 919 (8th Cir. 2002); *Paoli*, 916 F.2d at 855-56.  Here, Dr. Simmons has extensive experience in all elements of statistics about which she has testified as described below.  (*See* Simmons Dep. at 11:20-12:12; 22:21-22.)

Contrary to Plaintiffs' suggestion, the law simply does not require that an expert must be from a single, specific discipline in order to testify on a given issue.  *See, e.g., Smith,* 308 F.3d at 919 (holding that court erred in excluding medical expert's testimony

on grounds he was not an expert in biomechanics, physics, or engineering).  For example, in *In re Paoli*, the Third Circuit criticized the district court's "insistence [that the expert witness have] a certain kind of degree or background" and determined that the exclusion of the expert's testimony on the basis of her qualifications was "inconsistent with our jurisprudence in this area."  916 F.2d at 855.  Reiterating the "liberal Rule 702 expert qualification standard," the *Paoli* Court held that the exclusion of portions of the experts' testimony "simply because the experts did not have the degree or training which the district court apparently thought would be most appropriate" was an abuse of discretion. *Id*. at 856; *see also Majors*, 196 F.3d at 1215 (refusing to exclude testimony where proposed expert was not a CPA and only had an associate's degree in accounting because he had over eight years experience as a financial analyst with the FBI and had performed financial analysis in over fifty cases).

Here, Dr. Simmons has the relevant educational background, which included extensive study in advanced economics and finance concepts as well as a dissertation on securities litigation issues that required her to draw upon statistical tools like regression analysis.  Her educational background is coupled with twelve years worth of experience at Cornerstone in the practical application of economic and finance concepts in the field of securities and other types of business litigation.  (Simmons Dep. at 21:12-15.)

Also, as a consultant at Cornerstone, Dr. Simmons routinely performed event studies and provided damages analysis in securities cases.  (*Id.* at 68:22-69:13.)  To conduct this work, Dr. Simmons necessarily employed sophisticated statistical techniques, including the very regression analysis techniques at issue here.  (*Id.)*

In their Motion, Plaintiffs attempt to portray Dr. Simmons as primarily an accounting expert, despite her express testimony that she considers herself to be an expert in both the fields of economics and accounting.  (Pls.' Mot. at 4-8; Simmons Dep. at 20:25-21:2.)  Plaintiffs take the position that any background in accounting is wholly irrelevant to this case – a position ironically undercut by their own expert whose report purports to rely on a number of basic accounting articles and journals.[7]

Plaintiffs further attack Dr. Simmons' qualifications on statistical matters, taking a portion of her deposition testimony out of context.  (Pls.' Mot. at 6.)  Plaintiffs wrongly assert that Dr. Simmons conceded that she is not an expert in statistics because she lacks a Ph.D in statistics, a fact she shares in common with Plaintiffs' expert.  (*Id.*)  Dr. Simmons, however, specifically testified that she has an "expertise in statistics, especially statistics as applied to [the] analysis of financial issues."  (Simmons Dep. at 22:21-22.) There can be no doubt that Dr. Simmons has used statistics extensively and has relevant knowledge on these issues that would assist the trier of fact.  *See City of Tuscaloosa v. Harcros Chems., Inc.,* 158 F.3d 548, 562-63 (11th Cir. 1998).  As noted above, she has performed numerous event studies over the years, which necessarily required her to employ regression analysis techniques, and even her doctoral thesis as noted above required statistical analysis.  (*Id.* at 11:18-12:12; 68:22-69:5.)  Dr. Simmons is, thus, more than qualified to speak to the proper methods for statistical analysis utilized in event

---

[7]     Hakala cites to the following materials in his report submitted on November 3, 2009, all of which are from accounting publications: Thompson, Olsen and Dietrich, "Attributes of News About Firms: An Analysis of Firm-Specific News Reported in the *Wall Street Journal* Index," *Journal of Accounting Research,* Vol. 25:2, Autumn 1987, pp. 245-274; Thompson, Olsen, and Dietrich, "The Influence of Estimation Period News Events on Standard Market Model Prediction Errors," *The Accounting Review*, Vol. 63:3, July 1988, pp. 448-71; Ryan and Taffler, "Are Economically Significant Stock Returns and Trading Volumes Driven by Firm-Specific News Releases?" *Journal of Business Finance and Accounting,* Vol. 31:1, Jan./Mar. 2004, pp. 49-82.  (Hakala Report at 11 n.4, 11-12 n.6 & 13 n.9.)  Hakala's report was attached as Exhibit 2 to Defendants' Memorandum of Law in Support of their Motion to Exclude the Expert Opinions of Scott D. Hakala filed on March 2, 2009 ("Defs.' Hakala Mot.").

