# EXHIBIT A

**Certified Copy**

UNITED STATS DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

IN RE: MIVA, INC.

Civil Action No:
2 :05-cv-201-FtM-29-DNF

SECURITIES LITIGATION
~~~~~~~~~~~~~~~~~~~~~~

## VIDEOTAPED DEPOSITION OF LAURA E. SIMMONS, PH.D.

February 20, 2009
10:00 A.M.

Norfolk, Virginia, 23502.

Denise Galltin-Bailey, a Notary Public



ESQUIRE

Toll Free: 800.211.3776
Facsimile: 561.338.9294

Suite 120
2385 NW Executive Center Drive
Boca Raton, FL 33431
www.esquiresolutions.com

Laura E. Simmons, Ph.D.                                    February 20, 2009

10

1          MR. JONES:  Okay.  I have the subpoena.

2          I'm going to mark as Exhibit 1 the subpoena

3     to Dr. Simmons.

4          (The document was marked as Deposition

5     Exhibit No. 1.)

6     BY MR. JONES:

7          Q.    Let me show you a copy.  If you could turn

8     to Page 5, do you see where it says, "documents requested"?

9          A.    I do.  I'm assuming it's Page 5, but there

10    actually aren't any page numbers on the documents.

11         Q.    That's right.  It's the fifth page.  Roman

12    Numeral four, says "documents requested."

13         A.    Okay.  I do see that.

14         Q.    All right.  Will you take a look -- will

15    you take a quick look at the six requests that are listed

16    here.  And can you tell me once you've looked at it, are

17    there any other documents responsive to any of these

18    categories that you may not have produced?

19         A.    I've finished looking at the six requests,

20    and consistent with my prior review of this document, I

21    believe that I've produced all documents that are responsive

22    to this -- to this request.

23         Q.    Okay.  You went to the University of Texas,

24    graduated in 1986; is that correct?

25         A.    That is correct.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3776
Facsimile: 561.338.9294

Suite 120
2385 NW Executive Center Drive
Boca Raton, FL 33431
www.esquiresolutions.com

Laura E. Simmons, Ph.D.                                February 20, 2009

11

1          Q.         What did you study there?

2          A.         I studied -- I received an undergraduate

3    degree, a B.B.A. in accounting.

4          Q.         Did you minor in anything?

5          A.         No, I did not.

6          Q.         And you got your C.P.A. in 1989, right?

7          A.         That is correct.

8          Q.         What is your M.B.A. in from the University

9    of Houston?

10         A.         It's a general M.B.A., master's of

11   business.

12         Q.         So there's no specialization of that

13   M.B.A.?

14         A.         That's correct.

15         Q.         And then you have a Ph.D. in accounting; is

16   that right?

17         A.         That is correct.

18         Q.         Can you tell me about your doctoral

19   dissertation?  What was that about?

20         A.         My doctoral dissertation studied the

21   determinates of securities litigation outcomes.

22         Q.         What does that mean?

23         A.         That means I conducted a number of tests to

24   determine what types of factors explain dismissals of

25   securities litigation, as well as settlements of securities



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3776
Facsimile: 561.338.9294

Suite 120
2385 NW Executive Center Drive
Boca Raton, FL 33431
www.esquiresolutions.com

Laura E. Simmons, Ph.D.                                February 20, 2009

12

1   litigations.

2           Q.        And what process did you have to do to

3   determine that?

4                     MS. HURD:  Object to the form, vague,

5   ambiguous.

6                     THE WITNESS:  Well, it was a very long and

7   lengthy process, as you can imagine in the preparation of a

8   dissertation.  I can summarize it very briefly without

9   leaving -- leaving out really many of the details, in that

10  the analysis is primarily based on a regression -- a

11  regression analysis.  That's the primary statistical tool to

12  evaluate the determinates of securities litigation outcomes.

13  BY MR. JONES:

14          Q.        Okay.  Since you received your Ph.D., how

15  long have you taught in academia?

16          A.        I just began teaching in academia within

17  the last couple of years.  I began teaching last year at Old

18  Dominion University, and I'm currently at William and Mary --

19  the College of William and Mary.

20          Q.        So you never taught anywhere before, I

21  think, September of 2007; is that right?

22          A.        I also taught during my doctoral program at

23  the University of North Carolina at Chapel Hill.

24          Q.        But you didn't have your Ph.D. then?

25          A.        That's correct.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3776
Facsimile: 561.338.9294

Suite 120
2385 NW Executive Center Drive
Boca Raton, FL 33431
www.esquiresolutions.com

Laura E. Simmons, Ph.D.                                    February 20, 2009

20

1    BY MR. JONES:

2          Q.        Have you ever spoken at conferences that

3    were sponsored by Alston & Bird?

