**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| IN RE MIVA, INC. | ) | Civil Action File |
| SECURITIES LITIGATION | ) | No. 2:05-cv-00201-FtM-29DNF |
| | ) | |

**LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION**
**TO EXCLUDE THE EXPERT OPINIONS OF SCOTT D. HAKALA**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

ARGUMENT .........................................................................................................................2

   I.    RULE 702 SETS A FLEXIBLE STANDARD ..................................................................2

   II.   DR. HAKALA'S METHODOLOGY IS RELIABLE UNDER *DAUBERT* ..................3

      A.    Dr. Hakala Considers Confounding Factors In His Analysis ...................................4

         1.   *Defendants Provide No Basis for Their Claim* ..............................................4

         2.   *Defendants Ignore Dr. Hakala's Explicit Testimony* ..................................4

         3.   *Dr. Hakala Accurately Identifies Statements as Corrective Disclosures* .....................5

      B.    Dr. Hakala's Inflationary Loss Methodology is Well-Accepted in the Academic Community and by the Courts..........................................................................6

      C.    Dr. Hakala's Trading Model is a Reliable and Accepted Method for Calculating Damages ...........................................................................................8

         1.   *Dr. Hakala Tailors His Trading Model to the Facts of the Case* ...............8

         2.   *Defendants' Reliance on* Kaufman *and* Broadcom *is Misplaced* ...........9

         3.   *Aggregate Damages Calculations Are Consistent with the PSLRA* ...........10

      D.    Dr. Hakala's Event Study is Firmly Grounded in the Academic and Peer-Reviewed Literature ..............................................................................11

         1.   *Dr. Hakala's Selection of Market and Industry Indices is Consistent With Good, Generally Accepted Practices* ...............................................11

         2.   *Dr. Hakala Properly Selects Days on Which Material Information was Released About Miva* ..............................................................................13

         3.   *Dr. Hakala's Use of Intervention Variables is Well-Accepted and Consistent With the Academic Literature* ...............................................15

   III.  DR. HAKALA'S EXPERT OPINION IS RELEVANT UNDER *DAUBERT* .............17

      A.    Dr. Hakala Limits Damages to the Class Period....................................................17

      B.    Defendants' Argument Leads to Absurd Results.....................................................19

CONCLUSION.....................................................................................................................20

Lead Plaintiffs and certified class representatives Y.P. and Sampurna Jain ("Plaintiffs") respectfully submit this Opposition to Defendants' Motion to Exclude the Expert Opinions of Scott D. Hakala.[1]  As shown below, Dr. Hakala is an eminently qualified expert witness under Federal Rule of Evidence 702 and the Supreme Court's holdings in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), and should be allowed to offer his expert opinion at trial.

## INTRODUCTION

Plaintiffs have asked Dr. Scott D. Hakala, Ph.D., CFA to perform an event study analysis in this matter in order to assist with calculations of damages and loss causation, which stem from Miva's artificially inflated share price due to the misleading statements and omissions the Company made to investors.  On November 3, 2008, Dr. Hakala submitted his Expert Report,[2] and on February 18, 2009, he was deposed in Boca Raton, Florida.[3]

Dr. Hakala's qualifications as an expert witness are remarkable.  In 1989, Dr. Hakala received his Ph.D. in Economics from the University of Minnesota, where he wrote his doctoral dissertation under the direction of Edward Prescott—the recipient of the Nobel Prize in Economics in 2004.  Hakala Dec. at ¶7.[4]  He has recently published four peer-reviewed articles on subjects such as the economics of loss causation and the valuation of distressed equity securities.  Hakala Dep. at 10:4 to 11:5.  Since 2000, he has testified in 126 cases, and his testimony has been

---

[1] On March 2, 2009, Defendants filed their Motion to Exclude the Expert Opinions of Scott D. Hakala, and their Memorandum of Law in Support.  *See* Docket No. 153.  Defendants' Memorandum  is cited herein as "Def. Mem. __."

[2] Dr. Hakala's Expert Report is attached as Exhibit C to Lead Plaintiffs' Motion *in limine* to Exclude the Testimony and Expert Report of Dr. Laura E. Simmons and Incorporated Memorandum of Law, Docket. No. 158.  Dr. Hakala's Report is cited herein as "Hakala Rep. at __."

[3] A copy of the transcript of his deposition testimony is attached as Exhibit D to Plaintiffs' Motion *in limine*, and is cited herein as "Hakala Dep. at __."

[4] On March 2, 2009, Plaintiffs filed the Declaration of Scott D. Hakala, Ph.D., CFA Regarding the Opinions of Dr. Laura E. Simmons to accompany their Motion *in limine*.  *See* Docket No. 159.  Dr. Hakala's Declaration is cited herein as "Hakala Dec. at __."

accepted by numerous courts.[5]  In addition, Dr. Hakala has had several years of extensive training in the areas of statistical analysis and econometrics.  Hakala Dec. at ¶8.

Indeed, ***Defendants do not even question Dr. Hakala's experience and qualifications on any of the subjects to which he testifies***.  They cannot.  Rather, in asking the Court to exclude his testimony, Defendants string together a series of personal attacks, deliberate and intentional mischaracterizations of the record,[6] and cherry-picked court decisions whose reasoning has been overwhelmingly rejected by the majority of courts.  Courts have repeatedly denied attempts to exclude Dr. Hakala's testimony on exactly the same or similar grounds as those put forth by Defendants here.  *See* Hakala Dec. ¶4 and n. 1-3.  For the reasons stated below, the Court should deny Defendants' motion in their entirety.

