# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FT. MYERS DIVISION

IN RE:

MIVA, INC., Securities Litigation

Case No.  2:05-cv-201-FtM-29DNF

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

    This cause came on for consideration on the following motion filed herein:

| | |
|---|---|
| **MOTION:** | **MOTION FOR SUMMARY JUDGMENT (Doc. No. 155)** |
| **FILED:** | **March 2, 2009** |
| | |
| **THEREON** it is **RECOMMENDED** that the motion be **GRANTED**. | |

    The Defendants are requesting the Court to enter summary judgment alleging no genuine issue as to any material fact relating to the elements of damages and loss causation.  The Plaintiffs assert that the Defendants are not entitled to judgment as a matter of law.

### I.  Undisputed Facts

This case is a securities fraud class action brought by investors in FindWhat.com, Inc.

("FindWhat") against the corporation and three of its officers or former officers.[1]  The operative complaint is the Plaintiffs' Conforming Amended Consolidated Class Action Complaint (Doc. 108) filed on May 3, 2007.  FindWhat is an Internet Company which provides "pay-per-click" or keyword-targeted advertising services.  (Com.[2] ¶2).  The Plaintiffs alleged that eleven of the Defendants' public statements made between September 3, 2003 and March 16, 2005 were false or misleading.  In an Opinion and Order (Doc. 91) entered on March 15, 2007, the Honorable John E. Steele, United States District Judge found that Plaintiffs had adequately plead two of the eleven statements to survive a motion to dismiss.  The first statement occurred on February 23, 2005, in which some of the Defendants participated in a conference call. (See, Doc. 91, p. 27-28).  The second statement is included in the Form 10-K which was filed with the SEC on March 16, 2005, for the year ending December 31, 2004.  (See, Doc. 91, p. 28-29).  On March 12, 2008, Judge Steele entered an Opinion and Order (Doc. 139) granting class certification certifying that the class consisted "of all persons who purchased the common stock of FindWhat.com between February 23, 2005 and May 4, 2005," and naming the class representatives.  (See, Doc. 139, p. 23).  Judge Steele stated in this Order that "[t]he Court has already ruled that all statements prior to the February 23, 2005 conference call were not actionable and thus no basis for liability exists for any statements made prior to February 2005."  (Doc. 139, p. 4).

---

[1]  On June 6, 2005, FindWhat.com, Inc. changed its name to Miva, Inc.

[2]  "Com." refers to the Plaintiffs' Conforming Amended Consolidated Class Action Complaint.  (Doc. 108) filed on May 3, 2007.

## II.  Standard for Summary Judgment

Under Fed.R.Civ.Pro. 56(c) a motion for summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The burden of establishing the absence of a genuine material fact is on the moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An issue is "genuine" if there is sufficient evidence such that a reasonable jury could return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A fact is "material" if it may affect the outcome of the suit under governing law.  *Id.*

Once this burden is met the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'"  *Celotex Corp.*, 477 U.S. at 324, *Rice-Lamar v. City of Ft. Lauderdale, Fla.*, 232 F.3d 836, 840 (11th Cir. 2000).  In order to avoid the entry of summary judgment, a party faced with a properly supported summary judgment motion must come forward with extrinsic evidence, i.e., affidavits, depositions, answers to interrogatories, and/or admissions, which are sufficient to establish the existence of the essential elements to that party's case, and the elements on which that party will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322, *Hilburn v. Murata Elecs. N. Am., Inc.* 181 F.3d 1220, 1225 (11th Cir. 1999). When the nonmoving party fails to make a sufficient showing of an essential element of the case to which the nonmoving party has the burden of proof, the moving party is entitled to a judgment as a matter of law. *Anderson*, 477 U.S. 248.

In making this determination, the Court must view all of the evidence in a light most favorable to the non-moving party and resolve all reasonable doubts in that party's favor. *Johnson v. Booker T. Washington Broad. Servs., Inc.* 234 F.3d 501, 507 (11th Cir. 2000), *Samples on Behalf of Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988). The Court does not weigh conflicting evidence or make credibility determinations. *Hilburn,* 181 F.3d at 1225 (11th Cir. 1999). "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." *Tullius v. Albright,* 240 F.3d 1317, 1320 (11th Cir. 2001), (citing, *Clemons v. Dougherty County*, 684 F.2d 1365, 1369 (11th Cir. 1982)).

