UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

|  |  |  |
|---|---|---|
| IN RE MIVA, INC. | ) | Civil Action File |
| SECURITIES LITIGATION | ) | No. 2:05-cv-00201-FtM-29DNF |
|  | ) |  |

**LEAD PLAINTIFFS' OBJECTIONS TO THE
REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE FRAZIER**

Pursuant to Federal Rule of Civil Procedure 72(b)(2) and Local Rule 6.02, Lead Plaintiffs and certified class representatives Y.P. and Sampurna Jain ("Plaintiffs") respectfully submit their Objections to the Report and Recommendation (the "Report")[1] issued by the Honorable Judge Douglas N. Frazier on August 25, 2009.  (Dkt. # 183).  For the reasons detailed below, the Court should reject Magistrate Judge Frazier's Report and deny Defendants' Motion for Summary Judgment.  (Dkt. # 155).

**INTRODUCTION**

This is a securities class action against Miva, Inc. and certain of its former officers and directors.  Plaintiffs' allegations are very straightforward: on February 23 and March 16, 2005, Defendants made false statements and omissions regarding the quality of Miva's internet traffic. These false statements and omissions caused Miva's stock price to become artificially inflated, until a series of corrective disclosures on May 5, 6, and 9, 2005 caused Miva's share price to plummet, costing investors over $22 million.

Despite the straightforward nature of Plaintiff's allegations, Defendants have seized on the innocuous and wholly extraneous fact that the event study conducted by Plaintiffs' expert

---

[1] This Report is cited herein as "Report at __."

witness, Dr. Scott Hakala,[2] shows that Miva's stock price was also artificially inflated prior to the first day of the Class Period. In a desperate attempt to avoid liability for their lies and omissions—and ignoring that the great weight of the case law and academic opinion is wholly stacked against them—Defendants would have the Court ignore the stock's precipitous decline in May 2005 and believe that this somehow limits Plaintiffs' ability to prove loss causation.

Yet, as demonstrated below, this inflation is a byproduct of Dr. Hakala's event study and analysis—the methodology of which is valid and widely accepted by other experts in the field. Dr. Hakala's event study and financial analyses demonstrated that the purchasers of Miva's shares during the Class Period paid an inflated price as a result of false statements and omissions, and those purchasers who continued to hold Miva's shares at the end of the Class Period suffered heavy losses when Miva's share price declined as the illegitimate sources of revenue were removed from Miva's financial results.

Plaintiffs object to the Report because its conclusions rely on numerous errors of law and application of facts. The Report does not consider the process of how event studies are performed, and that Dr. Hakala's methodology conforms to the accepted academic standards for event studies. Its reasoning has been soundly rejected by the various courts which have considered similar issues. Accordingly, the Court should reject the Report.

## **PROCEDURAL HISTORY**

On March 2, 2009, Defendants filed their Dispositive Motion for Summary Judgment. (Dkt. # 155). This motion was referred to Magistrate Judge Frazier on March 16. (Dkt. # 167). On March 19, Plaintiffs filed their Opposition to Defendants' motion. (Dkt. # 172). On April 9,

---

[2] Dr. Hakala's qualifications as an expert witness are remarkable. In 1989, Dr. Hakala received his Ph.D. in Economics from the University of Minnesota, where he wrote his doctoral dissertation under the direction of Edward Prescott—the recipient of the Nobel Prize in Economics in 2004. He has recently published four peer-reviewed articles on subjects such as the economics of loss causation and the valuation of distressed equity securities, and has testified in over 125 cases.

oral argument was held before Magistrate Judge Frazier, in which he considered the Defendants' motion for summary judgment. On August 25, Magistrate Judge Frazier issued his Report, in which he recommended that summary judgment be granted in favor of Defendants. (Dkt. # 183). Defendants' motion for summary judgment was limited to the singular issue of whether Plaintiffs have shown, as a matter of law, the required element of loss causation and damages. (Report at 4).

## LEGAL STANDARD

A party's objection to a magistrate's report and recommendation "must specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection." *Ward v. Parks Elec. Co., Inc.*, 2009 WL 1684455, at *3 (M.D. Fla. Jun. 16, 2009) (quoting *Macort v. Prem, Inc.*, 208 Fed. Appx. 781, 783 (11th Cir. 2006)). A district judge must review de novo any part of the magistrate's report to which a party has properly objected. Fed. R. Civ. P. 72(b)(3). A de novo review "implies that the district court's consideration of the factual issue … be independent and based upon the record before the court." *Macort*, 208 Fed. Appx. At 784.

