UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

IN RE:  MIVA, INC.,
Securities Litigation

Case No.  2:05-cv-201-FtM-29DNF

_____

**OPINION AND ORDER**

This matter is before the Court on consideration of the
Magistrate Judge's Report and Recommendation (Doc. #183), filed
August 25, 2009, recommending that defendants' Dispositive Motion
for Summary Judgment (Doc. #155) be granted.  Lead Plaintiffs filed
Objections to the Report and Recommendation of Magistrate Judge
Frazier (Doc. #187) on September 18, 2009, and defendants filed a
Response in Opposition (Doc. #188) on October 5, 2009.

**I.**

After conducting a careful and complete review of the findings
and recommendations, a district judge may accept, reject or modify
the magistrate judge's report and recommendation.  28 U.S.C. §
636(b)(1); Williams v. Wainwright, 681 F.2d 732 (11th Cir. 1982),
cert. denied, 459 U.S. 1112 (1983).  A district judge "shall make
a *de novo* determination of those portions of the report or
specified proposed findings or recommendations to which objection
is made."  28 U.S.C. § 636(b)(1)(C).  This requires that the
district judge "give fresh consideration to those issues to which
specific objection has been made by a party."  Jeffrey S. v. State
Bd. of Educ., 896 F.2d 507, 512 (11th Cir. 1990)(quoting H.R. 1609,

94th Cong. § 2 (1976)).  The court may accept, reject or modify, in whole or in part, the findings and recommendations.  28 U.S.C. § 636(b)(1)(C).  The district judge reviews legal conclusions *de novo*, even in the absence of an objection.  See Cooper-Houston v. Southern Ry., 37 F.3d 603, 604 (11th Cir. 1994); Castro Bobadilla v. Reno, 826 F. Supp. 1428, 1431-32 (S.D. Fla. 1993), aff'd, 28 F.3d 116 (11th Cir. 1994) (Table).

## II.

This is a securities class action lawsuit brought by investors of FindWhat.com, Inc. (now known as Miva, Inc.)[1] against the corporation and some of its officers or former officers. Plaintiffs allege that Defendants made false and misleading statements and material omissions in order to inflate the price of the corporation's stock in violation of the Securities and Exchange Act of 1934.

Plaintiffs filed an Amended Complaint setting forth two counts which alleged eleven false and fraudulent statements.  In the Court's March 15, 2007, Opinion and Order (Doc. #91), the Court dismissed the Amended Complaint as to statements one through nine, but found statements ten and eleven to be sufficiently pled. Statement ten related to a February 23, 2005, conference call in which defendants Pisaris-Henderson and Agius stated in part:

---

[1]On June 6, 2005, FindWhat.com, Inc. changed its name to Miva, Inc.  The Court will generally refer to the corporate Defendant as FindWhat.

Third, we believe that lead quality should be and is becoming increasingly important to advertisers, and recent press coverage has focused substantial attention on the click broad issue and how it effects lead quality. For several years, we have understood the issue and have been investing heavily in protecting the integrity of our networks through both automated and human systems, thereby limiting our exposure to the issue.

That said, we believe that ultimately the value of a lead is best determined by whether that lead actually converts to a sale. Our recent acquisition of Miva empowers our visibility into the click stream, and for businesses with Miva storefronts, we are now able to track and add from the first click through to the point-of-sale. We don't need to employ intuition or advanced algorithms to determine whether traffic sources are good or bad. We are creating a single transparent platform that combines relevant advertising with the visibility to measure conversion rather than clicks alone, thereby giving us the ability to remove traffic sources from our networks that do not meet our high standard of conversion metrics, aligning our interest with those of our advertisers.

**In fact, during Q4 we intentionally removed numerous traffic sources that would otherwise have produced approximately $70,000 of revenue per day.** This action further illustrates our long-term view towards maintaining high standards and delivering high-quality leads to our advertisers.

**Let me repeat we have intentionally removed traffic sources from our distribution network that would otherwise have produced approximately $70,000 of revenue per day in topline revenue. Again, our focus is to deliver traffic that converts rather than just clicks alone.**

Although in the short-term allowing this traffic within our network could reduce revenues, we believe we're best served in the long-term by leading the industry through the creation of a transparent platform that will further differentiate our Company within the performance-based marketing world.

(¶ 87)(emphasis in original). Plaintiffs allege that these

statements are false because the fraudulent revenue sources were

-3-

not removed, according to the former Senior Director of Business Development, a former Marketing Manager, anonymous reports given to Plaintiffs' lead counsel, and an internal FindWhat report. (¶ 88.)