studies.  And her opinions regarding Hakala's misapplication of basic statistics principles
are shared with those courts that have excluded his prior testimony for these same
reasons.  *See, e.g., In re Xcelera.com Sec. Litig.*, No. 00-11649-RWZ, slip op. at 1-5 (D.
Mass. Apr. 25, 2008) (attached as Ex. 1 to Defs.' Hakala Mot.).

Plaintiffs also attack Dr. Simmons for failing to have a Ph.D in econometrics –
once again, something that their own expert is lacking.  (Pls.' Mot. at 6.)  Dr. Simmons,
however, testified that she took classes in econometrics for her doctoral degree, regularly
reviews papers and journals that focus on econometrics, obtained "significant expertise in
applying econometrics to financial issues" during her many years with Cornerstone, and
continues to deal with econometric issues for purposes of both her academic and
professional research and publication efforts.  (Simmons Dep. at 21:16-22; 23:1-10;
23:16-24; 24:2-5; 69:14-24.)

**C.    Dr. Simmons' Opinions Are Reliable And Relevant To The Loss
        Causation And Damages Issues Presently Before The Court.**

Plaintiffs' attack on the reliability of Dr. Simmons' methods and the relevance of
her opinions to this case is nothing more than a misguided effort to defend their own
expert's shortcomings masquerading as a *Daubert* challenge.  Plaintiffs bear the burden
of proof on the issues of loss causation and damages, but Plaintiffs' Motion strangely
reads as if they are faulting Defendants for failing to provide affirmative evidence on the
issues.  Nevertheless, as explained below, Dr. Simmons' opinions and related
methodology are well supported under *Daubert*'s reliability requirement.  Also, Dr.
Simmons offers testimony directly relevant to two critical issues in the case – loss
causation and damages – and Plaintiffs' attempt to satisfy these requirements through
Hakala's report.

- 8 -

Parenthetically, it is important to note that the Court in future rulings may not even need to reach several of the specific flaws in Hakala's opinions because of the overriding flaw in his inflation theory as explained in Defendants' Motions. (*See* Defs.' Hakala Mot. at 5-10; *see also* Defendants' Dispositive Motion for Summary Judgment ("Defs.' SJ Mot.") filed on March 2, 2009 at 7-13.) As explained in these filings, Hakala's opinion that the full extent of the alleged inflation in MIVA's stock price already existed a year prior to the only two statements the Court allowed to survive Defendants' Motions to Dismiss is fatal to Plaintiffs' claims. This necessarily means that the only damages claim Hakala's testimony can support has already been rejected by the Court twice before. (*See id.*)

1.    ***Dr. Simmons' Opinion That Loss Causation Cannot Be Supported From An Economic Perspective.***

Dr. Simmons has testified that the required element of loss causation cannot be shown in this case because (1) the only two alleged misstatements cited in the Complaint are not inflationary events that could have caused MIVA's stock to trade at a higher price than would have existed if the "truth" had been revealed and (2) there were no later disclosures that corrected or revealed the truth regarding these alleged misstatements. (Simmons Report at ¶ 7.) Plaintiffs attack this opinion as well as her view that Hakala's report similarly fails to establish loss causation. (*See* Pls.' Mot. at 11.)

It should be noted that Plaintiffs do not attack Dr. Simmons' other opinions related to loss causation -- namely, that Hakala fails to account for confounding information released on the same day as his supposed corrective disclosures. (Simmons Report at ¶¶ 8, 35-36.) This is likely due to the fact that Hakala admitted during his deposition (1) that confounding information existed in this case, (2) that it is possible to

- 9 -

account for and exclude confounding information, which he has done in other cases, and (3) that he performed no such quantitative analysis here.  (*See* Defs.' Hakala Mot. at 10-12.)