4          A.        Yes, I have.  As I also have spoken at

5    numerous other conferences sponsored by other law firms.  I

6    regularly speak on the topic of securities litigation.

7          Q.        What do you speak about?

8          A.        I typically speak about trends in

9    securities litigation based on my research on the topic.

10         Q.        Trends in what area?

11         A.        Trends in filings of securities cases, as

12   well as settlements of securities cases.  Sometimes even

13   trends in damage theories.

14         Q.        Are you an expert in accounting?

15         A.        Yes, I am.

16         Q.        Tell me why you're an expert in accounting.

17         A.        In addition to the fact that I have an

18   undergraduate degree in accounting, I also have a doctoral

19   degree in accounting.  And as you know, I am a professor of

20   accounting at the College of William and Mary.

21                   In addition to that, I have over five years

22   of experience practicing accounting with Price Waterhouse at

23   the time, which -- the firm was known as Price Waterhouse at

24   the time.

25         Q.        Are you an expert in economics?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3776
Facsimile: 561.338.9294

Suite 120
2385 NW Executive Center Drive
Boca Raton, FL 33431
www.esquiresolutions.com

Laura E. Simmons, Ph.D.                              February 20, 2009

21

1          A.        Yes.  I have -- I have expertise in

2     economics as well.

3                    One common misperception about a doctoral

4     degree in accounting is that it is about the study of more

5     advanced gap or more advanced accounting rules.  However, a

6     doctoral degree in accounting is actually quite similar to a

7     degree in finance.  And as such, one -- one taking -- one

8     enrolled in a doctoral program takes similar courses as to

9     one -- as one who is seeking a finance Ph.D. or even an

10    economics Ph.D.  We take many of the same courses and so

11    receive much of the same training.

12                   And in addition to my training and

13    associated with the doctoral program, I apply economic -- I

14    have applied economic concepts throughout my over 12 years or

15    so experience with Cornerstone Research.

16         Q.        What courses at the graduate level in

17    economics did you take?

18         A.        Well, it's been over 12, 13 years.  It was

19    1996 when I graduated.  It would have been 1994 when I

20    completed my course work.  So I'm not going to recall the

21    specific names of the courses.

22                   I certainly took econometrics.  I took

23    other basic economics courses at the advanced level.  But the

24    specific names of the courses, I can't recall at this point.

25         Q.        Have you ever taught a class in economics?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3776
Facsimile: 561.338.9294

Suite 120
2385 NW Executive Center Drive
Boca Raton, FL 33431
www.esquiresolutions.com

Laura E. Simmons, Ph.D.                                    February 20, 2009

22

1       A.        No, I have not.

2       Q.        Ever been asked to do that?

3       A.        No, I have not.

4       Q.        Have you ever received any awards in

5   economics?

6       A.        No, I have not.

7       Q.        How about any honors in economics?

8       A.        No, I have not.

9       Q.        Do you subscribe to any economic journals?

10      A.        Yes, I do.  I receive them -- a wide

11  variety of economic journals, not necessarily by my own

12  personal subscription but through the College of William and

13  Mary, and prior to that, through Cornerstone Research.

14      Q.        Which ones of those do you read regularly?

15      A.        I would say -- well, first of all, the

16  Journal of Accounting and Economics, which is partially

17  accounting and partially economics.  The Journal of Law and

18  Economics, the Rand Journal of Economics, to name a few.

19      Q.        How about statistics?  Are you an expert in

20  statistics?

21      A.        I have expertise in statistics, especially

22  statistics as applied to analysis of financial issues.  I

23  obviously don't have a Ph.D. in statistics, which is what I

24  think one would -- one would actually require in order to say

25  I am an expert in statistics.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3776
Facsimile: 561.338.9294

Suite 120
2385 NW Executive Center Drive
Boca Raton, FL 33431
www.esquiresolutions.com

Laura E. Simmons, Ph.D.                                    February 20, 2009

23

1      Q.        How about econometrics?  Are you an expert

2   in econometrics?

3      A.        Again, I have significant expertise in

4   applying econometrics to financial issues.

5      Q.        Where did you learn to do that?

6      A.        Again, I took econometrics courses in

7   conjunction with my Ph.D. program and have for, again, the

8   over decade of experience with Cornerstone Research

9   consistently applied economic -- economic -- econometric

10  techniques to analyzing financial issues.

11     Q.        Did you ever teach any classes in

12  econometrics?

13     A.        No, I have not.

14     Q.        Any awards or honors in that subject?

15     A.        No.

16     Q.        Do you subscribe or read any journals that

17  have to do with a -- that -- I'm sorry -- that focus on

18  econometrics?