## ARGUMENT

### I.    RULE 702 SETS A FLEXIBLE STANDARD

Rule 702 of the Federal Rules of Evidence governs the admissibility of scientific and expert testimony.[7]  The Supreme Court has made clear that under the Rules, the district court performs a critical "gatekeeping" role, which requires the court to ensure that the scientific evidence admitted is both relevant and reliable.  *Daubert*, 509 at 589.  The party offering the expert "does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable."  *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999).  In performing this gatekeeping role, the district court enjoys "considerable leeway" in determining

---

[5] *Id.* at 12:11-14; *see also* Exhibit A to the Declaration of Scott D. Hakala ("Hakala S.J. Dec."), attached as Exhibit A to Plaintiffs' Opposition to Defendants' Dispositive Motion for Summary Judgment.

[6] Dr. Hakala specifically addresses Defendants' mischaracterizations of the record in several cited cases in which he has testified.  *See* Hakala S.J. Dec. ¶¶4-5.

[7] Rule 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

whether an expert's testimony is reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152

(1999). The inquiry under Rule 702 is "a flexible one" and the focus must be on the principles and

methodology used, not on the conclusions generated. *Daubert*, 509 U.S. at 594-95. The inquiry

also must be "tied to the facts" of the particular case. *Kumho Tire Co.*, 526 U.S. at 150 (citing

*Daubert*, 509 U.S. at 591).[8]

When evaluating the reliability of an expert opinion, the trial judge must assess "whether

the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that

reasoning or methodology properly can be applied to the facts in issue." *United States v. Frazier*,

387 F.3d 1244, 1261-61 (11th Cir. 2004) (quoting *Daubert*, 509 U.S. at 592-93).[9] Even though it

is the function of the district court to conduct an analysis of an expert's methodology, it is

prohibited from making ultimate conclusions as to the persuasiveness of the proffered evidence.

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

## II.    DR. HAKALA'S METHODOLOGY IS RELIABLE UNDER *DAUBERT*

Dr. Hakala prepared his event study and inflation per share analysis in conformity with

accepted practices. Moreover, Dr. Hakala cites to numerous academic and peer-reviewed

authorities that validate these methods. *See* Hakala Decl. ¶¶2-4. Despite the abundant academic

support for Dr. Hakala's analysis, Defendants attempt to label his methodology as unreliable.

---

[8] The Eleventh Circuit has articulated a general approach to this inquiry:

> Expert testimony may be admitted into evidence if: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562-63 (11th Cir. 1998).

[9] The Supreme Court has set forth at least four factors that the district court may consider: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002) (citing *Daubert*, 509 U.S. at 593-94). These factors are illustrative, and do not constitute a definitive checklist or test. *Kumho Tire Co.*, 526 U.S. at 150.

However, in so doing, Defendants have provided no authorities to suggest that Dr. Hakala's

methods are unreliable. Defendants are misguided, and do not cite to a single academic or peer-

reviewed source to support their argument.

### A.    Dr. Hakala Considers Confounding Factors In His Analysis

In his Report, Dr. Hakala points to May 5, 6, and 9, 2005 as the days on which corrective

disclosures caused Miva's stock price to plummet. Hakala Rep. at ¶30. Defendants argue that

disclosures unrelated to Miva's click fraud also occurred on each of these days, and that Dr. Hakala

did not properly exclude the effect of this confounding information. Def. Mem. 10-12. In addition

to providing no basis for their claim, Defendants' argument completely and intentionally

misrepresents the record and distorts Dr. Hakala's testimony.

### 1.    Defendants Provide No Basis for Their Claim

Nowhere in their argument do Defendants provide a basis for their claim. **Defendants do**

**not specify or explain exactly which confounding factors Dr. Hakala supposedly failed to**

**exclude**. Def. Mem. 10-12. In a naked attempt to hide this glaring inadequacy, they launch into a

completely unwarranted personal attack on Dr. Hakala's competence by suggesting that he does

not know how to exclude confounding information. Def. Mem. 11. Defendants cannot even

identify affirmatively what they believe to be significant confounding factors, nor do they establish

that any alternative factors are of such significance as to be of concern. Defendants' argument

consists of mere conclusory statements which the Court must reject.

### 2.    Defendants Ignore Dr. Hakala's Explicit Testimony

Even though Defendants refuse to identify a single piece of confounding information in

their motion, they did question Dr. Hakala about confounding information in his deposition.

Specifically, Dr. Hakala discussed the resignation of former CFO Brenda Aguis (Hakala Dep. at

59:7-10), Miva's ongoing patent lawsuit (*id.* at 64:4-7), and Miva's acquisition-related expenses (*id.* at 65:18-23). Although Defendants fail to include any supposedly confounding factors in their motion, Dr. Hakala explicitly discussed the confounding factors he analyzed and the manner in which he was able to address, include or exclude such information.[10] In addition, Dr. Hakala explained the impact of qualitative factors using an analytical reference for the confounding information. *See* Hakala Dep. At 59:11-22; 61:22 to 62:8; 63:1-7; *see also* Hakala Dec. ¶26.

### 3. *Dr. Hakala Accurately Identifies Statements as Corrective Disclosures*

Defendants also take issue with Dr. Hakala's identification of days on which corrective disclosures occurred, arguing that he has not identified any statement that constitutes a corrective disclosure. Def. Mem. 11-12. Again, Defendants' argument is purely conclusory. ***Defendants do not explain why the statements Dr. Hakala identifies as corrective disclosures are not corrective disclosures***; neither do they cite to any case law to support their assertion. Based on a simple reading of Dr. Hakala's Report and Declaration, it becomes clear that Defendants' arguments completely lack merit.