### III.  Loss Causation and Economic Loss

The Motion for Summary Judgment is limited to one issue, whether the Plaintiffs have shown as a matter of law the required elements of loss causation and damages in this case. To establish loss causation and damages, the Plaintiffs have provided the expert opinion of Scott D. Hakala, Ph.D., CFA. The Defendants argue that assuming that Dr. Hakala's opinions are admissible,[3] the Defendants will show as a matter of law, that Dr. Hakala failed to show loss causation and damages for the two statements that remain in the case.

The Securities Exchange Act provides in part as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange – . . .
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or

---

[3] In other motions in the case, the Defendants argue that Dr. Hakala's opinion are not admissible. However, for the purposes of summary judgment only, the Court will consider the opinions of Dr. Hakala.

deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. §78(j).  The Security Exchange Commission ("SEC") promulgated the following rules:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
    (a) To employ any device, scheme, or artifice to defraud,
    (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
    (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. §240.10b-5.

In a typical action filed under 10b-5, a plaintiff must prove the following: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.,* 552 U.S. 148,  128 S.Ct. 761, 768 (2008). Loss causation is defined as "a causal connection between the material misrepresentation and the loss." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  The Security Exchange Act "expressly imposes on plaintiffs 'the burden of proving' that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover.'" *Id*. at 345-46 (quoting 15 U.S.C. §78u-4(b)(4)), See also *Lopez v. Rica Foods, Inc.* 277 Fed.Appx. 931, 932 (11th Cir. 2008).


## IV.  Report, Statements and Opinion of Dr. Hakala

To prove the loss causation and economic loss, the Plaintiffs employed Dr. Hakala.

## A. Expert Report

Dr. Hakala completed his Expert Report on November 3, 2008.  To produce his Report, Dr. Hakala performed an extensive event study analysis of the share price of FindWhat's shares "as a function of identified news and disclosure events, and movements in the share prices of MIVA's peers combined in one equal-weighted index."  (Report[4], ¶6).  Dr. Hakala states that for the Event Study Summary he looked at the false and misleading statements for the Conforming Period of February 23, 2005 through May 4, 2005 as delineated by the District Court in its Opinion and Order dated March 12, 2008 regarding Class Certification and its Opinion and Order regarding the Motion to Dismiss. (Report, ¶7).  Dr. Hakala stated that for his event study he identified material events relating to MIVA stock by reviewing news events on all days "when potentially material information came into the market."  (Report, ¶14).  Information was deemed to be material "if 'there [was] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" (Report, ¶26, citing *Basic Inc v. Levinson*, 108 S.Ct. 978, 983 (1988)).  Dr. Hakala opined, "[i]n my analysis, I believe that had the truth been known by investors in the market, the share price declines on May 5, 6 and 9, 2005 would have occurred on or before the beginning of the Class Period."  (Report, ¶30).  Dr. Hakala defined "economic loss causation" as "the portion of the loss in share price (assuming the shareholder purchased and sold the shares in the same amounts and at the same time, but at the 'true' values instead of at the inflated prices) that would not have occurred had the truth, as alleged by the Plaintiffs, been disclosed in a timely manner."  (Report, ¶31).  Dr. Hakala then defines the "value of the false

---

[4]  Dr. Hakala's Report is attached as Exhibit B to the Statement of Undisputed Material Facts (Doc. 156) and was entered into evidence at a hearing held on April 9, 2009 as an exhibit by the Defendants.  See, Doc. 177.

information" as the "'inflationary component'" in the price of the stock. (Report, ¶31). The stock then

has a true value and an inflationary component, and the inflationary component is based upon the fraud.

(Report, ¶31).

Dr. Hakala included his Event Study Summary. (See, Report, Exhibit B-1). On February 24,

2005, a day after the February 23, 2005 disclosure, Dr. Hakala found that the true value of the MIVA

stock was 73.56%. (Report, Exhibit B-1, p. 8). This same percentage for the true value of the stock

began from the first date in the Event Study Summary of February 24, 2004 (a year prior to the first

allegedly actionable misrepresentation), through May 3, 2005.  (Report, Exhibit B-1, p. 8, 9).  On

February 24, 2005, Dr. Hakala noted:

> FindWhat.com said quarterly earnings were flat from a year ago, sending shares down.
> FindWhat posted 4Q net income of $4.8M or 15¢ a diluted share compared with $3.5M
> or 15¢ a diluted share a year earlier, despite several acquisitions and a near 40%
> increase in the number of shares outstanding since the year earlier period.   In
> November, the company forecast income of 14¢ - 17¢ a share.  Quarterly revenue rose
> to $58.7M compared to $21M a year earlier.  Adjusted EPS were 19¢ a share due to a
> non-cash goodwill impairment charge recorded in the 4Q on the company's
> acquisition of Miva Corp., FindWhat said.  Operating expenses for the quarter rose to
> $51.6M from $15.6M, a year earlier, the company said.  Looking ahead, the company
> said it expects to earn 8¢ - 11¢ a share in the 1Q, and 53¢ - 69¢ a share in the full year
> 2005.  The company said it plans to increase internal investments in 2005 (Reuters
> News 02.23.05); FindWhat.com Inc. shares were down after the company was slapped
> with a slew of -7.68 brokerage downgrade following disappointing 1Q guidance.  The
> company sent Wall [sic]

The second statement which was the Form 10-K  filing with the SEC on March 16, 2005, was not

listed as an event in the Event Study Summary. (See, Report, Exhibit B-1, p.9).

**B.  Deposition of Dr. Hakala**

Dr. Hakala was deposed on February 18, 2009.[5]  Dr. Hakala testified that he had a "general

_____

[5]  Portions of the transcript of Dr. Hakala's testimony are attached to the Statement of
Undisputed Material Facts (Doc. 156) and a complete transcript of Dr. Hakala's testimony was

understanding" of the Court's orders in this case, and understood that the conference call of February 23, 2005,[6] and the 10-K filing on March 16, 2005 were the only misrepresentations which survived the Motion to Dismiss.  (Depo. p. 14-15).  Dr. Hakala's damages were related to the February 23, 2005, and March 16, 2005 statements.  (Depo. p. 15).  His Event Study Summary is his summary of the events and the amount of inflation attributed to various events.  (Depo. p. 18). The period of the Event Study Summary was February 23, 2004 to May 4, 2006. (Depo. p. 77).  Dr. Hakala stated that the Event Study Summary was completed prior to the District Court makings its rulings limiting the allegedly fraudulent statements and the time period for the class.  (Depo. p. 79-80).   Dr. Hakala testified that on February 24, 2004, the true value of the stock was 73.56%. (Depo. p. 19).  Dr. Hakala opined that the inflation in the stock price as of February 24, 2004, was due to false statements, but he recognized that these false statements were not actionable.  (Depo. p. 19).  Dr. Hakala testified, "[s]o what we're saying is that the inflation predates the class period, even if it's not actionable according to the Court."  (Depo. p. 19).    Dr. Hakala testified as follows:

> Q.  This is February 24, 2004, and you understand that's a year before the class period as certified by the Court; correct?
> A.  Yes.
> Q.  You understand that February 24 is a year before any actionable misrepresentation that the Court has recognized as surviving a motion to dismiss; correct?
> A.  Correct.
> Q.  And what you were saying here is that the inflation was already baked into the stock a year before that date.
> A.  Yes.

---

entered into evidence at a hearing held on April 9, 2009, as an Exhibit filed by the Defendants. (See, Doc. 178).

[6]  Dr. Hakala stated that there may have been press releases on February 23, 2005 that were involved, but he did know that the conference call and the Form 10-K were the actionable statements in the case.  (Depo. p. 15).

(Depo. p. 19-20). Dr. Hakala testified that he had the same true value percentage for February 23, 2004 through February 24, 2005. (Depo. p. 21). On February 24, 2005, Dr. Hakala noted a net drop in the stock price of FindWhat of 18.32%. (Depo. p. 22). Dr. Hakala testified that he did not include an event for March 16, 2005 which was the date of the 10-K filing because the representations in the filing was a repetition of prior statements rather than containing new information and did not move the market either up or down. (Depo. p. 29-30). The choice to include an event in the study is "based on our view that something might have been said on that day that had the potential to move the stock price." (Depo. p. 31). Generally, he does not include 10-K filings unless there is a statement that is different from what has been said previously to the market. (Depo. p. 32, 33).