## OBJECTIONS

**I. The Report incorrectly concludes that Dr. Hakala presented no data or analysis to support his conclusion that the two fraudulent statements on February 23 and March 16, 2005 artificially inflated Miva's stock price**

The Report finds that Dr. Hakala provided no analysis as to how much inflation may be attributable to Miva's fraudulent statements, because the inflation was present in Miva's stock prior to the statements being made (that is, prior to the Class Period),[3] and that he failed to analyze the effect of each particular statement. Report at 12. First, the evaluation of Dr.

---

[3] The Class Period runs from February 22, 2005 to May 4, 2005, inclusive. *See* Opinion and Order of March 12, 2008 (Dkt. # 139). Hereinafter, "March 12 Order."

3

Hakala's analysis is not a proper topic for a summary judgment motion. *See, e.g., In re Vivendi Universal, S.A., Sec. Litig.*, 605 F. Supp. 2d 586, 605 (S.D.N.Y. 2009) ("While defendants argue that 'Dr. Nye performed no analysis to arrive at this conclusion,' this is an argument better made in a challenge to Dr. Nye's credibility as an expert rather than a summary judgment motion."). However, even if it is proper, Plaintiffs respectfully submit that this conclusion is erroneous, because Dr. Hakala did present data and analysis supporting his conclusion, which is sufficient to create a genuine issue of material fact.[4]

Dr. Hakala testified that Miva's stock price was inflated by 26.44% prior to the first actionable statement on February 23, 2005. *See* Hakala Dep. at 19:5-18;[5] Hakala Rep., Ex. C-1 and C-2.[6] This fact, however, does not mean that Dr. Hakala has not provided any data or analysis to show what percentage of this inflation is attributable to the two misrepresentations. This is because:

> [E]vent studies *work backward* from what is ultimately determined to be a fair price, after dissipation of inflation, to determine how much inflation was contained in the price due to fraud during the relevant time frame all the way back to the beginning.

Madge S. Thorsen et al., *Rediscovering the Economics of Loss Causation*, 6 J. Bus. & Sec. L. 93, 109 (2005) (emphasis added).[7] In other words, Dr. Hakala properly began his analysis with the corrective disclosures that occurred on May 5, 6, and 9, 2005, and then worked backwards to

---

[4] The Report's reliance on *In re Northern Telecom Ltd. Sec. Litig.*, 116 F.Supp.2d 446, 460 (S.D.N.Y. 2000) is misplaced because in that case the court found that the testimony of the plaintiff's expert was "fatally deficient in that he did not perform an event study or similar analysis to remove the effects on stock price of market and industry information and he did not challenge the event study performed by defendants' expert." Here, Dr. Hakala has performed an extensive event study and directly challenged Defendants' proffered expert – who did not provide an event study. (Report at 12).

[5] Dr. Hakala was deposed on February 18, 2009. *See* Transcript at Dkt. # 158-5.

[6] Dr. Hakala submitted his Expert Report on November 3, 2008. Dkt. # 153, Exhibit 2, filed at Dkt. # 153-3,4,5.

[7] A copy of this article is attached as Exhibit A.

establish the amount of artificial inflation present in Miva's stock due to Defendants' false statements and omissions.[8] *See* Hakala Rep. ¶9. Dr. Hakala accepted that, consistent with this Court's prior orders, the first actionable statement was made on February 23, 2005. Hakala Rep. ¶5(b). Therefore, any amount of artificial inflation present in Miva's stock price prior to the beginning of the Class Period is irrelevant, because Dr. Hakala's event study methodology showed that it was Defendants' false statements and omissions made during the Class Period which caused the stock to be artificially inflated by 26.44%.

Dr. Hakala concluded that the entire 26.44% inflation during the Class Period is a result of the Defendants' false statements and omission—and not other factors—because he properly controlled for confounding information. Hakala Rep. ¶14; Hakala Dep. at 54:16 to 55:24. By controlling for confounding information and considering the financial effects of the fraud, Dr. Hakala ensured that it was Defendants' false statements and omissions alone which caused Miva's stock price to become artificially inflated:

> In fact, every day that the company withholds the truth after a false statement has been made, or continues to omit the truth from the market, the company as a practical matter is actively promoting the misrepresentation and inviting the market to price its stock with a fraud component. In other words, because the misrepresentation or omission is incorporated into the valuation process as soon as the new, material false information enters the market, as an economic matter, by definition, the defendants' fraudulent conduct *always* causes artificial inflation to enter the price.