Statement eleven related to a March 16, 2005, Form 10-K filed with the Securities and Exchange Commission for the year ending December 31, 2004. The Form was signed by all individual Defendants and certified by Defendants Pisaris-Henderson and Thune pursuant to the Sarbanes-Oxley Act of 2002. Plaintiffs cited to the following portion of the Form:

> Additionally, the U.S. Congress and some state legislatures have introduced legislation designed to regulate "spyware," which has not been precisely defined, but which is often defined as software installed on consumers' computers without their informed consent and which is designed to gather and, in some cases, disseminate information about those consumers, including personally identifiable information, without the consumers' consent. **We do not rely on "spyware" for any purpose and it is not part of our product offerings,** but the definition of spyware or proposed legislation relating to spyware may be broadly defined or interpreted to include legitimate ad-serving software, including toolbar offerings currently provided by our Primary Traffic division. Currently, legislation has focused on providing Internet users with notification of and the ability to consent or decline the installation of such software, but there can be no guarantee that future legislation will not provide more burdensome standards by which software can be downloaded onto consumers' computers. Currently all downloadable software that we distribute requires an express consent of the consumer and provides consumers with an easy mechanism to delete the software once downloaded.
>
> . . .
>
> We have implemented screening policies and procedures to minimize the effects of these

fraudulent clicks. **We believe that these policies and procedures assist us in detecting fraudulent click-throughs, which are not billed to our advertisers**. However, it is difficult to detect all fraudulent clicks and detection may become more difficult in the future if third parties implement more sophisticated fraudulent click-through schemes. To the extent that we are unable to detect click-through fraud, we may refund revenue that our advertiser have paid to us that is later discovered to be attributed to these fraudulent click-throughs. If we find new evidence of past fraudulent clicks, we may have to issue refunds to advertisers retroactively for amounts previously paid to our FindWhat.com or Espotting Network distribution partners.

. . .

From time to time, we receive fraudulent clicks on our ads by persons seeking to increase the advertising fees paid to distribution partners within our FindWhat.com and Espotting Networks. Click-through fraud occurs when a person or program clicks on an advertisement displayed on a website for the purpose of generating a click-through payment to the FindWhat.com and Espotting Networks partner rather than to view the underlying content. **We have developed automated proprietary screening applications and procedures to minimize the effects of these fraudulent clicks.** Click-throughs received through the FindWhat.com and Espotting Networks and through our private label partners' networks are evaluated by these screening applications and procedures. We constantly evaluate the efficacy of our efforts to combat click-through fraud, and may adjust our efforts for specific distribution partners or in general, depending on our ongoing analysis. These changes impact the number of click-throughs we record and bill to our advertisers, the bid prices our advertisers are willing to pay us for click-throughs and the revenue we generate.

. . .

During 2004 and 2003, no advertiser account represented more than 10% of our total revenue. We purchase Internet traffic from our distribution

partners. Expressed as a percentage of revenue, **none of the traffic purchased from any of these distribution partners represented over 10% of consolidated revenue in 2004.** Internet traffic purchases from one distribution partner in 2003 represented more than 10% of total revenue.

. . .

In the second half of the fourth quarter of 2004, we ceased displaying advertisements with distribution partners and affiliates of distribution partners whose traffic did not adequately convert to revenue for our advertisers in conjunction with our continued efforts to increase the quality of the Internet users accessing our customers' advertisements. Measured at the end of the fourth quarter, the removal of these distribution partners reduced our average click-through revenue by approximately $70,000 per day compared to what each such distribution partner had been producing on a daily basis immediately prior to removal. During 2003 and as a matter of ongoing business practice, we removed one or more distribution partners from our network at various times, however the impact to our revenue was not significant to the quarter or the year when they were removed. We plan to continue our efforts to provide our advertisers with high quality Internet traffic, an undertaking that may have short-term negative effects on our revenue, but which we believe will ultimately improve our click-through revenue in the long-term. We consider the removal of these distribution partners in the second half of the fourth quarter as ordinary to our business and in conformity with our long-stated goal of provided [sic] high quality traffic to our advertisers. In addition, although the Company admitted in the Form 10-K that it removed "one or more distribution partners from [its] network at various times" during 2003 "and as a matter of ongoing business practice," Defendants represented that "the impact to [the Company's] revenue was not significant to the quarter or the year when [the distribution partner(s)] were removed."

(¶¶ 89, 91, 93, 95)(emphasis in original).

Plaintiffs alleged that statements made in the Form, "[w]e do not rely on 'spyware' for any purpose and it is not part of our product offering," were false and misleading because the two largest distribution partners did in fact rely upon spyware. (Id. at ¶¶ 89-90.) Additionally, statements made in the Form assuring that FindWhat was implementing screening policies and procedures to minimize fraudulent clicks were allegedly false and misleading because Defendants knew or should have known that the majority of their distribution network relied on click fraud, (id. at ¶¶ 91-92); statements made that "none of the traffic purchased from any of these distribution partners represented over 10% of consolidated revenue in 2004" were false and misleading because the percentage of revenue generated by two distribution partners exceeded the threshold without disclosure, (id. at ¶¶ 93-94); and statements that distribution partners were taken off line in the fourth quarter of 2004 were untrue (id. at ¶ 96).