Plaintiffs wrongly suggest that Dr. Simmons' sole support for her opinions on loss causation is the Supreme Court's decision in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).  (Pls.' Mot. at 11.)  Dr. Simmons cited to *Dura* (as did Hakala) because it sets forth the relevant standard for proving loss causation in a securities case.  Plaintiffs' characterization of the basis for Dr. Simmons' loss causation opinions is simply false as her deposition testimony makes clear:

> Q:    In Section VII A [of your expert report], the only thing you rely or
>         cite to is the *Dur*a case; is that correct?
>                                      ***
> A:    I cite to the *Dura* case, however, . . . the basis for my opinion is
>         much more than just the *Dura* opinion.  Again, it's my experience in
>         analyzing damages in securities cases, as well as the knowledge of
>         the academic literature.

(Simmons Dep. at 54:15-23.)

As explained in her report, Dr. Simmons' conclusion that loss causation cannot be shown here is based on her review and analysis of Defendants' public statements cited in the Complaint, analyst reports issued over the course of the class period and immediately thereafter, other news items from this same time period, information on MIVA's stock price movements during and after the class period, and her decade-plus experience in assessing market reactions to company-specific announcements and other factors.  (Simmons Report at ¶¶ 1-7, Exs. 1-2.)  Dr. Simmons similarly testified at her deposition that her opinion that no corrective disclosures existed here was based on "[her] expertise and knowledge of the way the stock markets behave," "[her] consideration of finance

principles including specific principles relating to stock trading and market behavior,"
"[the fact that] as part of [her] doctoral training a significant portion [of time] was spent
on analyzing research related to stock trading [and] stock market behavior," and the
analysis that she has conducted "in dozens or perhaps a hundred cases . . . related to stock
market behavior."  (Simmons Dep. at 51:17-52:13.)

    Dr. Simmons also expressed the opinion that Hakala's report fails to provide any
linkage between Hakala's purported corrective disclosure days and the alleged
misstatements in the Complaint.  (Simmons Report at ¶¶ 25-37.)  As Dr. Simmons has
observed, there were no later corrective announcements that revealed any inaccuracies in
the statements made by Defendants on February 23, 2005 or March 16, 2005 – the only
two days on which potentially actionable misstatements may exist.  (*Id.*)[8]  This is a public
record fact that Dr. Simmons is entitled to rely upon for her opinions.

    In a belated attempt to rectify this and other fatal discrepancies in his report,
Plaintiffs – without seeking leave of court – have now submitted a new declaration by
Hakala in which he insists that he has satisfied the requirement of identifying relevant
corrective disclosures citing to his deposition testimony.  (Pls.' Mot. at 11-12.)  This
submission, which Defendants have requested should be struck as untimely, similarly
fails to identify any disclosure on the days cited by Hakala that corrected any aspect of
the two alleged misstatements that remain in this case.  As a result, this improper
supplemental submission by Hakala can neither assist Plaintiffs in satisfying their burden
of proving loss causation nor can it have any possible relevance to the Court's review of
those opinions offered by Dr. Simmons.

---

[8]    Plaintiffs also fail to mention that their own expert testified that he did not consider March 16,
2005 to be a date where any new information was disclosed to the market or where there was a statistically
significant stock price movement.  (*See* Defs.' Hakala Mot. at 18-19.)

And, once again, the Court ultimately may not need to reach specific issues like corrective disclosures because of the fatal over-arching flaw in Hakala's opinions as described in Defendants' Motions. The Court's prior rulings direct that Hakala's opinions on price inflation can only support a claim for damages as to statements that twice before were held to be non-actionable as a matter of law. (*See* Defs.' Hakala Mot. at 5-10; Defs. SJ Mot. at 7-13.)