19     A.        I would say that I don't subscribe to those

20  journals and read them on a regular basis.  I do find that

21  occasionally or even more -- periodically have need to refer

22  to those journals.

23     Q.        Which journals are those?  Can you tell me?

24     A.        The Journal of Econometrics would be one.

25     Q.        Any others?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3776
Facsimile: 561.338.9294

Suite 120
2385 NW Executive Center Drive
Boca Raton, FL 33431
www.esquiresolutions.com

Laura E. Simmons, Ph.D.                           February 20, 2009

24

1        A.        Not that I can recall right at this moment.

2                  I should say that actually, in addition to

3    journals -- economic journals, I might refer to individual

4    papers that deal with economic -- or excuse me -- econometric

5    issues as well.  And I would do that on an as-needed basis.

6        Q.        Your C.V. says that you did damage and

7    liability analyses for equity and fixed income securities

8    cases.  Can you tell me what that means, and what you did?

9        A.        That means that for many, many cases, I

10   engaged in analysis related to issue of damages, as well as

11   loss causation in cases both involving common stock and

12   preferred stock, as well as fixed income -- fixed income

13   securities.

14       Q.        At Cornerstone, you've done some research

15   publications in the period between 1997 and 2007.  Those all

16   relate to settlements?

17       A.        Yes, they do.

18       Q.        Who's Ellen Ryan?

19       A.        Ellen Ryan is a colleague of mine at

20   Cornerstone Research.

21       Q.        Are you at the same level or does one of

22   you work for the other or how does that work?

23       A.        Well, she does not work directly for me.

24   On the other hand, no, we are not at the same level.  In

25   fact, she currently has an administrative type position in



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3776
Facsimile: 561.338.9294

Suite 120
2385 NW Executive Center Drive
Boca Raton, FL 33431
www.esquiresolutions.com

Laura E. Simmons, Ph.D.                                    February 20, 2009

25

1   which her primary role is to manage issues -- manage the

2   practice of securities litigation, including the research

3   that we conduct jointly.

4              So her primary role at this current moment

5   is not to engage -- not to work on consulting matters,

6   specific cases.

7        Q.        How many peer review articles have you

8   published?

9        A.        I have published one peer review article at

10  this point.

11       Q.        What did that focus on?

12       A.        That was published in the auditing journal

13  and focused on issues related to auditing, and more

14  specifically, analytical procedures performed in audits.

15       Q.        Did it have anything to do with damage

16  analysis?

17       A.        No, it did not.

18       Q.        You list a number of media appearances, and

19  I prefer not to go through each one.  But can you tell me in

20  general what you're normally asked to speak about when you go

21  on these media appearances?

22       A.        Yes.  Specifically on topics related to

23  securities litigation.

24       Q.        Which topics?

25       A.        Primarily, securities litigation trends.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3776
Facsimile: 561.338.9294

Suite 120
2385 NW Executive Center Drive
Boca Raton, FL 33431
www.esquiresolutions.com

Laura E. Simmons, Ph.D.                                    February 20, 2009

26

1   Again, relating to my research.

2          Q.        That often have to do with settlements?

3          A.        Yes.

4          Q.        How do you find out that information about

5   settlements?  That's your -- your own personal research?

6          A.        Yes, it is.  In conjunction with support

7   from Cornerstone Research, and as you know, Ellen Ryan is

8   listed as a co-author, and so that's work that she assists --

9   assists with.

10         Q.        Have you ever studied law or taken any

11  legal classes?

12         A.        I took business law in conjunction with my

13  accounting program requirements.  As you probably know,

14  that's a requirement for the C.P.A. exam.

15         Q.        Do you consider yourself an expert in the

16  law?

17         A.        I do not.

18         Q.        Do you have a copy of your expert report

19  with you?

20         A.        I do not.

21                   MR. JONES:  I'm going to mark -- we're

22  going to mark the expert report of Dr. Simmons as Exhibit 2.

23                   Can the court reporter mark that as No.  2

24  and please hand it to the witness.

25                   (The document was marked as Deposition



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3776
Facsimile: 561.338.9294

Suite 120
2385 NW Executive Center Drive
Boca Raton, FL 33431
www.esquiresolutions.com

Laura E. Simmons, Ph.D.                                    February 20, 2009

34

1   that's it.

2                   MS. HURD:  Yes.  And you don't tell her to

3   answer because she knows that she can answer if she

4   understands the question.  Okay?