Dr. Hakala does identify corrective disclosures, and explains why these events constitute corrective disclosures. Hakala Rep. at ¶¶26-30; Hakala Dec. at ¶¶25-26. Moreover, Dr. Hakala's

---

[10] It is unsurprising that Defendants give no citation for this proposition, because it is blatantly false:

> What I did was even though some of the disclosure on 5/3 might have related to and might be partly dissipation inflation, I excluded that event entirely. And number two, *I did some financial analysis as to the reduction in revenues in the guidance and determined that the magnitude of the decline in the stock price that I was coming up with as attributable to the fraud was less than the valuation impact that would occur just from the lowering of guidance due to the removal of clients, partners who were involved in supposed click fraud or inappropriate practices. So in other words, I didn't just assume 100 percent of certain events*. I looked and said if this is the reduction in guidance, and if this reduction in guidance largely or primarily or exclusively relates to the issue of the complaint, then I would expect a certain drop in the stock price. And the drop in the stock price I'm observing over the days I'm identifying is less than that. *Therefore, I view the confounding events as already having been absorbed into the market* on— in the March 3rd event—I mean May 3rd event, or on prior days. *I also looked to see if some of the confounding events occurred previously*.

Hakala Dep. at 54:16 to 55:24 (emphases added); *see also* Hakala Rep. at ¶14.

analysis is consistent with the opinions of the majority of jurisdictions which have rejected the "mirror image" rule—a corrective disclosure need not precisely mirror an earlier misrepresentation or factual misstatement.[11]    Accordingly, Defendants' arguments completely lack merit and should be disregarded.

> **B.    Dr. Hakala's Inflationary Loss Methodology is Well-Accepted in the Academic Community and by the Courts**

Despite Dr. Hakala's extensive citations to the academic literature for his inflationary loss analysis[12] (Hakala Rep. ¶¶31-41 and footnotes), Defendants would somehow have the Court believe that his methodology is unreliable.  Def. Mem. 12-13.  Specifically, Defendants claim that Dr. Hakala's backwardization technique incorrectly incorporates the entire price decline of Miva's stock during the Class Period into the percentage of artificial inflation due to Miva's click fraud, even though some of the decline cannot be attributed to the fraud.  Def. Mem. 13.  However, even a casual reading of Dr. Hakala's Report reveals that Defendants' arguments are simply not true.  *See* Hakala Dec. ¶¶19-23; Hakala S.J. Dec. ¶¶1-3.[13]  Defendants' conclusory citations to *Dura* for the proposition that a plaintiff may not recover merely for a decline in stock price are meaningless,

---

[11]    *In re Williams Sec. Litig. – WCG Subclass*, 2009 U.S. App. LEXIS 3032 *25 (10th Cir. 2009) ("To be corrective, the disclosure need not precisely mirror the earlier misrepresentation. . ."); *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 543-44 (N.D. Ill. 2007) (rejecting "Defendants' rigid proposed rule, requiring that a corrective disclosure invariably must, on its face, specifically identify or explicitly correct a previous representation, or expressly disclose the particular fraudulent scheme the plaintiff alleges.").

[12] This damages measure is also referred to as the "out of pocket" rule.  Hakala Rep. at ¶32 n.27.  Defendants refer to it in their motion as "constant inflation percentage."

[13] *See also* Hakala Rep. at ¶33:

> I divide the total investment loss realized on a share purchased during the Class Period into two parts: (i) that portion of the investment loss that is due primarily to forces and events that would have occurred regardless of any wrongful acts and omissions, and (ii) that portion of the investment loss that relates to the inflation in the share price being dissipated and, therefore, is solely attributable to the allegations of wrongful acts and omissions (as evidenced by the market's reaction to the disclosure, or materialization, of the previously concealed or understated risk of the relevant truth).

because Dr. Hakala has in fact segregated the stock price decline due to Miva's fraud from the stock price decline due to other factors.

Incredibly, ***Defendants do not cite to a single peer-reviewed, academic publication that contradicts Dr. Hakala's methodology***. Instead, Defendants rely on a single district court case, *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195 (N.D. Okla. 2007), and conclusory citations to *Dura*.[14] However, Dr. Hakala testified in a related matter in *Williams* using the same concepts and methods he employed in this case to estimate inflation per share and per share damages. *See* Hakala Dec. ¶5. Indeed, Dr. Hakala's testimony was not stricken in *Williams* and, in fact, the court in *In re Williams Cos. Sec. Litig.*, Case No. 02-cv-72-SFP (FHM) (N.D. Okla. Feb. 9, 2007) approved a plan of allocation based on Dr. Hakala's event study and financial analyses.

Moreover, Defendants do not cite to a case other than *Williams* to buttress their argument, even though they claim "other courts" have disapproved of the inflationary loss method. Def. Mem. 13. Indeed, *Williams* is clearly a distinguishable minority decision, and the same backwardization and inflationary loss methodology Dr. Hakala used in this case has been routinely accepted by other courts.[15]

---

[14] Defendants also cite to their own expert's report once (Simmons Rep. at ¶¶43-45), which in turn relies on the same decision. Indeed, Defendants' argument appears to be nothing more than a regurgitation of a portion of their experts' own discredited report. Simmons Rep. at ¶¶40-45.

[15] *See In re Tyco Int'l, Ltd.*, 535 F. Supp. 2d 249 (D.N.H. 2007) (approving the use of a backwardization and inflationary loss methodology); *In re Broadcom Corp. Sec. Litig.*, 2005 U.S. Dist. LEXIS 41976 **11-16 (C.D. Cal. 2005) (rejecting argument that a formula utilizing "artificial inflation per share on the date of purchase" violates *Dura*); *In re Cigna Corp. Sec. Litig.*, 459 F. Supp. 2d 338, 350 (E.D. Pa. 2006) ("[A]n investor's proximate 'economic loss' is the actual amount that is attributable to the unrecovered inflation in the purchase price."); *In re Royal Dutch/Shell Transp. Sec. Litig.*, 404 F. Supp. 2d 605, 610 (D.N.J. 2005) ("[C]ourts generally had determined that the proper measure of damages in a 10(b) action is 'out-of-pocket losses.' The out-of-pocket rule permitted a purchaser to recover the difference between the purchase price and the true value of the securities absent the alleged fraud as measured by the correction in the market price following curative disclosure; i.e., the price paid minus the inflation attributable to the defendants' alleged wrongful acts."); *Rowe v. Marietta Corp.*, 1999 U.S. App. LEXIS 189 **11-12 (6th Cir. 1999) (approving district court's use of the out of pocket method to calculate damages).