## C. Supplemental Report of Dr. Hakala

The Plaintiffs filed the Declaration of Scott D. Hakala, Ph.D., CFA Regarding Defendants' Dispositive Motion for Summary Judgment as an Exhibit to their Opposition to the Defendants' Dispositive Motion for Summary Judgment. (Doc. 172-2). Dr. Hakala states that he "specifically limited the damages in this case to shares purchased during the Conforming Period of February 23, 2005 to May 4, 2005." (Decl. p. 1). Dr. Hakala also clarifies that

> Second, as set forth in Hakala Report ¶5(a) to (d) on pages 4 and 5, the Complaint alleged and my analysis found that the revenues from unethical or illegitimate sources was reflected in MIVA's revenues and earnings reported throughout 2004 and was, therefore, reflected in and inflated MIVA's share price prior to February 23, 2005. Had the list of actionable statements and the Class Period extended back in time to include disclosures and statements from 2004, I would have considered the disclosures and statements of the Defendants on February 23, 2005 to be both (i) partially corrective (in that they revealed that some portion of the revenues reported in 2004 were associated with low quality distribution partners purportedly being eliminated); and (ii) false and misleading (in that they implied that the unethical or illegitimate revenues for certain distribution partners had been removed and prevented investors from realizing the true extent to which MIVA's revenues were dependent on distribution partners that produced low quality advertising revenues as a result of 'spyware,' 'adware,' and other forms of click fraud). However, given this Court's rulings, the partially corrective

disclosures and statements on February 23, 2005,were not considered to be actionable and the inflation in MIVA's share price and true value percentage of 73.56% was not changed prior to that date in order to reflect that fact. That does not mean that the inflation in MIVA's share price during the Class Period was not a direct and logical consequence of the actionable statements during the Class Period. In Hakala Report ¶5(b) on page 4, I specifically assumed that the first actionable statements were made on February 23 and March 16, 2005 and that those statements misled investors and reinflated the share price of MIVA by misleading investors and preventing MIVA's share price from falling to its true value.

(Decl. p. 2-3). Dr. Hakala concludes that "[g]iven this discussion, contrary to Defendants' assertions, the inflation per share and actual damages analysis in the Hakala Report explicitly considered and recognized this Court's rulings and found (through both careful review of the disclosures, news and analyst reports and through financial analysis) the actionable statements of the Defendants to be the primary, if not exclusive, cause of the relative and absolute losses investors suffered between May 5 and May 9, 2005." (Decl. p. 4).

### V. Analysis

To prove economic loss and loss causation, a plaintiff has the burden of showing a causal connection between the material misrepresentation and the loss. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. at 342. In the instant case, the Plaintiffs have the burden of showing that the statements on February 23, 2005, and March 16, 2005, caused economic loss.

In the Event Study Summary, Dr. Hakala indicates that the true value of the FindWhat.com stock from February 24, 2004, (the first date listed in the Event Study Summary) was 73.56% and this true value for the stock continued through May 3, 2005. The inflation in the FindWhat.com stock remained a consistent 26.44% during the period which began over a year prior to the first actionable statement and months after the second actionable statement. The amount of inflation remained

constant in the stock even though on February 24, 2005, a day after the February 23, 2005 alleged fraudulent statement was made, the stock price fell by 18.32%. The Plaintiffs have the burden to show "a causal connection between the material misrepresentation and the loss." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. at 342.

The Defendants argue that if the inflationary rate of the stock remained the same before and after the alleged fraudulent statements were made, then the Plaintiffs cannot show a loss causation based upon the fraudulent statements. The Defendants contend that it is clear that the inflation in the stock was caused by statements made prior to the class period. The Defendants point to the testimony of Dr. Hakala when he states the following: "So what we're saying is that the inflation predates the class period, even if it's not actionable according to the Court." (Depo. p. 19). Therefore, the Defendants argue that the Plaintiffs have failed to show that economic loss was caused by the two remaining allegedly fraudulent statements.

The Plaintiffs argue that there are issues of material fact regarding loss causation. The Plaintiffs assert that Dr. Hakala's Report shows a causal connection between the decline in the stock price of FindWhat.com and the two actionable allegedly fraudulent statements as Dr. Hakala properly considered confounding information. The Plaintiffs contend that Dr. Hakala separated the decline in FindWhat.com's stock price in May 2005 due to false statements and omissions from the decline in stock price due to unrelated industry and market forces. The Plaintiffs argue that even though the stock price fell on February 24, 2005, the alleged false statement of February 23, 2005 prevented the stock from falling even further, Dr. Hakala also asserts that the March 16, 2005 statement also continued to reinflate the stock price.