Thorsen et al., *Rediscovering the Economics of Loss Causation*, at 99 (emphasis original) (citing Meritt B. Fox, *Understanding Dura*, 60 Bus. Law. 1547, 1547 (2005)); *see also Vivendi Universal*, 605 F. Supp. 2d at 597 ("When that information was previously concealed from the market by the fraud, we can properly conclude that whatever decline in the stock price was

---

[8] This methodology is valid and widely accepted by others in the field. Hakala Rep. ¶9 n.3; Thorsen et al., *Rediscovering the Economics of Loss Causation*, at 110 ("Backcasting establishes what percentage of the stock price was unaffected by fraud, or in other words, the 'true value'. . . .").

5

caused by the release of that information was also caused by the fraud.") (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)).

That Dr. Hakala properly controlled for confounding information belies the Report's conclusion that he provided no data or analysis to show what percentage of the inflation is attributable to the Defendants' false statements and misrepresentations on February 23 and March 16, 2005. Accordingly, the Court should reject this conclusion.

## II. The Report incorrectly concludes that Dr. Hakala never provided analysis as to the causation of economic loss from the statement made on February 23, 2005

The Report finds that Dr. Hakala provided no analysis as to the causation of economic loss from the false and misleading statements made by the Defendants on February 23, 2005. Report at 13. Specifically, the Report found that it "strains logic" that the Defendants' false and misleading statements and omissions "had any material causal connection" which artificially inflated Miva's share price, when the actual price of the stock declined. *Id.*

Plaintiffs respectfully submit that this conclusion is incorrect as a matter of law. Plaintiffs alleged in the Complaint[9] that Defendants made false and misleading statements and omissions regarding Miva's traffic quality. Compl. ¶¶29-63, 64, 86-96. The fact that Miva's stock price dropped on February 23 does not sever the connection between the materiality of the Defendants' false statements and omissions and the corresponding artificial inflation in Miva's stock price:

> [T]he mere absence of a statistically significant *increase* in the share price in response to fraudulent information does not "sever the link" between the material misstatements and the price of the stock. Rather, price stability may just as likely demonstrate the market consequence of fraud where the alleged fraudulent statement conveys that the company has met market expectations, when in fact it has not.

---

[9] Plaintiffs' Conforming Amended Consolidated Class Action Complaint, filed on May 3, 2007. Dkt. # 108.

6

*In re Scientific Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1340-41 (N.D. Ga. 2007) (emphasis original).  Other courts are in agreement with this logic:

> Logic suggests that if a material omission serves to conceal information that would otherwise cause the stock price to fall, the very fact that the price does not change (until corrective disclosure) would evince the statement's materiality.
>
> Similarly, though, if a statement that is actionable as an affirmative misstatement were to falsely pronounce that "all is well," in language that is verifiably, objectively false, it is conceivable that such a misstatement could serve to maintain the stock price at an artificially inflated level without also causing the price to increase further. In a case such as this one, where a plaintiff alleges that corrective disclosure caused a statistically significant price decrease, it is possible to determine retrospectively whether the alleged fraud (be it an affirmative misstatement or an omission) was material-if Plaintiff's allegations are ultimately supported by enough evidence to survive summary judgment, then a jury could reasonably find that the price drop at the end of each class period evinces the materiality of the challenged statements. For this reason, Defendants will not obtain summary judgment on the issue of materiality.

*In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, at *17 (D.N.J. Aug. 17, 2005) (internal citations omitted); *see also Swack v. Credit Suisse First Boston*, 383 F. Supp. 2d 223, 240 (D. Mass. 2004) ("Stock prices rise and fall for combinations of many different reasons. Defendants' conduct could have tempered a drop in price that would otherwise have occurred…"); *McEwen v. Digitran Systems, Inc.*, 160 F.R.D. 631, 640 (D. Utah 1994) ("Manifestly, the market does not react to information that is already anticipated."). Indeed, "the chain of causation . . . is a matter of proof at trial." *Vivendi Universal*, 605 F. Supp. 2d at 600 (*quoting Lentell*, 396 F.3d at 174).

The Report also concludes that Dr. Hakala provided no data or analysis to show exactly how much Miva's stock price would have declined if Defendants had not made misleading statements and omissions, and what economic loss is attributable to the statements made on February 23. (Report at 13).