On July 17, 2007, the Court granted reconsideration as to the issue of whether scienter was adequately pled. (Doc. #112.) Upon reconsideration, on February 15, 2008, the Renewed Motion to Dismiss was further granted to dismiss individual defendant Phillip Thune as to the February 2005 conference call and individual defendant Brenda Agius in all respects. (Doc. #138.) On March 12, 2008, the Court issued an Opinion and Order (Doc. #139) specifically reiterating that all statements prior to the February 23, 2005 conference call were not actionable and had no basis for

liability, and certifying a class as "consisting of all persons who purchased the common stock of FindWhat.com between February 23, 2005 and May 4, 2005." (Doc. #139, pp. 4, 23.)

Plaintiffs have succinctly summarized the current nature of their case as follows:

> This is a securities class action against Miva, Inc. and certain of its former officers and directors. Plaintiffs' allegations are very straightforward: on February 23 and March 16, 2005, Defendants Made false statements and omissions regarding the quality of Miva's internet traffic. These false statements and omissions caused Miva's stock price to become artificially inflated, until a series of corrective disclosures on May 5, 6, and 9, 2005 cause Miva's share price to plummet, costing investors over $22 million.

(Doc. #187, p. 1.)

## III.

The Motion for Summary Judgment argues that plaintiffs have not shown the elements of loss causation and damages related to either of the two remaining false statements. Plaintiffs rely upon the expert opinion of Scott D. Hakala, Ph.D., CFA to establish both elements. The Report and Recommendation found that the motion for summary judgment should be granted. The Magistrate Judge considered the evidence and testimony of Dr. Hakala without ruling on defendants' motions addressing the admissibility of his testimony.

The Court easily concludes, as did the Magistrate Judge, that neither economic loss nor loss causation have been shown as to the March 16, 2005, statement in the SEC Form 10-K filing. This

statement was not even listed as an event in Dr. Hakala's Event Study, and in his deposition Dr. Hakala stated he did not include this because the representations in the filing were a repetition of prior statements rather than containing new information, and the statement did not move the market either up or down. While Dr. Hakala retracted this in a supplemental declaration, the retraction is insufficient to create a genuine issue of material fact in light of his clear testimony in the deposition. McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003).

In any event, the evidence does not provide any material fact which would suggest that either statement caused economic loss. Dr. Hakala testified that the full amount of the alleged price inflation of the stock – 26.44% – existed beginning February 24, 2004, more than a year before either of the statements remaining in the Amended Complaint, and remained at that level after the statements at issue. Thus, the evidence from plaintiff establishes that the inflation in the stock price was caused by statements made prior to the class period in this case. As Dr. Hakala testified, "the inflation predates the class period, even if it's not actionable according to the Court." (Deposition, p. 19.) As the Magistrate Judge correctly found, Doc. #183, p. 12, the evidence from Dr. Hakala does not provide sufficient facts to create a disputed issue of material fact as to loss causation or economic loss. Although the Magistrate Judge also expressed additional "concerns" (Doc. #183, pp. 13-14) about both statements, it is

clear that Dr. Hakala's evidence was insufficient to defeat the summary judgment motion under the rules summarized above.

The Court has carefully considered the objections to the Report and Recommendation, as well as the record. The Court overrules the objections, and adopts the Report and Recommendation, as supplemented by this Opinion and Order.

Accordingly, it is hereby

**ORDERED AND ADJUDGED:**

1. Defendants' Motion for Leave to File Reply Memorandum in Support of Their Dispositive Motion for Summary Judgment and Motion to Exclude to Exclude [sic] the Expert Opinions of Scott D. Hakala (Doc. #174) is **DENIED** as moot.

2. Defendants' Motion to Exclude the Expert Opinions of Scott D. Hakala (Doc. #153) is **DENIED** as moot.

3. Lead Plaintiffs' Motion *In Limine* to Exclude the Testimony and Expert Report (Doc. #158) is **DENIED** as moot.

4. Defendants' Motion to Strike Declaration of Scott D. Hakala Regarding the Opinions of Dr. Laura E. Simmons (Doc. #169) is **DENIED** as moot.

5. Defendants' Motion and Supporting Memorandum to Strike the Declaration of Scott D. Hakala Regarding Defendants' Dispositive Motion for Summary Judgment (Doc. #173) is **DENIED** as moot.

6. Defendants' Motion for Leave to File Reply Memorandum in Support of Their Motion to Strike Declaration of Scott D. Hakala

Regarding Defendants' Dispositive Motion for Summary Judgment (Doc. #182) is **DENIED** as moot.

7.    The Report and Recommendation (Doc. #183) is hereby **ADOPTED** and the findings and conclusions are incorporated herein.

8.    Defendants' Dispositive Motion for Summary Judgment (Doc. #155) is **GRANTED**.

9.    As loss and causation cannot be shown, the case is dismissed with prejudice.

10.    The Clerk shall enter judgment in favor of the remaining defendants, terminate all pending deadlines and motions as moot, and close the file.

**DONE AND ORDERED** at Fort Myers, Florida, this ___16th___ day of November, 2009.


JOHN E. STEELE
United States District Judge


Copies:
Hon. Douglas N. Frazier
United States Magistrate Judge

Counsel of Record
Unrepresented parties