## 2. *Dr. Simmons' Specific Criticisms of Hakala's Report and Methodologies.*

### (a)     Hakala's Event Study and Regression Analysis.

Dr. Simmons has offered the opinion that Hakala's event study and regression analysis are unsound and arbitrary because (1) Hakala used an unscientific process to select his market and industry indices that prohibits Dr. Simmons (or anyone else) from replicating his selection process and (2) he also employed an arbitrary and subjective process for selecting event days for his study that similarly prohibits any replication and verification of his results. (Simmons Report at ¶¶ 38-39; Simmons Dep. at 34:21-36:4.) Courts routinely exclude expert opinions where the opposing party's expert is unable to replicate the proffered analysis because such an evaluation is necessary to ensure reliability under *Daubert*. *See, e.g.*, *Ruffin v. Shaw Indus., Inc.*, 149 F.3d 294, 297-300 (4th Cir. 1998); *Reynolds v. Freightliner LLC*, No. 05-70-GFVT, 2006 WL 5249744, at *9 (E.D. Ky. June 21, 2006). Indeed, "[t]he hallmark of [the *Daubert*] reliability prong is the scientific method, i.e., the generation of testable hypotheses that are then subjected to the real world crucible of experimentation, falsification/validation, and replication." *Caraker v. Sandoz Pharms. Corp.*, 188 F. Supp. 2d 1026, 1030 (S.D. Ill. 2001).

- 12 -

Plaintiffs criticize Dr. Simmons for not submitting an event study of her own and claim that this demonstrates she failed to employ a "scientific" approach to critiquing Hakala. (Pls.' Mot. at 19-20.) Dr. Simmons did not, however, need to prepare her own event study in order to form an opinion as to the quality of Hakala's work. (*See* Simmons Dep. at 34:21-35:2.) Dr. Simmons testified that she endeavored to replicate Hakala's event study analysis, but was unable to do so due to the fundamental flaws in his work. (Simmons Report at ¶¶ 8, 38-39; Simmons Dep. at 34:21-36:4.) Her stated opinion is that Hakala's work defied testing and would thwart any attempt by a reviewer to replicate his work. (*Id.*) That opinion is based on Dr. Simmons' personal experience in attempting unsuccessfully to replicate Hakala's analysis from the data available in his report. (*Id.*)

Thus, when asked to comment on Dr. Hakala's work, Dr. Simmons employed an entirely appropriate and scientific approach – she attempted to replicate his analysis. As noted above, reproducibility is at the heart of the scientific process and also the *Daubert* analysis. Dr. Simmons' inability to replicate Hakala's study calls into question only the reliability of Hakala's opinions, not hers, and presents sufficient grounds standing alone to exclude his opinions under *Daubert*. The following passage from Dr. Simmons' deposition aptly demonstrates this point:

> Q: There's no event study in your report, correct?
>
> A: That's right. In order to render my opinions in this case, I did not find it necessary to conduct . . . an event study. I did, however, as I mentioned before, attempt a replication of Dr. Hakala's event study.
>
> Q: What was the result of that?
>
> A: Well, it's impossible for a researcher to completely replicate Dr. Hakala's event study.
>
> Q: Why?

- 13 -

A:    Because he has employed judgmental techniques without providing a scientific basis. . . . [F]or example, . . . his process of including event days, which he eliminates from the regression period that he analyzes. He provides no description of a systematic basis in which he arrived at those dates, and therefore, as an independent researcher, I have no basis or no method to go and attempt to complete the same analysis.

In addition, he provides no systematic description or evidence of how he constructed his peer indices. And therefore I'm unable, any independent researcher would be unable, to actually replicate the construction of his peer indices, which are a key component to his event study analysis.

Q:    Okay. So you're – you were unable to replicate the report. Were you able – or did you attempt to create your own?

***

A:    As I mentioned before, I did not conduct a separate event study. I did, however, take the inputs that Dr. Hakala has described that he used in his event study, and then went through the process of . . . mechanically trying to recreate his results.

(Simmons Dep. at 34:21-36:4.)