5                   MR. JONES:  All right.

6                   MS. HURD:  Thank you.

7                   MR. JONES:  Fair enough.

8                   MS. HURD:  Why don't we have the question

9   read back because we've had a bit of a discussion here.

10                  (The record was read back as requested.)

11                  MS. HURD:  The objection stands.

12                  THE WITNESS:  I don't recall all of the

13  allegations in the complaint at this point.

14                  I did not assume any factual allegations

15  were true regarding, I believe, the two individuals cited in

16  the complaint specifically associated with the so-called

17  click fraud revenue.  I'm sorry.  Click fraud issue.

18                  And generally, I would say I did not assume

19  that the allegations in the complaint were factual.

20  BY MR. JONES:

21       Q.       There's no event study in your report,

22  correct?

23       A.       That's right.  In order to render my

24  opinions in this case, I did not find it necessary to

25  conduct -- to conduct an event study.  I did, however, as I



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3776
Facsimile: 561.338.9294

Suite 120
2385 NW Executive Center Drive
Boca Raton, FL 33431
www.esquiresolutions.com

Laura E. Simmons, Ph.D.                              February 20, 2009

35

1   mentioned before, attempt a replication of Dr. Hakala's event

2   study.

3          Q.       What was the result of that?

4          A.       Well, it's impossible for a researcher to

5   completely replicate Dr. Hakala's event study.

6          Q.       Why?

7          A.       Because he has employed judgmental

8   techniques without providing a scientific basis.  For -- for

9   example, the -- his process of including event days, which he

10  eliminates from the regression period that he analyzes.  He

11  provides no description of a systematic basis in which he

12  arrived at those dates, and therefore, as an independent

13  researcher, I have no basis or no method to go and attempt to

14  complete that same analysis.

15                 In addition, he provides no systematic

16  description or evidence of how he constructed his peer

17  indices.  And therefore I'm unable, as any independent

18  researcher would be unable, to actually replicate the

19  construction of his peer indices, which are a key component

20  to his event study analysis.

21         Q.       Okay.  So you're -- you were unable to

22  replicate the report.  Were you able -- or did you attempt to

23  create your own?

24                 MS. HURD:  Object to the form, vague.

25                 THE WITNESS:  As I mentioned before, I did



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3776
Facsimile: 561.338.9294

Suite 120
2385 NW Executive Center Drive
Boca Raton, FL 33431
www.esquiresolutions.com

Laura E. Simmons, Ph.D.                                February 20, 2009

36

1    not conduct a separate event study.  I did, however, take the

2    inputs that Dr. Hakala has described that he used in his

3    event study, and then went through the process of -- of

4    mechanically trying to recreate his results.

5    BY MR. JONES:

6            Q.      So you say, you did not create your own

7    event study, but could you have?

8            A.      I could have, but as I said before, it was

9    not necessary to render my opinions in this case.

10           Q.      Why?

11           A.      Because the fundamental flaws in

12   Dr. Hakala's report stand alone, are separate from -- in

13   part, are separate from the conduct of his event study.

14           Q.      So what if there was no event study from

15   Dr. Hakala, and you were asked to create an event study in

16   this case?  You couldn't do that?

17           A.      No.  If I was --

18                   MS. HURD:  Let me object.

19                   THE WITNESS:  Sorry.

20                   MS. HURD:  Objection, mischaracterizes her

21   prior testimony.

22                   THE WITNESS:  If I was asked to conduct an

23   event study in this case, I would have been able to do so,

24   yes.

25   BY MR. JONES:



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3776
Facsimile: 561.338.9294

Suite 120
2385 NW Executive Center Drive
Boca Raton, FL 33431
www.esquiresolutions.com

Laura E. Simmons, Ph.D.                                    February 20, 2009

51

1    question.

2                    THE WITNESS:  Anything's possible.  And I

3    think that would be my answer to your question.

4    BY MR. JONES:

5            Q.        Can you look at Paragraph 19 of your

6    report, please, on Page 10?

7            A.        Yes, I have it.

8            Q.        All right.  So going down to the last

9    sentence on that page, do you see where it says, "as

10   discussed in more detail in Section VI.B"?

11           A.        Yes, I do.

12           Q.        Okay.  Then right after that.  It says,

13   "The May disclosures identified by Dr. Hakala do not correct

14   or reveal any "truth" regarding an alleged misrepresentation

15   on this day."  Do you see that?

16           A.        Yes, I do.

17           Q.        What scientific method or source do you

18   rely on to reach your opinion there?

19           A.        Again, consideration of finance principles,

20   including specific principles relating to stock trading and

21   market behavior.