Additionally, the inflationary loss methodology has been widely accepted in the relevant academic literature.[16]  Indeed, neither Defendants nor their expert have produced a single academic source that questions or contradicts Dr. Hakala's methodology.  In stark contrast, Dr. Hakala has cited to numerous academic and peer-reviewed sources that endorse the methodology he uses.  Because Dr. Hakala's inflationary loss methodology meets the requirements of *Daubert*, the Court should reject Defendants' arguments.

### C.    Dr. Hakala's Trading Model is a Reliable and Accepted Method for Calculating Damages

Defendants take issue with the trading model Dr. Hakala uses, characterizing it as unreliable.  Def. Mem. 14-16.  In what has become a common pattern, ***Defendants cite to no academic literature that questions or contradicts the model Dr. Hakala uses in this case***.  Instead, in an attempt to shift the Court's focus away from this glaring defect, Defendants blatantly and deliberately misrepresent the actual model Dr. Hakala uses, and focus on other cases that have rejected trading models which have absolutely nothing to do with this case.

### 1.    Dr. Hakala Tailors His Trading Model to the Facts of the Case

Defendants claim that Dr. Hakala did not prepare a specific trading model for this case.  Def. Mem. 14.  However, this claim completely ignores the steps Dr. Hakala took in applying his trading model to the facts, including allocating insider trades over time based on trading volume, allocating changes in short position based on trading volume, and allocating daily changes in

---

[16]  *See, e.g.*, John Finnerty & George Pushner, *An Improved Two-Trader Model for Estimating Damages in Securities Fraud Class Actions*, 8 Stanford J.L. Bus. & Fin. 213, 218-27 (2003) (discussing using the "backwardation method" based on percentage returns, not absolute dollar changes); Michael Barclay & Frank Torchio, *A Comparison of Trading Models used for Calculating Aggregate Damages in Securities Litigation*, 64 Law & Contemp. Probs. 105, 105-06 (2001) ("In general, damages per share are calculated as the artificial inflation when the shares were purchased minus the artificial inflation when the shares were sold."); *see also* Hakala Rep. at ¶¶31-41 and notes; Hakala Dec. at ¶¶19-23 and notes.

institutional holdings based on reported levels of daily trading volume relative to quarterly trading volume. Hakala Rep. at ¶¶42-48 and notes.

        **2.**        ***Defendants' Reliance on* Kaufman *and* Broadcom *is Misplaced***

In support of their assertion that trading models "of the type used by Hakala" are unreliable (Def. Mem. 14), Defendants cite to *Kaufman v. Motorola*, 2000 U.S. Dist. LEXIS 14627 (N.D. Ill. 2000), and *In re Broadcom Corp. Sec. Litig.*, 2005 U.S. Dist. LEXIS 44424 (C.D. Cal. 2005). Defendants' reliance on each of these cases is wholly misplaced, which becomes manifest upon even a cursory reading of the courts' respective opinions.

In *Kaufman*, the court did preclude the expert witness from testifying as to his opinion on aggregate damages. 2005 U.S. Dist. LEXIS 14627, at *7. However, the court explained that the expert witness "employed the ***proportional trading model*** to determine aggregate damages . . . ." *Id.* at *2 (emphasis added). It was the proportional trading model that the court found did not satisfy *Daubert*. *Id.* at *5. ***Dr. Hakala does not use the proportional trading model in this case***.

Rather, Dr. Hakala "prepared an analysis of aggregated damages applying NERA's ***multi-trader model*** for determining aggregate damages." Hakala Rep. at ¶46 (emphasis added).[17] Indeed, the multi-trader model provides "a more accurate method of calculating the damages to shareholders resulting from securities fraud" and satisfies the *Daubert* standard for admissibility of expert testimony "because it is consistent with the available empirical evidence on shareholder trading behavior, it has been peer reviewed, the error rate can be quantified, and the underlying theory is more widely accepted among financial economists than the theories on which the alternative models are based." *See* Finnerty & Pushner at 251.

---

[17] The multi-trader model is set forth in *Best-Fit Estimation of Damaged Volume in Shareholder Class Actions: the Multi-Sector, Multi-Trader Model of Investor Behavior*, Marcia Kramer Mayer, NERA Rep. (Oct. 2000).

Moreover, the very papers Dr. Hakala relies upon for his trading model specifically reject the proportional trading model. *Id.* at 1. Defendants' attempts to suggest Dr. Hakala uses the proportional trading model—when in fact the paper he relies upon specifically rejects the proportional trading model—is nothing more than a blatant and deliberate misrepresentation of the record.

Defendants also rely on *Broadcom*, quoting it wholly out of context. Their reliance on this case is equally inapposite. While the court in that case opted to use a claims administration process, it chose to do so "under the ***unique circumstances*** of [that] particular case." *Broadcom*, 2005 U.S. Dist. LEXIS 44424, at \*\*2-3 (emphasis added).[18] The court refers to the "unique circumstances" which prompted its decision six times throughout the course of its opinion. Nowhere do Defendants assert or even imply that similar "unique circumstances" are present in this case which would warrant a proof of claims process. Moreover, the court recognized that:

> Proof by the ***aggregate approach is the traditional method, and so it is usable in a PSLRA case, unless it is shown to be unreliable and a more accurate method is available***. There is no hard-and-fast rule on the use of aggregate damages, and the determination whether that method is appropriate is governed by considerations of economy, fairness, and other equitable considerations.