The Plaintiffs must "offer evidence showing that the challenged conduct artificially maintained or inflated the company's stock price." *In re Northern Telecom Ltd. Securities Litigation*, 116 F.Supp. 2d 446, 460 (S.D. NY 2000). Beyond Dr. Hakala's conclusion that the two actionable fraudulent statements contributed to maintaining the inflation in the stock price, Dr. Hakala presents no empirical data to support his statement. "Although it is not necessary that plaintiff show defendant's misstatement was the sole or exclusive cause for his loss, he must show that it was a substantial or significant contributing cause. *In re Zonagen, Inc. Securities Litigation*, 322 F.Supp. 2d 764, 781 (S.D. Tex. 2003) (citing *Robbins v. Kroger Properties, Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997)). Dr. Hakala provided no analysis as to how much inflation may be attributable to either or both of the allegedly fraudulent statements. Dr. Hakala fails to analyze the effect of each particular misrepresentation. *See*, *Id*. To determine economic loss, the Plaintiffs must tie the fraudulent statement to the loss, and there is no evidence as to how much, if any, of the inflation in the FindWhat.com's stock was attributable to either statement, nor how much, if any, of the loss was attributable to these statements. Dr. Hakala testified that the stock was inflated by 26.44% prior to these statements being made and this rate continued for months after the statements, yet his reports and depositions have not provided any data, analysis or study to show what percentage of this inflation is attributable to the two actionable statements. He includes in his report that "had the truth been known by investors in the market, the share price declines on May 5, 6, and 9, 2005 would have occurred on or before the beginning of the Class Period." (Report, ¶30). If the declines would have occurred prior to the beginning of the Class Period, and these statements occurred during the class period, then the Plaintiffs have failed to tie any loss to these particular statements.

The Court also has concerns regarding the statement of February 23, 2005. On the day after the statement was made, the price of FindWhat.Com stock declined by 18.32%. It strains logic that an allegedly fraudulent statement had any material causal connection which inflated the price of the FindWhat.com stock when the actual price declined especially as there was no change in the inflationary component of the stock. The Court understands that Dr. Hakala's opinion is that the stock price would have fallen even more if the allegedly fraudulent statements were not made, however, he provides no data or analysis to show exactly how much the stock price would have declined if this statement had not been made, and what economic loss is attributable to this statement. Dr. Hakala did testify that "the inflation predates the class period, even if it's not actionable according to the Court." (Depo. p. 19). He also agrees that inflation was "baked into the stock a year before" the allegedly fraudulent statements were made. (Depo. p. 19-20). Dr. Hakala never provides any analysis as to the causation of economic loss from the statement made on February 23, 2005.

The Court has separate concerns regarding the statement of March 16, 2005. The alleged misrepresentation on March 16, 2005 was included in the 10-K filing with the SEC, but was not included in Dr. Hakala's Event Study Summary. In his Event Study Summary, Dr. Hakala included the false and misleading statements for the "Conforming Period." (Report ¶7). He identified the "material events" relating to FindWhat stock and the information was determined to be material if there was a substantial likelihood that the disclosure would have altered the market information that had been disclosed already. (Report, ¶26). Dr. Hakala testified that he chose not to include the 10-K filing on March 16, 2005 because the filing was a repetition of prior statements and contained no new information. (Depo. p. 29-30). He chose an event to be included by determining if the statement had a potential to move the stock price. (Depo. p. 31).

Dr. Hakala chose not to include the 10-K filing with the SEC as an event in his Event Study Summary. According to Dr. Hakala's Report and testimony, by not including the 10-K filing of March 16, 2005, he did not consider the information in that filing to be a material event. Further, he did not find that the 10-K filing had a substantial likelihood that its disclosure would alter the market information for an investor. If the filing of the 10-K on March 16, 2005, was not a significant enough event to be included in the study, and an opinion of an investor who reviewed that filing would not be swayed nor would the market change based upon that filing, then the Plaintiffs have failed to show that the 10-K filing of March 16, 2005, would have caused an economic loss for an investor. Dr. Hakala does opine that the 10-K filing was a repetition of prior statements and therefore it continued to inflate the stock price. However, the law requires the misrepresentation to be material and be connected to the loss, and the Plaintiffs failed to show that the 10-K filing of March 16, 2005, was a material misrepresentation that caused economic loss.

## VI. Conclusion

The Court finds that the Plaintiffs have failed to provide evidence of loss causation and economic loss attributable to the two allegedly fraudulent statements of February 23, 2005, and March 16, 2005. Therefore, the Court respectfully recommends that the Motion for Summary Judgment (Doc. 155) be granted in favor of the Defendants.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully recommended in Chambers in Ft. Myers, Florida this ___25th___ day of August, 2009.

DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record