As discussed above, Dr. Hakala scientifically concluded that Defendants' misrepresentations and omissions on February 23 were the sole cause of 26.44% inflation in Miva's stock price on that date.[10] Furthermore, Dr. Hakala does indeed provide analysis as to the economic loss attributable to the false statements and omissions made on February 23. He clearly explained that "[i]nflationary loss means the loss due to the fraud and is measured by inflation of the day of purchase minus inflation on the day of sale (or measuring date, if not sold before 90 days after the end of the Class Period)." Hakala Rep. ¶32. This methodology is valid and widely accepted by other experts in the field. Hakala Rep. ¶32 n.27. Using this methodology, Dr. Hakala calculated aggregate damages of $22.24 million. Hakala Rep. ¶48.

Plaintiffs submit that the Report's implication that Plaintiffs must assign a specific amount of loss to the February 23 statement is incorrect. *See* Report at 13. Rather, the loss must be measured by the effect the corrective disclosures had on the price of Miva's stock at the end of the Class Period. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40 n.5 (2d Cir. 2009) ("[L]oss causation can be established by a 'corrective disclosure to the market' that 'reveal[s] ... the falsity of prior recommendations.'"); *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 352 (3rd Cir. 2009) ("[M]ateriality of the alleged misrepresentations is self-evident when we look at the market's negative reaction—to the tune of a nine-percent drop in stock price in three days. . . ."); *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 231 (5th Cir. 2009) ("Loss causation is easiest to show when a corrective disclosure reveals the fraud to the public and the price subsequently drops …"). Accordingly, the Court should reject this conclusion.

---

[10] And that Defendants' false statements and omissions on March 16 continued to artificially inflate Miva's stock price.

**III.     The Report incorrectly concludes that Dr. Hakala failed to show that Miva's Form 10-K filing on March 16, 2005 caused an economic loss**

The Report finds that, because Dr. Hakala did not include the Miva's March 16 Form 10-K in his event study, then it cannot be material; further, if the misrepresentations in that Form 10-K are not material, then they cannot have caused economic loss. Report at 14. Plaintiffs respectfully submit that this conclusion is erroneous.

This Court has already held that the false statements and omissions contained in the March 16 Form 10-K are material. *See* Opinion and Order of March 15, 2007, at 28-32 (Dkt. # 91). As Dr. Hakala explained in his deposition:

> An event could be material even if the stock price didn't move if the event makes a misrepresentation which prevents the stock price from moving a statistically significant amount. . . .
>
> So you could have a material statement that causes no movement in the stock price, but nevertheless if it was false and a different statement was made on that day, the stock would have moved very differently. That could still be deemed a material statement.

Hakala Dep. at 23:19 to 24:7. Essentially, the Report confuses and conflates Defendants' material misrepresentations and omissions with statistically significant movements in Miva's stock price. Dr. Hakala found that March 16 was not a *statistically significant* event, not that March 16 was not a *material* event. Hakala Dep. at 29:10-13.

Other courts have agreed that statements can be material without causing a statistically significant change in stock price. *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 279 (S.D.N.Y. 2008) ("[T]here is no requirement that stock prices fluctuate as a result of a defendant's misstatements or omissions in order for them to be material.") (*citing United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991)); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 282 (N.D. Ala. 2009) ("[T]he mere absence of a statistically significant *increase* in the share price in

9

response to fraudulent information does not 'sever the link' between the material misstatements and the price of the stock.") (*citing Scientific Atlanta*, 571 F. Supp. 2d at 1340-41).

Furthermore, as demonstrated above, the Report's implication that Plaintiffs must assign a specific amount of loss to the March 16 statement is incorrect. Accordingly, the Court should reject this conclusion.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that the Court should reject the recommendation in Magistrate Judge Frazier's Report and deny Defendants' Motion for Summary Judgment.

Dated: September 18, 2009                                  Respectfully submitted,

**SAXENA WHITE P.A.**

By: */s/ Christopher S. Jones*
  Maya Saxena
  Florida Bar No. 0095494
  Joseph E. White III
  Florida Bar No. 0621064
  Christopher S. Jones
  Florida Bar No. 306230
  Lester Hooker
  Florida Bar No. 0032242
  2424 North Federal Highway
  Suite 257
  Boca Raton, FL 33431
  Tel.: (561) 394-3399
  Fax: (561) 394-3382

  **Lead Counsel for Lead Plaintiffs**

**CERTIFICATE OF SERVICE**

    I certify that on September 18, 2009, I electronically filed the foregoing Lead Plaintiffs' Objections to the Report and Recommendation of Magistrate Judge Frazier with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered users.

                                                  */s/ Christopher S. Jones*
                                                  Christopher S. Jones
                                                  Florida Bar No. 306230