For her opinions on Hakala's event study, Dr. Simmons also relied, as Plaintiffs acknowledge, on "[her] knowledge of the vast literature on the conduct of event studies." (Simmons Dep. at 53:16-20.) Plaintiffs, however, falsely claim that her report "cites to none of that literature to support her opinion." (Pls.' Mot. at 10-11; *see also id.* at 12.) Dr. Simmons' report does cite to several publications that set forth the proper methods for performing an event study, which as Dr. Simmons has explained were not followed by Hakala.[9] She is also entitled to and did rely for her opinions in this case on her years

---

[9]    *See* Simmons Report at 4 n.3 (citing A.C. MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature,* Vol. XXXV (March 1997); J. Binder, "The Event Study Methodology Since 1969," *Review of Quantitative Finance and Accounting,"* 11 (1998). In an attempt to mislead the Court, Plaintiffs cite to deposition testimony from Dr. Simmons where she was asked whether there were any outside publications cited in a particular section of report. (*See* Pls.' Mot. at 10-11 (citing Simmons Dep. at 53:21-54:12); *see also id.* at 12 (citing Simmons Dep. at 55:24-25).)

of experience in personally performing event studies in securities class actions as described above. (Simmons Dep. at 68:22-69:5.)

Plaintiffs' main criticism of Dr. Simmons is that they contend Hakala cited to more outside publications in his report than Dr. Simmons did. (Pls.' Mot. at 11-15.) Indeed, Plaintiffs' primary retort to every contrary opinion offered by Dr. Simmons is to invoke these citations. (*Id.*) In reality, the much touted "support" that Hakala purports to have for his event study methodology simply does not exist. (*See* Simmons Dep. at 61:7-20.) When asked about the very articles cited by Hakala that supposedly corroborated his event day selection process, Dr. Simmons testified that they did not support his methods and, in fact, "Dr. Hakala is well known for citing numerous academic sources . . . which don't support his application in the event study analysis." (*Id.* at 61:18-20.)

For example, as noted above, Dr. Simmons has criticized Hakala for selecting days for use in his event study based on his personal opinion that the news released on those days would have been material to investors. (Simmons Report at ¶ 39; *see also* Simmons Dep. at 59:21-60:5; 72:9-17.) Plaintiffs do not dispute that this was in fact the "process" employed by Hakala and he confirmed this fact at his deposition. (*See* Defs.' Hakala Mot. at 18-19.)

Plaintiffs claim that this criticism of Hakala is not well founded because he cites to articles supposedly supporting his selection methods. (Pls.' Mot. at 12-14.) In point of fact, none of the articles he cites sanction the use of a researcher's personal views on materiality for the selection of event days.[10] Thus, Plaintiffs' argument that Dr. Simmons

---

[10]     For example, in the *Journal of Finance* article cited by Hakala, the author eschews a subjective analysis of materiality with regard to firm-specific news events by recognizing all dates on which the identified firms appeared in two prominent sources for financial news (the Dow-Jones news service and *The Wall Street Journal*) regardless of the subject matter of the particular news items involved. *See* Roll,

- 15 -

lacks peer-reviewed support for her opinions has the cart before the horse.  Plaintiffs bear

the burden of demonstrating loss causation and damages and have chosen to attempt to

meet this burden through Hakala's event study.  As shown above and based on Dr.

Simmons' testimony, Hakala has employed a methodology for selecting event days for

his study that, even according to his own citations, is unsupported and not generally

accepted in the field of economics.  Dr. Simmons is entitled to rely on the lack of

academic and professional support for Hakala's chosen methods as well as her own,

contrary experience in performing event studies in numerous cases over the course of her

career.

(b)     <u>Hakala's Overuse of Dummy Variables</u>.

Dr. Simmons has offered the related opinion that Hakala's event study is flawed

due to his overuse of "dummy" or indicator variables.  (Simmons Report at ¶ 39.)  Dr.

Simmons' views on this issue are hardly unique, given that Hakala's testimony has been

excluded previously under *Daubert* for this exact same reason.  *See In re Xcelera.com*,

slip op. at 1.  As Dr. Simmons has explained, Hakala's excessive use of dummy variables

allows him to create days of supposedly significant stock price reactions where, if he had

followed proper event study methods, the days would not have so qualified.  (Simmons

Report at ¶ 39.)[11]

---

"R^2," *Journal of Finance*, Vol. 43:3, Jul. 1988.  In other words, unlike Hakala who reviewed multiple news sources and made arbitrary and subjective determinations as to which news events *he* deemed material.  *Id.*  The various other articles cited by Hakala similarly fail to support his arbitrary approach.  *See, e.g.*, Thompson, Olsen and Dietrich, "Attributes of News About Firms: An Analysis of Firm-Specific News Reported in the *Wall Street Journal* Index," *Journal of Accounting Research*, Vol. 25:2 Autumn 1987.  Copies of these articles are attached hereto as Exhibit B.