22           Q.        Can you be any more specific?

23           A.        Well, if we go back to the disclosures

24   identified by Dr. Hakala in May, what I mean is that there

25   is no connection to the statements made on February 23rd.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3776
Facsimile: 561.338.9294

Suite 120
2385 NW Executive Center Drive
Boca Raton, FL 33431
www.esquiresolutions.com

Laura E. Simmons, Ph.D.                    February 20, 2009

52

1        Q.        So in reaching that conclusion there at the

2    end, the one I read to you the bottom of Page 10, did you

3    have to use your own judgment to do that?

4        A.        I think I'm relying on my expertise and

5    knowledge of the way that stock markets behave, yes.

6        Q.        What expertise do you have in how stock

7    markets behave?

8        A.        Again, as part of my doctoral training, a

9    significant portion was spent on analyzing research related

10    to stock trading, stock market behavior, and in addition,

11    again, in my work with Cornerstone Research in dozens or

12    perhaps a hundred cases, that analysis that I've conducted in

13    those cases has related to stock market behavior.

14        Q.        Okay.  If you look at this sentence with me

15    one more time at the bottom of Page 10.  Is that fact or

16    opinion?

17                  MS. HURD:  Object to the form of the

18    question.

19                  THE WITNESS:  That is my expert opinion.

20    BY MR. JONES:

21        Q.        Based on the same things you've just told

22    me?

23        A.        Yes.

24        Q.        So it's not based on any facts that you

25    read?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3776
Facsimile: 561.338.9294

Suite 120
2385 NW Executive Center Drive
Boca Raton, FL 33431
www.esquiresolutions.com

Laura E. Simmons, Ph.D.                                    February 20, 2009

53

1            MS. HURD:   Object to the form of the

2    question, mischaracterizes the prior testimony.

3            THE WITNESS:   No.   It considers the facts

4    that I've read and applies the concepts that I'm trained in,

5    and that is the basis for my opinion.

6    BY MR. JONES:

7        Q.        If you can turn to Page 22 of your report,

8    please?

9        A.        Yes.

10       Q.        Do you see there's Section VII, and it has

11   a heading?

12       A.        Yes.

13       Q.        And what does that heading say?

14       A.        The heading says, "The Hakala Report is

15   Flawed -- Flawed and Unscientific."

16       Q.        All right.   What scientific or academic

17   sources do you rely on in Section VII to reach that

18   determination?

19       A.        My -- my knowledge of the vast literature

20   on the conduct of event studies.

21       Q.        But you don't cite to any of that in

22   Section VII, do you?

23       A.        I don't actually cite to -- well, I'm not

24   sure because we referred to -- earlier, we referred to a few

25   papers that I do cite to, and I don't know whether they



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3776
Facsimile: 561.338.9294

Suite 120
2385 NW Executive Center Drive
Boca Raton, FL 33431
www.esquiresolutions.com

Laura E. Simmons, Ph.D.                          February 20, 2009

54

1    actually appear in Section VII --

2          Q.      Well, okay.  Let's look at -- let's look

3    at --

4                  MS. HURD:  Well, let's let her finish her

5    answer before you go to the next question.

6                  MR. JONES:  Go ahead.

7                  MS. HURD:  Laura, were you done?

8                  THE WITNESS:  Well, I was going to say that

9    I wanted to just check and see if there were -- any of the

10   papers happen to be cited in this particular section, and I

11   see just from a quick look, that it appears that they are

12   not.  So now I am finished.

13                 MR. JONES:  Okay.  I apologize.

14   BY MR. JONES:

15         Q.      In Section VII A, the only thing you rely

16   or cite to is the Dura case; is that correct?

17                 MS. HURD:  Object to the form of the

18   question, mischaracterizes prior testimony.

19                 THE WITNESS:  I cite to the Dura case,

20   however, again, the basis for my opinion is much more than

21   just the Dura opinion.  Again, it's my experience in

22   analyzing damages in securities cases, as well as the

23   knowledge of the academic literature.

24   BY MR. JONES:

25         Q.      But you decided not to discuss those things



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3776
Facsimile: 561.338.9294

Suite 120
2385 NW Executive Center Drive
Boca Raton, FL 33431
www.esquiresolutions.com

55

1     in Section A; is that correct?

2               A.        When you say discussed those things, I do

3     discuss the reasoning why Dr. Hakala fails to establish loss

4     causation.

5               Q.        Yes.  But I'm talking about the basis and

6     the sources.  The only basis you provide in Section A is the

7     Dura case, right?

8                         MS. HURD:  Objection, mischaracterizes

9     prior testimony.

10                        THE WITNESS:  That's the only citation to a

11    document that I provide.