*Id.* at \*7 (internal citations omitted) (emphasis added). Here, Defendants have failed to show that Dr. Hakala's model is unreliable or that a more accurate method of determining damages exists. Moreover, Dr. Hakala's multi-trader model is soundly based in the academic literature. Hakala Rep. at ¶¶42-48 and notes.

### 3.     Aggregate Damages Calculations Are Consistent with the PSLRA

In their final desperate attack on Dr. Hakala's trading model, Defendants argue that it violates the PSLRA. Def. Mem. 15-16. Defendants cite to a single case, *Bell v. Fore Sys.*, 2002

---

[18] The "unique circumstances" to which the court refers include particular offsets and claims with regard to damages for claims in options which are not present in this action.

U.S. Dist. LEXIS 27871 (W.D. Pa. 2002). Specifically, Defendants argue that *Bell* determined that

the provision on limitation of damages of the PSLRA, 15 U.S.C. § 78u-4(e), mandates

individualized damages for each plaintiff, not aggregate damages. Def. Mem. 15-16.

Again, Defendants cite to no more than a single district court case—a case which explicitly

acknowledged that "there is a substantial ground for differences of opinion" regarding its holding.

*Bell*, 2002 U.S. Dist. LEXIS 27871, at *17. This "substantial ground for differences of opinion"

exists because, as the court itself acknowledges, its holding is "at odds with current litigation

practices." *Id.* The court's holding is so "at odds with current litigation practices" that numerous

subsequent opinions have explicitly rejected it.[19] Indeed, a subsequent opinion *in the same district*

rejected *Bell*'s erroneous holding. *See In re Rent-Way Sec. Litig.*, 218 F.R.D. 101, 119 (W.D. Pa.

2003) ("Plaintiffs have satisfied the Court that they will be able to present a workable framework

for determining aggregate damages and price inflation at time of trial."); *see also* Hakala S.J. Dec.

¶5. Accordingly, the weight of authority firmly supports the holding that aggregate damages

calculations are consistent with the PSLRA.

**D.      Dr. Hakala's Event Study is Firmly Grounded in the Academic and Peer-Reviewed Literature**

**1.      *Dr. Hakala's Selection of Market and Industry Indices is Consistent With Good, Generally Accepted Practices***

Defendants take issue with the methodology Dr. Hakala uses to construct his market and

industry indices, believing that he employs an "unscientific method." Def. Mem. 17-18. However,

---

[19] *See In re Oxford Health Plans, Inc. Sec. Litig.*, 244 F. Supp. 2d 247, 251 (S.D.N.Y. 2003) ("The decision in *Bell* conflates 'plaintiff' with 'absent class member represented by plaintiff' . . . There is no basis to do this); *In re Broadcom Corp. Sec. Litig.*, 2005 U.S. Dist. LEXIS 44424, at *7 (C.D. Cal. 2005) ("After review of the PSLRA, the Court concludes the statute neither requires nor prohibits proof of aggregate damages . . . . Proof by the aggregate approach is the traditional method, and so it is usable in a PSLRA case."); *In re Worldcom, Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 2216, at *25 (S.D.N.Y. 2005) ("The Underwriter Defendants have not shown that an aggregate damages award should not be made by a jury. Aggregate damages awards are a standard practice in securities cases. Before and after the enactment of the PSLRA, absent class members in securities fraud cases have been awarded a common fund of damages computed by the trier of fact, based usually on expert testimony.").

***Defendants do not cite to a single scientific article that contradicts or questions the methodology Dr. Hakala uses for constructing the indices***.  Nor do Defendants explain which companies are incorrectly included or what companies they would or would not have included instead.

At his deposition, Dr. Hakala testified extensively as to the exacting steps he took to construct the indices he used.  Dr. Hakala details the relevant academic and valuation literature guiding him, which discusses the selection of guideline companies.  Hakala Dep. at 36:23 to 38:24; 39:14 to 40:16.  Dr. Hakala further specifies that he reviewed analyst and news reports to identify the companies that are comparable to Miva.  *Id.* at 35:2 to 36:10.  Dr. Hakala further explains why S&P credit ratings are not necessarily an indication of whether companies are comparable for purposes of creating an index (*id.* at 38:25 to 39:13); that market capitalization is typically not a factor when selecting companies, but when it is, it is usually a weak factor (*id.* at 43:10 to 44:8); how betas can be used to determine appropriate index companies (*id.* at 44:20 to 46:1); and that the percentage of institutional holders is a weakly-considered factor in selecting companies (*id.* at 46:2 to 47:1).

Defendants allege that Dr. Hakala has not provided "the details of the price movement analysis" of the companies included in the indices he constructed.  Def. Mem. 17.  This is blatantly false.  In fact, Dr. Hakala produced to Defendants the price data, returns spreadsheets, statistical regression analyses and analyst reports for the companies he included in the indices he constructed as well as the companies he considered and rejected.  Simply because Defendants chose not to review the data Dr. Hakala provided to them does not mean that it does not exist.  Hakala Dec. at ¶11.  Defendants further complain that Dr. Hakala provides no explanation for why he rejected

12

certain companies from the indices he constructed. Def. Mem. 17. Defendants' argument is based

on nothing other than deliberate disregard of Dr. Hakala's extensive deposition testimony.[20]

### 2.    *Dr. Hakala Properly Selects Days on Which Material Information was Released About Miva*

Defendants claim that Dr. Hakala's selection of the "event days"[21] in his event study are

subjective and not based on any economic standards. Def. Mem. 18-19. Continuing their pattern

of making arguments that wholly lack any sort of substantive foundation, ***Defendants cite to no***

***academic, peer-reviewed authority that contradicts or questions Dr. Hakala's methodology for***

***selecting event days***. Indeed, Defendants' argument evinces a fundamental misunderstanding of

how event studies are constructed and performed. *See* Hakala Dec. ¶¶9-18; Hakala Rep. ¶14-16, n.