[11]     May 9, 2005 – one of Hakala's supposed corrective disclosure days – is a prime example.  (Simmons Dep. at 70:23-71:16.)  If subjected to a properly designed event study, this day would not have registered a statistically significant stock price movement.  (*See id.*)

Plaintiffs again cry foul, claiming that Dr. Simmons' opinions are in conflict with articles cited by Hakala that support his excessive use of dummy variables.  (Pls.' Mot. at 13-14.)  However, as Dr. Simmons has explained, none of these articles support the use of dummy variables on every single event day included in a study:

> Q:    Okay. Can you give me any particular criticisms of any of the articles listed [by Hakala] in Footnote 4 [page 11 of his Report]?
>
> ***
>
> A:    . . . [N]one of the academic articles that I'm aware of that he has cited supports the removal of days in his event study.  As I describe, in his report he's eliminated something like 19 percent of the days in the relevant time period.  None of the academic studies that he [cites] that I'm aware of would support that type of analysis, and it's unsound.
>
> ***
>
> Q:    . . .So what source says that, that 19 percent is too much?
>
> A:    Actually, there's no reason to eliminate any days during an event study period unless, what the academic literature tells you, unless there is a fundamental economic, structural change during the periods of analysis.  For example, say 9/11, it does not support, if you doing an event study, this selection of numerous days just because company information is released.
>
> Q:    So can you name any sources that say that Dr. Hakala's 19 percent is wrong?
>
> A:    It's not the 19 percent that's just wrong. . . . He lists these sources as support for his methodology, but they do not describe the approach that he's taken, of removing company-specific news events.
>
> Q:    So in Footnote 4, what does the [R]oll paper say about this issue?
>
> A:    I believe the [R]oll paper, as I recall it, is an exploratory paper on event studies.  It doesn't come to the recommendation, though, that when conducting an event study, one should remove all company-specific news events.

> Q:     How about the Thompson, Olsen, and Dietrich studies listed here?
>        What do those say about the issue?
>
> A:     As I recall, none of these papers suggest the procedure that Hakala
>        has followed.

(Simmons Dep. at 61:22-63:16.)  Again, Plaintiffs' mechanical invocation of Hakala's article citations is a red-herring.  Dr. Simmons is entitled to rely on the lack of support for such dummy variable practices in Hakala's own citations and also on her personal experience in preparing event studies, which is directly contrary to the techniques employed by Hakala here.

(c)     <u>Hakala's Percentage Inflation Approach</u>.

Plaintiffs have similarly failed to show how Dr. Simmons' opinions regarding the percentage inflation approach utilized by Hakala are somehow unreliable.  Plaintiffs argue that Dr. Simmons cites to "no scientific sources to support her opinion" that Hakala's percentage inflation approach is illogical and unscientific.  (Pls.' Mot. at 14.) Yet this argument is based on the faulty premise that Hakala's percent inflation method is supported by some "scientific" source in the first place that must then be rebutted by contrary sources offered by Dr. Simmons.  As shown previously, this is simply not the case.  (Defs.' Hakala Mot. at 12-13.)

Nevertheless, Dr. Simmons included in her report specific calculations demonstrating how the use of the percentage inflation approach in any case like the present one, *i.e.*, one involving a stock price drop at the end of the class period, necessarily leads to results that are illogical and in violation of the relevant legal standards set forth in *Dura.*  (Simmons Report at ¶¶ 41-42.)  There was no need to resort to multiple citations where *Dura* very clearly states that a plaintiff cannot recover simply

- 18 -

because the value of purchased shares declined over time.  (*See id.*)  By taking the percentage stock price decline as measured at the end of the class period and automatically applying that percentage backwards to every proceeding day in the class period, Hakala is wrongly subsuming the entirety of the class period stock price decline in his damages figure, as Dr. Simmons' analysis shows.  (*Id.*)  For her opinions, Dr. Simmons is also entitled to and did rely on her years of experience in preparing damages models and analysis in securities class actions.  (Simmons Report at Ex. 1; Simmons Dep. at 69:8-13.)