12    BY MR. JONES:

13              Q.        Okay.  In Section B, the only citation that

14    you provide is Dr. Hakala's report; is that right?

15              A.        That is the case because that is the only

16    citation to a document, again, that I provide because the

17    opinion is one that is based on well-known, well-accepted

18    finance principles.

19              Q.        But those aren't listed here in Section B,

20    right?

21                        MS. HURD:  Object, mischaracterizes prior

22    testimony.

23                        THE WITNESS:  As we've already discussed,

24    there are no sources.  There are no citations, other than the

25    one we've already mentioned.



Toll Free: 800.211.3776
Facsimile: 561.338.9294

Suite 120
2385 NW Executive Center Drive
Boca Raton, FL 33431
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Laura E. Simmons, Ph.D.                                    February 20, 2009

59

1    his own judgment of materiality, rather than any scientific

2    methodology for the selection of these days.  Do you see

3    that?

4              A.       Yes, I do.

5              Q.       Isn't it true that all statistical analysis

6    calls for some exercise of informed judgment?

7              A.       Well, it's true that statistical analysis

8    often involves judgment.  It's not the type of judgment that

9    has been exercised by Dr. Hakala.  In fact, he has -- his

10   analysis precludes a scientific study of his results because

11   he provides no explanation or justification of the selection

12   of his event dates.

13             Q.       How do you pick these days that you mention

14   without using any judgment?  Can that be done?

15                      MS. HURD:  Object to the form.

16                      THE WITNESS:  I'm sorry.  I don't think

17   that question can be answered.  You said, how do you pick

18   these days?  In other words, these days that were selected by

19   Dr. Hakala.

20   BY MR. JONES:

21             Q.       Could Dr. Hakala have picked, where you say

22   in the sentence, these days without using any of his

23   judgment?

24             A.       Well, I think where the misunderstanding

25   lies is that there is no reason to pick these days if



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3776
Facsimile: 561.338.9294

Suite 120
2385 NW Executive Center Drive
Boca Raton, FL 33431
www.esquiresolutions.com

Laura E. Simmons, Ph.D.                                February 20, 2009

60

1    conducting a proper event study.

2            Q.      Why is that?

3            A.      Because as I've described in my report, the

4    selection of those days actually leads to a fundamental flaw

5    in his event study.

6            Q.      Okay.  So what are the sources that

7    describe the methodology that one should use to select days

8    for an event study?

9            A.      I think you might be misunderstanding the

10   way that an event study should be conducted.

11           Q.      You can't answer my question?

12           A.      Can you rephrase it?

13           Q.      I don't think so.  What I'd like you to

14   answer is -- or tell me why you can't answer it, is what are

15   the sources that describe the methodology that you should use

16   to select days in an event study?

17                   MS. HURD:  Objection.  Asked and answered.

18                   THE WITNESS:  Well, normally, when one

19   selects days for study in an event study, they are the days

20   of interest, for example, in a litigation matter, that are at

21   issue in the case.

22                   In this instance, they would be the alleged

23   corrective disclosures, and those would be the days that are

24   being analyzed in the event study.

25                   MR. JONES:  Okay.  Can we mark Dr. Hakala's



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3776
Facsimile: 561.338.9294

Suite 120
2385 NW Executive Center Drive
Boca Raton, FL 33431
www.esquiresolutions.com

Laura E. Simmons, Ph.D.                                    February 20, 2009

61

1    report.

2                    I'm going to mark Dr. Hakala's report as

3    Exhibit 3.  And if you could hand it to Dr. Simmons.

4                    (The document was marked as Deposition

5    Exhibit No. 3.)

6    BY MR. JONES:

7            Q.        If you could turn to Page 11 of that

8    report, please.

9            A.        Yes, I have it.

10           Q.        Okay.  You see in Footnote 4, Dr. Hakala

11   cites certain sources.  Do you see that?

12           A.        Yes, I do.

13           Q.        Can you -- are these sources correct for

14   the reasons that Dr. Hakala cites to them for?

15           A.        No --

16                   MS. HURD:  Object to the form of the

17   question.

18                   THE WITNESS:  Dr. Hakala is well known for

19   citing numerous academic sources of which don't support his

20   application in event study analysis.

21   BY MR. JONES:

22           Q.        Okay.  Can you give me any particular

23   criticisms of any of the articles listed in Footnote 4?