4-10.

Defendants claim that Dr. Hakala provides no information regarding the methodology he

uses to identify event days in his study. Def. Mem. 18. This claim is patently false. Dr. Hakala

provides citations to six different academic and peer-reviewed papers that support his

methodology. Hakala Rep. at ¶14, n.4. Defendants do not, and cannot, provide a single source

that disagrees with these sources Dr. Hakala has cited.

Defendants take issue with the actual days on which Dr. Hakala identified material

information, believing them to be arbitrary and based on his opinion. Def. Mem. 18. First, even

---

[20] For example, Dr. Hakala excluded Jupitermedia and Local.com due to the fact that those companies did not trade during the time of his study and for other peculiarities. Hakala Dep. at 50:15-19. Google was not included in the indices because of the timing of its IPO. *Id.* at 51:21-22. Other companies were excluded either because Dr. Hakala did not have consecutive price sequence data throughout the entire study period, or because the price data was inadequate. *Id.* at 50:22 to 51:1; 70:11-15. *See also* Hakala Rep. at ¶18 ("The aforementioned rejected indices and companies failed to provide a significant incremental explanation of the returns from MIVA's shares over the Study Period because they were redundant with the selected indices, too specialized or had too many company-specific events to be appropriate for an index applicable to MIVA."). Notably, while Defendants (incorrectly) complain that Dr. Hakala provides no explanation for why he excluded certain companies, Defendants do not even suggest that a single company was incorrectly excluded from the indices he created.

[21] While Defendants refer to "event days," Dr. Hakala more precisely speaks of days on which he identified material information. Hakala Rep. at ¶14.

while making this claim, Defendants do not question a single day on which Dr. Hakala identified

material information.  They do not argue that certain days should be excluded from Dr. Hakala's

event study, nor do they argue that Dr. Hakala incorrectly included other days.

Second, Dr. Hakala's identification of days on which material events occurred is not as

arbitrary as Defendants would have the Court believe.  Dr. Hakala did not, as Defendants imply,

come up with his own definition of "materiality."  Instead, as a foundation for the identification of

material information, Dr. Hakala used the NASDAQ guidelines, as recognized by the Securities

and Exchange Commission.[22]  Building on these guidelines, Dr. Hakala employed third party news

and analyst reports, all consistent with the academic literature.  Hakala Rep. at ¶14 n.6.

Third, Defendants plainly ignore the large amounts of academic literature on this point,

which clearly recognizes that the process of selecting days on which material information is

released calls for some exercise of informed judgment.[23]  Defendants believe the fact that Dr.

Hakala did not identify material information on March 16, 2005 is indicative of his purportedly

arbitrary methodology.  Def. Mem. 18-19.  On March 16, 2005, Plaintiffs allege that Miva made

false statements or omissions in the Form 10-K it filed with the SEC.  Conforming Am. Compl.

¶¶89-96 (Docket No. 108).  Even disregarding the previous discussion of why Dr. Hakala's

---

[22] *See Self-Regulatory Organizations, Notice of Filing of Proposed Rule Change by the National Association of Securities Dealers, Inc. Relating to Issuer Disclosure of Material Information*, 67 Fed. Reg. 51,306-51,310 (Aug. 7, 2002); Hakala Rep. at ¶14 n.6; *In re Omnicom Group, Inc. Sec. Litig.*, Case No. 02 Civ. 4483, (S.D.N.Y. Aug. 24, 2007), Transcript of Proceedings, pp. 28-33 (p. 31 "Relying on public information including a list of probable material events set forth by NASD, Dr. Hakala used his experience and judgment to evaluate the materiality of the disclosures made on each day he chose to exclude…. The fact that Dr. Hakala performed an event study that relied in part on his exercise of judgment is not a ground for excluding his testimony. . . . For the foregoing reasons, the defendant's motion to exclude the proposed expert testimony of Dr. Hakala [with respect to event study methodology and the calculation of inflation per share] is denied.")

[23] *See, e.g.*, Frank J. Fabozzi, Sergio M. Focardi & Petter N. Kolm, *Financial Modeling of the Equity Market: From CAPM to Cointegration* 431-32 (Wiley 2006) ("[A]ny process of model selection must start with strong economic intuition. . . . Economic intuition clearly entails an element of human creativity. As in any other scientific and technological endeavor, it is inherently dependant on individual abilities."); John Y. Campbell, Andrew W. Lo & A. Craig MacKinlay, *The Econometrics of Financial Markets* 524 (Princeton Univ. Press 1997) ("These considerations may be in the form of well-articulated mathematical models of economic behavior, or behavioral models motivated by psychological phenomena, or simply heuristic rules of thumb based on judgment, intuition, and past experience. . . .").

methodology is not arbitrary, Defendants' argument is misguided. Indeed, Dr. Hakala specifically explained that he did not include information released on March 16 in his event study because that information had already been released to investors three weeks previously and was already reflected in Miva's stock price—consistent with an efficient market. *See* Hakala Dep. at 30:3-11.