     (d) <u>Hakala's Trading Model</u>.

   Plaintiffs criticize Dr. Simmons' reference in her report to *In re Broadcom Corp. Securities Litigation*, No. CV02-301, 2005 U.S. Dist. LEXIS 12118 (C.D. Cal. June 3, 2005), a **decision where Hakala's use of the same trading model offered here was rejected due to its *Daubert* shortcomings.** *Id.* at *8-*12; Pls.' Mot. at 17-18.  Again, Dr. Simmons cited to this opinion in her report only after she had first explained (1) that Hakala's trading model is based on a working paper that was never published and, thus, has never been subjected to peer review and (2) that, based on her familiarity with this paper and over twelve years of experience in working with various damages models, all trading models are inherently speculative because they attempt to predict trading behavior without resort to actual trading data concerning the stock at issue.  (Simmons Report at ¶¶ 46-47.)

   Plaintiffs bear the burden of demonstrating economic losses and their only attempt to meet this burden is through Hakala's report.  His damages opinion, in turn, is based on a trading model that has never been accepted in any peer reviewed publication,

is subject to a high level of uncertainty as Dr. Simmons has testified based on her personal experience in preparing damages analyses, and, as she correctly points out, has also been rejected on several occasions by other courts.  (*Id.* at ¶¶ 44-45, 47-48.)  The mere fact that Dr. Simmons cited to cases rejecting this same type of trading model in addition to offering her own opinion as to its unreliability does not transform her opinions into "legal opinions."[12]  Indeed, if that were standard, Hakala's own testimony would need to be excluded as he cites to several legal decisions on this issue and others throughout his report.  (*See* Hakala Report at ¶¶ 2, 26 n.22, 32 n.27 & 48 n.39.)

## III.    CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court deny Plaintiffs' Motion.

Respectfully submitted, this 19th day of March, 2009.

s/ Joseph G. Foster
Joseph G. Foster
Florida Bar No. 0301980

PORTER WRIGHT MORRIS &
 ARTHUR LLP
5801 Pelican Bay Blvd.
Suite 300
Naples, FL  34108-2709
Tel:  (239) 593-2900
Fax:  (239) 593-2990

-and-

---

[12]    Unlike the opinions excluded in the cases cited by Plaintiffs (*see* Pls.' Mot. at 17-18), Dr. Simmons does not purport to draw legal conclusions regarding the facts presented. *See, e.g., United States v. Long*, 300 F. App'x 804, 015  (11th Cir. 2008) (testimony excluded where expert opined that defendant's conduct constituted "an artifice or scheme to defraud" invoking the language found in Rule 10b-5); *United States v. Scop*, 846 F.2d 135, 138 (2d Cir. 1988) (excluding testimony where expert testified that "certain individuals were . . . material participants in the manipulation of th[e] stock" and "engaged in a manipulative and fraudulent scheme in furtherance of that manipulation" invoking the language of Section 10(b) and Rule 10b-5).

- 20 -

Todd R. David
Georgia Bar No. 206526
Susan E. Hurd
Georgia Bar No. 379628

ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309
Tel: (404) 881-7000
Fax: (404) 881-7777

*Counsel for Defendants*

LEGAL02/31185809v8

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION**

|  |  |  |
|---|---|---|
| **IN RE MIVA, INC.** | ) | **CIVIL ACTION FILE** |
| **SECURITIES LITIGATION** | ) | **NO. 2:05-cv-00201-FtM-29DNF** |
|  | ) |  |
|  | ) |  |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date I electronically filed the foregoing

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE TO

EXCLUDE THE TESTIMONY AND EXPERT REPORT OF DR. LAURA E.

SIMMONS with the Clerk of Court using the CM/ECF system, which will send a notice

of electronic filing to all registered users.

This 19th day of March, 2009.


s/ Joseph G. Foster_____
Joseph G. Foster
Florida Bar No. 0301980