24                   MS. HURD:  Object to the form of the

25   question, mischaracterizes prior testimony.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3776
Facsimile: 561.338.9294

Suite 120
2385 NW Executive Center Drive
Boca Raton, FL 33431
www.esquiresolutions.com

Laura E. Simmons, Ph.D.                                February 20, 2009

62

1              THE WITNESS:  None of the academic -- none

2     of the academic articles that I'm aware of that he has cited

3     supports the removal of days in his event study.  As I

4     describe, in his report he's eliminated something like

5     19 percent of the days in the relevant time period.  None of

6     the academic studies that he supports that I'm aware of would

7     support that type of analysis, and it's unsound.

8     BY MR. JONES:

9              Q.      So what sources do you use?

10             MS. HURD:  Object to the form of the

11    question.

12             THE WITNESS:  When you say what sources I

13    use, what sources do I use for -- for what?

14    BY MR. JONES:

15             Q.      To select what the proper percentage is.

16    You said -- you said that 19 percent is too much.  So what

17    source says that, that 19 percent is too much?

18             A.      Actually, there's no reason to eliminate

19    any days during the event study period unless, what the

20    academic literature tells you, unless there is a fundamental,

21    economic, structural change during the periods of analysis.

22    For example, say, 9/11, it does not support, if you're doing

23    an event study, this selection of numerous days just because

24    company information is released.

25             Q.      So can you name any sources that say that



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3776
Facsimile: 561.338.9294

Suite 120
2385 NW Executive Center Drive
Boca Raton, FL 33431
www.esquiresolutions.com

63

1  Dr. Hakala's 19 percent is wrong?

2        A.        It's not the 19 percent that's just wrong.

3  These sources just don't support.  He lists these sources as

4  support for his methodology, but they do not describe the

5  approach that he's taken, of removing company-specific news

6  events.

7        Q.        So in Footnote 4, what does the roll paper

8  say about this issue?

9        A.        I believe the roll paper, as I recall it,

10  is an exploratory paper on event studies.  It doesn't come to

11  the recommendation, though, that when conducting an event

12  study, one should remove all company-specific news events.

13        Q.        How about the Thompson, Olsen, and Dietrich

14  studies listed here?  What do those say about the issue?

15        A.        As I recall, none of these papers suggest

16  the procedure that Dr. Hakala has followed.

17        Q.        So if we're talking about dummy

18  variables -- you know what a dummy variable is, right?

19        A.        Yes.  I prefer the term indicator variable,

20  but if you prefer dummy variable, I'm certainly happy to use

21  that instead.

22        Q.        Okay.  We'll say indicator variables.

23              How many indicator variables are too many?

24  Can that be answered?

25        A.        Well, that question -- again, I think



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3776
Facsimile: 561.338.9294

Suite 120
2385 NW Executive Center Drive
Boca Raton, FL 33431
www.esquiresolutions.com

Laura E. Simmons, Ph.D.                                    February 20, 2009

68

1              MR. JONES:  Can we take a short break,

2     please?

3              THE VIDEOGRAPHER:  Going off the record,

4     time indicated on the screen.

5              (Recess taken.)

6              THE VIDEOGRAPHER:  Okay.  We're now back on

7     the record, time indicated on the screen.  This is tape

8     number three.

9              You may continue.

10             MS. HURD:  Dr. Simmons -- I'm sorry, you

11    need to -- you need to say --

12             MR. JONES:  I'll just say I'm going to turn

13    the floor over to Susan Hurd.

14

15                         EXAMINATION

16

17    BY MS. HURD:

18        Q.      I just have a couple of questions,

19    Dr. Simmons.  And once again, you know me, but for the

20    record, I represent the defendants in this case.

21        A.      Right.

22        Q.      My first question for you is, you know, how

23    many times over the course of your career have you been asked

24    to perform an event study?

25        A.      Well, I would say that over the course of



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3776
Facsimile: 561.338.9294

Suite 120
2385 NW Executive Center Drive
Boca Raton, FL 33431
www.esquiresolutions.com

69

1    my, say, 12 years with Cornerstone as a researcher or many

2    years with Cornerstone Research, I have probably been asked

3    to do that in the majority of the securities cases that I've

4    worked on.  And I would put that number at somewhere between

5    dozens and a hundred cases.

6                    (Discussion off the record.)

7    BY MS. HURD:

8            Q.      Dr. Simmons, similar question:  Over the

9    course of your career, you know, how many times have you been

10   asked to look at a damages issue, perform a damages

11   calculation?

12           A.      Really, the same answer.  I would put it at

13   somewhere between dozens and a hundred cases.

14           Q.      Okay.  And in conjunction with your

15   research and consulting in litigation, have you ever had

16   occasion to apply econometrics principles?

17           A.      In almost every securities case that I have

18   worked on, and again, that would reference the numbers that

19   I've mentioned before, I've had a reason to apply econometric

20   issues.  In addition -- or to consider econometric issues.