Defendants suggest that this information was not material because the Company's stock price did not move and Miva was trading in an efficient market. This argument is completely inaccurate and illogical. The information released on March 16, 2005 was materially false and misleading and kept the Company's stock price artificially inflated. Accordingly, this information was material not because it moved the stock price, but because it reinforced materially misleading information previously released, causing the stock price to remain inflated and preventing a stock price drop.[24]

### 3.    Dr. Hakala's Use of Intervention Variables is Well-Accepted and Consistent With the Academic Literature

In their last, desperate attack on Dr. Hakala's methodology, Defendants argue that he uses an excessive amount of "dummy variables."[25] Def. Mem. 19-21. Yet again, Defendants do not cite to a single academic or peer-reviewed authority to support their argument or to establish criteria for acceptance of their argument. Instead, to support their proposition, Defendants cite to *In re Xcelera.com Sec. Litig.*, 2008 U.S. Dist. LEXIS 77807 (D. Mass. 2008), an opinion which is distinguishable in that Dr. Hakala included all news events and relied on bulletin board postings as news events in order to find sufficient variables for a company that was not widely covered. Here,

---

[24] *See In re Scientific-Atlanta, Inc. Secs. Litig.*, 571 F. Supp. 2d 1315, 1340-1341 (N.D. Ga. 2007) ("Contrary to Defendants' argument, the mere absence of a statistically significant increase in the share price in response to fraudulent information does not 'sever the link' between the material misstatements and the price of the stock. Rather, price stability may just as likely demonstrate the market consequence of fraud where the alleged fraudulent statement conveys that the company has met market expectations, when in fact it has not."); *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 352 (3d Cir. N.J. 2009) (finding that the lack of stock price movement after an announcement "does not negate the finding of materiality").

[25] "Dummy variable" is another term for "intervention variable."

Dr. Hakala uses intervention variables only on patently material news events and in just 104 out of 555 trading days, or 18.74%. Def. Mem. 20 n.10. This use is well within the parameters contemplated by the academic literature.

For example, in 1988, Richard Roll performed an empirical investigation on the actual price movements of individual common stocks as influenced by the broader economy, industry factors, and specific news events. Richard Roll, *$R^2$*, 43 J. Fin. 541 (1988). His study consisted of ninety-six publicly traded companies, for which he used the Dow-Jones News Retrieval System to gather news events appearing in *The Wall Street Journal* and on the Dow-Jones news wire. *Id.* at 542, 549. Roll writes that, "[o]n average over all ninety-six stocks, ***23.7 percent*** of the daily observations were excluded by being either the day of a news event or the preceding day." *Id.* at 558 (emphasis added).[26]

Furthermore, the proper test for the assertion of including "an excessive number of dummy variables" is the F-test.[27] Performing an F-test for the intervention variables he chose, Dr. Hakala found statistical significance at the 99.9% confidence level. Hakala Dec. at ¶15. Neither Defendants nor their expert have provided the Court with an F-test to support their conclusory argument that Dr. Hakala used too many intervention variables.

In sum, Dr. Hakala provides voluminous citations for his methodology to recognized scholars in the fields of econometrics, finance, and statistics in both his Report and his Declaration. While Defendants challenge his methodology, they do not provide a single academic, peer-

---

[26] *See also* Robert B. Thompson II, Chris Olsen & J. Richard Dietrich, *The Influence of Estimation Period News Events of Standardized Market Model Prediction Errors*, 63 Acct. Rev. 448 (1988) (identifying and controlling for all company-specific events found in *The Wall Street Journal* Index on 12.3% of trading days for a set of 2,358 selected stocks traded on the New York Stock Exchange and the American Stock Exchange); Nihat Aktas, Eric de Bodt & Jean-Gabriel Cousin, *Event Studies With a Contaminated Estimation Period*, 13 J. Corp. Fin. 129, 139 (2007) (using the "manually filtered approach" of Thompson et al. (1988) as a benchmark against which to test other models).

[27] "An observation-specific dummy is a dummy variable that takes on the value of one for a specific observation and zero for all other observations. . . . An *F* test would be used to test if several observations could be considered consistent with the estimated equation." Peter Kennedy, *A Guide to Econometrics* 253-54 (MIT Press 5th ed. 2003).

16

reviewed, or scholarly source to support their argument. Neither do Defendants challenge a single source that Dr. Hakala has cited. *Daubert* commands that district courts must perform "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid." 509 U.S. at 592-93. Defendants have failed to produce a single scientific source that challenges the validity of Dr. Hakala's methodology or offers an alternative that would invalidate its conclusions.[28] As a result, the Court should reject Defendants' argument and admit Dr. Hakala's expert testimony.

### III. DR. HAKALA'S EXPERT OPINION IS RELEVANT UNDER *DAUBERT*

#### A. Dr. Hakala Limits Damages to the Class Period

Defendants believe that Dr. Hakala's testimony should not be admitted because his event study considers statements made prior to the beginning of the class period. Def. Mem. 6. This claim is absurd. ***Defendants do not point to any portion of Dr. Hakala's Report or deposition testimony where he states that events prior to February 23, 2005 form the basis for his damages calculations***. Indeed, Dr. Hakala makes explicit in his Report that "[d]amages for 10b-5 purposes are restricted such that ***only shares purchased during the Conforming Period*** [*i.e.*, the class period] and held until at least May 4, 2005 are entitled to damages." Hakala Rep. at ¶42 (emphasis added).