21                   In addition, I deal with econometric issues

22   in my research, which is composed not only of my annual

23   publication on securities research, which is a professional

24   type publication, but in addition, my academic research.

25           Q.      You'll recall that Mr. Jones asked you some



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3776
Facsimile: 561.338.9294

Suite 120
2385 NW Executive Center Drive
Boca Raton, FL 33431
www.esquiresolutions.com

Laura E. Simmons, Ph.D.                    February 20, 2009

70

1   questions about calculations in your report.  How do you

2   define a calculation for purposes of your expert report?

3          A.        I was defining the term calculation to

4   refer to something that would actually require a calculator

5   to determine.  So a mathematical type calculation.

6          Q.        Right.  And just so the record's clear, can

7   you go over briefly what other work or analysis you did for

8   purposes of preparing your report, other than the

9   mathematical calculations discussed previously?

10          A.        Right.  Well, I began with a study of the

11  relevant documents in the case, which include both the legal

12  documents, as well as documents such as the analyst reports,

13  the company's own information releases, and so forth, and

14  considered that mix of information, and in addition to the

15  analysis that Dr. Hakala has performed in which I analyzed

16  the aspects in his report pertaining to his conceptual

17  points, as well as his event study analysis.

18          Q.        Thank you.

19                    We had some discussion earlier today about

20  dummy variables.  And I apologize, but I forget what the

21  term -- the preferred term was.

22          A.        Indicator variables.

23          Q.        Indicator variables.  Can you explain what

24  effect Dr. Hakala's use of indicator variables had on his

25  opinions in your opinion?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3776
Facsimile: 561.338.9294

Suite 120
2385 NW Executive Center Drive
Boca Raton, FL 33431
www.esquiresolutions.com

Laura E. Simmons, Ph.D.                          February 20, 2009

71

1    A.        Well, in particular, it affects one opinion

2    in that -- if I could just refer to his report very quickly.

3    He concludes that May 9th is a statistically significant day.

4    However, if you were to follow the conventional method of

5    conducting an event study, that particular day would not be

6    statistically significant.

7    Q.        And when you say the conventional method,

8    what are you referring to there?

9    A.        I'm referring to a method which does not

10   use dummy variables to exclude all news -- company-specific

11   news during the period, which Dr. Hakala judgmentally

12   identified, used a dummy variable to exclude them from his

13   regression.  That's the deviation from the conventional event

14   study approach, and leads to his conclusion that May 9th is a

15   statistically significant day or price movement in which, if

16   you followed the conventional method, it would not be.

17   Q.        You were asked some questions about click

18   fraud.  Can you identify for us any point during the relevant

19   time period -- and let's just pick the class period, February

20   23, 2004, through May 24, 2005 -- where the company

21   attributed any traffic removal to click fraud?

22   A.        No.  I don't believe the company attributed

23   anything to click fraud.  I believe its statements were more

24   along the lines of improving quality traffic, removing

25   dubious traffic.



ESQUIRE
an Alexander Gallo company

Toll Free: 800.211.3776
Facsimile: 561.338.9294

Suite 120
2385 NW Executive Center Drive
Boca Raton, FL 33431
www.esquiresolutions.com

Laura E. Simmons, Ph.D.                                February 20, 2009

72

1      Q.      And we had some discussion earlier about

2   how you exercised your judgment in preparing your report.

3   Can you compare and contrast for us how you exercised

4   judgment in preparing your report based on how you view

5   Dr. Hakala exercised judgment in preparing his report?

6      A.      Yes.  I exercised judgment, as I mentioned

7   before, in the selection of analyst reports to use as an

8   illustration to decide what to include in my report for the

9   benefit of the reader.  The difference between that exercise

10  of judgment and Dr. Hakala's judgment is that he applied

11  judgment in what is supposed to be a scientific analysis, one

12  that should be able to be replicated by an independent

13  researcher.  And instead, what he's done is judgmentally

14  selected days to remove from his analysis period without a

15  systematic or scientific method to determine those days.  And

16  again, that prevents an independent researcher from

17  replicating his analysis.

18                  MS. HURD:  Those are the questions that I

19  have.

20                  MR. JONES:  I have no more questions at

21  this time.

22                  THE VIDEOGRAPHER:  This deposition is

23  completed then at 12:27 p.m., time indicated on the screen.

24                  MS. HURD:  She'll -- I'm worry.  She wants

25  to read and sign.



ESQUIRE

an Alexander Gallo Company

Toll Free: 800.211.3776
Facsimile: 561.338.9294

Suite 120
2385 NW Executive Center Drive
Boca Raton, FL 33431
www.esquiresolutions.com