Dr. Hakala also makes this point unmistakably clear in his deposition testimony. *See* Hakala Dep. at 15:20-23. Moreover, Dr. Hakala specifically states that he assumes the first actionable statements were made on February 23, 2005, consistent with the Court's previous orders. Hakala Rep. at ¶5(b). Defendants' theory that Dr. Hakala somehow calculated damages

---

[28] *See In re Parmalat Sec. Litig.*, 2008 U.S. Dist. LEXIS 64296 (S.D.N.Y. Aug. 20, 2008) (finding that "plaintiffs' strongest support for market efficiency is provided by Dr. Hakala's equity event study", and noting that defendants' expert "did no event study to show how Dr. Hakala's analysis would have differed had the claimed flaws in his work been corrected."); *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 185 (S.D.N.Y. 2008) (finding that defendants have "not shown that Dr. Hakala's methodology is incapable of proving loss causation on a class-wide basis.").

based on inactionable statements is based on nothing more than a complete and blatant disregard of his Report and deposition testimony.

In its March 15, 2007 Order, the Court ruled that "Plaintiffs allege that these statements [in the February 23, 2005 conference call] are *false* because the fraudulent revenue sources were not removed . . . . The Court finds these allegations to be sufficient."  March 15 Order at 28 (Docket No. 91) (emphasis added).  Because the Court found that Plaintiffs adequately alleged that a false and misleading statement or omission occurred on February 23, Dr. Hakala did not treat the statements on that day as a partially corrective disclosure.[29]

Since Dr. Hakala treats February 23, 2005 as a day on which false statements or omissions were made, and not a day on which a corrective disclosure was announced, the true value percent does not change.  *Id.*; Hakala Rep. Ex. B-1.  In other words, had a corrective disclosure been made on February 23, the true value percent of the stock would necessarily have changed because the corrective disclosure by definition would be removing the artificial inflation of Miva's stock.  But because the Plaintiffs and the Court speak of a false statement or omission occurring on February 23, this false statement or omission is preventing Miva's stock from trading at its true, non-artificially inflated value, as illustrated by the following chart (reproduced from Hakala Rep. Ex. C-2.):

---

[29] *See also* Hakala S.J. Dec. ¶3.



The Value Line represents the price at which Miva's stock would have traded if not for the artificial inflation. Hakala Rep. at ¶9. The Miva line represents the price Miva's stock actually traded at, which includes the artificial inflation. As one can clearly see from Dr. Hakala's chart, the false statements or omissions made on February 23, 2005, while causing Miva's stock price to fall, *prevented it from falling to the price it should have been trading at*. This is the essence of Plaintiffs' allegations—that on February 23, Defendants made false statements or omissions that caused Miva's stock price to be artificially inflated, allegations which the Court has found to be sufficient. March 15 Order at 28.

### B.    Defendants' Argument Leads to Absurd Results

When taken to its logical conclusion, Defendants' argument becomes absurd and leads to anomalous results. In its March 15 Order, the Court concluded the Plaintiffs sufficiently pled the basis for their beliefs that the statements made on February 23, 2005 and March 16, 2005 were false and misleading or omitted material information concerning click fraud. March 15 Order at

19

28, 31-32.[30]  The Court concluded that "these two paragraphs, read in conjunction with others

spread throughout the Amended Complaint, satisfy the requirements of 15 U.S.C. § 78u-4(b)(4)."

March 15 Order at 33.[31]

Various class members invested in Miva's stock between February 23 and May 4, 2005

believing these two false and misleading statements or omissions to be true.  When the corrective

disclosures came to light in May 2005, the value of these class members' investments in Miva was

decimated.  Defendants are actually arguing that even if the Defendants publicly acknowledged

making material misrepresentations and omissions about the quality of Miva's traffic during the

Class Period, these defrauded class members cannot recover damages because Miva's stock price

was already inflated at the beginning of the class period.  Such an argument is completely contrary

to the Federal Securities laws and should be rejected by the Court.

## CONCLUSION

As shown above, Dr. Hakala's methodology is soundly based in the academic and peer-

reviewed literature, and his opinion is clearly relevant to the facts in issue.  For these reasons,

Plaintiffs respectfully request that this Court reject Defendants' Motion to Exclude the Expert

Opinions of Scott D. Hakala in its entirety.

---

[30] In their Complaint (¶¶140, 142 [Docket No. 108]), Plaintiffs allege:

> At the time of said misrepresentations and omissions [on February 23, 2005 and March 16, 2005], Lead Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of MIVA, which were not disclosed by these Defendants, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their MIVA securities during the Class Period, or, if they had acquired such securities during the Class Period, *they would not have done so at the artificially inflated prices which they paid.* . . .

> As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.  (Emphasis added).

[31] The Court never explicitly states which "other[]" paragraphs satisfy the loss causation requirement, although it does use paragraph 101 (describing Miva's plummeting stock price on May 3, 2005) as an example.  March 15 Order at 33.

DATED: March 19, 2009                    Respectfully submitted,

                                         **SAXENA WHITE P.A.**

                                         By: */s/ Christopher S. Jones*
                                                 Maya Saxena
                                                 Florida Bar No. 0095494
                                                 Joseph E. White III
                                                 Florida Bar No. 0621064
                                                 Christopher S. Jones
                                                 Florida Bar No. 306230
                                                 Lester Hooker
                                                 Florida Bar No. 0032242
                                                 2424 North Federal Highway
                                                 Suite 257
                                                 Boca Raton, FL 33431
                                                 Tel.: (561) 394-3399
                                                 Fax: (561) 394-3382

                                         **Lead Counsel for Lead Plaintiffs**

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

|  |  |  |
|---|---|---|
| IN RE MIVA, INC. | ) | Civil Action File |
| SECURITIES LITIGATION | ) | No. 2:05-cv-00201-FtM-29DNF |
|  | ) |  |

**CERTIFICATE OF SERVICE**

I certify that on March 19, 2009, I electronically filed the foregoing Lead Plaintiffs'

Opposition to Defendants' Motion to Exclude the Expert Opinions of Scott D. Hakala with the

Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all

registered users.

_/s/ Christopher S. Jones_
Christopher S. Jones
Florida Bar No. 306230